## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

STEVEN J. ABRAHAM, and
H LIMITED PARTNERSHIP
on behalf of themselves and others
similarly situated,

       Plaintiffs,

vs.                                                                          No. CIV 12-0917 JB/CG

WPX PRODUCTION PRODUCTIONS, LLC,
f/k/a WILLIAMS PRODUCTION COMPANY,
LLC; WILLIAMS FOUR CORNERS, LLC;
and WILLIAMS ENERGY RESOURCES, LLC,

       Defendants.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion to Dismiss

Claims for Plaintiffs' Lack of Standing, filed February 12, 2014 (Doc. 131)("MTD"); (ii) the

Defendants' Motion to Exclude Expert Report of John Burritt McArthur, filed February 17, 2014

(Doc. 137)("Motion to Exclude"); and (iii) the Plaintiffs' Motion in Limine Concerning Certain

Testimony of Kris Terry, filed April 18, 2014 (Doc. 184)("Motion in Limine").  The Court held

hearings on March 13, 2014, and May 9, 2014.  The primary issues are: (i) whether the Court

should dismiss Plaintiffs Steven J. Abraham's and H Limited Partnership's claims on the basis

---

[1]On September 12, 2014, the Court entered an Order denying the Defendants' Motion to
Dismiss Claims for Plaintiffs' Lack of Standing, filed February 12, 2014 (Doc. 131).  See Order,
filed September 12, 2014 (Doc. 227)("Order").  On September 18, 2014, the Court entered an
Order granting in part and denying in part the Defendants' Motion to Exclude Expert Report of
John Burritt McArthur, filed February 17, 2014 (Doc. 137).  On March 19, 2015, the Court
entered an Order denying the Plaintiffs' Motion in Limine Concerning Certain Testimony of Kris
Terry, filed April 18, 2014 (Doc. 184).  In each Order, the Court stated that it would "at a later
date issue an opinion more fully detailing its rationale for this decision."  Order at 1 n.1.  This
Memorandum Opinion is the promised opinion for each Order.

that overriding royalty owners and royalty owners have such different interests that they do not have standing to assert the same causes of action; (ii) whether expert John B. McArthur's testimony will assist the Court in determining whether to certify a class; and (iii) whether expert Kris Terry's testimony will assist the Court in determining whether to certify a class, and whether she may provide custom-and-usage testimony.  Because the Plaintiffs demonstrate the requirements for standing under Article III of the Constitution of the United States of America, the Court denies the MTD.  Regarding the Motion to Exclude, McArthur may testify about the royalty agreements' meaning to help the Court to determine whether it can certify a class, but he cannot testify to legal conclusions that the case meets rule 23's class certification requirements. Finally, the Court will deny the Motion in Limine and will decline to limit Terry's testimony, because it helps the Court determine whether common questions exist that impact the entire class.

## FACTUAL BACKGROUND

This matter arises from alleged royalty underpayments related to oil and gas leases in the San Juan Basin in New Mexico and Colorado.  See Third Amended Class Action Complaint, ¶¶ 13-14, at 5, filed October 29, 2012 (Doc. 15)("TAC").

> The San Juan Basin, one of the largest natural gas producing fields located in northwest New Mexico and southwest Colorado, was originally developed in the early 1950's by El Paso Natural Gas Company . . . .  The natural gas produced in the San Juan Basin is conventional gas which contains methane (natural gas) and entrained natural gas liquids ("NGLs"), such as ethane and butane.  In order to make the gas safe to enter the interstate pipeline, the NGLs must be removed from the gas stream.

Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1091, 1099 (10th Cir. 2005).  The named Plaintiffs are Steven J. Abraham, a New Mexico resident who "owns mineral interests in Colorado and New Mexico," TAC ¶ 1, at 1, and H Limited Partnership, a New Mexico limited

partnership that owns mineral interests in New Mexico, see TAC ¶ 2, at 1-2.  The Plaintiffs filed

this class action on behalf of a proposed class membership to include

> [a]ll present and former owners of royalty and overriding royalty which burden oil
> and gas leases and wells in the San Juan Basin of Colorado . . . [and] New
> Mexico, which leases and wells are now or were formerly held by WPX
> Production LLC, Williams Production Company, LLC, or their corporate
> affiliates, successors or predecessors in title, which leases are producing or have
> been productive of conventional natural gas recovered from sandstone or shale
> formations, and which gas is or has been transported and delivered for extraction
> and marketing of natural gas liquids from the gas at the Ignacio Processing Plant
> in La Plata County, Colorado, the Kutz Plant in San Juan County, and the
> Lybrook Plant in Rio Arriba County, New Mexico.

TAC ¶ 22, at 7-8.

The Defendants include WPX Energy Production, LLC ("WPX Production"), as well as

Williams Four Corners, LLC, and Williams Energy Resources, LLC ("Williams Resources"),

(all of these collectively referred to as the "Williams Companies").  TAC ¶¶ 3-5, at 2-3.  WPX

Production is an "'upstream' exploration and production company that owns, develops and

operates oil and gas leases and gas wells in the Rocky Mountain west, including the San Juan

Basin of Colorado and New Mexico and markets some of its gas production."  TAC ¶ 3, at 2.

Williams Four Corners is a "'midstream' enterprise that owns and operates a 3,500 mile natural

gas gathering system, and processing and fractionation facilities within the San Juan Basin of

Colorado and New Mexico.  Williams Four Corners provides its services for gas produced by

WPX Production from its working interest in leases."  TAC ¶ 4, at 2.  Williams Energy

Resources "performs the functions of acquiring, selling and marketing the natural gas liquids, oil

and other hydrocarbons produced by WPX Production on its own behalf and on behalf of

Williams Four Corners midstream business."  TAC ¶ 5, at 3.

The Plaintiffs allege that the Defendants' "combined conduct" resulted in

> WPX's systemic underpayment of Royalty due to the failure to pay on the burdened leaseholds' production on NGLs and on oil and condensate, understating the liquids content of production, the improper charging of post-production expenses against production revenues, and deductions in the royalty computation of charges that are not actually incurred and are unreasonable. NGLs produced as part of the gas stream are subsequently extracted at plants owned and operated by Williams and retained and disposed of by Williams free of royalty at a substantial financial detriment to the plaintiffs and the proposed class by reason of the challenged conduct in which Williams participates with WPX. Although WPX has the contractual Royalty payment obligation, Williams are jointly responsible with WPX for the underpayment of plaintiffs' and the class' royalties.

TAC ¶ 14, at 5.

## **PROCEDURAL BACKGROUND**

The Plaintiffs' claims against WPX Production include: (i) breach of contract (Count I), see TAC ¶¶ 58-61, at 17-18; (ii) breach of the covenant of good faith and fair dealing (Count II), see TAC ¶¶ 62-65, at 18-19; (iii) breach of the implied covenant to market under New Mexico and Colorado law (Counts IV and V), see TAC ¶¶ 70-79, at 20-22; and (iv) violation of the New Mexico Oil and Gas Proceeds Payment Act, N.M. Stat. Ann. §§ 70-10-1 to 70-10-6 (Count VII), see TAC ¶¶ 86-88, at 23. The claims against Williams Four Corners and Williams Resources are for unjust enrichment (Count III). See TAC ¶¶ 66-69, at 19. Against the Williams Companies, the Plaintiffs request a declaratory judgment, accounting for the underpayments, and an injunction for the future royalty calculations and payments (Count VI). See TAC ¶¶ 80-85, at 22-23.

The parties in this case have filed numerous motions. This opinion addresses three of them: (i) the Defendants' MTD; (ii) the Defendants' Motion to Exclude; and (iii) the Plaintiffs' Motion in Limine.

1.      **The Defendants' MTD**.

The Defendants filed the MTD on February 12, 2014.  See MTD at 1.  They ask the Court to dismiss the case on the ground that the "Plaintiffs lack standing to bring these claims." MTD at 1.  They state that the "Plaintiffs purport to represent present and former owners of royalty and overriding royalty interests in [New Mexico and Colorado].  However, in New Mexico, neither Abraham nor H Ltd. owns any royalty interests subject to Plaintiffs' claims; rather, they own only overriding royalty interests."  MTD at 2.  Likewise, the Defendants allege that the Plaintiffs do not own: (i) any overriding royalty interests in Colorado; or (ii) former royalty interests in either state.  See MTD at 2.

The Defendants explain that, in proposed class actions, "the named plaintiffs must have *individual* standing in order to bring claims on behalf of the absent class members."  MTD at 4 (emphasis in original).  Because the Plaintiffs own only overriding royalty interests[2] in New Mexico and royalty interests in Colorado, the Defendants contend that the Plaintiffs lack standing to assert any of their claims "on behalf of royalty interest owners in New Mexico, overriding royalty interest owners in Colorado, or former royalty or overriding royalty interest

---

[2]The Court has previously described overriding royalty interests:

8. An "overriding royalty" is "[a] share of either production or revenue from production (free of the costs of production) carved out of a lessee's interest under an oil-and-gas lease. . . .  An overriding royalty interest ends when the underlying lease terminates." Black's Law Dictionary 1446 (9th ed. 2009).

9. An overriding royalty interest is considered a subcategory of royalty interest. See Garman v. Conoco, Inc., 886 P.2d 652, 657 (Colo. 1994)(en banc)("An overriding royalty is, first and foremost, a royalty interest." (quoting 2 Williams & Meyers § 418.1)).

Anderson Living Trust v. WPX Energy Prod., LLC, 306 F.R.D. 312, 321 (D.N.M. 2015)(Browning, J.).

owners."  MTD at 5.  The Defendants argue that the Plaintiffs' overriding royalty interests are not sufficient to provide standing to assert claims for injuries to royalty owners, because "[r]oyalty and overriding royalty interests therefore are different property interests, establishing different legal rights, under different state laws."  MTD at 8.  In short, the Defendants assert that the Plaintiffs must be injured pursuant to the same royalty instrument under which each class member allegedly suffers injury.  See MTD at 9-10.

Additionally, the Defendants contend that interest owners in one state do not have standing to assert claims on behalf of interest owners in another state.  See MTD at 10-12.  They state that, because Abraham owns only Colorado royalty interests, he "cannot allege injury-in-fact with respect to any New Mexico royalty interests."  MTD at 10.  Moreover, the Defendants contend that "his royalty interests have no causal relation to, and cannot be redressed by, New Mexico law."  MTD at 11.  Finally, the Defendants assert that neither Abraham nor H Limited have standing to assert claims on behalf of former royalty owners, as neither named Plaintiff is a former royalty owner.  See MTD at 12.

The Plaintiffs responded on March 3, 2014.  See Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss Claims for Plaintiffs' Lack of Standing, filed March 3, 2014 (Doc. 151)("Response to MTD").  The Plaintiffs allege that the Defendants' "'standing' arguments in some respects border on the absurd.  If taken to its logical end, there can never be a royalty underpayment class action."  Response to MTD at 3.  The Plaintiffs begin by pointing out that their case is not

> about whether or not royalty instruments allow or do not allow deductions for costs of gathering and processing to be deducted from gas production sales proceeds in computing royalty.  This is a case about the failure to pay royalty on all production, specifically on excluding the most valuable part of the production in computing royalty.

Response to MTD at 3.  The Plaintiffs also allege that the prices WPX Production uses to calculate royalty payments to the Plaintiffs and to class members on the residue gas are the result of an affiliate transfer price rather than on an arm's-length sale to third parties.  See Response to MTD at 4.

The Plaintiffs argue that the Defendants are "legally obligated to pay Royalty to the plaintiffs and class members on all hydrocarbons *produced*," and that no royalty or overriding royalty agreement "allows defendants to substitute for valuable NGLs a replacement volume of less valuable residue gas in calculating royalty payments" or "authorizes reducing Royalty payments by use of affiliate pricing."  Response to MTD at 4-5 (emphasis in original).  The Plaintiffs contend that they have standing to represent all class members based on the "uniform basis of the plaintiffs' claims that *all royalty instruments require payment on all production*." Response to MTD at 5-6 (emphasis in original).  The Plaintiffs therefore argue: "They have suffered injury based on defendants' underpayment of royalty," and suffer "the same injury suffered uniformly by all class members."  Response to MTD at 6.

The Defendants replied on March 9, 2014.  See Defendants' Reply in Further Support of Motion to Dismiss Claims for Plaintiffs' Lack of Standing, filed March 9, 2014 (Doc. 167)("Reply on MTD").  The Defendants state that the Plaintiffs are "[u]nable to show that they personally have been subjected to any injurious conduct respecting New Mexico royalty interests or Colorado overriding interests."  Reply on MTD at 1.  The Defendants argue that, instead, the Plaintiffs "simply conflate one interest with the other and one sovereign state with the other." Reply on MTD at 1.  They state that the Supreme Court of the United States has held that plaintiffs must demonstrate standing for each claim.  See Reply on MTD at 3 (citing Daimler Chrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006)).  Specifically, the Defendants point to the

Supreme Court's statement that Article III standing as to one claim does not suffice for all claims arising from the same nucleus of operative fact.  See Reply on MTD at 3 (citing Daimler Chrysler Corp. v. Cuno, 547 U.S. at 352).

Here, the Defendants argue, the Plaintiffs have not demonstrated standing for each claim. See Reply on MTD at 4-5.  Namely, they have not shown standing to sue on behalf of former royalty owners, New Mexico royalty interests, or Colorado overriding royalty interests.  See Reply on MTD at 4-5.  They conclude by asserting that "the filing of a putative class action does *not* excuse the named plaintiffs from establishing their individual standing to bring *each claim asserted*."  Reply on MTD at 5 (emphasis in original).

The Court held a hearing on March 13, 2014.  See Transcript of Hearing, filed June 26, 2014 (Doc. 200)("March 13 Tr.").   The Defendants stated that they were challenging the Plaintiffs' standing under Article III for two primary reasons: (i) overriding royalty owners, royalty owners, and former royalty owners suffer injuries that give rise to different causes of action; and (ii) the actions that cause the New Mexico royalty owners' injuries are distinct from those that cause the Colorado royalty owners' injuries. See March 13 Tr. at 15:15-16:24 (Court, Sheridan).

The Defendants began with their first argument and asserted that overriding royalty owners, royalty owners, and former royalty owners have different causes of action, so one named Plaintiff cannot have standing on the other groups' behalf.  See March 13 Tr. at 21:15-20 (Sheridan).  They argued that, in New Mexico, overriding royalty owners do not have a "viable cause of action for underpayment of royalty based upon an implied covenant to market."  March 13 Tr. at 21:19-25 (Sheridan).  Along the same lines, they alleged that former royalty owners can sue only on a personal property right and not for accrued royalties.  See March 13 Tr. at 23:1-13

(Sheridan).  They stated that, because overriding royalty owners have a different cause of action than royalty owners and former royalty owners, the named Plaintiffs suffer a different injury than the proposed class members allegedly suffer.  The Court asked, if the Defendants' allegation is true, whether the better solution would be to certify a narrower class.  See March 13 Tr. at 24:12-16 (Court).  The Defendants stated that the Court could address the issue through narrowing the class, but stated that it should first determine whether the named Plaintiffs have standing to assert each claim.  See March 13 Tr. at 24:17-25:6 (Sheridan).

The Defendants appeared to contest only whether the named Plaintiffs had standing regarding the implied-duty-to-market claim.[3]  Moreover, they conceded that the Supreme Court of Colorado "gives overriding royalty owners the right to sue upon implied covenants."  March 13 Tr. at 29:21-24 (Sheridan).  They stated that, "if the Court were to equate royalty interests in Colorado with overriding royalty interests in Colorado on the grounds that there is no difference between them, and that a declaratory judgment can be granted, regardless of the absence of such a property owner, then maybe you could find standing" with respect to the Colorado claims.  March 13 Tr. at 29:24-30:5 (Sheridan).  Nevertheless, they argued that overriding royalty owners could not sue for breach of the implied duty to market in New Mexico, thereby depriving Abraham of standing on the Plaintiffs' implied-duty-to-market claim.  See March 13 Tr. at 33:6-12 (Sheridan).  Similarly, they argued that former owners were not entitled to recover royalties because they do not have a cause of action for underpayment of royalties.  See March 13 Tr. at 39:8-23 (Sheridan).  Although the Defendants conceded that each different lease form does not

_____

[3]Initially, the Defendants disputed whether the named Plaintiffs had standing to assert claims on behalf of the class for their declaratory judgment claim.  See March 13 Tr. at 20:5-21:11 ("I think it would be very, very unusual for a Court to declare what a royalty means under Colorado law, and have that apply to all royalties in New Mexico.").  The Plaintiffs clarified, however, that "we have not asked that the declaratory judgment claim be certified."  March 13 Tr. at 48:5-6 (Condon).

require a different plaintiff, see March 13 Tr. at 27:3-4 (Sheridan), they concluded that "there has

to be a plaintiff to assert each one of the claims that's being asserted," March 13 Tr. at 40:7-9

(Sheridan).

Moving to their second argument, they asserted: "[M]erely because a person in a

jurisdiction has suffered an injury in fact is not by itself sufficient for that person to have

standing to assert claims on behalf of others whose injuries may arise under the laws of another

jurisdiction."  March 13 Tr. at 16:10-16 (Sheridan).  The Court observed that "clearly the law

doesn't require people to be in identical situations."  March 13 Tr. at 18:18-19 (Court).  It stated

that "the injury might be different, but the wrong would be the same; would it not?"  March 13

Tr. at 19:16-18 (Court).  The Defendants admitted that no court has stated that one state royalty

owner could not represent another state's royalty owner.  See March 13 Tr. at 34:4-9 (Court,

Sheridan).  Despite this concession, they argued that the Court should not allow one state royalty

owner to represent another state's royalty owner, because "royalty litigation winds up being state

specific."  March 13 Tr. at 35:4-7 (Sheridan).

The Plaintiffs responded that the Defendants did not identify "a single way in which the

injury suffered by all of the putative class members is any different from the injury suffered by

the named plaintiffs in this case[,] [b]ecause the injury is royalty underpayment."  March 13 Tr.

at 43:3-10 (Condon).  The Plaintiffs argued that the named Plaintiffs and all of the proposed

class members suffer that same injury, even though some of them have claims for breach of

contract, and others have claims for breach of the implied covenant to market or good faith and

fair dealing.  See March 13 Tr. at 43:11-15 (Condon).  The Court noted that the Defendants "got

pretty close to conceding that."  March 13 Tr. at 43:16-17 (Court).  It observed that "the second

element, the causal connection," was the issue, "because I don't think there is really an issue on the third element," redressability.  March 13 Tr. at 43:17-19 (Court).

The Court asked whether it poses a problem that different conduct caused the injuries. See March 13 Tr. at 44:14-16 (Court).  While the Plaintiffs admitted that "it might be a problem" if the challenged conduct was different under New Mexico and Colorado law, they argued that the conduct is not different.  March 13 Tr. at 44:17-20 (Condon).  They asserted that New Mexico and Colorado may have different law, thereby giving the plaintiffs in different states different causes of action, but that "the challenged conduct is the same."  March 13 Tr. at 44:17-23 (Condon).  They stated:

> The challenged conduct here is the keep whole royalty payment methodology which WPX has used to pay royalty and overriding royalty to New Mexico royalty owners, New Mexico overriding royalty owners, Colorado royalty owners, Colorado overriding royalty owners through the entire course of the damage period for which we're seeking recovery . . . .
>
> [T]he fact that there may be different elements of a cause of action, whether you're operating under Colorado law or New Mexico law, doesn't make the challenged conduct different.  The conduct is the same, and that is the royalty payment methodology that WPX has used to pay royalty and overriding royalty.

March 13 Tr. at 44:24-45:8 (Condon).  The Plaintiffs argued that the Defendants do not challenge that the Plaintiffs have met the three standing elements as to themselves.  Rather, the Plaintiffs asserted that the Defendants challenge the Plaintiffs' ability to represent the various categories of proposed class members.  See March 13 Tr. at 45:18-23 (Condon).

Additionally, the Plaintiffs contended that there is no difference between a royalty or an overriding royalty interest "for the purposes of the claims for which we're seeking certification. They're all entitled to bring a claim for royalty underpayment, or underpayment of overriding royalty based upon breaches of the underlying agreements or the implied covenants."  March 13 Tr. at 53:1-8 (Condon).  Furthermore, they stated that the named Plaintiffs have standing to

represent former royalty owners, because former royalty owners suffer the same injury as the named Plaintiffs and the same behavior causes the injury.  See March 13 Tr. at 54:14-24 (Condon).  They asserted that the issue regarding former owners is how to distribute any award to those owners who owned their royalty or overriding royalty during the limitations period.  See March 13 Tr. at 54:14-24 (Condon).

In the end, the Plaintiffs reminded the Court that they sought certification only on three claims: breach of contract, breach of the duty of good faith and fair dealing, and breach of the covenant to market.  See March 13 Tr. at 48:5-10 (Condon).  They stated that, if the Court concluded that the named Plaintiffs could not adequately represent the proposed class, "the remedy would be to simply certify those claims that you believe are worthy of certification, rather than dismissal."  March 13 Tr. at 52:11-14 (Condon).  They agreed, however, that at least one named Plaintiff must have Article III standing to raise each claim.  See March 13 Tr. at 56:8-13 (Condon, Court).

After the hearing, the Defendants filed supplemental briefing to inform the Court of a case that stood for the proposition that "a putative class representative lacks standing to bring class-wide claims, including common law claims, under state laws that bear no causal relationship to the plaintiff's injury."  Notice of Supplemental Authority on Motion to Dismiss for Lack of Standing, filed May 12, 2014 (Doc. 193)("Supplemental Authority").  The Defendants describe Lauren v. PNC Bank, N.A., 296 F.R.D. 389 (W.D. Pa. 2014).  There, the plaintiff sought to bring claims for unjust enrichment on behalf of a nationwide class.  See 296 F.R.D. at 390.  She sought to assert claims under the laws of all fifty states, even though her claim arose exclusively under Ohio law.  See 296 F.R.D. at 390.  The United States District Court for the Western District of Pennsylvania determined that "it is undisputed that she has

standing to assert an unjust enrichment claim under Ohio law." 296 F.R.D. at 390. Nevertheless, it held that she lacked standing to assert claims based on the common law of unjust enrichment in other states. In response to this decision, the Defendants argue that the case "demonstrates that such limitations on class representative standing apply not only to state statutory claims, but to common law claims as well." Supplemental Authority at 2.

### 2.     **The Motion to Exclude.**

In the Motion to Exclude, the Defendants "move to strike the legal opinions offered by Plaintiffs' expert, John Burritt McArthur, and preclude him from testifying at the class certification hearing." Motion to Exclude at 1. The McArthur Report provides McArthur's opinion whether, "based on [his] experience with oil and gas leases, case management, and class actions, the claims and type of evidence at issue in this case satisfy the elements for certification as a class action." Report of John Burritt McArthur at 1-2, filed January 13, 2014 (Doc. 118-13)("McArthur Report"). The stated purpose "is to discuss how the leases in this case can inform the certification decision." McArthur Report at 2. McArthur states that he reviewed numerous documents, including the documents that the parties exchanged during initial disclosures, relevant portions of the New Mexico and Colorado leases, a spreadsheet summarizing the payment terms in the leases, and class representative affidavits. See McArthur Report at 3.

McArthur then describes his education and experience. He states that he has a bachelor's degree from Brown University, a master's degree in economics from the University of Connecticut, a law degree from the University of Texas, a Masters in Public Administration from Harvard University's Kennedy School of Government, and a Ph.D. from the Goldman School of Public Policy from the University of California, Berkeley. See McArthur Report at 3-4. He has

been involved in complex commercial litigation for approximately thirty years, much of it involving oil-and-gas issues.  <u>See</u> McArthur Report at 4-5.  He has authored numerous law journal articles concerning the oil-and-gas industry, including articles on implied covenants, market-value leases, and one titled <u>The Class Action Tool in Oilfield Litigation</u>, 45 Kan. L. Rev. 1 (1996).  <u>See</u> McArthur Report at 5.

Next, McArthur analyzes the leases.  <u>See</u> McArthur Report at 8.  In doing so, he also provides his opinion that the class representatives' claims are common with class members' claims and will predominate over any individualized issues.  <u>See</u> McArthur Report at 8-10; <u>id.</u> at 10 (stating that the "vast majority of the parties' effort in discovery and at trial will be devoted to the common questions listed below"); <u>id.</u> at 10 (stating that the "questions that will consume significant trial time . . . are common to the class"); <u>id.</u> at 11 (stating that "the class representatives are seeking the same relief, and will raise the same questions, as the other class members").  He provides information on the leases' language, observing that all leases "are form leases" and stating that "the relevant terms appear in just a small portion of the leases, mainly the royalty payment clauses."  McArthur Report at 12.  He explains that "proceeds or gross proceeds language [] specifically precludes deductions (regardless of implied duties)."  McArthur Report at 13.

McArthur describes how "[n]one of the leases have language that authorizes WPX to fail to report and pay royalties on NGLs."  McArthur Report at 14.  He supports this conclusion by explaining how various technical aspects of oil-and-gas leases do not authorize lessees to avoid paying royalties on NGLs.  <u>See</u> McArthur Report at 14-15.  Specifically, he argues that the granting clause, the royalty payment mechanism, and the royalty payments clauses that document the manner of computing royalties do not allow lessees to avoid paying royalties on

NGLs.  See McArthur Report at 15.  Throughout the remainder of the report, McArthur provides a mix of: (i) technical explanations and terminology definitions, see McArthur Report at 15 (explaining that the "oil term, which generally immediately precedes the gas royalty payment, requires free-of-cost delivery or, sometimes, has a payment alternative, of 'oil'"); and (ii) legal conclusions that common questions predominate, see McArthur Report at 19.

McArthur later filed a Supplemental Report, which responds to the Defendants' expert reports.  See Supplemental Report of John Burritt McArthur at 1-2, filed March 3, 2014 (Doc. 152-1)("Supplemental Report").  He describes how most lessees "generally pay their lessors a share of their liquids value or receipts."  Supplemental Report at 2-3.  He explains lease terminology, including what the word "gas" means.  Supplemental Report at 3.  Additionally, he argues that the Defendants' expert reports reveal more classwide disputes.  See Supplemental Report at 3.

The Defendants' main objection to McArthur's report is that it "renders his legal opinion that the Court should certify Plaintiffs' proposed class," even though "experts cannot propound legal opinions or conclusions."  Motion to Exclude at 1.  The Defendants cite various instances in the McArthur Report where McArthur allegedly substitutes his opinions for the Court's opinions whether to certify the class.  See Motion to Exclude at 2.  They argue: "McArthur's report is a legal brief masquerading as an expert report.  As such, it invades the province of the court as the sole arbiter of legal questions and fails to meet the requirements of Rules 702 and 704."  Motion to Exclude at 2.

The Defendants then assert that rule 702, which provides that expert testimony is admissible if it "will help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, bars the McArthur Report for two reasons.  First, they argue that the

report "will not aid the Court in any fact-finding for purposes of class certification."   Motion to Exclude at 3.   They contend that his report offers only legal opinions whether the Court can certify the class, which will not "assist the Court in understanding the evidence or determining a fact in issue."   Motion to Exclude at 3.   Second, the Defendants assert that the McArthur Report does not meet rule 702's threshold requirement that expert opinions be based on "scientific, technical or other specialized knowledge."   Motion to Exclude at 4 (quoting Fed. R. Evid. 702(a)).   Additionally, the Defendants argue that the McArthur Report violates rule 702, which "bars legal conclusions contained in expert reports."   Motion to Exclude at 4.

The Plaintiffs responded on March 3, 2014.   See Plaintiffs' Response in Opposition to Defendants' Motion to Exclude Expert Report of John Burritt McArthur, filed March 3, 2014 (Doc. 152)("Response to Motion to Exclude").   They argue that McArthur's testimony satisfies rule 702 and 704's requirements.   See Response to Motion to Exclude at 8-10.   First, they contend that his opinions involve technical, specialized knowledge, thus satisfying rule 702's baseline requirement.   See Response to Motion to Exclude at 2-3.   They describe McArthur's education and experience to support their contention that he has specialized knowledge.   See Response to Motion to Exclude at 2.

Second, the Plaintiffs assert that McArthur's report contains "factual testimony concerning the lessor-lessee relationship, [and] the types of royalty instruments at issue in this case . . . ."   Response to Motion to Exclude at 1-2.   They state that McArthur "does not intend to opine on whether the legal standard for class certification has been satisfied."   Response to Motion to Exclude at 3; id. at 8-9 (explaining that McArthur's report cites legal standards and cases to "provide a foundation for his opinions," and not to instruct the Court to apply those standards).   They contend that, instead, McArthur intends to provide insight into the royalty

- 16 -

instruments involved and their impact on class certification.  See Response to Motion to Exclude at 4.  They explain that courts routinely allow experts "to testify concerning the meaning of contract terms in oil and gas disputes and litigation involving complex contracts."  Response to Motion to Exclude at 5-6.  They argue that the reason that courts allow this expert testimony in oil and gas disputes is because the cases "involve industry specific terminology and practices." Response to Motion to Exclude at 6.

The Plaintiffs also object to the Defendants' Motion to Exclude as being "overbroad and non-specific."  Response to Motion to Exclude at 8.  They contend that motions in limine must "state the specific matter to which objection is made."  Response to Motion to Exclude at 8. They assert that the Defendants "ask the Court to exclude the entire report, all opinions offered, and to exclude Mr. McArthur from testifying at the class certification hearing."  Response to Motion to Exclude at 8.  They argue that, because the Plaintiffs "have offered nothing more than broad generalizations," the Court should deny the Motion to Exclude.  Response to Motion to Exclude at 8.

The Defendants replied on March 10, 2014.  See Defendants' Reply in Support of Motion to Exclude Expert Report of John Burritt McArthur, filed March 10, 2014 (Doc. 169)("Reply to Motion to Exclude").  Largely, they reiterate the arguments they raised in the Motion to Exclude. They contend that the Plaintiffs contradict themselves in their Response to Motion to Exclude, sometimes asserting that the McArthur Report does not intend to provide legal conclusions alone, while other times asserting that the McArthur Report describes whether the royalty agreements contain common factual issues.  See Reply to Motion to Exclude at 2.  They assert that McArthur provides his ultimate legal conclusion that certification is appropriate.  See Reply to Motion to Exclude at 2-3.  Specifically, they contend that McArthur's assertion that common

issues of law or fact exist and predominate are legal conclusions "on which expert testimony is inadmissible."  Reply to Motion to Exclude at 3.

The Defendants concede, however, that McArthur's testimony might be admissible if it summarized the royalty and overriding royalty agreements without providing a "substantive analysis and interpretation of those terms."  Reply to Motion to Exclude at 4.  Nevertheless, the Defendants maintain that McArthur's testimony is inadmissible here, where it allegedly defines and applies the law.  See Reply to Motion to Exclude at 4-5.  Finally, they assert that their Motion to Exclude is not vague, because they provide "a bullet point list of specific cites to opinions that are objectionable" in the Motion to Exclude.  Reply to Motion to Exclude at 6.

At the March 13 hearing, the Court discussed the Motion to Exclude.  See March 13 Tr. at 63:6-8 (Court).  The Court asked why the Plaintiffs sought to exclude McArthur's testimony, but not other experts' testimony.  See Tr. at 63:20-24 (Court).  The Defendants asserted that McArthur's "announced purpose is nothing more and nothing less than to tell the Court what the law is and how to apply it."  Tr. at 64:3-6 (Anderson).  The Court then asked the Defendants whether they thought McArthur could provide any helpful factual testimony.  See Tr. at 65:12-16 (Court).  They asserted that McArthur could provide nothing more than legal opinions, because lease interpretation "is a question of law reserved for the Court."  Tr. at 66:3-12 (Anderson).

The Defendants added that they sought to exclude not only McArthur's testimony, but also his report and Supplemental Report.  See Tr. at 67:5-13 (Anderson).  They asserted that the reports are legal briefs with legal conclusions that do not meet rule 702 or 704's requirements. See Tr. at 67:25-68:2 (Anderson).  Finally, the Defendants clarified that, even though Tenth Circuit precedent directs district courts to consider all lease language to determine whether class

certification is proper, the Tenth Circuit does not allow plaintiffs' experts to interpret those leases on the Court's behalf. <u>See</u> Tr. at 68:24-69:10 (Anderson).

The Plaintiffs admitted that the McArthur Report contained some discussions about the class certification elements. <u>See</u> Tr. at 69:21-24 (Condon). Nonetheless, they asserted that they did not intend to ask McArthur to provide legal conclusions. <u>See</u> Tr. at 69:24-70:5 (Condon). They argued that the Court must determine whether any of the leases contain variations that could preclude class certification, and that here, the Court must consider whether any of the leases authorize the Defendants to use the keep-whole methodology for royalty payments or otherwise allow the Defendants not to pay royalties on natural gas liquids and condensate. <u>See</u> Tr. at 71:1-15 (Condon). They contended that the Court must allow experts to examine the leases and provide a synopsis of the lease categories and meanings. <u>See</u> Tr. at 71:16-72:3 (Condon). More specifically, they stated that, under <u>Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.</u>, 725 F.3d 1213 (10th Cir. 2013), district courts

> are entitled to take expert testimony on the issue of the lease forms, the lease language, how they relate to the claims in the case, whether they present common issues, whether they present a circumstance where the same evidence is going to be used to prove the claims for all the class members, or whether there are variations in the lease language and the overriding royalty instruments that have a bearing on how you're going to try the case. There is no rule that says that in a royalty underpayment case you, the district court, can't rely on experts for that analysis, but that you have to read every one of these instruments yourself. And I would suggest that that's kind of an absurd position.

Tr. at 72:8-24 (Condon). The Plaintiffs then compared McArthur to the Defendants' expert, Kris Terry, who would also describe the lease language. <u>See</u> Tr. at 70:10-13 (Condon). The Plaintiffs concluded by stating that the Court is entitled to determine what evidence will be helpful in deciding the class certification issues. <u>See</u> Tr. at 75:1-4 (Court).

The Court asked the Defendants whether the Tenth Circuit has held that experts can testify on the meaning of certain contractual language, especially if the language is technical or specific to an industry.  See Tr. at 77:10-18 (Court).  The Defendants agreed that the Tenth Circuit approves of such expert testimony, and that the Court could admit McArthur's testimony if it was limited to such technical explanations.  See Tr. at 77:19-78:3 (Anderson).  Despite their concession, they maintained that the Court must exclude McArthur's report and testimony because it discusses what the lease language means as a matter of law.  See Tr. at 78:4-14 (Anderson).

The Court observed that, after reading McArthur's report, McArthur could provide some useful factual information.  See Tr. at 80:10-14 (Court).  The Court informed the parties that it would not exclude McArthur's report entirely, but cautioned the plaintiffs not to allow McArthur to testify to legal conclusions.  See Tr. at 80:14-22 (Court).  The Court stated that McArthur could discuss whether different lease terms carry different meanings.  See Tr. at 81:1-8 (Court).  The Court agreed that McArthur could not provide legal conclusions, but stated that it would allow him to testify, and the Defendants could "object to any legal conclusions or opinions that he's offering."  Tr. at 81:11-15 (Court).  Regarding the report itself, the Court noted that the Plaintiffs had not offered it into evidence and that it was merely part of the record.  See Tr. at 81:22-24 (Court).  Nevertheless, the Court stated that, if it concluded that the McArthur Report was "just purely a legal brief, we may not want to have it in the record."  Tr. at 82:13-15 (Court).  Accordingly, the Court denied the motion in part and granted it in part, "with the cautionary instructions to the plaintiff to try to toe the line" and avoid testifying to legal conclusions.  Tr. at 82:16-19 (Court).

3.      **The Motion in Limine**.

In the Motion in Limine, the Plaintiffs ask the Court to prohibit Kris Terry from "characterizing her opinions as representing alleged custom and practice or industry usage." Motion in Limine at 1.  The Plaintiffs first allege that Terry "has no knowledge or personal experience in the production or marketing of oil, gas, or natural gas liquids in the San Juan Basin" before 1979, when she began working in the oil and gas industry as an attorney.  Motion in Limine at 3.  They contend that Terry lacks "expertise regarding the understanding or expectation of royalty or overriding royalty owners regarding royalty provisions."  Motion in Limine at 3.  Second, the Plaintiffs argue that Terry's opinion that "gas" means "gas as it emerges from the well and does not include extracted NGLs or condensate" is mistaken.  Motion in Limine at 2-3.  They contend that Terry's opinion "is contrary to the universal industry definition of 'gas,' which is understood to include methane gas and entrained NGLs and condensate which emerge as part of the gas stream."  Motion in Limine at 3-4.  Furthermore, the Plaintiffs state, the "current custom and practice of lessees and royalty payors in the San Juan Basin is that where conventional gas is gathered and processed, the royalty payor pays on sales revenues from residue gas and from NGLs."  Motion in Limine at 4.

Next, the Plaintiffs argue that Terry does not offer "custom and usage opinion testimony," aside from her one-sentence opinion that lessees pay royalty only on methane gas, so she cannot present any testimony on custom and usage.  Motion in Limine at 6.  The Plaintiffs contend that rule 26(a)(2)(B) of the Federal Rules of Civil Procedure require experts to disclose: (i) a statement of all opinions the witness will express and the basis for them; and (ii) the facts and data the expert considered to form those opinions.  See Motion in Limine at 5.  They predict that Terry will likely introduce her opinions "under the guise of industry custom and usage,"

even though she did not disclose those opinions in her report and there is no foundation for those opinions.  Motion in Limine at 7.  Moreover, they argue that Terry cannot testify regarding custom and usage without showing that "both parties to the contract knew" of that custom and usage.  Motion in Limine at 8.  Accordingly, the Plaintiffs contend that Terry's report does not establish a foundation for any custom-and-usage testimony concerning the royalty language's meaning.  See Motion in Limine at 8.

The Defendants responded, first arguing that Terry is qualified.  See Response in Opposition to Plaintiffs' Motion in Limine Concerning Certain Testimony of Kris Terry, filed May 5, 2014 (Doc. 191)("Response to Motion in Limine").  They explain that she received a law degree from the University of Oklahoma, and worked in the oil-and-gas industry in both legal and business roles for approximately ten years.  See Response to Motion in Limine at 1.  "Since she left," the Defendants state, she has spent twenty-five years "in the oil and gas industry as an independent consultant providing a variety of services to clients."  Response to Motion in Limine at 1.  They contend that Terry has "extensive experience reviewing various types of royalty instruments, including oil and gas leases," and has "testified as an expert in the oil and gas industry in numerous actions pending in both state and federal court."  Response to Motion in Limine at 2.  The Defendants note that Terry has specialized experience in the oil-and-gas industry in the San Juan Basin, because she "previously sponsored testimony involving the same industry and the history of oil and gas production in New Mexico."  Response to Motion in Limine at 2.

In response to the Plaintiffs' argument that Terry offered no custom-and-usage opinion in her report, the Defendants point to various places throughout Terry's report that discuss industry custom and usage.  See Response to Motion in Limine at 11-12.  They also direct the Court's

attention to Exhibit C, A Brief History of the Production and Sale of Natural Gas in New Mexico and Colorado at 26, filed May 5, 2014 (Doc. 191-1)("History of New Mexico Natural Gas Sales"), which is appended to her report.  See Response to Motion in Limine at 2-3.  The History of New Mexico Natural Gas Sales addresses the history of the production and sale of natural gas in the San Juan Basin, which "provides context as to what the parties could have known at the time they entered into the various lease and overriding royalty agreements."  Response to Motion in Limine at 2-3.  The Defendants argue that Terry's testimony is relevant because it bears on the Plaintiffs' ability to demonstrate that some question of law or fact can be answered "*all at once and that the single answer* to that question will resolve a central issue in all class members' claims."  Response to Motion in Limine at 3 (emphasis in original).  In sum, the Defendants argue that Terry disclosed that she would offer industry custom-and-usage testimony throughout her report.  See Response to Motion in Limine at 13.

Finally, the Defendants argue that custom-and-usage testimony is admissible to help the Court determine whether the royalty instruments are susceptible to differing interpretations, and therefore whether the Plaintiffs can meet rule 23's commonality and predominance requirements.  See Response to Motion in Limine at 13.  They contend that the Court has already allowed industry custom-and-usage testimony from the Plaintiffs' own expert, McArthur.  See Response to Motion in Limine at 10.  The Defendants assert that, in New Mexico, courts may hear custom-and-usage evidence to determine whether language that appears unambiguous "is actually unclear."  Response to Motion in Limine at 14 (citing Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 708 F. Supp. 2d 1209, 1228-29 n.14 (D.N.M. 2010)(Browning, J.)).  The Defendants conclude that, because the Court can hear this evidence, "the Court should permit Ms. Terry's testimony in its entirety."  Response to Motion in Limine at 16.

The Court heard the Motion in Limine on May 9, 2014.   See Transcript of Class Certification Proceedings (taken May 9, 2014), filed June 26, 2014 (Doc. 199)("May 9 Hearing").   At the hearing, the Plaintiffs conceded that they "don't question her qualifications." May 9 Hearing at 776:15-16 (Gonzales).   They further agreed that Terry can state her personal opinion and interpretation.   See May 9 Hearing at 777:11-15 (Gonzales).   They centered their dispute on whether industry usage-and-custom evidence on lease language existed in the 1940s and 1950s.   See May 9 Hearing at 776:20-777:6 (Gonzales).   They argued that, because the existence of such industry custom and usage did not necessarily exist at that time, it is a matter of fact and Terry cannot testify to it.   See May 9 Hearing at 777:11-17 (Gonzales).

The Defendants observed that Terry's testimony was largely similar to McArthur's testimony.   See May 9 Hearing at 778:15-22 (Sheridan).   They noted that the Court agreed to allow McArthur to testify and to respond to Terry's testimony, as long as neither expert opined on legal issues relating to the class certification decision.   See May 9 Hearing at 778:15-22 (Sheridan).   They argued that the Court should admit Terry's testimony "on whatever basis the Court is inclined to accept Mr. McArthur's testimony."   May 9 Hearing at 780:8-13 (Sheridan). The Defendants pointed out that, unlike a merits trial, the issue here was not what the contract means, but rather: "Is there the potential for the meaning of these agreements to have differing results?"   May 9 Hearing at 779:5-10 (Sheridan).   They argued that industry custom-and-usage testimony is admissible on the merits, so that testimony could also affect the answers to the class certification requirements.   See May 9 Hearing at 779:12-16 (Sheridan).   Consequently, they stated, Terry did not offer the testimony to help the Court decide the contracts' meaning, but to help the Court determine whether the contracts "likely may differ across the class."   May 9 Hearing at 779:17-23 (Sheridan).

- 24 -

The Court stated that it was inclined to allow the testimony, because experts can usually discuss custom and usage within an industry.  See May 9 Hearing at 777:18-23 (Court).  The Court therefore took Terry's testimony subject to the Plaintiffs' objection.  It directed the Plaintiffs to object when the testimony broached areas where the Motion in Limine might apply.  See May 9 Hearing at 778:1-10 (Court).  The Court stated that it would decide whether to use or rely upon the testimony when it writes the opinion deciding the Motion in Limine.  See May 9 Hearing at 778:1-10 (Court).  The Plaintiffs agreed to the Court's suggestion.  See May 9 Hearing at 778:10-11 (Gallegos).  The Plaintiffs did not object to Terry's testimony on the grounds that it was inadmissible as explained in their Motion in Limine.  See May 9 Hearing at 780:20-877:11 (Court, Gallegos, Sheridan, Terry).

## LAW REGARDING STANDING

A federal court may hear cases only where the plaintiff has standing to sue.  Standing has two components.  First, standing has a constitutional component arising from Article III's requirement that federal courts hear only genuine cases or controversies.  Second, standing has a prudential component.  See Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1224 n.7 (10th Cir. 2008)(Lucero, J.)(noting that prudential standing concerns may prevent judicial resolution of a case even where constitutional standing exists).  The burden of establishing standing rests on the plaintiff.  See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).  The plaintiff must "allege . . . facts essential to show jurisdiction.  If they fail to make the necessary allegations, they have no standing."  FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(internal citations and quotations omitted).  Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "unless the contrary appears affirmatively from the record."  Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v.

Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986))(internal quotation marks omitted).  "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record."  Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(Henry, J.)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231)(citations omitted)(internal quotation marks omitted).

1.    **Article III Standing.**

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  San Juan Cty., Utah v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc).  See U.S. Const. art. III, § 2.  "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'"  Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)(Ebel, J.)(quoting Massachusetts v. EPA, 549 U.S. 497, 539 (2007))(internal quotation marks omitted).  "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing."  San Juan Cty., Utah v. United States, 503 F.3d at 1171. To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision."  Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(Hartz, J.)(internal quotation marks omitted).

"Standing is determined as of the time the action is brought."  Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(Seymour, J.)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)(Ebel, J.)).  In Smith v. U.S. Court of

Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law.  484 F.3d at 1285.  The Tenth Circuit noted that the plaintiff had recently taken his state appeal and, therefore,

> was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in Nova Health Sys. v. Gandy, the Tenth Circuit found that abortion providers had standing to challenge an Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law.  416 F.3d 1154. Although finding standing, the Tenth Circuit was careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova Health faced any imminent likelihood that it would lose some minor patients seeking abortions.  416 F.3d at 1155.  Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing.  See 416 F.3d at 1155.

## 2.    **Prudential Standing.**

"Prudential standing is not jurisdictional in the same sense as Article III standing." Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007)(Ebel, J.).  Prudential standing consists of "a judicially-created set of principles that, like constitutional standing, places limits on the class of persons who may invoke the courts' decisional and remedial powers."  Bd. of Cty. Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(Ebel, J.)(internal quotation marks

omitted).  Generally, there are three prudential-standing requirements: (i) "a plaintiff must assert

his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be

a generalized grievance shared in substantially equal measure by all or a large class of citizens";

and (iii) "a plaintiff's grievance must arguably fall within the zone of interests protected or

regulated by the statutory provision or constitutional guarantee invoked in the suit."  Bd. of Cty.

Comm'rs v. Geringer, 297 F.3d at 1112 (internal quotation marks and citations omitted).

Traditionally, federal courts framed the zone-of-interests test as an issue of prudential

standing.  The Supreme Court recently clarified that the zone-of-interests analysis "is an issue

that requires us to determine, using traditional tools of statutory interpretation, whether a

legislatively conferred cause of action encompasses a particular plaintiff's claim."  Lexmark Int'l

v. Static Control Components, 134 S. Ct. 1377, 1387 (2014).  Statutory standing "extends only to

plaintiffs whose interests fall within the zone of interests protected by the law invoked."

Lexmark Int'l v. Static Control Components, 134 S. Ct. at 1387.  Notably, the Supreme Court

stated that it "often 'conspicuously included the word 'arguably' in the test to indicate that the

benefit of any doubt goes to the plaintiff.'"  Lexmark Int'l v. Static Control Components, 134 S.

Ct. at 1389 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 132

S. Ct. 2199 (2012)).  Moreover, the test "forecloses suit only when a plaintiff's interests are so

marginally related to or inconsistent with the purposes implicit in the statute that it cannot

reasonably be assumed that Congress authorized the plaintiff to sue."  Lexmark Int'l v. Static

Control Components, 134 S. Ct. at 1389 (internal quotation marks and citations omitted).  This

"lenient approach" preserves the APA's flexible judicial-review provisions.  Lexmark Int'l v.

Static Control Components, 134 S. Ct. at 1389.

3.      **Standing in Class Actions.**

Rule 23 "must be interpreted in keeping with Article III constraints." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 612 (1997). See Vallario v. Vandehey, 554 F.3d 1259, 1269 n.7 (10th Cir. 2009)(stating that class certification analysis must begin with Article III standing). The named plaintiffs must therefore have individual standing to bring claims on behalf of the absent class members. See Sierra Club v. Morton, 405 U.S. 727, 734 (1972); DG ex rel Stricklin v. Devaughn, 594 F.3d 1188, 1198 (10th Cir. 2010); Rector v. City & Cty. of Denver, 348 F.3d 935, 949-50 (10th Cir. 2003)(concluding that standing exists if at least one named plaintiff meets the requirements). The named plaintiffs may not rely on potential class members' injuries to establish their standing. See Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 n.20 (1976)(citing Warth v. Seldin, 422 U.S. 490, 502 (1975)(stating that named plaintiffs who seek to represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent")); Thomas v. Metro. Life Ins. Co., 631 F.3d 1153, 1159 (10th Cir. 2011)("Prior to class certification, the named plaintiffs' failure to maintain a live case or controversy is fatal to the case as a whole -- that unnamed plaintiffs might have a case or controversy is irrelevant."). Furthermore, the plaintiffs must show standing with respect to each form of relief sought. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185 (2000). If a plaintiff does not have standing to bring a suit, federal jurisdiction never attaches to the suit. See O'Shea v. Littleton, 414 U.S. 488, 494 (1974). Federal jurisdiction must be continuous from the beginning to the end of the suit. See U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 396-97 (1980).

4.       **Class-Action Standing and the Relation-Back Doctrine.**

In Genesee County Employees' Retirement System v. Thornburg Mortgage Security Trust 2006-3, 825 F. Supp. 2d 1082, 1153-54 (D.N.M. 2011)(Browning, J.)("Genesee County"), the Court considered how the relation-back doctrine applies in class-action cases.  Specifically, it considered whether a class member who became a named plaintiff later in the litigation could have standing that would relate-back to the time the original plaintiff filed the complaint.  See 825 F. Supp. 2d at 1082.  The Court determined that the original named plaintiff -- Genesee County Employees' Retirement System -- lacked standing to assert certain claims for various securities offerings, because it did not purchase any securities in those offerings.  See 825 F. Supp. 2d at 1153-54 ("Genesee County did not have standing when it filed the Original Complaint to assert claims regarding the nine other offerings from which it did not allege purchases.").  Subsequently, two previously unnamed class members became named plaintiffs in the case.  See 825 F. Supp. 2d at 1153-54.  The Court concluded that these new plaintiffs -- Midwest Operating and Maryland-National Capital -- together had standing to assert claims for the three offerings at issue.  See 825 F. Supp. 2d at 1156-58.

The Court then discussed the requirement that a case-or-controversy be present throughout the entire suit to decide whether Midwest Operating's and Maryland-National Capital's standing related back under Article III to the time Genesee County filed the Original Complaint.  See 825 F. Supp. 2d at 1156-58.  To conclude that Midwest Operating's and Maryland-National Capital's standing related back, the Court relied on a line of Supreme Court decisions that hold that, even when a named plaintiff's claims become moot, the constitutional doctrine of mootness does not bar the named plaintiff from continuing to litigate claims on behalf of the class.  See 825 F. Supp.2d at 1156-58.  One of the cases that the Court discussed in

some detail is <u>United States Parole Commission v. Geraghty</u>, 445 U.S. 388 (1980).  <u>See</u> 825 F.

Supp. 2d at 1156-58.  The Court evaluated whether that line of cases extends to a situation where

the original named plaintiff lacked standing but where subsequent named plaintiffs, who at an

earlier point in time were unnamed members of a class, become named plaintiffs through an

amendment to the pleadings.  <u>See</u> 825 F. Supp. 2d at 1156-58.  The Court then found that

standing related back in this case, relying on language from some Tenth Circuit decisions and a

decision from the United States Court of Appeals for the Third Circuit in <u>Haas v. Pittsburgh</u>

<u>National Bank</u>, 526 F.2d 1083 (3d Cir. 1975):

> Because the addition of these new lead Plaintiffs in the Amended
> Complaint relates back to the filing of the Original Complaint, subject-matter
> jurisdiction has been continuous in this suit from its institution to the present time.
> <u>See</u> <u>U.S. Parole Comm'n v. Geraghty</u>, 445 U.S. at 396-97.  Before the filing of
> the Amended Complaint on December 10, 2010, no court had yet determined that
> Genesee County lacked standing to assert claims on behalf of any of the asserted
> class members.  The intervening amendment to the complaint resolved any
> constitutional standing issues.  Furthermore, Genesee County had standing to
> assert claims relating to at least one of the offerings on issue.  While the Tenth
> Circuit has not addressed the specific issue of lack of standing of a class
> representative and relation back of a pleading amendment, the Court believes that
> the Tenth Circuit's precedent indicates it would allow such relation back.  As the
> Tenth Circuit has recognized, a newly substituted lead plaintiff "has effectively
> been a party to an action against these defendants [when] a class action covering
> him was requested but never denied."  <u>Joseph v. Wiles</u>, 223 F.3d at 1168.  The
> Tenth Circuit has said, in the context of a district court deciding the predominance
> issue during the class certification process incorrectly, that "the status of class
> members is to be determined by relation back to the date of the initiation of this
> suit" for limitations purposes.  <u>Esplin v. Hirschi</u>, 402 F.2d 94, 101 (10th Cir.
> 1968).  Similarly, the Third Circuit has expressly allowed relation back on the
> issue of standing where a district court subsequently decertified a class after it
> determined that the lead plaintiff did not have standing to assert claims on behalf
> of the class.  <u>See</u> <u>Haas v. Pittsburgh Nat'l Bank</u>, 526 F.2d at 1095-98.  Using
> language similar to the Tenth Circuit's language in <u>Joseph v. Wiles</u>, the Third
> Circuit noted: "These plaintiffs were in existence at the time the action was
> originally brought and were described as claimants in the complaint.  The only
> change effectuated by the district court's order was the prompt addition of a
> nominal plaintiff who [regarding all of the claims]."  <u>Haas v. Pittsburgh Nat'l</u>
> <u>Bank</u>, 526 F.2d at 1097.  Thus, the Third Circuit found "[t]he amendment of the

complaint by the addition of [a new lead plaintiff] relates back to the initial filing
of the complaint." Haas v. Pittsburgh Nat'l Bank, 526 F.2d at 1098.

Genesee Cty. Emps. Retirement Sys. v. Thornburg Mortg. Sec. Tr. 2006-3, 825 F. Supp. 2d at

1156-57 (alterations in original).  The Court then acknowledged that "the issue of mootness is a

distinct Article III concern from standing."  825 F. Supp. 2d at 1157.  To resolve the difference

between mootness and standing as it bears on relation back under Article III, the Court relied in

part on another Tenth Circuit decision, Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d

1239 (10th Cir. 2011):

> While the issue of mootness is a distinct Article III concern from standing,
> the Tenth Circuit has addressed some analogous principles in Lucero v. Bureau of
> Collection Recovery, Inc., a case that discusses whether a named plaintiff can
> serve as a class representative even though his claims later become moot.  In
> discussing the Supreme Court's rationale for finding such substitution as
> consistent with Article III standing requirements, the Tenth Circuit stated:
>
>> By attributing a legal status in the case or controversy to unnamed
>> class members apart from that of the class representative, Sosna
>> suggests that in a proposed class action the non-named class
>> members have an unyielding interest that could precede the
>> moment of class certification -- the premise appearing to be that
>> any live Article III interest a class may or may not have in a case is
>> or is not present from its inception.
>
> Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d at 1245.  Furthermore,
> the Tenth Circuit recognized that the Supreme Court has "apparently
> acknowledge[d] that the personal stake of the indivisible class may inhere prior to
> a definitive ruling on class certification."  Lucero v. Bureau of Collection
> Recovery, Inc., 639 F.3d at 1245.  More specifically, the Tenth Circuit held that
> "a nascent interest attaches to the proposed class upon the filing of a class
> complaint such that a rejected offer of judgment for statutory damages and costs
> made to a named plaintiff does not render the case moot under Article III."
> Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d at 1249.  In the context
> of mootness, the Supreme Court has recognized that some form of relation back
> can apply in the context of Article III:
>
>> Although one might argue that Sosna contains at least an
>> implication that the critical factor for Art. III purposes is the timing
>> of class certification, other cases, applying a "relation back"
>> approach, clearly demonstrate that timing is not crucial.  When the

claim on the merits is "capable of repetition, yet evading review," the named plaintiff may litigate the class certification issue despite loss of his personal stake in the outcome of the litigation. The "capable of repetition, yet evading review" doctrine to be sure, was developed outside the class-action context. But it has been applied where the named plaintiff does have a personal stake at the outset of the lawsuit, and where the claim may arise again with respect to that plaintiff; the litigation then may continue notwithstanding the named plaintiff's current lack of a personal stake. Since the litigant faces some likelihood of becoming involved in the same controversy in the future, vigorous advocacy can be expected to continue.

U.S. Parole Comm'n v. Geraghty, 445 U.S. at 398. Likewise, the Supreme Court has articulated: "A plaintiff who brings a class action presents two separate issues for judicial resolution. One is the claim on the merits; the other is the claim that he is entitled to represent a class." U.S. Parole Comm'n v. Geraghty, 445 U.S. at 402.

Genesee Cty. Emps. Retirement Sys. v. Thornburg Mortg. Sec. Tr. 2006-3, 825 F. Supp. 2d at 1157-58.

It is important to emphasize that the term "relation back" is a term that courts use in various contexts, even though the relation-back principles in each of those contexts are distinct. At issue in Genesee County were two distinct relation-back concepts: (i) relation back of case-or-controversy requirements in class-action lawsuits under Article III based on the doctrine the Supreme Court discussed in United States Parole Commission v. Geraghty; and (ii) relation back of pleading amendments to an earlier pleading under rule 15(c) for purposes of avoiding the effect of a statute of limitations and/or a statute of repose. See 825 F. Supp. 2d at 1157-58. These issues were interrelated in Genesee County, and the standing issues present some complexity. The Court will therefore describe the Supreme Court and Tenth Circuit case law that drives the Court's analysis.

In United States Parole Commission v. Geraghty, the Supreme Court set out to address "an issue of substantial significance, under Art. III of the Constitution, to class-action litigation."

445 U.S. at 390.  The problematic case-or-controversy issue in that case was that the named plaintiff was seeking to appeal a district court's denial of class certification on behalf of "all federal prisoners who are or will become eligible for release on parole," even though, "before any brief had been filed in the Court of Appeals, [the named plaintiff] was mandatorily released from prison," because "he had served 22 months of his sentence, and had earned good-time credits for the rest."  445 U.S. at 393-94.  The defendants "moved to dismiss the appeals as moot" in light of the named plaintiff's release from prison, and the United States Court of Appeals for the District of Columbia concluded "that the litigation was not moot."  445 U.S. at 394.

The D.C. Circuit reasoned that, "[i]f a class had been certified by the District Court, mootness of respondent['s] personal claim would not have rendered the controversy moot" such that "an erroneous <u>denial</u> of a class certification should not lead to the opposite result."  445 U.S. at 394 (emphasis in original).  More specifically, the D.C. Circuit held that "certification of a 'certifiable' class, that erroneously had been denied, relates back to the original denial and thus preserves jurisdiction."  445 U.S. at 394.  The Supreme Court recognized that, even when "there is no chance that the named plaintiff's expired claim will reoccur, mootness still can be avoided through certification of a class prior to expiration of the named plaintiff's personal claim."  445 U.S. at 398.  It concluded that "[s]ome claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires."  445 U.S. at 399.  The Supreme Court used the term "relation back" when discussing these principles.  <u>See</u> 445 U.S. at 398 ("Although one might argue that <u>Sosna [v. Iowa, 419 U.S. 393 (1975),]</u> contains at least an implication that the critical factor for Art. III purposes is the timing of class certification, other cases, applying a 'relation

back' approach, clearly demonstrate that timing is not crucial."). The Supreme Court characterized "[t]he 'relation back' principle" as "a traditional equitable doctrine." 445 U.S. at 404 n.11. The Supreme Court, synthesizing its precedent, also stated that "[t]hese cases demonstrate the flexible character of the Art. III mootness doctrine." 445 U.S. at 400.

For its conclusion that standing can relate back under Article III in a class action, the Court also relied on Haas v. Pittsburgh National Bank, a Third Circuit case. See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3, 825 F. Supp. 2d at 1156-58. While this case addresses both standing and relation back, it does not expressly state that standing relates back under Article III. See Haas v. Pittsburgh National Bank, 526 F.2d at 1095-98 ("The amendment of the complaint by the addition of Equibank cardholder Mitchell, therefore, relates back to the initial filing of the complaint on November 13, 1972."). The Court relied on this case in part, because of its concern that a case-or-controversy -- an aspect of subject-matter jurisdiction -- be present throughout the entirety of the litigation, citing United States Parole Commission v. Geraghty as a source for that concern. See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3, 825 F. Supp. 2d at 1156-57 ("Because the addition of these new lead Plaintiffs in the Amended Complaint relates back to the filing of the Original Complaint, subject-matter jurisdiction has been continuous in this suit from its institution to the present time."). The Court then noted, after analyzing this issue: "Furthermore, even if relation back does not apply to standing deficiencies, because the Plaintiffs have already amended their Original Complaint to cure the standing deficiencies, dismissing the Amended Complaint based on the defects in the Original Complaint and granting leave to amend would serve no purpose." 825 F. Supp. 2d at 1158.

The Court's discussion whether standing relates back under Article III in class actions was unnecessary to the facts of Genesee County. Reliance on relation back under Article III as discussed in United States Parole Commission v. Geraghty is necessary when named plaintiffs whose claims have become moot are still trying to litigate a case on behalf of the class, particularly when important procedural and merits determinations have taken place before the named plaintiffs' claims became moot. For instance, the plaintiff's claims in United States Parole Commission v. Geraghty became moot on appeal and not before the district court had ruled on any substantive motions, which was the procedural posture in Genesee County. See U.S. Parole Comm'n v. Geraghty, 445 U.S. at 393-94 ("On June 30, 1977, before any brief had been filed in the Court of Appeals, Geraghty was mandatorily released from prison; he had served 22 months of his sentence, and had earned good-time credits for the rest."). The Supreme Court addressed a similar scenario in Sosna v. Iowa, a case upon which the Supreme Court relied in United States Parole Commission v. Geraghty, where the plaintiff's case became moot, because she had satisfied the residency requirement she was challenging by the time her case made its way to the Supreme Court. See Sosna v. Iowa, 419 U.S. at 398 ("By the time her case reached this Court, however, appellant had long since satisfied the Iowa durational residency requirement . . . .").

The plaintiffs in both of those cases were seeking to avoid dismissal of the case, which had progressed significantly, as moot on the basis that their claims were capable of repetition yet evading review. See U.S. Parole Comm'n v. Geraghty, 445 U.S. at 398 ("When the claim on the merits is 'capable of repetition, yet evading review,' the named plaintiff may litigate the class certification issue despite loss of his personal stake in the outcome of the litigation."); Sosna v. Iowa, 419 U.S. at 400-01 (relying on the principle that the plaintiff's claims were "capable of

- 36 -

repetition, yet evading review").  The Supreme Court recognized an important limit on allowing

flexible treatment of the mootness doctrine under Article III: "A litigant must be a member of the

class which he or she seeks to represent at the time the class action is certified by the district

court."  Sosna v. Iowa, 419 U.S. at 403.

Furthermore, the Tenth Circuit has recognized that a plaintiff may properly seek leave to

amend to cure standing deficiencies, assuming those deficiencies are curable.  For instance, the

Tenth Circuit stated in Suarez v. Utah Board of Pardons and Parole, 76 F. App'x 230 (10th Cir.

2003):

> The district court found that Suarez's allegations were unsupported by
> specific facts and did not contain a claim that he had been personally injured by
> the alleged religious discrimination. Suarez, however, made additional factual
> allegations in his opening brief before this court, from which we conclude he
> could have amended his complaint to demonstrate he had standing to assert viable
> Establishment Clause and Equal Protection Clause claims.

76 F. App'x at 234.  The Tenth Circuit cited an older decision, Reynoldson v. Shillinger, 907

F.2d 124 (10th Cir. 1990), for the proposition that "a pro se prisoner's complaint should not be

dismissed without leave to amend a potentially curable defect in standing."  Suarez v. Utah Bd.

of Pardons & Parole, 76 F. App'x at 234 (citing Reynoldson v. Shillinger, 907 F.2d at 126).

Named plaintiffs, however, seeking to "add named plaintiffs" in a class action who "have

standing to assert securities fraud [or other] claims," do not have standing to challenge a district

court's denial of leave to amend to add unnamed plaintiffs, although the potential new plaintiffs

could do so.   Thomas v. Metro. Life Ins. Co., 631 F.3d 1153, 1159-60 (10th Cir.

2011)(recognizing that a named plaintiff in a "putative class action" is "not aggrieved by the

court's denial of leave to amend" to add a "potential new plaintiff," because "the only person

aggrieved was the potential new plaintiff, who did not appeal the order").

The Court includes this information not because the case in Genesee County would turn out differently under the Court's later conclusions, but to clarify the Court's understanding of the law.[4]   The Court concludes, upon further consideration of the matter, that standing does not relate back under Article III in the context of a class action.   The Tenth Circuit provides a helpful discussion of how standing differs from mootness, specifically that mootness is a more flexible case-or-controversy requirement than standing:

> Like Article III standing, mootness is oft-cited as a constitutional limitation on federal court jurisdiction.  E.g., Building & Constr. Dep't v. Rockwell Int'l Corp., 7 F.3d 1487, 1491 (10th Cir. 1993)("Constitutional mootness doctrine is grounded in the Article III requirement that federal courts only decide actual, ongoing cases or controversies."); see Matthew I. Hall, The Partially Prudential Doctrine of Mootness, 77 Geo. Wash. L. Rev. 562, 571 (2009)(citing footnote 3 in Liner v. Jafco, Inc., 375 U.S. 301 . . . (1964), as the first occasion in which the Supreme Court expressly derived its lack of jurisdiction to review moot cases from Article III).   But although issues of mootness often bear resemblance to issues of standing, their conceptual boundaries are not coterminous.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189-92 . . . (2000).   Indeed, the Supreme Court has historically recognized what are often called "exceptions" to the general rule

---

[4]The original named plaintiff, Genesee County, had standing to assert claims on behalf of the class for the offering in which it purchased securities, so the case would never have been subject to outright dismissal on standing grounds.  See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3, 825 F. Supp. 2d at 1151-52 ("Genesee County had standing only to assert claims on the class' behalf with respect to claims relating to the 2007-4 offering, as it did not allege that it made any purchases from the other nine.").   The Court also noted in its earlier opinion that, even if standing does not relate back, the Plaintiffs had already cured any standing deficiencies by adding in Maryland-National Capital and Midwest Operating as lead plaintiffs:

Furthermore, even if relation back does not apply to standing deficiencies, because the Plaintiffs have already amended their Original Complaint to cure the standing deficiencies, dismissing the Amended Complaint based on the defects in the Original Complaint and granting leave to amend would serve no purpose.  Because the Plaintiffs have already demonstrated they can cure any standing deficiencies and the dismissal in part would be without prejudice, the Defendants will suffer no harm if no dismissal occurs.  American Pipe & Construction Co. v. Utah tolling applies to the claims of the class members, which would prevent the time-barring of their claims from the applicable statute of limitations or repose.

825 F.Supp.2d at 1158.

against consideration of moot cases, as where a plaintiff's status is "capable of repetition yet evading review," S. Pac. Terminal Co. v. Interstate Commerce Comm'n, 219 U.S. 498, 515 . . . (1911), or where a defendant has ceased the challenged action but it is likely the defendant will "return to his old ways" -- the latter often referred to as the voluntary cessation exception, United States v. W.T. Grant Co., 345 U.S. 629, 632 . . . (1953); see also, e.g., City of Erie v. Pap's A.M., 529 U.S. 277 . . . (2000).  These exceptions do not extend to the standing inquiry, demonstrating the contours of Article III as it distinctly pertains to mootness.  Friends of the Earth, Inc., 528 U.S. at 191 . . . .

Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d at 1242-43.  The Supreme Court

provides a similar illustration of these principles:

> Furthermore, if mootness were simply "standing set in a time frame," the exception to mootness that arises when the defendant's allegedly unlawful activity is "capable of repetition, yet evading review," could not exist.  When, for example, a mentally disabled patient files a lawsuit challenging her confinement in a segregated institution, her postcomplaint transfer to a community-based program will not moot the action, Olmstead v. L.C., 527 U.S. 581, 594, n. 6 . . . (1999), despite the fact that she would have lacked initial standing had she filed the complaint after the transfer.  Standing admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum.  See Steel Co., 523 U.S., at 109 . . . ("'the mootness exception for disputes capable of repetition yet evading review . . . will not revive a dispute which became moot before the action commenced'")(quoting Renne v. Geary, 501 U.S. 312, 320 . . . (1991)).

> . . . .

> Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake.  In contrast, by the time mootness is an issue, the case has been brought and litigated, often (as here) for years.  To abandon the case at an advanced stage may prove more wasteful than frugal.  This argument from sunk costs does not license courts to retain jurisdiction over cases in which one or both of the parties plainly lack a continuing interest, as when the parties have settled or a plaintiff pursuing a nonsurviving claim has died.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. at 190-92.  The Court

was not correct in concluding that standing is, like mootness, subject to relation back under the

principles discussed in United States Parole Commission v. Geraghty.  In holding that mootness

can relate back, <u>United States Parole Commission v. Geraghty</u> relies heavily on the exception to the mootness restriction when the dispute is capable of repetition yet evading review.  <u>See</u> <u>U.S. Parole Comm'n v. Geraghty</u>, 445 U.S. at 398 ("When the claim on the merits is 'capable of repetition, yet evading review,' the named plaintiff may litigate the class certification issue despite loss of his personal stake in the outcome of the litigation.").  As the Supreme Court has stated: "Standing admits of no similar exception . . . ."  <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. at 191.

That these mootness exceptions do not also apply to standing is consistent with the Supreme Court's characterization of mootness as "flexible."  <u>U.S. Parole Comm'n v. Geraghty</u>, 445 U.S. at 400 ("These cases demonstrate the flexible character of the Art. III mootness doctrine.").  <u>Accord</u> <u>Clark v. State Farm Mut. Auto. Ins. Co.</u>, 590 F.3d 1134 (10th Cir. 2009)("Nonetheless, the Supreme Court has applied the mootness doctrine less strictly in the class action context.  In light of the relative independence of the class entity from any one party, the Court has recognized the more 'flexible character of the Art. III mootness doctrine' in the class action context.").  In comparison, the Supreme Court has stated about standing: "We have always insisted on strict compliance with this jurisdictional standing requirement."  <u>Raines v. Byrd</u>, 521 U.S. 811, 819 (1997).

While the Supreme Court has recognized that there may be certain prudential standing inquiries that are more flexible, it has not extended that flexibility to the constitutional standing inquiries.  <u>See</u> <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 161 n.1 (1990)("The cases relied upon by petitioner to establish that the strict requirement of standing, in some circumstances, is only a 'rule of practice' that can be relaxed in view of countervailing policies are inapposite, because they concern <u>prudential</u> barriers to standing, not the mandates of Art. III." (emphasis in

original)).   The Supreme Court in <u>Whitmore v. Arkansas</u> gave as examples of prudential standing: (i) third-party standing, <u>see</u> <u>Eisenstadt v. Baird</u>, 405 U.S. 438, 445 (1972)("In any event, appellant concludes, since Baird was not himself a single person denied access to contraceptives, he should not be heard to assert their rights.   We cannot agree."); and (ii) overbreadth of a statute for First Amendment purposes, <u>see</u> <u>Dombrowski v. Pfister</u>, 380 U.S. 479, 486-87 (1965)("We have fashioned this exception to the usual rules governing standing because of the '* * * danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.'" (citation omitted)); <u>United States v. Raines</u>, 362 U.S. at 22 ("This Court has indicated that where the application of these rules would itself have an inhibitory effect on freedom of speech, they may not be applied.").

Those prudential exceptions were not at play in <u>Genesee County</u>.   In a class action, the class representative must have a personal stake in the outcome of the case and cannot assert claims based on injuries others have suffered:

> That a suit may be a class action, however, adds nothing to the question of standing, for even named plaintiffs who represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."

<u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26, 40 n.20 (1976)(quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 502 (1975)).   It is true that the Tenth Circuit has held that "a nascent interest attaches to the proposed class upon the filing of a class complaint such that a rejected offer of judgment for statutory damages and costs made to a named plaintiff does not render the case moot under Article III."   <u>Lucero v. Bureau of Collection Recovery, Inc.</u>, 639 F.3d at 1249.   One should not, however, read that language too broadly as applying also to standing in light of the applicable

- 41 -

Supreme Court precedent.  The Tenth Circuit itself recognized a distinction between mootness

and standing in Lucero v. Bureau of Collection Recovery, Inc.:

> Like Article III standing, mootness is oft-cited as a constitutional
> limitation on federal court jurisdiction.  E.g., Building & Constr. Dep't v.
> Rockwell Int'l Corp., 7 F.3d 1487, 1491 (10th Cir. 1993)("Constitutional
> mootness doctrine is grounded in the Article III requirement that federal courts
> only decide actual, ongoing cases or controversies."); see Matthew I. Hall, The
> Partially Prudential Doctrine of Mootness, 77 Geo. Wash. L. Rev. 562, 571
> (2009)(citing footnote 3 in Liner v. Jafco, Inc., 375 U.S. 301 . . . (1964), as the
> first occasion in which the Supreme Court expressly derived its lack of
> jurisdiction to review moot cases from Article III).  But although issues of
> mootness often bear resemblance to issues of standing, their conceptual
> boundaries are not coterminous.  See Friends of the Earth, Inc. v. Laidlaw Envtl.
> Servs. (TOC), Inc., 528 U.S. 167, 189-92 . . . (2000).  Indeed, the Supreme Court
> has historically recognized what are often called "exceptions" to the general rule
> against consideration of moot cases, as where a plaintiff's status is "capable of
> repetition yet evading review," S. Pac. Terminal Co. v. Interstate Commerce
> Comm'n, 219 U.S. 498, 515 . . . (1911), or where a defendant has ceased the
> challenged action but it is likely the defendant will "return to his old ways" -- the
> latter often referred to as the voluntary cessation exception, United States v. W.T.
> Grant Co., 345 U.S. 629, 632 . . . (1953); see also, e.g., City of Erie v. Pap's
> A.M., 529 U.S. 277 . . . (2000).  These exceptions do not extend to the standing
> inquiry, demonstrating the contours of Article III as it distinctly pertains to
> mootness.  Friends of the Earth, Inc., 528 U.S. at 191 . . . .

639 F.3d at 1242-43.

Furthermore, the Supreme Court relied on the mootness exception of capable of

repetition yet evading review in United States Parole Commission v. Geraghty, and that

exception would have no bearing on the issue of standing.  A case can become moot based on

intervening events, such as settling the case, see U.S. Bancorp Mortgage Co. v. Bonner Mall

P'ship, 513 U.S. 18, 25 (1994)("Where mootness results from settlement, the losing party has

voluntarily forfeited his legal remedy by the ordinary processes of appeal . . . ."), or becoming a

resident of the State whose residency laws one is challenging, see Sosna v. Iowa, 419 U.S. at 399

("If appellant had sued only on her own behalf, both the fact that she now satisfies the one-year

residency requirement and the fact that she has obtained a divorce elsewhere would make this

case moot and require dismissal.").  In comparison, while mootness, a statute of limitations, or some other legal doctrine may eventually bar a suit, one cannot lose standing once one has it.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. at 190-92 ("Furthermore, if mootness were simply 'standing set in a time frame,' the exception to mootness that arises when the defendant's allegedly unlawful activity is 'capable of repetition, yet evading review,' could not exist.").

It would only become necessary for standing to relate back in situations comparable to those in United States Parole Commission v. Geraghty, such as an appellate court determining, after full litigation of the merits of the claims, that the named plaintiff never had standing.  See U.S. Parole Comm'n v. Geraghty, 445 U.S. at 394 ("On June 30, 1977, before any brief had been filed in the Court of Appeals, Geraghty was mandatorily released from prison; he had served 22 months of his sentence, and had earned good-time credits for the rest.  Petitioners then moved to dismiss the appeals as moot.").  One could also conceive that a defendant could raise a challenge to a class representative's standing after the plaintiff succeeded on the merits, such as after a trial, a situation that might similarly require relation back to avoid disruption of the litigation on behalf of the class.  For these reasons, the Court concludes that standing does not relate back under Article III in the context of a class action.

## LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided Daubert v. Merrell Dow Pharmaceuticals, Inc., trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide."   United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.).  "The Court now must not only decide whether the expert is qualified to

testify, but, under Daubert v. Merrell Dow Pharmaceuticals, Inc., whether the opinion testimony

is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d

at 1224. "Daubert v. Merrell Dow Pharmaceuticals, Inc. requires a court to scrutinize the

proffered expert's reasoning to determine if that reasoning is sound." United States v.

Gutierrez-Castro, 805 F. Supp. 2d at 1224.

### 1.    Rule 702.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if:

**(a)**     the expert's scientific, technical, or other specialized knowledge
will help the trier of fact to understand the evidence or to
determine a fact in issue;

**(b)**      the testimony is based on sufficient facts or data;

**(c)**     the testimony is the product of reliable principles and methods; and

**(d)**     the expert has reliably applied the principles and methods to the
facts of the case.

Fed. R. Evid. 702.  Rule 702 thus requires the trial court to "determine whether the expert is

proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist

the trier of fact to understand or determine a fact in issue." United States v. Muldrow, 19 F.3d

1332, 1337 (10th Cir. 1994).

Rule 702 uses a liberal definition of "expert."  Fed. R. Evid. 702 advisory committee's

note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest

sense of the word, e.g. physicians, physicists, and architects, but also the large group sometimes

called 'skilled' witnesses, such as bankers or landowners testifying to land values.").   An expert

is "required to possess such skill, experience or knowledge in that particular field as to make it

appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004).

The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Electric Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

### 2.      The Standard in Daubert.

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 594-95 (1993)("Daubert"); Witherspoon v. Navajo Ref. Co., LP, No. 03-1160 BB/LAM, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)). The Supreme Court

articulated a non-exclusive list of factors that weigh into a district court's first-step reliability

determination, including: (i) whether the method has been tested; (ii) whether the method has

been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and

whether the witness applied them in the present case; and (v) whether the witness' method is

generally accepted as reliable in the relevant medical and scientific community.  See Daubert,

509 U.S. 594-95.  The court is also to consider: (i) whether the witness' conclusion represents an

"unfounded extrapolation" from the data; (ii) whether the witness has adequately accounted for

alternative explanations for the effect at issue; (iii) whether the opinion was reached for the

purposes of litigation or as the result of independent studies; or (iv) whether it unduly relies on

anecdotal evidence.  See Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649, at *3 (citing

Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  The Tenth Circuit stated the applicable

standard in Norris v. Baxter Healthcare Corp.:

> Rule 702 requires the district court to "ensure that any and all scientific testimony
> or evidence is not only relevant, but reliable."  [Bitler v. A.O. Smith Corp., 391
> F.3d 1114, 1120 (10th Cir. 2004)](quoting Daubert, 509 U.S. at 589 . . .).  This
> obligation involves a two-part inquiry.  Id.  "[A] district court must [first]
> determine if the expert's proffered testimony . . . has 'a reliable basis in the
> knowledge and experience of his [or her] discipline.'"  Id. (quoting Daubert, 509
> U.S. at 592 . . . .).  In making this determination, the district court must decide
> "whether the reasoning or methodology underlying the testimony is scientifically
> valid. . . ."  Id. (quoting Daubert, 509 U.S. at 592-93 . . .).  Second, the district
> court must further inquire into whether proposed testimony is sufficiently
> "relevant to the task at hand."  Daubert, 509 U.S. at 597.

397 F.3d 878, 883-84 (10th Cir. 2005)(footnote omitted).  "The second inquiry is related to the

first.  Under the relevance prong of the Daubert analysis, the court must ensure that the proposed

expert testimony logically advances a material aspect of the case . . . .  The evidence must have a

valid scientific connection to the disputed facts in the case."  Norris v. Baxter Healthcare Corp.,

397 F.3d at 884 n.2 (citing Daubert, 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the

Supreme Court)); Daubert, 509 U.S. at 591)).  If the expert's proffered testimony fails on the first

prong, the Court does not reach the second prong.  See Norris v. Baxter Healthcare Corp., 397

F.3d at 884.

In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the

rules under Daubert v. Merrell Dow Pharm., Inc., to non-scientific expert testimony.  See 526

U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general

'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but

also to testimony based on 'technical' and 'other specialized' knowledge.").  The Supreme Court

recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert v. Merrell Dow

Pharm., Inc., will not apply to all cases:

> Our emphasis on the word 'may' thus reflects Daubert's description of the Rule
> 702 inquiry as a flexible one.  Daubert makes clear that the factors it mentions do
> not constitute a definitive checklist or test.  And Daubert adds that the
> gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert, the court must focus generally on "principles and

methodologies, and not on the conclusions generated."  Armeanu v. Bridgestone/Firestone N.

Am., Tire, LLC, No. CIV 05-0619 JB/DJS, 2006 WL 4060665, at *11 (D.N.M. Sept. 26,

2006)(Browning, J.)(citing Daubert, 509 U.S. at 595).  "Despite this focus on methodology, an

expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is

simply too great an analytical gap between the data and the opinion proffered."  Armeanu v.

Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations

omitted)(internal quotation marks omitted).

The proponent of the expert's opinion testimony bears the burden of establishing that the

expert is qualified, that the methodology he or she uses to support his or her opinions is reliable,

and that his or her opinion fits the facts of the case and thus will be helpful to the jury.  See

Norris v. Baxter Healthcare Corp., 397 F.3d at 881.  As the United States Court of Appeals for

the Ninth Circuit noted in Claar v. Burlington Northern Railroad Co., 29 F.3d 499 (9th Cir.

1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method.   Certainly, scientists may form initial tentative hypotheses.   However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03 (citation omitted).

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact.   In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083 JB/WPL, 2006 WL 4079623, at *10 (Dec. 15,

2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir.

2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion.

See  Norris v. Baxter  Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated

connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found

to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific

presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d at 1228 ("An untested

hypothesis cannot be a scientifically reliable basis for an opinion on causation.").  A court is not

required "to admit opinion evidence that is connected to existing data only by the ipse dixit of

the expert.  The court may conclude that there is simply too great an analytical gap between the

data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)("Test results on animals are not necessarily reliable evidence of the same reaction in humans.").

Courts have also excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N. R.R. Co., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

### 3.    The Necessity of Evaluating an Issue Under Daubert.

Daubert's restrictions apply to both "novel" expert testimony and "well-established propositions." Daubert, 509 U.S. at 593 n.11 ("Although the Frye[5] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." Daubert, 509 U.S. at 593 n.11. "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert, 509 U.S. at 593 n.11.

---

[5]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule Fed. R. Evid. 702, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States, 293 F. at 1014.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under <u>Daubert</u> . . . ." <u>Attorney Gen. of Okla. v. Tyson Foods, Inc.</u>, 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." <u>Attorney Gen. of Okla. v. Tyson Foods, Inc.</u>, 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. <u>See Attorney Gen. of Okla. v. Tyson Foods, Inc.</u>, 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the [polymerase chain reaction] methodology, and in fact some courts have indicated their acceptance of it.").

## EXPERT TESTIMONY ON ULTIMATE ISSUES

Rule 704 of the Federal Rules of Evidence states:

(a)     **In General -- Not Automatically Objectionable.** An opinion is not objectionable just because it embraces an ultimate issue.

(b)     **Exception.** In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

Fed. R. Evid. 704. "Traditionally, there was a general doctrine that witnesses could not give their opinion or conclusions on an ultimate issue of fact." <u>Vondrak v. City of Las Cruces</u>, 2009 WL 3241555, at *10 (D.N.M. Aug. 25, 2009)(Browning, J.). "The stated justification was sometimes that such testimony usurps the function or invades the province of the jury." <u>Vondrak v. City of Las Cruces</u>, 2009 WL 3241555, at *10 (quoting 1 K. Broun, <u>McCormick on Evidence</u> § 12 (6th ed. 2006 update)). The Federal Rules of Evidence reflect that the ultimate-issue rule has been abolished. <u>See United States v. Smith</u>, 156 F.3d 1046, 1054 (10th Cir. 1998). Although rule 704(a) permits an expert to testify about areas that embrace an ultimate issue,

there are some other limitations, aside from those expressed in rule 704(b), regarding testimony

on ultimate issues.  More specifically, the Tenth Circuit has stated: "[A]n expert may not state

legal conclusions drawn by applying the law to the facts." A.E. by and Through Evans v. Indep.

Sch. Dist. No. 25, of Adair Cty., Okla., 936 F.2d 472, 476 (10th Cir. 1991).

"Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference

as to a defendant's mental state; it does not prevent an expert from testifying to facts or opinions

from which the jury could conclude or infer that the defendant had the requisite mental state."

United States v. Ganadonegro, 2012 WL 592170, at *5 (D.N.M. Feb. 17, 2012)(Browning,

J.)(citing United States v. Torres, 53 F.3d 1129, 1141-42 (10th Cir. 1995)).  The restrictions in

rule 704(b) do not apply to lay witnesses, see United States v. Goodman, 633 F.3d 963, 968

(10th Cir. 2011), although the lay witnesses' testimony must still be helpful to the trier of fact to

satisfy rule 701, see Fed. R. Evid. 701(b).  "[Rules 701, 702, and 403] afford ample assurances

against the admission of opinions [under rule 704] which would merely tell the jury what result

to reach, somewhat in the manner of the oath-helpers of an earlier day."  United States v. Barile,

286 F.3d 749, 759-60 (4th Cir. 2002).  Pursuant to rule 704, it is the Court's task "to distinguish

[helpful] opinion testimony that embraces an ultimate fact from [unhelpful] opinion testimony

that states a legal conclusion."  United States v. Perkins, 470 F.3d at 158 (internal quotation

marks omitted).  In making that determination, a court should consider whether the question

tracks the language of the legal principle or statute at issue, and then consider whether any terms

employed have a specialized legal meaning.  See United States v. Perkins, 470 F.3d at 158.

## ANALYSIS

As the named Plaintiffs may individually pursue all of the claims they assert, and because

they have shown that they meet all of Article III's standing requirements, the Plaintiffs have

standing.  Regarding the Motion to Exclude, McArthur may testify about the royalty agreements'

meaning to help the Court to determine whether it can certify a class, but he cannot testify to

legal conclusions that the case meets rule 23's class certification requirements.  Finally,

regarding the Motion in Limine, because Terry's testimony helps the Court determine whether

common questions exist that impact the entire class, the Court will admit her testimony.

## I.     THE PLAINTIFFS HAVE STANDING TO PURSUE THEIR CLAIMS.

Overriding royalty owners have a cause of action for breach of implied covenants both in

New Mexico and Colorado.  The Plaintiffs have royalty or overriding royalty interests in New

Mexico and Colorado.  Accordingly, the Plaintiffs have standing regarding their claims for

breach of the implied duty to market and breach of the covenant of good faith and fair dealing.

The Plaintiffs have also demonstrated that they satisfy Article III's required elements on their

remaining claims.

### A.     THE PLAINTIFFS HAVE STANDING TO ASSERT CLAIMS FOR BREACH OF THE IMPLIED DUTY TO MARKET AND THE COVENANT OF GOOD FAITH AND FAIR DEALING.

The Supreme Court of Colorado has determined that both overriding royalty owners and

royalty owners may pursue claims for breach of the implied duty to market and breach of the

covenant of good faith and fair dealing.  While the Supreme Court of New Mexico has not made

such an express determination, the Court concludes that it would likely follow Colorado.

Because the named Plaintiffs have individual causes of action for these implied covenants, they

have standing to assert these claims.

1.   **In New Mexico and Colorado, Royalty and Overriding Royalty Owners Have a Cause of Action for Breach of the Implied Duty to Market, and for Breach of the Covenant of Good Faith and Fair Dealing.**

The Defendants argue that the named Plaintiffs lack standing, because the Plaintiffs own only overriding royalty interests in New Mexico, and they assert that overriding royalty owners cannot sue for breach of the implied duty to market.  See MTD at 6-7.  They describe a "royalty" as the "*landowner's* share of production; it is 'reserved by the owner for permitting another to develop his property for oil and gas, usually without expense to the property owner.'"  MTD at 7 (citing Duvall v. Stone, 1949-NMSC-074, ¶ 15, 213 P.2d 212, 32).  They state that the "same is true in Colorado."  MTD at 7.  In contrast, the Defendants define an overriding royalty as an interest "'carved out' of the interest of the lessee or 'reserved' in a transfer of the lessee's interest."  MTD at 7.  They argue that lessees -- not the landowner-lessor -- create overriding royalties.  See MTD at 7.  See XAE Corp. v. SMR Property Mgmt. Co., 968 P.2d 1201, 1206 (Okla. 1998).  The Defendants contend that, because overriding royalties are outside the lessor-lessee relationship, overriding royalty owners do not have standing to assert a claim for breach of the implied duty to market.  See MTD at 7-10.

Although New Mexico has not specifically addressed the issue, both Texas and Colorado have concluded that overriding royalty owners may sue for breach of the implied covenant to market.  In Garman v. Conoco, Inc., 886 P.2d 652 (Colo. 1994)(en banc), for example, the Supreme Court of Colorado stated that overriding royalty interest owners, like ordinary royalty interest owners, can sue for breach of the implied duty to market.  See 886 P.2d at 659.  The Supreme Court of Colorado acknowledged that "[s]ome question exists whether the implied covenants under an oil and gas lease extend to overriding royalty owners."  Garman v. Conoco, Inc., 886 P.2d at 659 n.23.  Nevertheless, it concluded that

- 53 -

the rationale for application of the covenants to protect the lessor similarly extends to the interest of an overriding royalty owner. *Id.* at [2 Howard R. Williams & Charles J. Meyers, Oil and Gas Law] § 420.1 [(1981)]. *See also Bolton v. Coats*, 533 S.W.2d 914, 916 (Tex. 1975) (implied covenant to protect against drainage extended to overriding royalty owners). The commentators note an alternative covenant based on the duty of fair dealing, which applies to every contract, also extends to the relationship owed by the operator to nonworking interest owners. *Id.* § 420.2. Imposition of a duty of fair dealing does not contradict *Degenhart v. Gold King Petroleum Corp.*, 851 P.2d 304 (Colo. App. 1993) in which the court of appeals correctly explained the reservation of an overriding royalty interest does not create a confidential or fiduciary relationship. *Id.* at 306.

Garman v. Conoco, Inc., 886 P.2d at 659. The Supreme Court of Colorado therefore concluded that, "absent an assignment provision to the contrary, overriding royalty interest owners are not obligated to bear any share of post-production expenses" under the implied duty to market. 886 P.2d at 661. The Supreme Court of Colorado stated that it was not imposing an additional duty on the lessee, nor expanding the duty previously recognized. See 886 P.2d at 659. Instead, it was merely requiring the lessee to perform the same duties for overriding royalty owners as it did for royalty owners. See 886 P.2d at 659. The Supreme Court of Colorado reasoned that overriding royalty owners need the same protections as royalty owners. See 886 P.2d at 659. Both of them own non-working interests and cannot control the working interest owner's decisions on marketing. Both of them, therefore, need protection to ensure that the working interest owner markets the products. See 886 P.2d at 659.

Similarly, in Bolton v. Coats, 533 S.W.2d 914 (Tex. 1975), the Supreme Court of Texas determined that an overriding royalty owner can sue for alleged violations of implied covenants. See 533 S.W.2d at 916-17. The Supreme Court of Texas described how an "assignee of an oil and gas lease impliedly covenants to protect the premises against drainage" -- the implied covenant at issue -- "when the assignor reserves an overriding royalty." 533 S.W.2d at 916-17 (citing Phillips Petroleum Co. v. Taylor, 115 F.2d 726 (5th Cir. 1940), cert. denied, 313 U.S. 565

- 54 -

(1941)).  See Condra v. Quinoco Petroleum, Inc., 954 S.W.2d 68, 72 (Tex. App. 1997).
According to the Supreme Court of Texas, this result must occur to accomplish the implied
covenant's purpose: protecting lessors.  See 533 S.W.2d at 916-17; Cole Petroleum Co. v. U.S.
Gas & Oil Co., 41 S.W.2d 414, 64 (Tex. 1931)(implying the covenant to market in an
assignment creating an overriding royalty interest).  The Court of Appeals of Texas recognized
that royalty and overriding royalty owners' interests "arise from different instruments."  Condra
v. Quinoco Petroleum, Inc., 954 S.W.2d at 72.  Nevertheless, it explained how the Supreme
Court of Texas has found "an analogy between implied covenants in a lease and those in an
assignment."  954 S.W.2d at 72.  Because overriding royalty interest owners need the same
protections as royalty interest owners, the Court of Appeals of Texas concluded that overriding
royalty interest owners "have the right to enforce the implied covenant to market arising under
their assignment."  954 S.W.2d at 72.

    The Defendants point to XAE Corp. v. SMR Property Management Co., where the
Supreme Court of Oklahoma held that "implied covenants of the oil and gas lease could not be
enforced by the overriding royalty owner."  968 P.2d at 1206.  It reasoned that "the overriding
royalty interest is different from the lessor's royalty interest.  An overriding royalty . . . generally
arises through contracts between the lessee and a third person."  968 P.2d at 1207.  The Supreme
Court of Oklahoma stated that implied covenants serve to mutually benefit the "lessor and
lessee."  968 P.2d at 1206.  The lessor, however, "having generally no interest in the working
interest, is not a party to such contracts."  968 P.2d at 1206.  Accordingly, the Supreme Court of
Oklahoma concluded that, because the lessor was not a party to the contract creating an
overriding royalty, the implied duty to market, whose purpose is to protect the lessor, did not
apply.  See 968 P.2d at 1208.  Scholars recognize the divergence between the Oklahoma

- 55 -

viewpoint and the Texas and Colorado viewpoint.  They acknowledge that under traditional real

covenant theory, "the owner of an override carved out of the working interest would not be able

to enforce the benefits of the real covenant."  Bruce M. Kramer, Royalty Interest in the United

States: Not Cut From the Same Cloth, 29 Tulsa L.J. 449, 457 (1994).  Nevertheless, they note

that "many courts refused to get bogged down in what they perceived to be arcane and ancient

real covenant law and looked at the underlying purposes of implying covenants."  Kramer, supra,

at 458.  See Ernest E. Smith III, Duties and Obligations Owned by an Operator to Nonoperators,

Investors and Other Interest Owners, 32 Rocky Mtn. Min. L. Inst. 12-1 (1986); Michael D.

Salim, Implied Covenants Between Assignors and Assignees of Oil and Gas Leases: Policy and

Precedent, 31 Sw. L.J. 905, 917, 921-23 (1977).  By focusing on the reasons behind the implied

covenants, they observe that "several courts reached the conclusion that the override owner was

in a similar position to that of the lessor so as to justify the implication of certain of the leasehold

covenants."  Kramer, supra, at 458.  See Phillips Petroleum Co. v. Taylor, 116 F.2d at 995

(holding that an overriding royalty owner could sue on implied covenants, because without such

causes of action, he "might be seriously prejudiced by deprivation of his only enforcement

privilege"); United States Steel Corp. v. Whitley, 636 S.W.2d 465 (Tex. Ct. App. 1982).

The Supreme Court of New Mexico has not directly addressed the issue.  The two cases

that provide insight into the Supreme Court of New Mexico's position conflict with each other to

some extent, but the Court determines that the most recent case reflects New Mexico's likely

position.  Nonetheless, the Court will describe the tension in New Mexico's case law.  In the

earlier case, Continental Potash, Inc. v. Freeport McMoran, Inc., 1993-NMSC-039, 858 P.2d 66,

the Supreme Court of New Mexico considered whether the trial court erred in "enforcing implied

covenants against the defendants that were inconsistent with the provisions of the written

agreements." 1993-NMSC-039, ¶ 67, 858 P.2d at 83.  It held that a trial court cannot enforce an implied covenant, with the exception of the covenant against drainage, when an express contractual provision governs.  See 1993-NMSC-039, ¶ 67, 858 P.2d at 83.  Although the Supreme Court of New Mexico did not state that implied covenants cannot run to overriding royalty interests, it stated that "[i]mplied covenants generally exist only in a lessor-lessee relationship." 1993-NMSC-039, ¶ 67, 858 P.2d at 83.  It acknowledged that, on occasion, "courts will imply covenants to protect the interests of an owner of an overriding royalty that is carved out of a working interest." 1993-NMSC-039, ¶ 61, 858 P.2d at 82.  It noted, however, that the "only instance in which courts seem to be in universal agreement is in implying a covenant against drainage in an oil and gas lease." 1993-NMSC-039, ¶ 62, 858 P.2d at 82.  The Supreme Court of New Mexico did not state that New Mexico would not imply other covenants, like the duty to market, into overriding royalties.  The Supreme Court of New Mexico indicated, however, that because overriding royalty interests do not arise from the lessor-lessee relationship, they might not necessarily contain the same implied covenants as the original lease. See 1993-NMSC-039, ¶ 62, 858 P.2d at 82.

The Supreme Court of New Mexico then interpreted Tenth Circuit precedent, which indicated that New Mexico courts might imply all of the implied covenants into overriding royalty interests, very narrowly.  See 1993-NMSC-039, ¶ 62, 858 P.2d at 82 (interpreting Cook v. El Paso Nat. Gas Co., 560 F.2d 978, 987 (10th Cir. 1977)(affirming the lower court's holding that "the owner of an overriding royalty interest has standing to invoke the implied covenant to protect against drainage")(emphasis added)).  The Supreme Court of New Mexico stated that the precedent stood only for the proposition that courts can imply one implied duty -- the covenant against drainage -- into overriding royalty interests.  See 1993-NMSC-039, ¶ 62, 858 P.2d at 82.

While Continental Potash, Inc. v. Freeport McMoran, Inc. suggests that the Supreme Court of New Mexico might preclude overriding royalty owners from suing on implied covenants, the Supreme Court of New Mexico's more recent precedent suggests the opposite.

Sixteen years after Continental Potash, Inc. v. Freeport McMoran, Inc., the Supreme Court of New Mexico in Davis v. Devon Energy Corp., 2009-NMSC-048, 218 P.3d 75, allowed overriding royalty interest owners to pursue claims for breach of the implied duty to market. See 2009-NMSC-048, ¶ 37, 218 P.3d at 86. In the proposed class action, the named plaintiffs owned only royalty interests and not overriding royalties. See 2009-NMSC-048, ¶ 1, 218 P.3d at 77. Nonetheless, the Honorable Edward L. Chavez, Chief Justice of the Supreme Court of New Mexico, determined that the plaintiffs could represent the proposed class of "hundreds of individuals and entities that own thousands of royalty interests and overriding royalty interests." 2009-NMSC-048, ¶ 5, 218 P.3d at 78 (emphasis added). Given the "Defendants' standardized treatment of all class members in deducting certain costs," the Supreme Court of New Mexico determined that the district court "would be in a position to declare the rights of the parties on a class-wide basis with respect to the propriety of those deductions." 2009-NMSC-048, ¶ 19, 218 P.3d at 81. Thus, the Supreme Court of New Mexico determined that the overriding interest owners had a common claim for breach of the implied duty to market, which is implied in law into the agreements, just like the royalty owners did. See 2009-NMSC-048, ¶ 37, 218 P.3d at 86 (finding that the implied duty to market was "an issue common among all class members and is appropriate for class certification"). The Supreme Court of New Mexico therefore implicitly determined that overriding royalty owners can pursue relief for breach of the implied duty to market.

The Court concludes that the current Supreme Court of New Mexico would adhere to this determination and agree that overriding royalty owners can pursue claims for breach of the implied duty to market, at least in a case like this one where the Defendants treated all the Plaintiffs the same.  As further support, in Davis v. Devon Energy Corp., the Supreme Court of New Mexico gave Continental Potash, Inc. v. Freeport McMoran, Inc. a very narrow interpretation, thereby limiting the holding's future applicability.  See 2009-NMSC-048, ¶¶ 26-37, 218 P.3d at 83-86.  In particular, the Supreme Court of New Mexico described Continental Potash, Inc. v. Freeport McMoran, Inc. as determining whether implied covenants exist "in the context of mining law."  2009-NMSC-048, ¶ 29, 218 P.3d at 83.  Furthermore, it explained that Continental Potash, Inc. v. Freeport McMoran, Inc. analyzed covenants implied in fact, while the implied duty to market is a covenant implied in law.  See 2009-NMSC-048, ¶ 29, 218 P.3d at 83.  It stated:

> What Continental Potash failed to make clear, however, is that there are different types of 'covenants' that may be implied in a given agreement, and depending on the nature of the promise to be implied, different rules of construction apply.  In other words, Continental Potash is not applicable in all cases.
>
> . . . .
>
> As a result, the analysis set forth in Continental Potash only applies to those promises that may be implied because the parties so intended them.  Its analysis does not apply to covenants that impose legal duties upon contracting parties as a matter of law.
>
> In this way, Continental Potash is inapplicable to the implication of the marketable condition rule as announced by the district court in this case.

2009-NMSC-048, ¶¶ 29-35, 218 P.3d at 83-86.  It thereby distinguished this particular covenant as not within the scope of Continental Potash, Inc. v. Freeport McMoran, Inc.'s holding.  Furthermore, the Supreme Court of New Mexico stated that it implies the implied duty to market "on oil and gas producers in equity, without looking to the language of the agreements or other

evidence of the parties' intentions."  2009-NMSC-048, ¶ 35, 218 P.3d at 86.  That the Supreme Court of New Mexico implies this duty in equity on all oil-and-gas producers, and allows overriding royalty class members to pursue relief for breach of the duty to market, suggests that producers must always comply with this duty with respect to both royalty owners and overriding royalty owners.  The Supreme Court of New Mexico concluded its opinion by disclaiming Continental Potash, Inc. v. Freeport McMoran, Inc.'s applicability to the issue whether the implied duty to market is implied in all royalty instruments: "[T]he requirements of *Continental Potash* are likewise inapplicable to a determination of whether the marketable condition rule may be implied in each royalty agreement."  Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 35, 218 P.3d at 86.  This conclusion also aligns with Tenth Circuit precedent suggesting that implied duties extend to overriding royalty interests.  See Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1091, 1113 (10th Cir. 2005)(allowing overriding royalty owners to pursue claims for breach of the implied duty to market in New Mexico, even though the Tenth Circuit concluded that their claims were not meritorious); Cook v. El Paso Nat. Gas Co., 560 F.2d at 987.  Accordingly, as owners of overriding royalties in New Mexico, and because the Defendants treated all of the Plaintiffs the same, the named Plaintiffs can demonstrate that their alleged harm arises under New Mexico law and that New Mexico law can redress the alleged injury.

### 2.   The Plaintiffs Demonstrate the Elements of Article III Standing for Their Claims that the Defendants Breached the Implied Duty to Market, and the Covenant of Good Faith and Fair Dealing.

As described above, if a plaintiff has an overriding royalty interest, he may sue for breach of the implied duty to market and breach of the covenant of good faith and fair dealing.  See Davis v. Devon Energy Corp., 2009-NMSC-048, ¶¶ 35-36, 218 P.3d at 86; Garman v. Conoco,

Inc., 886 P.2d at 659.  The question, at the standing stage, is not whether the named Plaintiffs own the exact same interest as those class members they seek to represent, but whether they own an interest on which they can demonstrate Article III's standing elements.  At the class certification stage, the Court will determine whether their interests are similarly situated with the class members they seek to represent.

Here, both Abraham and H Limited have overriding royalty interests burdening WPX Production's wells in New Mexico.  See Response to MTD at 3.  Likewise, Abraham has a royalty interest burdening WPX Production's wells in Colorado.  See Response to MTD at 3.  In asserting that the Defendants did not pay them the appropriate amount of royalty or overriding royalty payments, they allege a concrete injury, which the Defendants' alleged breach of the implied duty to market caused.  See FAC ¶¶ 84-89, at 22-23.  Damages can redress this underpayment.  See FAC ¶ 88, at 22-23.  They have therefore alleged a concrete injury that the Defendants caused.  Because the Court concludes that New Mexico allows overriding royalty owners to sue for breach of the implied duty to market, at least when the Defendants have treated the overriding royalty owners the same as the royalty owners, the laws of New Mexico can redress the Plaintiffs' injury.  Similarly, because Colorado allows royalty owners to pursue a claim for breach of the implied duty to market, the laws of Colorado could redress the Plaintiffs' injury.  Accordingly, the Plaintiffs have standing to assert a claim for breach of the implied duty to market under both New Mexico and Colorado law.  See 2009-NMSC-048, ¶¶ 35-36, 218 P.3d at 86; Garman v. Conoco, Inc., 886 P.2d at 659.

Second, as both Colorado and New Mexico imply the covenant of good faith and fair dealing into every contract, including contracts for overriding royalty interests, both royalty owners and overriding royalty owners may pursue claims for breach of the covenant of good

faith and fair dealing.  See Continental Potash, Inc. v. Freeport McMoran, Inc., 1993-NMSC-039, ¶ 64, 858 P.2d at 82 (stating that "the owner of an overriding royalty interest" may pursue claims for breach of the covenant of good faith and fair dealing, which is implied in every New Mexico contract); Amoco Oil Co. v. Ervin, 908 P.2d 493, 499 (Colo. 1995)(en banc)(concluding that the implied covenant of good faith and fair dealing is implied at law in every contract, even if the contract contains a provision precluding implied covenants).   In asserting that the Defendants did not pay them sufficient royalty or overriding royalty payments, they alleged a concrete injury, which the Defendants' alleged breach of the covenant of good faith and fair dealing caused.  See FAC ¶¶ 76-79, at 20-21.  This underpayment can be redressed through damages.  See FAC ¶ 78, at 21.  Consequently, Abraham and H Limited have standing to sue for breach of the covenant of good faith and fair dealing under New Mexico law and Abraham has standing to sue for breach of the covenant under Colorado law.

The Defendants contend that a named plaintiff whose injuries have no causal relation to a state, or cannot be redressed by the laws of a state, lacks standing to assert that claim.  See MTD at 10.  Specifically, they argue that "Abraham owns royalty interests burdening WPX oil and gas leases in Colorado," so he "cannot allege injury-in-fact with respect to any New Mexico royalty interests."  MTD at 10.  As the Court explained above, however, both Abraham and H Limited have in fact suffered injuries in New Mexico which New Mexico laws can redress.  They suffer alleged royalty underpayments, which they contend stem from the Defendants' breach of their New Mexico overriding royalty contracts, breach of the implied duty to market, and breach of the covenant of good faith and fair dealing.  New Mexico laws provide redress for these injuries.

As additional support, the Court notes that courts have certified class actions on behalf of royalty and overriding royalty owners when the plaintiffs pursue claims for breach of the implied

duty to market.  See Elliott Industries, Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d at 1113 (allowing a class of royalty and overriding royalty owners to pursue claims for breach of the implied duty to market in New Mexico); Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 37, 218 P.3d at 86 (allowing a class of royalty and overriding royalty owners to pursue claims for breach of the implied duty to market, even though the named plaintiffs owned only royalties).  In certifying the class, courts must find that the named plaintiff's claims are typical of the class' claims, which requires a conclusion that the named plaintiff has standing.  See Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1287 (11th Cir. 2001)("[T]here cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class."); Rector v. City and Cty. of Denver, 348 F.3d at 950; Prado-Steiman v. Bush, 221 F.3d 1266, 1280 (11th Cir. 2000).  As these courts have concluded that the named plaintiff's claims were typical of the class' claims, the courts have determined that the named plaintiffs had standing on each of the claims to represent the royalty and overriding royalty owners, and that the overriding royalty owners' claims were typical to the royalty-owner class representatives.

### 3.  The Plaintiffs Have Standing Even Though They Are Not Former Royalty Owners.

The Defendants appear to contend that the named Plaintiffs lack standing, because their claims are not typical of the proposed class.  See MTD at 12.  Specifically, they assert that the named Plaintiffs do not have standing to represent former royalty owners.  See MTD at 12.  The issue of standing, however, is separate from the issue whether the named plaintiff adequately represents the class.  See Griffin v. Dugger, 823 F.2d 1476, 1482 (11th Cir. 1987); Brown v. Sibley, 650 F.2d 760, 771 (5th Cir. 1981)(stating that the "constitutional threshold [of standing] must be met before any consideration of the typicality of claims or commonality of issues

required for procedural reasons by Fed. R. Civ. P. 23").   "Only after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others."   Griffin v. Dugger, 823 F.2d at 1482.   See Prado-Steiman ex rel. Prado v. Bush, 221 F.3d at 1280.

As described above, the standing inquiry requires the Plaintiffs to show only injury, causation, and redressability for each claim alleged.   See Sierra Club v. Morton, 405 U.S. at 734. With respect to the implied duty to market and the covenant of good faith and fair dealing, the Plaintiffs have established their own individual standing.   See supra at 60-63.   The Court will demonstrate that the named Plaintiffs have standing as to the remaining claims in Part II.   See infra at 28.   Contrary to the Defendants' argument, the Plaintiffs do not assert a claim for "accrued royalty," which is a "chose in action and personal property."   Krone v. Lacy, 97 N.W.2d 528, 533 (Neb. 1959).   As they do not assert this claim, they need not show they have standing to assert it.   Accordingly, the Plaintiffs have demonstrated that "at least one named plaintiff has suffered the injury that gives rise to [each] claim."   Griffin v. Dugger, 823 F.2d at 1483.   Had the Plaintiffs asserted a claim solely on behalf of former royalty owners, the Court's result might be different.   See RMA Ventures Calif. v. SunAmerica Life Ins. Co., 576 F.3d 1070, 1073 (10th Cir. 2009)(stating that "a plaintiff's standing is contingent upon the entitlement to enforce an asserted right").[6]

---

[6]At this time, the Court does not decide whether a former royalty interest owner is entitled to sue on an accrued royalty.   Compare Phillips Petroleum Co. v. Adams, 513 F.2d 355, 363-64 (5th Cir. 1975)(stating that an oil and gas lease assignment did not transfer personal property of lessee in unliquidated right to payment for previously extracted gas), with OTC Petroleum Corp. v. Brock Exploration Corp., 835 S.W.2d 792, 795 (Tex. Ct. App. 1992)(stating that an unqualified assignment of an oil-and-gas lease transferred the lessee's rights in a take-or-pay contract claim).

As long as the named Plaintiffs can demonstrate that they have standing to assert the claims they have alleged, whether the named Plaintiffs can represent certain proposed class members is better addressed at the class certification stage.  See Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982)(describing the commonality and typicality requirements that courts must consider in determining whether to certify a class); E. Texas Motor Freight Sys. v. Rodriguez, 431 U.S. 395, 403 (1977).  In reversing the lower court, the United States Court of Appeals for the Sixth Circuit in Fallick v. Nationwide Mutual Insurance Co., 162 F.3d 410 (6th Cir. 1998), described the mistake that the Defendants make here:

> The district court's opinion warrants close scrutiny, as its analysis confuses the requirements of Article III and Rule 23 of the Federal Rules of Civil Procedure, which govern standing and the certification of class actions.
>
> . . . .
>
> As this Court has made clear, however, once an individual has alleged a distinct and palpable injury to himself he has standing to challenge a practice even if the injury is of a sort shared by a large class of possible litigants.  Once his standing has been established, whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure.

162 F.3d at 423 (internal citations and footnote omitted).  At the class certification stage, the Court can analyze whether former royalty owners are similarly situated and whether to narrow the class.

The Defendants cite In re Wellbutrin XL Antitrust Litigation, 260 F.R.D. 143, 152 (E.D. Pa. 2009), to support their argument.  There, the named plaintiffs sued for breach of numerous state antitrust and consumer protection laws.  See 260 F.R.D. at 147-48.  Although the plaintiff organizations were "located in Alabama, Illinois, Tennessee and Ohio," they sought relief for all those who purchased an antidepressant drug in each enumerated state.  260 F.R.D. at 148.  The

Honorable Mary McLaughlin, United States District Judge for the Eastern District of Pennsylvania, held that the named plaintiffs had Article III standing to assert state statutory violations only under the laws of those states where the plaintiff organizations or their members were located or had purchased the drug.  See 260 F.R.D. at 156.  Judge McLaughlin explained that courts must analyze standing on a claim-by-claim and state-by-state basis:

> A named plaintiff whose injuries have no causal relation to, or cannot be redressed by, the legal basis for a claim does not have standing to assert that claim.  For example, a plaintiff whose injuries have no causal relation to Pennsylvania, or for whom the laws of Pennsylvania cannot provide redress, has no standing to assert a claim under Pennsylvania law, although it may have standing under the law of another state.

In re Wellbutrin XL Antitrust Litigation, 260 F.R.D. at 152.  In other words, Judge McLaughlin reasoned that the named plaintiff must show a causal connection between his alleged injury and wrongful conduct that implicates each state's laws.  See 260 F.R.D. at 152.

The Court agrees with the Defendants that named plaintiffs must have standing and that the Court should analyze that issue before certifying a class.  The Defendants err, however, if they suggest that In re Wellbutrin XL Antitrust Litigation stands for the proposition that the Court must also determine whether proposed class members have standing before the Court certifies a class.  In re Wellbutrin XL Antitrust Litigation does not stand for such a proposition.  See 260 F.R.D. at 155-157.  Judge McLaughlin states plainly that "the named plaintiffs" lacked standing.  260 F.R.D. at 155.  She did not consider the unnamed, proposed class members.  See 260 F.R.D. at 155-157.  In fact, she recognized that the Supreme Court of the United States has stated that courts should determine proposed class members' standing only after they certify a class.  See Ortiz v. Fibreboard Corp., 527 U.S. 815, 831 (1999)(deferring consideration of the proposed class members' standing until after considering whether to certify the class); Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 612 (1997)(stating that, "because [the resolution of class

certification issues] is logically antecedent to the existence of any Article III issues, it is appropriate to reach them first"). The Defendants' argument that the named Plaintiffs lack standing, because proposed class members may have a different injury, therefore fails. Accordingly, the Court concludes that the Plaintiffs have standing to assert these claims; it will address the Defendants' arguments relating to former royalty owners in determining whether to certify a class.

### B. THE PLAINTIFFS HAVE ESTABLISHED STANDING FOR THEIR OTHER CLAIMS.

"[A] plaintiff must demonstrate standing for each claim he seeks to press." Daimler Chrysler Corp. v. Cuno, 547 U.S. at 352. Article III standing as to one claim does not "suffice for all claims arising from the 'same nucleus of operative fact[.]'" Daimler Chrysler Corp. v. Cuno, 547 U.S. at 352. Standing requires that "the particular plaintiff [be] entitled to an adjudication of the *particular claim* asserted." Daimler Chrysler Corp. v. Cuno, 547 U.S. at 352 (quoting Allen v. Wright, 468 U.S. 737, 752 (1984)(emphasis in original)). Although the Defendants do not appear to dispute the Plaintiffs' standing on claims over which they do not seek certification, the Court concludes that the Plaintiffs have demonstrated standing for each claim.

### 1. The Plaintiffs Have Standing to Assert Their Breach-of-Contract Claim.

The Plaintiffs have standing to assert their claim for breach of contract. The Defendants argue that "neither Abraham nor H Ltd. is party to an oil and gas lease or other instrument under which they individually own a landowner/lessor's royalty interest in New Mexico," so they have

no standing.  MTD at 9.[7]  Overriding royalty owners, like royalty owners, may pursue claims for breach of contract, because an overriding royalty interest is a contract, just like a royalty interest is a contract.  See Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d at 1108; Anderson Living Trust v. ConocoPhillips Co., LLC, 952 F. Supp. 2d 979, 1022 (D.N.M. 2013)(Browning, J.).  Regardless whether the Plaintiffs have a royalty or overriding royalty contract, they have the same alleged contractual injury: royalty underpayment.  See Response to MTD at 3; FAC ¶¶73-75, at 20 (alleging that the Defendants' scheme caused underpayments on all "Royalty Agreements"[8]).  The Plaintiffs allege that no royalty or overriding royalty agreement "allows defendants to substitute for valuable NGLs a replacement volume of less valuable residue gas in calculating royalty payments" or "authorizes reducing Royalty payments by use of affiliate pricing."  Response to MTD at 4-5.  They therefore contend that they have standing based on the "uniform basis of the plaintiffs' claims that *all royalty instruments require payment on all production*."  Response to MTD at 5-6 (emphasis in original).

   With respect to Article III's requirements, the Plaintiffs contend that the Defendants' actions -- royalty underpayments and affiliate pricing -- caused their injury.  See Response to MTD at 3-4.  Moreover, the Court can redress this injury through a damages award.  They are "suing in their individual capacity only on their own royalty instruments."  Response to MTD at

---

   [7]At the hearing, the Defendants appeared to relinquish their assertion that the Plaintiffs lacked standing on their breach-of-contract claim.  See March 13 Tr. at 21:2-5 (Sheridan).  They admitted that the Plaintiffs' claim for royalty underpayment "could be settled in the context of a claim for breach of contract based on the cause of action for damages."  March 13 Tr. at 21:2-5 (Sheridan).  The Defendants appear more concerned with the fact that the Plaintiffs seek to represent class members regarding the breach of contract claim.  As stated earlier, this concern is better addressed when the Court determines whether to certify a class.  At this stage, the Plaintiffs need only show that they have individual standing with respect to each claim.

   [8]In the FAC, the Plaintiffs define "Royalty Agreements" to include all oil and gas leases and overriding royalty agreements.

12.  That each royalty or overriding royalty contract may contain slightly different provisions is irrelevant to standing.  It may doom class certification, but it does not preclude the named Plaintiffs from showing that they have suffered a concrete injury that the alleged royalty underpayments caused, and the Court can redress that alleged injury.  The Defendants admitted at the hearing that each different lease form does not require a different plaintiff.  See March 13 Tr. at 27:3-4 (Sheridan).

### 2.        The Plaintiffs Have Standing to Assert Their Remaining Claims.

Regarding the Plaintiffs' conspiracy claim, they adequately allege that the Defendants caused them to suffer a concrete injury.  They state that the alleged conspiracy "cause[d] WPX to unlawfully breach its Royalty agreements with plaintiffs and members of the putative class by failing to pay and/or underpaying Royalty on residue gas, NGLs and condensate."  FAC ¶ 91, at 23.  In the FAC, they describe more concretely how the alleged conspiracy caused their harm. See FAC ¶¶ 90-95, at 23-24.  Additionally, they have shown that the Court can redress this injury through damages.   See FAC ¶ 94, at 24.   As they show injury, causation, and redressability, the Plaintiffs meet Article III's standing requirements for their conspiracy claim.

With respect to the Plaintiffs' claim for a declaratory judgment, they also sufficiently allege Article III's standing requirements.  They ask the Court to determine "the manner and method by which defendants are lawfully required to account for Royalty paid and payable to plaintiffs and members of the class on NGLs, oil and on all legitimate market value sales of natural gas."  FAC ¶ 97, at 24.  Again, the relevant inquiry at this stage is whether the Plaintiffs have standing to assert their own claims -- not whether they can adequately represent the class. Because the Plaintiffs have interests burdening wells in New Mexico and Colorado, and they ask the Court to declare the "rights and legal relations between the parties" regarding these interests,

they sufficiently assert their own interest.  FAC ¶ 97, at 24.  The Court could redress their harm by declaring the parties' future obligations.  See FAC ¶ 98, at 24; Anderson Living Trust v. ConocoPhillips Co., LLC, 952 F. Supp. 2d 979, 1055 (concluding that the plaintiffs could "seek declaratory relief to declare the Defendants' future obligations to the Plaintiffs").

Finally, the Plaintiffs have demonstrated that they have standing regarding their claim for relief under the Oil and Gas Proceeds Payment Act.  The Plaintiffs' allege that WPX Production caused their injury when it "violated the Act by failing to make such payments to plaintiffs as required."  FAC ¶ 104, at 26.  They state that the "Act entitles plaintiffs to recover from defendant 18% per annum interest on the sums due the class."  FAC ¶ 104, at 25.  The Proceeds Payment Act defines "oil and gas proceeds" as "all payments derived from oil and gas production from any well located in New Mexico, whether royalty interest, overriding royalty interest, production payment interest or working interest . . . ."  N.M. Stat. Ann. § 70-10-2.  The Plaintiffs have therefore alleged that the Defendants caused their injury and that the Court can redress it through damages.

## II.   THE COURT WILL ALLOW MCARTHUR TO TESTIFY ABOUT THE ROYALTY INSTRUMENTS' MEANING TO ASSIST THE COURT'S CLASS CERTIFICATION DECISION, BUT HE CANNOT TESTIFY TO LEGAL CONCLUSIONS.

The Defendants challenge McArthur's testimony under rules 702 and 704 of the Federal Rules of Evidence.  See Motion to Exclude at 2-4.  They ask the Court to exclude McArthur's report and to preclude him from testifying at the class certification hearing.[9]  See Motion to

---

[9]The "Plaintiffs do not intend to offer Mr. McArthur's reports at the class certification hearing," Response to Motion to Exclude at 1, so the Court's analysis focuses on whether McArthur's testimony is admissible. Additionally, the Defendants do not challenge the methodology underlying McArthur's opinion under Daubert.  Accordingly, the Court's opinion focuses on the Defendants' specific objections concerning rules 702 and 704.  The Court also finds that McArthur's testimony is reliable, relevant, and complies with Daubert's requirements.

Exclude at 6.  Rule 702 allows expert testimony if the witness is "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  McArthur's thorough education and extensive experience in oil and gas litigation give him the specialized knowledge and experience to testify regarding language in oil-and-gas contracts.  The Court described his experience in the procedural section:

> He states that he has a bachelor's degree from Brown University, a master's degree in economics from the University of Connecticut, a law degree from the University of Texas, a Masters in Public Administration from Harvard University's Kennedy School of Government, and a Ph.D. from the Goldman School of Public Policy from the University of California, Berkeley.  See McArthur Report at 3-4.  He has been involved in complex commercial litigation for approximately thirty years, much of it involving oil and gas issues.  See McArthur Report at 4-5.  He has authored numerous law journal articles concerning the oil and gas industry, including articles on implied covenants, market value leases, and one titled The Class Action Tool in Oilfield Litigation, 45 Kan. L. Rev. 1 (1996).

Supra at 13.

Although McArthur is an attorney and legal knowledge is not scientific or technical knowledge, McArthur also has such specialized knowledge, experience, and education that his opinion on lease language rests on a substantial foundation.  See LifeWise Master Funding v. Telebank, 374 F.3d at 928 (stating that a witness may qualify as an expert under rule 702 if he possesses "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation"); New Mexico v. General Elec. Co., 335 F. Supp. 2d 1266, 1305-06 (D.N.M. 2004)(Jenkins, J.)(allowing a law professor's testimony about the Rio Grande River's history and various legal documents relating to the river, even though some of his statements were "framed in terms of the ultimate issue").  "[McArthur's] testimony

---

See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert . . . .").

as an expert on class certification and on merits issues has been accepted in several New Mexico royalty underpayment lawsuits."  Response to Motion to Exclude at 2.  See SEECO, Inc. v. Hales, 22 S.W.3d 157, 168 (Ark. 2000)(affirming the trial court's decision to admit McArthur's testimony concerning royalty instruments and the duty to market).  The Defendants do not dispute that McArthur has specialized or technical knowledge, and is qualified to testify.  Having such specialized or technical knowledge alone, however, is not sufficient to allow McArthur to testify to the information in his report.

To be admissible, rule 702 also requires that McArthur's testimony "assist the trier of fact to understand or determine a fact in issue."  United States v. Muldrow, 19 F.3d at 1337.  Similarly, the Tenth Circuit has stated that rule 704 requires courts to exclude testimony that "articulates and applies the relevant law," which "circumvents the jury's decision-making function by telling it how to decide the case."  Specht v. Jensen, 853 F.2d 805, 808 (10th Cir. 1993).  Pure legal conclusions, therefore, do not meet rule 702 or rule 704's standards.  See Specht v. Jensen, 853 F.2d at 807 ("There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge.")(internal citation and quotation marks omitted); A.E. by and Through Evans v. Indep. Sch. Dist. No. 25, of Adair Cty., Okla., 936 F.2d at 476 ("[A]n expert may not state legal conclusions drawn by applying the law to the facts.").

"[T]he line between an inadmissible legal conclusion and admissible assistance to the trier of fact in understanding the evidence or in determining a fact in issue is not always bright."  Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d 1207, 1212 (D.C. Cir. 1997).  To resolve whether an expert's statement is a legal conclusion, courts should "determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from

that present in the vernacular.  If they do, exclusion is appropriate." Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d at 1212 (quoting Torres v. Cty. of Oakland, 758 F.2d 147, 151 (6th Cir. 1985)).  See United States v. Perkins, 470 F.3d at 158 (directing courts to consider whether any terms employed have a specialized legal meaning).

Here, the McArthur Report contains numerous statements that have a "distinct and specialized meaning in the law." Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d at 1212 (quoting Torres v. Cty. of Oakland, 758 F.2d at 151).  See, e.g., McArthur Report at 10 ("The questions that will consume significant trial time, questions that will be subject to disagreement and expert testimony at trial, are common to the class."); id. at 13 ("The leases in this case point clearly to common questions."); id. at 22 ("The Class Representatives' Claims are Typical."). Commonality, typicality, adequacy, numerosity, superiority, and predominance are all legal terms of art.  See Fed. R. Evid. 23.  Accordingly, whether the case meets rule 23's class certification requirements is an issue for the Court to decide, not McArthur.  See Specht v. Jensen, 853 F.2d at 809 (stating that "testimony on ultimate issues of law by the legal expert is inadmissible because it is detrimental to the trial process").  Testimony regarding rule 23's legal standard will not assist the Court in determining whether to certify a class, because the Court is an expert in the law and needs no guidance from McArthur.  See Specht v. Jensen, 853 F.2d at 807; Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d at 1213 ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.").

Stating that certain common issues predominate applies the relevant law, which circumvents the Court's decision-making function by telling it how to decide the case.  See Specht v. Jensen, 853 F.2d at 808; A.E. by and Through Evans v. Indep. Sch. Dist. No. 25, of

Adair Cty., Okla., 936 F.2d at 476.  McArthur's application of the relevant law violates rule 704.

Although the Plaintiffs have already stated that "McArthur does not intend to opine on whether

the legal standard for class certification has been satisfied," Response to Motion to Exclude at 3,

the Court emphasizes here that McArthur cannot provide pure legal conclusions.  See United

States v. Simpson, 7 F.3d 186, 188-89 (10th Cir. 1993).

     The McArthur Report also discusses various technical issues concerning "the lessor-

lessee relationship, the types of royalty instruments at issue in this case," "the nature and

characterization of lease forms, how the language of the royalty instruments relates to the claims

in this case," and various other technical information.  Response to Motion to Exclude at 1-3.  To

certify a class, the Court must necessarily consider the royalty instruments involved and

determine whether common questions predominate.  See Wallace B. Roderick Revocable Living

Tr. v. XTO Energy, Inc., 725 F.3d at 1218 (instructing district courts to analyze the royalty

instruments and their impact on class certification).  This consideration demands information

regarding the royalty instruments' language and meaning, which is not common knowledge, and

whether the language is subject to varying interpretations that might preclude class certification.

See SEECO, Inc. v. Hales, 22 S.W.3d at 168; Carter Oil Co. v. OKC Corp. v. McCasland, 190

F.2d at 891 (10th Cir. 1951)(affirming the trial court's decision to allow expert testimony on oil

and gas terms); Arkla Exploration Co. v. Boren, 411 F.2d 879, 882 (8th Cir. 1969)(allowing

expert testimony about the meaning of certain phrases in a drilling contract).

     "[A]n expert may offer his opinion as to facts that, if found, would support a conclusion

that the legal standard at issue was satisfied, but he may not testify as to whether the legal

standard has been satisfied."  Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d at 1212-13.

Much of the McArthur Report describes factual information about lease language that, if true,

would support a conclusion that rule 23 may be satisfied.  The Defendants concede that, if McArthur testifies to factual information about lease language without providing legal opinions, his testimony might be admissible.  <u>See</u> Reply to Motion to Exclude at 3.  The Court will therefore allow McArthur to testify on this factual information, so long as he does not testify to ultimate legal conclusions.  <u>See</u> <u>United States v. Dazey</u>, 403 F.3d 1147, 1171 (10th Cir. 2005)(affirming the district court's admission of expert testimony, because the expert explained the facts supporting his conclusion in a way that allowed the jury to make its own conclusion).

The Defendants cite <u>Woodard v. Andrus</u>, 2009 WL 140527 (W.D. La. Jan. 20, 2009)(Vance, J.), as evidence that courts have rejected the same type of expert report at issue here.  <u>See</u> Motion to Exclude at 5.  There, the Honorable Sarah S. Vance, United States District Judge for the Western District of Louisiana, excluded the plaintiffs' expert report, because it "does not offer any opinion as to what the underlying facts are, nor does it otherwise attempt to help the court 'understand the evidence;'" it contained only legal conclusions on "whether this case can satisfy the requirements for class certification."  2009 WL 140527, at *1-2.  Judge Vance concluded that the "proffered testimony is focused <u>exclusively</u> on whether the legal standard for class certification has been satisfied."  2009 WL 140527, at *1-2 (emphasis added). Unlike the report in <u>Woodard v. Andrus</u>, McArthur's report contains factual information about lease language and does not focus exclusively on rule 23's legal standards.  McArthur discusses the case's underlying facts and explains the technical facts concerning the royalty agreements. This testimony will help the Court to understand the hundreds of royalty agreements at issue. Accordingly, McArthur may testify about the royalty agreements' meaning to enable the Court to determine whether it can certify a class, but he cannot testify to legal conclusions that the case meets rule 23's class certification requirements.

**III.    THE COURT DENIES THE MOTION IN LIMINE AND ADMITS TERRY'S
         TESTIMONY.**

Rule 702 allows expert testimony if the witness is "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Terry's thorough education and extensive experience in oil and gas litigation give her the specialized knowledge and experience to make her opinion rest on a substantial foundation.  See LifeWise Master Funding v. Telebank, 374 F.3d at 928 (stating that a witness may qualify as an expert under rule 702 if he or she possesses "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation"); New Mexico v. General Elec. Co., 335 F. Supp. 2d at 1305-06 (allowing a law professor's testimony about the Rio Grande River's history and various legal documents relating to the river, even though some of his statements were "framed in terms of the ultimate issue").  Terry formed her opinions based on her work in the oil-and-gas industry, making her opinion reliable and in compliance with Daubert's requirements.  See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert . . . .").  Terry has also testified in numerous oil-and-gas disputes, including one before this Court: Anderson Living Trust v. WPX Energy Production, LLC, CIV 12-0040 JB/WPL (D.N.M.).  See Transcript of Anderson Trust Class Certification Hearing, filed May 5, 2014 (Doc. 191-4); Kris L. Terry Selected Consulting Experience at 20, filed May 5, 2014 (Doc. 191-1).  The Court therefore concludes that Terry meets rule 702's requirement that she be "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.

Rule 702 also requires that Terry's testimony be relevant, and "assist the trier of fact to understand or determine a fact in issue."  United States v. Muldrow, 19 F.3d at 1337.  Terry's testimony provides information regarding certain royalty language's specialized meaning, which

will assist the Court in determining whether that language is subject to different interpretations, and therefore, whether the Court can certify a class.  Moreover, Terry has reliably applied her knowledge and experience to this case's facts, as rule 702(d) requires.  See Fed. R. Evid. 702(d).  That Terry did not work in the oil-and-gas industry in the 1940s, a portion of the time frame at issue, does not disqualify her testimony.  See Motion in Limine at 1-2 (arguing that the Defendants cannot establish that Terry's custom-and-usage testimony "is based upon the state of the industry in the San Juan Basin in the 1940s-1960s").  Like all experts, she can gain the requisite foundation for her testimony through various means, including personal experience and study.  See Fed. R. Evid. 702.  Similarly, that the Plaintiffs disagree with some of Terry's conclusions does not make her testimony inadmissible.  To argue that Terry's conclusions are erroneous, the Plaintiffs cite statutory definitions from N.M. Stat. Ann. § 70-10-2(A) and C.R.S.A. § 34-60-103(5), which define oil and gas to include natural gases and related hydrocarbons.  See Motion in Limine at 2.  The Plaintiffs contend that these statutory definitions undercut Terry's opinion that "royalty becomes due upon physical extraction of the gas," which does not include refined NGLs.  Motion in Limine at 3.  As the Defendants note, however, Terry's testimony is relevant, not to determine gas' meaning, but to determine whether the contracting parties intended for the Defendants to pay royalty on the gas as extracted from the ground, or on the later refined products.  See Response to Motion in Limine at 8.  Moreover, the New Mexico Legislature enacted these statutory and regulatory definitions many years after many of the leases were formed.  See N.M. Stat. Ann. § 70-10-2(A)(enacted in 1985); C.R.S.A. § 34-60-103(5)(enacted in 1963).   In short, the Defendants have demonstrated that Terry's testimony is reliably grounded on her expertise.

Furthermore, contrary to the Plaintiffs' complaints, Terry adequately disclosed the subject matter of her testimony.   Terry discusses her intent to testify regarding oil-and-gas industry custom and usage as it pertains to the class certification inquiry throughout her report:

> I have been retained by the attorneys for WPX to provide my opinions as an expert in the oil and gas industry concerning the usage of terms, the customs and the practices in the oil and gas industry, and the historical context and circumstances that have, over time, informed the understanding of parties to oil and gas agreements. (¶ 2)

> I have been asked to investigate and offer opinions on the Plaintiffs' claims from the perspective of: (i) the facts and circumstances surrounding the execution of the various leases, unitization agreements, assignments of leases, and division and transfer orders between WPX and the Plaintiffs, and their respective predecessors-in-interest, including the regulatory and marketing circumstances extant at the time such contracts were executed and thereafter; (ii) oil and gas industry custom, practice and usage relating thereto; (iii) the historical course of performance and course of dealing between the parties regarding royalty payment under such leases, division and transfer orders, assignments of oil and gas leases, unitization agreements and other agreements . . . . (¶ 3)

> I have independently researched the history of the development of the oil and gas industry in the State of New Mexico to include the San Juan Basin. . . In addition, I have relied on my direct, personal experience marketing natural gas in the San Juan Basin. (¶ 4)

> I have considered the issues raised by the Plaintiffs and the effect that the language in the instruments and the circumstances that existed at the time the instruments were executed could have on the resolution of the claims. (¶ 5)

> It is essential in approaching the questions presented to appreciate the historical circumstances surrounding the production and sale of natural gas in New Mexico and Colorado, as well as the historical circumstances surrounding the payment of royalties on production of gas under the forms of leases and division orders at issue. And, equally important, it is important to understand the role business men and women played in the development of the San Juan Basin who acquired leases, and assigned working interests, creating the various overriding royalty interests. (¶ 24)

> For purposes of this report, I have focused particularly on the initial leasing activity in the San Juan Basin, and the course of performance and course of dealing under the private and federal leases and other instruments. In addition, I describe the changes in the industry that resulted in the ability of a company like WPX to sell gas to midstream companies like WPX Energy Gas Marketing and

others. This history of the oil and gas industry in the San Juan Basin is attached as Exhibit C. (¶ 26) (In the Motion, Plaintiffs ignore the content of Exhibit C.)

The lease assignments and other instruments creating overriding royalty interests at issue should be viewed in light of the circumstances surrounding the execution of such agreements, particularly in the late 1940s and early 1950s when many of these interests were created. (¶ 36)

Ms. Harvey, representing H Limited, the only Plaintiff holding an agreement with WPX in New Mexico, has an overriding royalty, not a royalty. These overriding royalty reservations do not provide for royalty to be paid on the enhanced downstream value of gas, after processing to remove entrained liquefiable hydrocarbons. Further, consideration of the surrounding circumstances in the industry and the long-standing course of performance would dictate that H Limited be paid as it has been. (¶ 37)

Since many of the leases and working interests now owned by WPX were at one time owned either by El Paso Natural Gas Company or Pacific Northwest Pipeline, the early division orders covering the Plaintiffs' royalty and overriding royalty interests were issued by these pipeline companies. These division orders expressly provide that the gas and components thereof are to be valued at the well, and royalties paid on the wellhead price. (¶ 46)

The historical division orders also support WPX's view that it has acted in good faith in paying royalties on a wellhead value. (¶ 51)

Response to Motion in Limine at 11-12. The Plaintiffs admitted at the class certification hearing in which Terry testified that Terry did not testify to anything that they had not anticipated. See May 9 Hearing at 874:16-18 (Gallegos)("I don't know that there is anything that we did not anticipate.").

Finally, custom-and-usage testimony is admissible to assist the Court in determining whether the Court can certify a class. Terry's testimony, like McArthur's, will help the Court determine whether commonality and predominance exist under rule 23. Industry custom-and-usage testimony is especially relevant under New Mexico's contract interpretation rules. Under New Mexico law, even

if the language of the contract appears to be clear and unambiguous, "a court may hear evidence of the circumstances surrounding the making of the contract and of

> any relevant usage of trade, course of dealing, and course of performance," in order to decide whether the meaning of a term or expression contained in the agreement is actually unclear.

Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 708 F. Supp. 2d at 1228-29 n.14 (quoting Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 11, 845 P.2d 1232, 1235). Accordingly, the parties may proffer "evidence of the circumstances surrounding the making of the contract," including "preliminary negotiations," and "of any relevant usage of trade, course of dealing, and course of performance" on the threshold question of ambiguity, including in oil and gas royalty litigation. Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 11, 845 P.2d at 1235; C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 15, 817 P.2d 238, 243 n.8. The Defendants do not offer Terry's custom-and-usage testimony to prove the underlying royalty agreements' meaning. Rather, the Court will use the evidence to determine whether the royalty language might have different meanings, and therefore, whether the Plaintiffs have met rule 23's commonality and predominance requirements. For class certification motions, "the testimony must be relevant to determining 'whether there was a common pattern and practice that could affect the class as a whole.'" Keegan v. Am. Honda Motor Co., 284 F.R.D. 504, 515 (C.D. Cal. 2012)(Morrow, J.)(quoting Ellis v. Costco Wholesale Corp., 657 F.3d 970, 983 (9th Cir. 2011)). Terry has laid the requisite foundation to provide custom-and-usage testimony regarding whether certain language could be subject to varying interpretations. Because Terry's testimony helps the Court determine whether common questions exist that impact the entire class, the Court will admit her testimony.

**IT IS ORDERED** that: (i) the Defendants' Motion to Dismiss Claims for Plaintiffs' Lack of Standing, filed February 12, 2014 (Doc. 131), is denied; (ii) the Defendants' Motion to Exclude Expert Report of John Burritt McArthur, filed February 17, 2014 (Doc. 137), is granted

in part and denied in part -- John Burritt McArthur may testify about the royalty agreements'
meaning to help the Court to determine whether it can certify a class, but he cannot testify to
legal conclusions that the case meets rule 23's class certification requirements; and (iii) the
Plaintiffs' Motion in Limine Concerning Certain Testimony of Kris Terry, filed April 18, 2014
(Doc. 184), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Jake Eugene Gallegos
Michael J. Condon
Gallegos Law Firm, P.C.
Santa Fe, New Mexico

　　　*Attorneys for the Plaintiffs*

Sarah Gillett
Dustin L. Perry
Hall Estill Hardwick, P.C.
Tulsa, Oklahoma

--and--

Christopher A. Chisman
Holland & Hart LLP
Denver, Colorado

--and--

Mark F. Sheridan
Bradford C. Berge
Robert J. Sutphin
John C. Anderson
Elisa C. Dimas
Holland & Hart LLP
Santa Fe, New Mexico

　　　*Attorneys for the Defendants*