# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

STEVEN J. ABRAHAM, and
H LIMITED PARTNERSHIP,
on behalf of themselves and others
similarly situated,

       Plaintiffs,

vs.                                            No. CIV 12-0917 JB/CG

WPX PRODUCTION PRODUCTIONS, LLC,
f/k/a WILLIAMS PRODUCTION COMPANY,
LLC, WILLIAMS FOUR CORNERS, LLC,
and WILLIAMS ENERGY RESOURCES, LLC,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

**THIS MATTER** comes before the Court on the Plaintiffs' Renewed Motion for Class

Certification, filed January 13, 2014 (Doc. 116).  The Court held a multi-part class certification

hearing, which took place on: (i) May 8 and 9, 2014; (ii) March 13 and 14, 2014; (iii) June 30,

2014; and (iv) July 14, 2014.  <u>See</u> Transcript of Hearing, taken March 13, filed June 26, 2014

(Doc. 200); Transcript of Hearing, taken March 14, 2014 (Doc. 201); Transcript of Hearing,

taken May 8, 2014, filed June 26, 2014 (Doc. 198); Transcript of Hearing, taken May 9, 2014,

filed June 26, 2014 (Doc. 199); Transcript of Hearing, taken June 30, 2014, filed July 23, 2014

(Doc. 211); Transcript of Hearing, taken July 14, 2014, filed July 23, 2014 (Doc.

---

[1]On September 30, 2014, the Court entered an Interlocutory Order granting in part and
denying in part the Plaintiffs' Renewed Motion for Class Certification, filed January 13, 2014
(Doc. 116).  <u>See</u> Interlocutory Order, filed September 30, 2014 (Doc. 233).  The following day,
the Court vacated the Interlocutory Order and stated that it would "issue an order when it issues
the opinion" more fully explaining the Court's rationale.  Order Vacating Interlocutory Order,
filed October 1, 2014 (Doc. 234).   This Memorandum Opinion and Order is the promised
opinion.

212)(collectively, "Tr.").[2]   The primary issues are: (i) whether a class is ascertainable; (ii) whether the determination of which class wells' gas is processed at the processing plants named in the Plaintiffs' class definition defeats the predominance requirement of rule 23 of the Federal Rules of Civil Procedure; (iii) whether textual variations among the leases within the proposed class defeat commonality and predominance under rule 23; and (iv) whether rule 23(a)'s requirements -- numerosity, commonality, typicality, and adequacy -- and rule 23(b)(3)'s requirements -- predominance and superiority -- are otherwise met with regard to the proposed class.   First, because the Plaintiffs' class definition includes only those wells whose gas is or has been processed at three specific processing plants, and the Court cannot determine whether some of the wells' gas was processed at those plants, the Court cannot adequately ascertain the class. Second, because the Plaintiffs' class definition includes only that gas that was processed for natural gas liquid extraction and marketing, the Court must determine which gas was processed. This inquiry weighs against finding predominance.   Third, the central issue in this case -- how the Defendants should have paid the Plaintiffs -- varies between leases.   Accordingly, when considered alongside the other individual issues, textual variations among the leases destroy commonality and predominance.   Therefore, this proposed class action satisfies the rule 23(a) prerequisites of numerosity, typicality, and adequacy, and the rule 23(b)(3) requirement of superiority, but it fails rule 23(a)(2)'s commonality prerequisite and rule 23(b)(3)'s predominance requirement.   The Court thus denies the Motion.

---

[2]Although the transcripts of each day of the class certification hearing are filed as separate documents on CM/ECF, the transcripts' internal pagination is consecutive across all six documents, and the Court will thus cite them as a single transcript.   All pincites refer to the transcripts' internal pagination -- the black numbers in the top right corner -- and not CM/ECF's pagination.

## FINDINGS OF FACT

Both the Plaintiffs and the Defendants have submitted proposed findings of fact.  See Plaintiffs' Proposed Findings of Fact and Conclusions of Law Regarding Class Certification, filed August 15, 2014 (Doc. 217)("Plaintiffs' Findings"); Defendants' Requested Findings of Fact and Conclusions of Law, filed August 18, 2014 (Doc. 218)("Defendants' Findings").  The Court has carefully considered all proposed facts, and accepts some of them, rejects others, and finds some facts that no party brought to its attention.[3]  The Court also liberally judicially notices background facts.  See Fed. R. Evid. 201.  All of these findings of fact are authoritative only on the question of class certification, and the parties may relitigate any of them at the merits stage. See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).  The Court applied the Federal Rules of Evidence at the class certification hearing, ruled on several evidentiary objections, and considered only admissible evidence in finding these facts.

The Court organizes this portion of its Memorandum Opinion and Order into eight parts. First, it will define some of the specific industry terms applicable in this case.  Second, it will introduce the important players in this action: the Defendants and their corporate affiliates, the named Plaintiffs, and the absent class members.  Third, the Court will explain the process of producing, gathering, and processing or treating natural gas, including the transfer-of-title

---

[3]The Court is not required to make formal findings of fact in ruling on a class certification motion.  See Fed. R. Civ. P. 54(a)(3) ("The court is not required to state findings or conclusions when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other motion."); id. advisory committee's notes to 2007 amendments ("Amended Rule 52(a)(3) says that findings are unnecessary 'unless these rules provide otherwise.'  This change reflects provisions in other rules that require Rule 52 findings on deciding motions.  Rules 23(e), 23(h), and 54(d)(2)(C) [but not rule 23(a), (b), or (g)] are examples.").  The Court has elected to do so for the parties' benefit.

process in this case.  Fourth, the Court will describe the breakdown of the different textual royalty provisions in the class leases.  Fifth, it will describe the different textual overriding royalty provisions among the class.  Sixth, the Court will describe how the Defendants have paid royalties and overriding royalties to the class.  Seventh, it will describe the issues relevant to WPX Production's gathering and processing negotiations and agreements.  Eighth, and last, the Court will summarize a few key pieces of evidence relating to the parties' and the Court's ability to construct a classwide damages-distribution model.

### 1.    Definitions: The Terminology Applicable in This Case.

1.    The Court will first define the operative terms used throughout this Memorandum Opinion and Order.  The Court takes many of the definitions from a similar case involving royalty disputes in the San Juan Basin, Anderson Living Trust v. WPX Energy Production, LLC, 306 F.R.D. 312 (D.N.M. 2014)(Browning, J.)("Anderson").   The Court divides the definitions into three sections: one on lease terminology, which defines the terms that relate to the legal relationship between the Plaintiff-lessors and Defendant-lessees; a second on oil-and-gas production, gathering, and processing, which defines the terms that relate to the working relationship between the Plaintiff-landowners and Defendant-oil companies; and a third on royalty accounting, which defines the terms that relate to the financial relationship between the Plaintiff-royalty owners and the Defendant-working interest owners.  The Court will, in subsequent sections, explain how these concepts relate to this case, but includes this section as both a preface and a reference.

### a.    Lease Terminology.

2.    A "mineral lease" is "[a] lease in which the lessee has the right to explore for and extract oil, gas, or other minerals," and splits land into a working interest and a royalty interest. Black's Law Dictionary 971 (9th ed. 2009).

3.      A "mineral deed" is "[a] conveyance of an interest in the minerals in or under the land." Black's Law Dictionary 477 (9th ed. 2009).

4.      A "working interest" includes "[t]he rights to the mineral interest granted by an oil-and-gas lease, so called because the lessee acquires the right to work on the leased property to search, develop, and produce oil and gas, as well as the obligation to pay all costs"; a working interest in land entails the right to drill, and remove oil and gas from the land, subject to burdening royalty interests. Black's Law Dictionary 1745 (9th ed. 2009).

5.      A "royalty interest" is "[a] share of production -- or the value or proceeds of production free of the costs of production -- when and if there is production." Black's Law Dictionary 1466 (9th ed. 2009).

6.      The word "production" in the oil-and-gas industry has numerous meanings, but they typically revolve around the well, and not around subsequent processing: a "production" can refer to the well itself, to the fresh-out-of-the-ground product that the well produces, or to the act of drawing the product out of the ground. 8 Howard R. Williams, Charles J. Meyers, Patrick H. Martin & Bruce M. Kramer, Williams & Meyers Oil and Gas Law 816-18 (2013)("Williams & Meyers").

7.      "Authorities are split over what costs are the costs of production." Black's Law Dictionary 1466 (9th ed. 2009).  For example, under Colorado law, production "end[s] when a first-marketable product has in fact been obtained," which often only occurs after processing, Rogers v. Westerman Farm Co., 29 P.3d 887, 904 (Colo. 2001)(en banc).

8.      An "overriding royalty" is "[a] share of either production or revenue from production (free of the costs of production) carved out of a lessee's interest under an oil-and-gas

lease. . . .   An overriding royalty interest ends when the underlying lease terminates."  Black's Law Dictionary 1446 (9th ed. 2009).

9.      An overriding royalty interest is considered a subcategory of royalty interest.  See Garman v. Conoco, Inc., 886 P.2d 652, 657 (Colo. 1994)(en banc)("An overriding royalty is, first and foremost, a royalty interest."  (quoting 2 Williams & Meyers § 418.1)).

10.     A "division order" is "[a] contract for the sale of oil or gas, specifying how the payments are to be distributed."  Black's Law Dictionary 549 (9th ed. 2009).

11.     "Royalty owners enter into division orders to sell minerals and to instruct how payments are to be made under a mineral lease."  Black's Law Dictionary 549 (9th ed. 2009).

12.     "Working-interest owners also commonly sign division orders to instruct purchasers how payments are to be divided."  Black's Law Dictionary 549 (9th ed. 2009).

13.     A division order cannot modify the underlying mineral lease's terms.  See Anderson, 306 F.R.D. at 321.

14.     A "division order is typically terminable at the will of either party."  8 Williams & Meyers at 272.

15.     A "transfer order" is an instrument conveying a royalty interest to another person. Anderson, 306 F.R.D. at 321.

    b.      **Natural Gas Terminology.**

16.     "Hydrocarbons" are a class of chemical compounds composed exclusively of hydrogen and carbon; it is also a generic term for petroleum products such as oil and natural gas.[4]

_____

[4]A "hydrocarbon" is a molecular compound that contains only hydrogen and carbon. Hydrocarbon, Wikipedia.org, http://en.wikipedia.org/wiki/Hydrocarbon.  Both natural gas, which is composed primarily of methane ($CH_4$), and commercial gasoline, which is composed primarily of a mix of alkanes ranging from butane ($C_4H_{10}$) to dodecane ($C_{12}H_{26}$) -- including, importantly,

17.     "Natural gas" is a gaseous mixture of hydrocarbons, the primary one being methane ($CH_4$), commonly used as fuel in homes and in businesses.  Glossary, United States Energy Information Administration, http://www.eia.gov/tools/glossary/index.cfm?id=N ("EIA Glossary").

18.     Natural gas must generally be treated or processed -- to remove waste products such as water vapor, sulfides, carbon dioxide, nitrogen, and other impurities, as well as valuable, heavier hydrocarbons such as ethane, butane, propane, and pentane -- before it can be put into a pipeline system or marketed as a fungible commodity.  See 30 C.F.R. § 1206.171.

19.     Natural gas can be obtained as a byproduct of oil drilling, retrieved using standard drilling techniques in natural gas fields or coalbeds, or obtained through hydraulic fracturing -- also known as fracking -- in shale deposits.  See EIA Glossary.

20.     "Conventional gas" is natural gas obtained from natural-gas fields, which are typically sandstone deposits.  Tr. at 158:1-159:23.  See Anderson, 306 F.R.D. at 322.

21.     Conventional gas typically undergoes processing to remove impurities, separate out valuable natural gas liquids, and render the gas into marketable condition.  See Anderson, 306 F.R.D. at 322.

22.     "Coalbed methane" or "CBM" is natural gas obtained from coal seams.  EIA Glossary.

---

octane ($C_8H_{18}$) -- are composed entirely of hydrocarbons.  See Natural Gas, Wikipedia.org, http://en.wikipedia.org/wiki/Natural_gas; Gasoline, Wikipedia.org, http://en.wikipedia.org/wiki/Gasoline.  Propane ($C_3H_8$) is also a hydrocarbon that serves as a commercial fuel.  See Propane, Wikipedia.org, http://en.wikipedia.org/wiki/Propane.  For the purposes of this Memorandum Opinion and Order, "hydrocarbons" is a generic term that includes all oil, natural gas, and related petroleum products.

23.     Coalbed methane is typically only methane and carbon dioxide, and is generally treated only for carbon dioxide removal and possibly water-vapor removal -- rather than being processed -- before it is placed in a pipeline.  See Anderson, 306 F.R.D. at 322.

24.     "Shale gas" is natural gas obtained -- almost always by the process of hydraulic fracturing -- from shale.  EIA Glossary.

25.     "Casinghead gas," also known as "oil well gas" or "associated gas," is natural gas obtained from an oil well.  EIA Glossary.

26.     The phrase "natural gas liquids" ("NGLs") refers to hydrocarbons heavier than methane that can -- either on their own via condensation or through processing -- be drawn from natural gas, converted into the liquid state, and sold as fuel.  30 C.F.R. § 1206.171.

27.     The constituent "liquefiable hydrocarbons" in NGLs include propane, butane, pentane, and hexane.  EIA Glossary.

28.     Among NGL compounds, heavier compounds are typically more valuable than lighter ones.  See Anderson, 306 F.R.D. at 322.

29.     "Heavier," in this context, refers to the compound's molecular weight, which, for alkane hydrocarbons, equates to the magnitude of the $n$ term in the generic chemical formula $C_nH_{(2n+2)}$.  See Anderson, 306 F.R.D. at 322.

30.     For example, pentane ($C_5H_{12}$) is heavier than butane ($C_4H_{10}$), which is, in turn, heavier than propane ($C_3H_8$).  See Anderson, 306 F.R.D. at 322.

31.     All of the constituent compounds of NGLs are heavier than methane ($CH_4$), which is the primary component of natural gas.  See Anderson, 306 F.R.D. at 322.

32.     NGLs are commonly entrained in -- or entrapped and carried along with -- natural gas.  See Anderson, 306 F.R.D. at 322.

33.     "Natural gasoline" refers to a mixture of natural gas liquid products manufactured from natural gas.  Anderson, 306 F.R.D. at 322.

34.     Natural gasoline is not the same substance as automotive gasoline.[5]  See Anderson, 306 F.R.D. at 322.

35.     "Wet gas" is natural gas entrained with a significant amount of NGLs.  EIA Glossary.

36.     "Dry gas" is natural gas that is mostly devoid of NGLs.  EIA Glossary.

37.     Almost all coalbed methane is dry gas.  See Anderson, 306 F.R.D. at 323.

38.     Gas must be in a dry state before it can be placed into an interstate pipeline; when gas is dry after being processed, it is referred to as "residue gas."  EIA Glossary.

39.      "Natural gas condensate," or just "condensate," refers to NGLs recovered at the surface without resorting to processing.  30 C.F.R. § 1206.171.

40.     "Condensation," generically, is the physical phase change where a gas is converted to a liquid.  The American Heritage Dictionary of the English Language 277 (William Morris ed., New College ed. 1976).

41.     "Well condensate" or "wellhead condensate" is condensate recovered at the wellhead.  Anderson, 306 F.R.D. at 323.

---

[5]Natural gasoline can be used to power an automobile, but the low octane content -- natural gasoline has an octane rating of 30 to 50, as opposed to the 85 to 94 seen in automotive gasoline in the United States -- reduces the amount of compression it can withstand before combusting, and causes premature detonation in the engine cylinder -- called pre-ignition -- which leads to engine knocking.  See Anderson, 306 F.R.D. at 322 n.4; Natural Gasoline, Wikipedia.org, http://en.wikipedia.org/wiki/Natural_gasoline; Natural-Gas Condensate, Wikipedia.org, http://en.wikipedia.org/wiki/Natural-gas_condensate; Octane Rating, Wikipedia.org, http://en.wikipedia.org/wiki/Octane_rating; Engine Knocking, Wikipedia.org, http://en.wikipedia.org/wiki/Engine_knocking.  Natural gas is, thus, a non-ideal fuel for standard petrol engines.

42.     A "wellhead" is the point where hydrocarbons are taken out of the ground, but the term is sometimes used to refer to anywhere hydrocarbons go while on the lease plot.  EIA Glossary.

43.     A "separator" or "production unit" is a device at the wellhead that separates liquids -- namely water and well condensate -- from the gas.  Anderson, 306 F.R.D. at 323.

44.     A "facility measurement point" is the point where a "measurement device is located for determining the volume of gas removed from the lease."  30 C.F.R. § 1206.171.

45.     "The facility measurement point may be on the lease or off-lease," but is intended to measure the natural gas attributable to a specific lease before it is comingled with gas from other leases in a gathering system.  30 C.F.R. § 1206.171.

46.     A "'completion' refers to a well that has been completed," i.e., perforated and isolated in the well bore, such that gas is capable of being produced from the well.  Anderson, 306 F.R.D. at 323.

47.     "Lease use" gas is gas that the working interest owner uses -- to power machinery, fuel heaters, et cetera -- on the lease.  Anderson, 306 F.R.D. at 323.

48.     A "gathering system" is the system of low-pressure lines that transport natural gas from the lease site, i.e., the wellhead, to a processing plant or other central point.  EIA Glossary.  See 30 C.F.R. § 1206.171.

49.     "Drip condensate" is any natural gas condensate "recovered downstream of the facility measurement point [the wellhead] without resorting to processing."  30 C.F.R. § 1206.171.

50.     "Drip condensate includes condensate recovered as a result of its becoming a liquid during the transportation of the gas removed from the lease or recovered at the inlet of a

gas processing plant by mechanical means, often referred to as scrubber condensate."  30 C.F.R. § 1206.171.

51.     Drip condensate is NGLs that condense into liquid form in the gathering system, i.e., after the gas has left the wellhead, but before it gets processed.  See 30 C.F.R. § 1206.171.

52.     A "pig" is a term for a mechanical device that pushes drip condensate sitting in a gathering system's lines out into a receptacle for eventual sale.  Anderson, 306 F.R.D. at 323.

53.     A "fractionator" is a machine that separates NGLs into their constituent parts -- such as propane, butane, and pentane -- after they are removed during processing.  EIA Glossary.

54.     A "processing plant" is a facility that takes impure, unmarketable natural gas from a gathering system and converts it -- by removing impurities and NGLs -- into pipeline-quality natural gas, which can then be compressed and sent into the interstate pipeline system. Anderson, 306 F.R.D. at 323-24.

55.     A processing plant is typically connected to a gathering system on the input end and a pipeline system on the output end.  See Anderson, 306 F.R.D. at 324.

56.     A "treatment plant" is a facility that is fundamentally similar to a processing plant -- i.e., it takes impure gas from a gathering system and renders it into marketable condition -- but it does not remove NGLs from the gas.  Anderson, 306 F.R.D. at 324.

57.     Treatment removes carbon dioxide and often dehydrates the gas -- i.e., it removes the water vapor -- but, unlike processing, it does not extract NGLs.  See Anderson, 306 F.R.D. at 324.

58.     Gas that is relatively clean -- i.e., free from impurities -- and dry -- i.e., free from NGLs -- may need only to be treated, rather than processed.  See Anderson, 306 F.R.D. at 324.

59.     Coalbed methane typically requires only treatment to remove carbon dioxide.  It tends to contain more carbon dioxide than conventional gas.  See Anderson, 306 F.R.D. at 324.

60.     "Bypassing" is when a gathering system delivers raw gas to a processing plant, but does not process the raw gas.  Instead, the raw gas is mixed with processed gas in such proportions that the resultant product is still of pipeline quality.  Anderson, 306 F.R.D. at 324.

61.     In New Mexico, the term "post-production costs" refers to costs associated with making the natural gas marketable after the gas is severed or removed from the ground."  8 Williams & Meyers at 787.  See ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶ 11, 299 P.3d 844, 850 (endorsing this definition).

62.     "Marketable condition means a condition in which lease products are sufficiently free from impurities and otherwise so conditioned that a purchaser will accept them under a sales contract typical for the field or area."  30 C.F.R. § 1206.171.

63.     For the class wells, natural gas generally comes into marketable condition when it is of sufficient quality to be accepted into the interstate pipeline system.  See Foster v. Merit Energy Co., 282 F.R.D. 541, 546 (W.D. Okla. 2012)(Friot, J.)(referring to "commercially marketable (essentially interstate pipeline quality) gas"); Rogers v. Westerman Farm Co., 29 P.3d 887, 905 (Colo. 2001)(en banc)("It may be, for all intents and purposes, that gas has reached the first-marketable product status when it is in the physical condition and location to enter the pipeline."  (citing TXO Prod. Corp. v. State ex rel. Comm'rs of Land Office, 903 P.2d 259, 262-63 (Okla. 1994))); Savage v. Williams Prod. RMT Co., 140 P.3d 67, 71 (Colo. Ct. App. 2005)(holding that "the trial court applied the correct legal standard" regarding "the condition of the gas at the wellhead" when it "found that 'the gas was marketable only after processing and transportation to the interstate pipeline connection in a condition that made it acceptable for

delivery into said pipelines"); Amoco Prod. Co. v. N.M. Taxation & Revenue Dep't, 2003-NMCA-092, ¶¶ 11-12, 74 P.3d 96, 99 ("'[P]rocessing' is that which takes place in order for the gas to be marketable or acceptable to interstate pipelines."); Parry v. Amoco Prod. Co., No. CIV 94-0105, 2003 WL 23306663, at *1 (Colo. Oct. 6, 2003)("[T]he Court concludes that the gas in question is marketable only at the inlet to the interstate transmission pipeline . . . ."). But see Creson v. Amoco Prod. Co., 2000-NMCA-081, ¶ 24, 10 P.3d 853, 859 (repeating the parties' undisputed agreement that gas is marketable at the wellhead where it is "actually marketed at the wellhead," circumstances which do not apply in this case).

64.    "Residue gas" refers to post-processing, pipeline-quality natural gas.  30 C.F.R. § 1206.171.

65.    An "MCF" is a unit of volume used to measure natural gas; it stands for 1,000 cubic feet, which is equivalent to a cube that is 10-feet high, 10-feet wide, and 10-feet deep. Frequently Asked Questions, United States Energy Information Administration, http://www.eia.gov/tools/faqs/faq.cfm?id=45&t=8 ("EIA FAQs").

66.    A "Btu" is a unit of energy equal to approximately 1,055 joules;[6] it is the amount of energy needed to heat -- or the amount of energy released by cooling -- one pound of water by one degree Fahrenheit.  EIA Glossary; EIA FAQs.

67.    An "MBtu" or "MMBtu" is 1,000,000 Btus.[7]  EIA FAQs.

---

[6]The SI -- or International System of Units -- measurement of energy is the joule (J), which is the amount of energy necessary to exert one Newton (N) of force -- the force required to accelerate one kilogram of mass by one meter per second-squared -- over a distance of one meter: $1 \text{ J} = 1 \text{ N} \cdot \text{m} = 1 \text{ kg} \cdot \text{m}^2/\text{s}^2$.  The joule is the scientific standard unit, but, as the oil-and-gas industry uses Btus, the Court's references to quantities of energy will be in Btus.  See Anderson, 306 F.R.D. at 326 n.6.

[7]An MBtu and an MMBtu are, oddly, the same thing.  In "MBtu," the "M" stands for the English-language "million"; in "MMBtu," the "Ms" refer to the Roman numeral that represents

68.     A "Btu factor" is a ratio describing the energy per volume of natural gas.   EIA Glossary; EIA FAQs.

69.     In this case, Btu factors are quoted in units of MMBtus per MCFs.

70.     The Btu factor of pure methane -- perfectly dry natural gas -- is 1.005.  See Tr. at 487:4-8 (Griffin); id. at 738:7-11 (Emory, Gallegos).

71.     Gas' Btu factor rises as the amount of entrained NGLs increases, and drops as the number of entrained, inert impurities -- such as carbon dioxide and gaseous nitrogen -- rises.  See Tr. at 485:9-18 (Griffin).

72.     The average Btu factor of processed natural gas in the United States is 1.025.  See EIA FAQs.

73.     The Btu factors of the gas produced from the class wells in this case vary from about .9 to 1.25.  See Tr. at 486:6-487:8 (Griffin).

74.     As natural gas is valuable, ultimately, for its energetic potential -- i.e., the amount of heat it produces when burned -- its price is based not only on the volume of natural gas being sold, but also that natural gas' Btu factor.  See EIA FAQs.

75.     "GPM" stands for "gallons [of NGLs] per MCF [of gas]," and is a characteristic that reveals the quantity of entrained NGLs that can theoretically be extracted from the gas via condensation and processing.  Natural Gas Liquids at 5, Brookings Energy Security Initiative Natural Gas Task Force (Mar. 2013), available at http://www.brookings.edu/~/media/research/ files/reports/2013/04/01-natural-gas-ebinger-avasarala/natural-gas-briefing-1-pdf.pdf. See Report of John W. Emory ¶ 28, at 15 (dated January 27, 2014)(Defendants' Hearing Ex. 73)("Emory Report").

---

one thousand.  The "MM" in "MMBtu" refers to 1,000 • 1,000, or one million.  See Anderson, 306 F.R.D. at 326 n.7.

76.     When NGLs are removed from natural gas, it causes a "shrink" in the energy content -- the number of MMBtus in -- the resultant natural gas.  Anderson, 306 F.R.D. at 326.

77.     Producers measure the percentage of the gas stream composed of methane, ethane, butane, and propane in units known as gallons per thousand cubic feet ("gpm").  Tr. at 375:6-11 (Gallegos, McArthur); id. at 428:21-24 (Tysseling).

### c.     Royalty Distribution and Accounting Terminology.

78.     The "netback" or "workback" method is a method of determining the wellhead price of gas by starting with the downstream (processed) sale price of the ultimate product, and deducting the costs -- such as those for transportation, processing, and manufacturing -- of converting the gas from the condition at the wellhead to the condition at final sale.  See 8 Williams & Meyers at 643-644; 30 C.F.R. §§ 1206.151, 1206.171.

79.     The netback method "is widely accepted as the best means for estimating the market value of gas at the well where no such market exists."  Abraham v. BP Am. Prod. Co., 685 F.3d 1196, 1199-1200 (10th Cir. 2012)(Kelly, J.)(joined by Murphy & Hartz, JJ.).

80.     A "weighted average method" is a method of paying royalties in which each royalty owner is paid based on a predetermined portion -- usually determined by lease acreage -- of the sales revenue from several pooled leases' productions.  8 Williams & Meyers at 1139.  For example, if a pool of leases totaling 1,000 acres produced $1,000,000.00 in natural gas, a 250-acre lease would receive $250,000.00, regardless whether that lease actually produced $250,000.00 in natural gas.

81.     An "index price" or "posted price" is a price for natural gas that a major industry publication publishes; royalties paid on the basis of index prices are not, themselves, based on the actual sale price of the gas, but, rather, on an average of arm's length transactions within a particular geographic area.  8 Williams & Meyers at 496.

82.     A "keep whole" contract is one that requires the processor to compensate the royalty owner for any loss in thermal potential (energy) that natural gas undergoes from processing -- namely, the Btu factor of gas decreases when NGLs are removed.  8 Williams & Meyers at 533.

83.     What the Defendants call their "keep whole basis" of paying royalties is tantamount to basing royalty payments on the natural gas' energy -- measured in MMBtus -- at the wellhead.  Tr. at 483:7-16 (Griffin).  Under the keep-whole methodology, the Defendants: (i) measure the gas produced at the lease in Mcfs; (ii) apply a Btu factor to those Mcfs, which determines the millions of Btus that exited the meter; (iii) multiply the Federal Energy Regulatory Commission ("FERC") index price for residue gas by the Btus produced; and (iv) deduct certain costs to determine the net value of the gas produced.  See Tr. at 483:7-25 (Griffin).

84.     "Whole stream valuation" is a manner of paying royalties in which the working interest owner compensates the lessor for entrained NGLs by paying them a fraction of the NGLs' sale proceeds, rather than simply compensating the lessors on an MMBtu basis at the wellhead, when NGLs are still entrained.   Tr. at 447:19-455:1 (Berge, Tysseling).   See Supplemental Expert Report of John C. Tysseling, Ph.D. at 20 (dated February 14, 2014)(Plaintiffs' Hearing Ex. 222)("Tysseling Report"); Anderson, 306 F.R.D. at 327.  In short, the whole-stream method requires the lessee to: (i) "perform separate valuations of what the residue gas is worth" and "what the natural gas liquids are worth;" and (ii) add those values together after deducting the costs required to recover the liquids.  Tr. at 482:20-483:3 (Griffin).

85.     An "arm's length" transaction is a transaction between entities that are not corporate affiliates of one another.  Anderson, 306 F.R.D. at 328.

2.      **The Principals: The Parties and Other Important Entities.**

86.      The Defendants and their relationships to both one another and certain non-Defendant corporate affiliates are important in this case, because one of the Plaintiffs' contentions is that the Defendants paid their royalties on the basis of affiliate sales prices rather than on arm's length sales.  See, e.g., Complaint ¶ 12, at 5; id. ¶ 20, at 7.

87.      The named Plaintiffs are important, because they must adequately represent the entire class, and their claims must be common to and typical of those of the entire class.  See Fed. R. Civ. P. 23(a).

88.      Before December 31, 2011, "WPX and Williams [Four Corners] were corporate affiliates as wholly or partially owned subsidiaries of Williams Companies Inc."  Complaint ¶ 42, at 12.

89.      Although there was a corporate spinoff in January, 2012, which broke these entities into two camps with separate public ownership, this break is not especially important to this case, both because of how late it came in the class time period and because the contracts between the now non-affiliates that cover this case were executed when the contractual parties were corporate affiliates.  Accordingly, transactions under these contracts are still considered affiliate transactions even after the spinoff.

a.      **The Defendants.**

90.      There are three Defendants in this case: (i) WPX Energy Production, LLC ("WPX Production"), formerly known as Williams Production, LLC; (ii) Williams Four Corners, LLC ("Williams Four Corners"); and (iii) Williams Energy Resources, LLC ("Williams Energy").  Complaint ¶¶ 3-5, at 2-3.

91.     On December 31, 2011, Williams Production Company, LLC changed its name to WPX Energy San Juan, LLC.  See WPX Energy Production, LLC's Corporate Disclosure Statement at 1, filed November 27, 2012 (Doc. 24)("WPX Corporate Disclosure").

92.     On January 13, 2012, WPX Energy San Juan, LLC changed its name to WPX Energy Production, LLC.  See WPX Corporate Disclosure at 1.

93.     WPX Energy Production, LLC is a wholly owned subsidiary of WPX Energy, Inc. ("WPX Energy"), which is a publicly-held corporation.  WPX Corporate Disclosure at 1.

94.     Until a 2012 spin-off, the exploration and production companies comprising WPX Production "were wholly owned by their parent corporation Williams Companies Inc.," Complaint ¶ 3, at 2, which also owns the general partner interest and the majority of the limited partner interest in Williams Partners LP ("Williams Partners"), Form 8-K for Williams Companies, Inc., Securities and Exchange Commission (Oct. 27, 2014), available at http://biz. yahoo.com/e/141027/wmb8-k.html.

95.     Williams Four Corners and Williams Energy are wholly owned subsidiaries of Williams Partners.  See Form 8-K for Williams Companies, Inc., Securities and Exchange Commission (Oct. 27, 2014), available at http://biz.yahoo.com/e/141027/wmb8-k.html; Williams Four Corners LLC's and Williams Energy Resources LLC's Corporate Disclosure Statement, filed November 26, 2012 (Doc. 23).

96.     Williams Four Corners owns all the assets that Williams Field Services Co. ("Williams Field Services") formerly owned; Williams Field Services assigned all its interest to the newly created Williams Four Corners on June 20, 2006.  Anderson, 306 F.R.D. at 330.

97.     Williams Field Services was formerly named Northwest Pipeline Corp. ("Northwest Pipeline"), until it changed its name in 1992.  See Tr. at 395:1-6 (McArthur, Sheridan).

98.     The Court will refer to WPX Production, Williams Four Corners, and Williams Energy Resources collectively as "the Defendants."

### b.     The Defendants' Corporate Affiliates.

99.     WPX Gas Resources Company ("WPX Gas") is a wholly owned subsidiary of WPX Energy.  List of Subsidiaries of WPX Energy, Inc., Securities and Exchange Commission, available      at      http://www.sec.gov/Archives/edgar/data/1518832/000119312513084857/ d448908dex211.htm.

100.    WPX Gas was formerly named WFS Gas Resources Company ("WFS Gas Resources"), until it changed its name on December 1, 1998.  See Anderson, 306 F.R.D. at 330.

101.    WPX Energy Marketing, LLC ("WPX Energy Marketing") is a wholly owned subsidiary of WPX Energy.  List of Subsidiaries of WPX Energy, Inc., Securities and Exchange Commission, available at http://www.sec.gov/Archives/edgar/data/1518832/00011931251308 4857/d448908dex211.htm.

102.    WPX Energy Marketing was formerly named Williams Gas Marketing, Inc. ("Williams Gas Marketing"), until it changed its name on June 20, 2011.  See Deposition of Frank Lee Field at 10:1-11:25 (taken December 5, 2013)("Field Depo."); Deposition of Sheryl Ward at 13:1-17:20 (taken November 13, 2013)("Ward Nov. Depo.").

103.    Williams Gas Marketing was formerly named Williams Power Company, Inc. ("Williams Power"), until it changed its name on November 16, 2007.  Field Depo. at 10-11; Ward Nov. Depo. at 13-17.

104.    Williams Power was formerly named Williams Energy Marketing & Trading Company ("Williams Marketing and Trading"), until it changed its name on August 6, 2003. See Anderson, 306 F.R.D. at 330.

105.    Any transactions between the two of the following list of entities is considered an affiliate transaction[8] and not an arm's length sale: WPX Production, WPX Rocky Mountain, WPX San Juan, Williams Production LLC, Williams Production Co., WPX Energy, Williams RMT, WPX Holdings, Williams Energy, Williams Partners, Williams Four Corners, Williams Field Services, Northwest Pipeline, WPX Gas, WFS Gas, WPX Energy Marketing, Williams Gas Marketing, Williams Power, Williams Marketing and Trading, Williams Energy Services, and Williams EDT.  See Anderson, 306 F.R.D. at 330; Ward April Depo. at 89:6-13 (Ward).

106.    The Court will refer to these entities, generically, as "WPX affiliates."

        c.    **The Named Plaintiffs, i.e., the Proposed Class Representatives.**

107.    Plaintiff Steven J. Abraham owns royalty interests in Colorado and overriding royalty interests New Mexico.  See Tr. at 231:2-7 (Abraham, Gallegos).  In 1995, Abraham acquired his royalty interests, which his family passed down to him, originating with his grandmother Hazel Abraham in 1955.  See Tr. at 231:16-232:15 (Abraham, Gallegos).

108.    Despite receiving the division orders and other payment information from the Defendants, Abraham knew very little about the information he received, did not actively manage his interests, and did not know how the Defendants were calculating his royalty payment -- including that he was not compensated for the value of the NGLs produced.  See Tr. at 232:19-236:9; id. at 239:9-22 (Abraham, Gallegos).

_____

[8]Several of the listed entities are former or later names of other listed entities, and several of the listed entities never temporally coexisted, as a result of the many name changes that virtually every listed entity underwent during the course of events giving rise to this litigation. Regardless, any transaction between the listed entities is not an arm's length transaction.

109.    While serving as a class representative in a prior oil-and-gas dispute, Abraham v. BP America Production Co., 685 F.3d 1196 (10th Cir. 2012), Abraham learned that the gas produced from wells on conventional formations in which he has an interest contain valuable natural gas liquids on which he was not paid.  See Tr. at 240:9-241:4 (Abraham, Gallegos).

110.    Abraham understands the burdens involved in being a named plaintiff and agrees to actively participate in this case, attending depositions, mediations, hearings, the trial, and any other negotiations involved.  See Tr. at 241:18-242:11 (Abraham, Gallegos); id. at 244:22-25 (Abraham, Gallegos).

111.    Plaintiff H Limited Partnership, a New Mexico limited partnership, owns mineral interests in New Mexico.  See Tr. at 294:3-295:3 (Gallegos, Harvey).

112.    Plaintiff H Limited Partnership, formed in 1996, owns the mineral interests that Francis Harvey assembled.  See Tr. at 294:3-295:3 (Gallegos, Harvey).  It primarily owns overriding royalty interests on wells in Tracts 30 and 42 of the San Juan Basin's Rosa Unit, which is in the Mesa Verde participating area.  See Tr. at 298:15-304:22 (Gallegos, Harvey); id. at 308:16-18 (Gallegos, Harvey).  In 2008, Haila Harvey became the managing partner, and in 2009, she engaged J.E. Gallegos to assist her with any oil-and-gas related issues that could arise. See Tr. at 297:3-298:7 (Gallegos, Harvey).

113.    Before H. Harvey became H Limited's managing partner in 2008, she had no work experience in the oil-and-gas business.  See Tr. at 294:22-24 (Gallegos, Harvey).

114.    H. Harvey understands her role as class representative, has been deposed, has testified at class certification hearings, has attended court sessions, and is willing to serve as class representative.  See Tr. at 308:19-310:20 (Gallegos, Harvey).

### d.   **The Proposed Class Members.**

115.    The parties "agree that the Court should determine the motion for class certification based on the definition contained in Plaintiffs' Fourth Amended Complaint," amended to exclude the Defendants and their affiliates, including: WPX Production, Williams Four Corners, Williams Energy, and their predecessors, successors, and affiliates.  Agreed Order on Defendants' Motion to Determine Class Certification Based on the Class Definition Contained in Plaintiffs' Fourth Amended Complaint, filed September 24, 2015 (Doc. 243)("Agreed Order on Class Definition").

116.    Per the class definition, the proposed class members are all present and former owners of royalties and overriding royalties that burden oil-and-gas leases and wells in the San Juan Basin of Colorado and New Mexico, where those leases and wells are now or were formerly held by the Defendants or their corporate affiliates, successors, or predecessors, and where the oil or natural gas produced from the leases was delivered to the Ignacio processing Plant in La Plata County, Colorado, the Kutz Plant in San Juan County, New Mexico, or the Lybrook Plant in Rio Arriba County, New Mexico, for processing.  See Complaint ¶ 25, at 8; Tr. at 360:21-361:4 (McArthur).

117.    The proposed class membership excludes the United States of America in its own right, and as trustee for Indian tribes or Indian lessors, and "any other lessors for which an agency of the Secretary of Interior administers royalties."  Class Definition at 2.

118.    The proposed class definition also excludes "the State Land Board of Colorado and the Commissioner of Public Lands of New Mexico and oil and gas leases issued by either of those states."  Class Definition at 2.

119.    The proposed class definition includes a total of 1,715 proposed class members. See Ward April Deposition at 9:16-24 (Ward)(taken April 29, 2014)("Ward April Depo.").

120.    The class definition covers approximately 1,637 wells.   See Tr. at 87:3-4 (Gallegos); Class Well List (Plaintiffs' Hearing Ex. 225)("Class Well List").

121.    Out of the 1,637 wells, 1,254 are located in federal units[9] in New Mexico.  See Tr. at 1012:22-1013:4 (Gallegos); Griffin Supplemental Report (Defendants' Hearing Ex. 143).[10]

122.    Although WPX Production calculates royalty volumes and value on an individual, well-by-well basis for all wells committed to a participating area[11] within a federal unit, a royalty owner's actual "entitlement is based on the volume of all the wells in the unit."  Ward April

----

[9]"Unitization" is the joining of various types of lands, leases, and interests within a known geologic area to cooperatively operate and develop the oil and gas resources in accordance with the best economic, engineering, and geological practices available.  See Unitization Information, New Mexico State Land Office, Oil Gas & Minerals Division, http://www.nmstatelands.org/Mineral_Resources.aspx.  This case involves wells on federal units. The Court will explain the accounting methods WPX Production uses to account for wells in federal units below.

[10]The Plaintiffs initially argued that the Class Well List "shows 1415 out of 1637 wells are in federal units."  Plaintiffs' Findings at 15 n.4.  Their expert, David Hajny, testified that all wells on the Class Well List with "unit" in the name are unit wells.  Tr. at 178:15-179:6 (Hajny). There are many wells, however, that appear on the Class Well List designated with unit names that are not actually unit wells.  See Ward April Depo. at 57:24-65:19 (Ward); id. at 73:6-12 ("[J]ust because a unit is in the name of the well doesn't mean that it is in the participating area and part of the unit."); id. at 152:3-154:23 (Ward).  These wells are not included within the unit, despite their designation, because it is not economically viable to include them in the unit.  See Ward April Depo. at 57:24-65:19 (Ward)("If a well is -- was either economically not viable for unit participation and to be in the unit or it has not been certified as economical, then it's presented just on a well basis on the check.")(noting that the well named "Rosa Unit No. 185-A" is "not in the Rosa Mesa Verde unit in that participating area").  The Defendants' well count took these factors into account in determining that 383 non-unit wells existed.  See Tr. at 554:8-555:24 (Griffin).  During the class certification hearing's closing arguments, the Plaintiffs apparently conceded that there were 383 wells that were not located on federal units.  See Tr. at 1012:22-1013:4 (Gallegos).

[11]A "participating area" is that portion of the unit area to which production of a commercial well is allocated.  Unitization Information, New Mexico State Land Office, Oil Gas & Minerals Division, http://www.nmstatelands.org/Mineral_Resources.aspx.

Depo. at 60:12-62:22 (Ward).  See id. at 57:24-65:19 (Ward); id. at 63:7-15 (Ward)(explaining H Limited's interest and stating that "he is participating in all the volumes of all the wells in that unit as opposed to getting only his entitled share of the well that he . . . has an interest in before it was committed to the unit").  Wells in participating areas of federal units therefore "receive a percentage of the participating area's revenue, as opposed to the individual well that they might have owned an overriding royalty in."  Tr. at 556:22-25 (Griffin); id. at 180-183.  Accordingly, an owner's royalty entitlement is based on the volume of gas that all of the wells in the participating unit produce rather than the gas that the one well produces.  See Tr. at 557:1-20 (Gallegos, Griffin); Unit Agreement for the Development and Operation of the Rosa Unit Area, Counties of San Juan and Rio Arriba, State of New Mexico at 3 (dated May 10, 1948)(Plaintiffs' Hearing Ex. 310)("Rosa Unit Agreement").

123.    The unit agreements define the unitized substances as "All oil, gas, natural gasoline and associated fluid hydrocarbons in any and all formations . . . ."  Tr. at 180:15-19 (Hajny); Rosa Unit Agreement at 3.   Each geological formation in a unit has its own participating area, such as the Pictured Cliffs, Mesa Verde, or the Dakota formations.  See Tr. at 181:13-182:3 (Gallegos, Hany).

124.    In New Mexico, there are six "nonratified" royalty owners who own sixteen different royalty and/or overriding royalty interests within the exterior boundaries of a federal unit, but have not committed their interests to the unit.  See Ward April Depo. at 13:3-12 (Sutphin, Ward).  Nonratified owners are paid based on the production of the well in which they own an interest rather than on a unit basis.  See Ward April Depo. at 11:20-12:14 (Sutphin, Ward).

**3.** **The Process: Natural Gas Extraction, Gathering, Processing, Transfer, and Sale.**

125.  Raw natural gas exiting the wellhead contains substances such as NGLs, water, carbon dioxide, nitrogen, and other contaminants, some of which must be separated before the gas is suitable for insertion into a pipeline.  See Tr. at 157:17-158:10 (Gallegos, Hajny); id. at 488:1-11 (Griffin).

126.  Raw natural gas is typically not of sufficient quality to be placed into an interstate pipeline; it must first be treated for removal of at least carbon dioxide, and usually water vapor and NGLs.  See Tr. at 157:17-158:10 (Gallegos, Hajny); id. at 671:11-15 (Emory).

127.  As natural gas emerges from a well, a meter measures the volume of natural gas produced daily, which is stated in Mcf.  See Tr. at 483:7-16 (Griffin).  Because the meter does not measure the gas' Btu content on a daily basis, WPX Production instead applies an individual Btu factor for each well to determine the MMBtus in the raw gas stream.  See Tr. at 488:14-25 (Berge, Griffin); id. at 546:9-549:20 (Gallegos, Griffin); id. at 710:10-16 (Emory, Gallegos).

128.  The NGL content, or Btu factor, of gas from a particular well is ascertained by annually testing a sample of the well's gas for its chemical content, then entering the data in the gathering system's electronic accounting system.  See Tr. at 547:1-25 (Gallegos, Griffin); id. at 710:17-21 (Emory, Gallegos).

129.  A well's NGL content will change from year to year.  See Tr. at 549:5-12 (Gallegos, Griffin).

130.  Different wells produce different volumes of gas.  See Tr. at 747:3-22 (Emory, Gallegos).

131.  The New Mexico Oil and Gas Proceeds Payment Act, N.M. Stat. Ann. § 70-10-1 through § 70-10-6, defines "oil and gas" to include "crude oil, natural gas, casinghead gas,

condensate or any other related hydrocarbons."  N.M. Stat. Ann. § 70-10-2.  <u>See</u> Tr. at 377:1-11 (Gallegos, McArthur).

132.    The class definition excludes wells or coal gas from the Fruitland coal formation. <u>See</u> Tr. at 86:7-8 (Gallegos); <u>id.</u> at 414:1-4 (Gallegos, Tysseling).

133.    Despite this exclusion, some of the class wells are "commingled wells," which means that two formations -- a conventional formation and a coal-bed formation -- produce gas into a single well, where the gas is commingled.  <u>See</u> Tr. at 673:6-15 (Emory).  There is one meter at the wellhead, which meters and samples this commingled stream.  <u>See</u> Tr. at 673:20-21 (Emory).  The Class Well List contains 282 commingled wells.  <u>See</u> Tr. at 675:4-6 (Emory).

134.    In contrast, some class wells are "dual completion" wells, which mean that two formations produce gas into a single well, but the gas from each formation is maintained separately and metered separately.  <u>See</u> Tr. at 674:9-16 (Emory).  The class well list contains fifteen dual-completion wells.  <u>See</u> Tr. at 675:4-6 (Emory).

135.    Of the 282 commingled wells, thirteen wells have a Fruitland Coal completion in addition to at least one conventional completion.  <u>See</u> Well Detail for Table 3 of John Emory's Expert Report dated January 27, 2013 at 1-7 (Defendants' Hearing Ex. 139)("Commingled Well List").  "An engineering analysis would need to be made as to the estimated composition of the conventional production versus the CBM production based on the composition of the commingled stream."  Emory Report ¶ 28, at 16.[12]  <u>See</u> Tr. at 678:3-5 (Emory).

---

[12]Although the Plaintiffs disputed the existence of any commingling at the hearing, they did not introduce any evidence to contradict Emory's testimony that some wells commingle. Instead, they correctly note that the Defendants have identified only thirteen commingled wells, which is less than one percent of the 1,637 class wells.  <u>See</u> Plaintiffs' Findings ¶ 64, at 22.  The Plaintiffs did not introduce any evidence regarding the extent of the commingling in each of these wells.

136.    For some of the remaining comingled wells, WPX Production does not own an interest in the other formation(s) in which the well is completed.  See Commingled Well List at 1-7.

137.    Some wells produce gas with a higher Btu content -- and thus more liquids -- than other wells.  See Tr. at 485:9-18 (Griffin); id. at 747:13-16 (Emory, Gallegos).  Moreover, each well has a different composition of NGLs, meaning that some wells produce more ethane than propane, while other wells produce no propane but have a considerable amount of ethane and butane.  See Tr. at 492:3-17 (Griffin).

138.    When the gas exits the wellhead, it is run through a separator, which removes the liquid water and NGLs.  See Tr. at 753:17-23 (Emory).

139.    No gaseous-phase natural gas from the class wells was sold to a third party from the wellhead; all of it goes into a gathering system.  See Tr. at 383:13-16 (McArthur); id. at 755:15-18 (Emory, Sutphin).

140.    The reduction in pressure and temperature that occurs when producing natural gas causes heavier hydrocarbon molecules to "condense" and separate from the gas stream at the lease.  These are known as well condensate or oil.  Tysseling Report at 16.

141.    After liquids are separated from the gas, the gas is transmitted from the wellhead to an affiliate gathering system and is metered before it leaves the lease.  See Tr. at 483:7-16 (Griffin).

142.    Metering measures the volume of gas that the lease produces measured in Mcfs. See Tr. at 488:1-25 (Griffin); id. at 754:1-5 (Emory).

143.    To obtain the thermo-energetic potential in a particular well's production, the Defendants must take an annual gas sample and run it through a gas chromatograph.  See Tr. at

754:11-14 (Emory); id. at 520:22-521:15 (Gallegos, Griffin).  This process reveals the well's Btu factor, which is multiplied by the well's volume to determine the NGL content.  See Tr. at 483:7-25 (Griffin).

144.     Gas chromatography is an analytical chemical technique whereby the natural gas mixture is placed into a column filled with an inert carrier gas, and a liquid or polymer "stationary phase" coating the column's walls.  The different chemical compounds in the natural gas travel from one end of the column to the other at different speeds, which correspond to their level of interaction with the stationary phase.  The various "retention times" of the different chemicals in the gas indicate the chemical identity of each compound in the gas.  See, e.g., Gas Chromatography, Wake Forest University Department of Chemistry, available at http://www.wfu.edu/chemistry/courses/organic/GC/index.html.   See generally Gas Chromatography, Wikipedia.org, available at en.wikipedia.org/wiki/Gas_chromatography.

145.     Once each compound -- and its proportion in the gas by weight and volume -- is determined, the known energetic properties of each compound are multiplied by that compound's proportional presence in the gas, and the overall thermo-energetic potential of the gas is determined.  See Gas Chromatography, Wake Forest University Department of Chemistry; Gas Chromatography, Wikipedia.org.

146.     The meter and chromatographic analyses produce data, which make it possible to determine the potential production value attributable to each individual well for all relevant production months.  See Tr. at 748:21-749:23 (Emory, Gallegos); Tysseling Report at 9-10.  This information is also used to calculate federal and state royalty interests.  See Tr. at 749:14-750:10 (Emory, Gallegos).

147.    In the gathering system, the natural gas is transmitted through the gathering system's network of low-pressure pipes to one of several processing or treatment plants.  See Tr. at 495:3-24 (Berge, Griffin).

148.    Conventional gas wells often flow to processing plants, because conventional gas has NGLs that can be removed and sold for a greater value than the value they add to the gas as entrained NGLs, which increase the gas' Btu factor.  See Tr. at 157:12-20 (Hajny); Comparison of NGL and Residue Natural Gas Prices (Left Scale) and Relative Prices (Right Scale)(Plaintiffs' Hearing Ex. 306).

149.    For gas that goes to a treatment plant, the plant removes the impurities from the raw gas, removes the $CO_2$, and removes the water vapor, leaving residue gas that can go into an interstate pipeline.  See Tr. at 496:1-6 (Griffin).

150.    At a processing plant, the gas is cleaned of impurities, and any NGLs that are still entrained in the gas are removed.  See Tr. at 496:13-25 (Griffin).

151.    Processing does not create new NGLs, nor does it change their constituency -- i.e., the proportion of the NGLs that are propane, butane, pentane, et cetera; it merely extracts them from the gas in which they were entrained.  See Tr. at 493:15-23 (Griffin).

152.    NGLs removed during processing are either: (i) sent to a fractionator and separated -- or "fractionated" -- into their constituent compounds, Tr. at 493:15-23 (Griffin); or (ii) fractionated at the processing plant, see Tr. at 498:12-20 (Griffin).  Only the Ignacio plant has the ability to perform "limited fractionation," meaning that it can "split out the propones and it also can split out some natural gasoline," enabling the processor to sell the NGLs locally.  Tr. at 498:10-16 (Griffin).

153.    For NGLs sold locally from the Ignacio plant, the plant takes a volume of the NGLs fractionated -- primarily propane and a small amount of natural gasoline -- and a fractionation fee, but there is no processor's tax or transportation cost.  See Tr. at 503:7-22 (Griffin).

154.    The other liquids that the Ignacio plant cannot fractionate must be shipped in the pipeline to a downstream fractionator in Mont Belvieu, Texas.  See Tr. at 498:16-20 (Griffin).

155.    For NGLs transported to the Mont Belvieu fractionation facility, fractionation fees and transportation fees apply for gas processed in New Mexico.  See Tr. at 498:24-499:3 (Griffin); id. at 502:23-25 (Griffin).

156.    The point at which residue gas is placed into the interstate pipeline system is the point of the first arm's-length sale.  See Tr. at 383:13-16 (McArthur).

157.    Williams Four Corners owns three plants to which class wells flow: the Lybrook processing plant, the Kutz processing plant, and the Ignacio processing plant.  See Tr. at 87:3-89:3 (Gallegos); id. at 360:21-360:4 (Gallegos, McArthur).

158.    Williams Four Corners also owns the gathering lines connecting the class wells to three four plants.  See Tr. at 360:21-361:4 (Gallegos, McArthur).

159.    An independent, third-party gathering system in the San Juan Basin, Enterprise San Juan Gathering, carries gas from non-class wells on which WPX Production has a working interest to Enterprise Gathering's Chaco processing plant.  See Tr. at 88:16-20 (Gallegos); id. at 159:16-22 (Gallegos, Hajny); id. at 361:9-14 (Gallegos, McArthur); Ward Nov. Depo. at 70:4-22 (Ward).

160.    WPX Production pays royalty on the NGLs processed at the Chaco plant, see Ward Nov. Depo. at 74:4-75:12, so the Plaintiffs' claims do not involve leases burdening WPX

Production's wells whose gas flows on the Enterprise Gathering system to the Chaco plant, see Tr. at 88:16-20 (Gallegos); id. at 361:9-21 (Gallegos, McArthur).

161.    A processing fee is typically a "flat fee," entitling the processor to a certain percentage of the NGLs processed from the plant, regardless of: (i) which wells produced the gas with the entrained liquefiable hydrocarbons; (ii) the distance between the wells and the processing plant; or (iii) the amount of gas that the wells produce.   Tr. at 166:13-167:13 (Gallegos, Hajny).

162.    Not all gas that goes to a processing or treatment plant is processed or treated; some can be "bypassed" around processing or treatment and then blended with processed or treated gas in proportions that ensure that the final mixture is of pipeline quality.   Tr. at 665:12-24 (Emory).

163.    The Williams Four Corners gathering systems are interconnected, which allows various gathering line segments to flow to different gathering systems and more than one plant. See Tr. at 649:1-9 (Emory, Sutphin).   Gas from a well may not actually flow to the plant associated with the gathering system to which the well is connected.   See Emory Report ¶ 44, at 24; Ward April Depo. at 119:1-5 (Ward)(explaining that gas may not be processed at a certain plant, even if the contract states that it will be delivered to that plant).

164.    The actual gas flow depends on "system interconnections and natural flow hydraulics resulting in volumes of commingled gas being delivered to different WFC's plants . . . ."   Emory Report ¶ 44, at 24.   A well's contractual dedication to a particular plant does not determine whether the well actually flows to that plant.   See Emory Report ¶ 45, at 25; Tr. at 649:10-650:1 (Emory, Sutphin).

165.    Some of the class wells do not deliver gas to the Ignacio, Kutz, or Lybrook plants to be processed.[13]  See Tr. at 649:10-650:9 (Emory, Sutphin).  Moreover, some of the gas from the class wells that is delivered to one of these plants gets bypassed around the processing plant, and therefore is not processed.  See Tr. at 662:3-12 (Emory, Sutphin); id. at 666:11-16 (Emory).

166.    It is impossible to determine whether a certain small percentage of the gas flows to the Ignacio plant, where it could be processed, or to the Milagro plant, where it is not processed.  See Tr. at 662:13-20 (Emory, Sutphin); Emory Report ¶ 48, at 26 n.20; Emory Report ¶ 47, at 25 ("[I]t would be virtually impossible to determine with certainty where all of the molecules from any given gas well would flow.").

167.    The volumes of processed gas change over time, because: (i) wells produce at different rates and decline in production over time; (ii) wells are added to or removed from the gathering systems; and (iii) the piping changes or expands.  See Tr. at 665:18-25 (Emory).  Because gas flow changes over time, a month-by-month study is the only way to ascertain where gas actually flowed on a month-by-month basis.  See Tr. at 716:24-717:8 (Emory).

168.    Three gathering trunks -- Trunk N, TRKNEAST, and TRKNWEST -- are interconnected between the conventional and coalbed gathering systems, enabling gas to flow to either the Milagro plant or a processing plant.  See Tr. at 658:18-661:18 (Emory, Sutphin); Emory Report ¶ 48, at 26 n.20.  Williams Four Corners does not maintain data to identify the plants to which the wells on these trunks flow.  See Tr. at 658:18-661:18 (Emory, Sutphin). Approximately sixteen percent of the production from the class wells flowed on these gathering lines.  See Tr. at 660:24-661:18 (Emory).

---

[13]The Plaintiffs introduce no evidence to contradict Emory's findings and detailed flow analysis.

169.    Production from two trunks -- Trunk B and Trunk C -- flows to the Ignacio plant, but bypasses the processing unit and is therefore not processed.  See Tr. at 666:2-668:2 (Emory, Sutphin).

170.    Williams Four Corners does not receive NGLs from WPX Production that is not processed for NGL removal.  See Tr. at 670:5-671:15 (Emory, Sutphin).  Instead, the NGLs remain entrained in the gas stream delivered to the transmission pipeline and sold on a Btu basis in downstream markets.  See Tr. at 670:5-671:15 (Emory, Sutphin).

171.    For WPX Production-operated and Williams Four Corners-gathered production at issue in this case:[14]

    a.  In 2007:

        i.  34% flowed to the Ignacio, Kutz and Lybrook plants, and was processed for NGL removal;

        ii.  42% flowed to the Milagro plant and was not processed;

        iii.  10% flowed to the Ignacio plant, but was not processed for NGL removal, because it was bypassed;

        iv.  16% flowed either to the Milagro plant and was not processed, or to the Ignacio plant and was processed;

    b.  In 2011:

        i.  23% flowed to the Ignacio, Kutz and Lybrook plants, and was processed for NGL removal;

        ii.  53% flowed to the Milagro plant and was not processed;

_____

[14]The following information is derived from the Processing Table (Defendants' Hearing Ex. 119).  Notably, Emory could not determine whether the gas flowing on Trunk N, TRKNEAST, and TRKNWEST flowed to the Milagro treatment plant or to the Ignacio processing plant.  See Emory Report at 26 n.20.  Because he was unable to make this determination, he assumed for purposes of his analysis that these trunks would flow equally to Ignacio and to Milagro.  See Emory Report at 26 n.20.  The Plaintiffs did not introduce sufficient evidence to demonstrate that the gas on these trunks flowed to the Ignacio plant for processing. See Emory Report at 26 n.20.

      iii.  8% flowed to the Ignacio plant, but was not processed for NGL removal, because it was bypassed;

      iv.  16% flowed either to the Milagro plant and was not processed or to the Ignacio plant and was processed;

  c.  In 2013:

      i.  26% flowed to the Ignacio, Kutz and Lybrook plants, and was processed for NGL removal;

      ii.  49% flowed to the Milagro plant and was not processed;

      iii.  9% flowed to the Ignacio plant, but was not processed for NGL removal, because it was bypassed;

      iv.  16% flowed either to the Milagro plant and was not processed, or to the Ignacio plant and was processed.

172.    The Court will now outline the process by which the title to the class' gas changed hands among Williams entity affiliates at various stages of the class time period for wells in the New Mexico on the Williams Four Corners gathering system.[15]

      a.    **Who Held Title on the Natural Gas from 2006 to December, 2010.**

173.    The production from the 1,637 class wells has been gathered and processed under a keep-whole arrangement between Williams affiliates since the time that the Defendants' predecessors entered into a gathering and processing agreement designated "J99" in March, 1991.  Tr. at 419:8-420:3 (Gallegos, Tysseling).  See Letter Agreement Northwest Pipeline Corporation and Williams Production Company Keepwhole J99 (Plaintiffs' Hearing Ex. 9).

174.    During the class period, a significant number of the class wells were covered by J99.  Tr. at 433:17-23 (Tysseling); Class Well List (Plaintiffs' Hearing Ex. 225).

---

[15]Ward testified that these procedures reflect the title-transfer process in Colorado as well as New Mexico.  See Ward Nov. Depo. at 12:15-22 (Ward).  Regardless of the extent to which these processes reflect Colorado procedures, they illustrate how Williams affiliates transferred title to one another throughout the class period.

175.    WPX Production and Williams Four Corners entered into a gathering and processing agreement designated as 372K that provides gathering of WPX Production gas to Williams Four Corner's Kutz processing plant in New Mexico.   See Tr. at 422:9-23:15 (Gallegos, Tysseling).

176.    From 1995 to 2010, Williams Production Co. and its post-1998 successor, Williams Production LLC, were the lessees on the class leases, meaning that they held title to all natural gas produced at the wellhead.   See Ward Nov. Depo. at 13:1-14:17 (Ward).

177.    The lessee would transfer title to the natural gas to a marketing affiliate -- WFS Gas Resources, or its successor WPX Gas Resources -- as it transferred physical possession of the gas to an affiliate gathering company, Williams Field Services.   See Ward Nov. Depo. at 13:1-14:17 (Ward).

178.    After processing the gas, WFS Gas Resources, or successor WPX Gas, transferred title to the residue gas to Williams Gas Marketing and title to the processed NGLs to Williams Power.  See Ward Nov. Depo. at 13:1-17 (Ward).

179.    Williams Gas Marketing and Williams Power would then sell their respective products to arm's-length buyers with the goal of selling the gas at a higher price than the price at which they obtained the gas.  See Field Depo. at 10:6-14:2; id. at 59:1-14 (Field); id. at 16:7-10 (Field); Ward Nov. Depo. at 14:23-25 (Ward).

180.    The prices for which Williams Gas Marketing sold the gas at arm's length were never used in royalty accounting.  See Ward Nov. Depo. at 14:1-15:25 (Ward); Field Depo. at 59:1-15 (Field).

b.   **The 2011 Reorganization.**

181.   In 2011, in preparation for the upcoming spinoff of various WPX affiliates, the Defendants and their affiliates executed a new set of gathering contracts.  See Deposition of Paul Dolan at 57:24-61:18 (Dolan)(taken February 10, 2014)("Dolan Depo."); Gas Gathering, Processing, Dehydrating and Treating Agreement between Williams Four Corners and WPX Gas Resources (dated July 1, 2011)(Plaintiffs' Hearing Ex. 11)("J99M").

182.   J99M combined the J99 and 372K services, replaced the prior contracts, and maintained the keep-whole arrangement whereby WFC "shall retain the gross Plant Products Processed from [WPX Production's] Gas. . . ."  J99M § 1.7.  See Dolan Depo. at 59:6-21 (Dolan); id. at 69:3-10 (Dolan).

183.   The agreement term extends for ten years through December 31, 2022, and binds the spun-off companies, despite being executed before the spinoff.  See J99M § 4; Dolan Depo. at 63:3-7 (Dolan).

184.   Transactions under the new gathering agreements are thus affiliate, non-arm's length transactions, because at the time they were executed, all parties to them were corporate affiliates.  See Deposition of Jefferson Paul Dolan at 52:1-5 (Dolan), taken February 10, 2014 in Anderson ("Dolan Anderson Depo.")(stating that "both companies were owned by the same parent").

185.   After WPX Production became independent and no longer affiliated with Williams Four Corners, however, WPX Production's independent marketing unit would not accept a keep-whole contract with Williams Four Corners for future gathering and processing services.  See Dolan Depo. at 20:8-27:14 (Dolan); id. at 74:15-22 (Dolan).

186.    WPX Production's December 9, 2013 contract with Williams Four Corners for gathering and processing services resulted in WPX Production retaining eighty percent of the NGLs.  See Dolan Depo. at 29:16-31:4 (Dolan); Gas Gathering, Processing, Dehydration and Treating Agreement between Williams Four Corners and WPX Production, dated December 9, 2013 (Plaintiffs' Hearing Ex. 205)("Dec. 2013 Gathering Contract").

### 4.    The Language in the Class Leases: The Breakdown of Textual Royalty Formulations.

187.    The class leases were largely executed in the 1940s and early 1950s, and, in all known instances, the original lessors and the original lessee representatives are unavailable.  See Tr. at 370:4-10 (Gallegos, McArthur); Beach Depo. at 24:10-15 (Beach).

188.    Every lease has a granting clause, which describes what is being conveyed to the lessee, and a royalty clause, which explains how royalty is to be paid.  See Tr. at 362:8-15 (McArthur); id. at 938:1-939:15 (McArthur); id. at 366:4-361:13 (McArthur).

189.    No lease expressly excludes payment of royalty for NGLs or condensate.  See Tr. at 370:17-371:7 (Gallegos, McArthur).

190.    All leases require payment on "gas."  Tr. at 937:13-25 (McArthur).

191.    The class leases provide that royalty is to be valued based on the following language: (i) "gross proceeds," without reference to being "at the well," "at the wellhead," or "at the mouth of the well"; (ii) "proceeds at the mouth of the well"; (iii) "proceeds on the sale of gas, as such"; (iv) "price" or "market price" "at the well"; (v) "net proceeds at the well"; (vi) "gross proceeds received when sold at the mouth of the well, market value if not sold at the mouth of the well"; (vii) "gross proceeds received for gas sold, used off the premises or in the manufacture of products therefrom, but in no event more than the actual amount received"; (viii) "proceeds if sold at the well, or if marketed off the premises, market value at the well"; (ix) "market value at

the well of the gas sold or used, provided that on gas sold the market value shall not exceed the amount received for such gas computed at the mouth of the well"; (x) "market value at the well if sold or used to manufacture products; on gas sold at the well, net proceeds realized; each after deduction of post-production costs"; and (xi) "market value at the well of the gas sold or used, provided that on gas sold the market value shall not exceed the amount received for such gas computed at the mouth of the well."[16]  Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

192.   Textual formulations (i), (ii), (iii), (iv), and (v) are "single-prong" royalty provisions, meaning that they pay the same regardless whether the gas is sold at the wellhead or off-site.  Lease Language Chart at 1; Tr. at 828:11-14 (Terry).

193.   Textual formulations (vi) through (xi) are "two-pronged" royalty provisions, meaning that they describe the value upon which royalty is to be paid in different terms, depending upon whether the gas is sold at the wellhead or off-site.  Tr. at 828:16-20 (Terry).

---

[16]The categories and the numbers that the Court uses in its Findings of Facts come from the Defendants' Lease Language Chart (Defendants' Hearing Ex. 125).  The Plaintiffs presented their own breakdown, which lumps the language into a smaller number of broader categories. See Spreadsheet of Lease Language (Plaintiffs' Hearing Ex. 303).  For instance, the Plaintiffs categorized 265 leases as paying on "Gross Proceeds," Plaintiffs' Lease Language Chart at 12, when only one lease out of the 480 leases at issue has an express single prong "gross proceeds" royalty clause.  Tr. at 824:1-827:21 (Sheridan, Terry).  The Plaintiffs include within that broad category both "gross proceeds" instruments, "proceeds" instruments, and "net proceeds" instruments.  Tr. at 826:11-17 (Terry).  The Defendants' expert Kris Terry argued that there could be a difference between these terms.  See Tr. at 827:1-8 (Terry).  For example, if a producer receives "some compensation as proceeds that is not strictly related to the price for the natural gas," such as reimbursement for another cost, "then the gross proceeds definition would sweep in royalties on that additional amount of money, whereas, I don't think that would be true with a proceeds lease."  Tr. at 827:1-8 (Terry).  Because these linguistic differences may affect royalty payment, the Court will maintain the separate categories unless the Plaintiffs demonstrate that the differences are irrelevant.

194.     Although 210 leases use textual formulation (iii), fifty-five leases contain specific, separate royalty provisions relating to casinghead gas, which the class wells, being gas wells, do not produce.  See Lease Language Chart at 1.

195.     Thirty-one of these 210 leases are Colorado leases and twenty-four of them are New Mexico leases.  See Lease Language Chart at 1.

196.     The majority of the leases are form contracts altered only to include the relevant individual information -- the parties' names, the location of the lease, et cetera -- and are therefore textually identical within their respective textual-formulation categories.  See generally Spreadsheet of Lease Language (Plaintiffs' Hearing Ex. 304)(categorizing each lease by its form number).

197.     Numbers stamped on the leases' top corners identify the form contract used to produce the lease, as well as the corporate author and model number.  See Tr. at 830:5-12 (Terry).

198.     Some leases have royalty clauses that differ from the language that a certain form contract uses.  See Tr. at 830:5-8 (Terry).

199.     The form designation as to the type of lease form does not necessarily mean that the royalty clause will be identical for all leases using one type of form.  Terry testified that "you can have a form that says -- it's the very same form on the front in that upper left-hand corner -- and you can have a royalty clause that's completely different."  Tr. at 830:4-8 (Terry).

200.     None of the leases expressly provide for payment on the basis of an index price, but none of them prohibits payment on that basis.  See Tr. at 857:17-22 (Terry).

201.    Similarly, the leases do not expressly prohibit the use of an affiliate transaction to compute the applicable royalty.   See Tr. at 857:23-858:2 (Sheridan, Terry); id. at 930:10-21 (McArthur).

202.    Of the 480 total class leases, 224 are single-pronged, and 256 are double-pronged; twenty-seven are illegible as to their royalty provisions.   See Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

203.    Of the 480 leases with legible royalty provisions, 381 are in Colorado, and ninety-nine are in New Mexico. See Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

### a.    The New Mexico Leases' Royalty-Provision Breakdown.

204.    Sixty-eight of the ninety-nine total New Mexico leases are single-pronged, and thirty-one are double-pronged. See Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

205.    Sixty-seven of the sixty-eight single-pronged New Mexico leases pay based on "proceeds on the sale of gas, as such" and the other lease pays on the basis of "net proceeds at the well."  Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

206.    Twenty-four of the thirty-one double-pronged New Mexico leases pay on the basis of "proceeds if sold at the well, or if marketed off the premises, market value at the well." Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

207.    Six of the thirty-one double-pronged New Mexico leases pay on the basis of "gross proceeds for gas used off the premises" and, "if used in the manufacture of gasoline, prevailing market rate."  Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

208.    One of the thirty-one double-pronged New Mexico leases pays on the basis of "market value at the well of the gas sold or used, provided that on gas sold the market value shall not exceed the amount received for such gas computed as the mouth of the well."   Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

b.      **The Colorado Leases' Royalty-Provision Breakdown.**

209.    One-hundred fifty-six of the 381 total Colorado leases are single-pronged, and 225 are double-pronged.  See Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

210.    One-hundred forty-three of the 156 total single-pronged Colorado leases pay on the basis of "proceeds on the sale of gas, as such."  Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

211.    Eight of the 156 total single-pronged Colorado leases pay on the basis of "proceeds at the mouth of the well."  Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

212.    Four of the 156 total single-pronged Colorado leases pay on the basis of "price [or market price] at the well."  Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

213.    One of the 156 total single-pronged Colorado leases pays on the basis of "gross proceeds," without reference to the mouth of the well.  Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

214.    Eighty-five of the 156 total double-pronged Colorado leases pay on the basis of "proceeds if sold at the well, or if marketed off the premises, market value at the well."  Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

215.    Seventy-five of the 156 total double-pronged Colorado leases pay on the basis of "market value at the well of the gas sold or used, provided that on gas sold the market value shall not exceed the amount received for such gas computed at the mouth of the well."  Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

216.    Thirty-four of the 156 total double-pronged Colorado leases pay on the basis of "gross proceeds received for gas sold, used off the premises or in the manufacture of products therefrom, but in no event more than the actual amount received."  Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

217.    Twenty-three of the 156 total double-pronged Colorado leases pay on the basis of "market value at the well if sold or used to manufacture products; on gas sold at the well, net proceeds realized; each after deduction of post-production costs."  Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

218.    These 23 leases are the only leases to disclaim or negate Colorado's marketable-condition rule.  See Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

219.    Five of the 156 total double-pronged Colorado leases pay on the basis of "gross proceeds for gas used off the premises.  If used in the manufacture of gasoline, prevailing market rate."  Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

220.    Three of the 156 total double-pronged Colorado leases pay on the basis of "gross proceeds received when sold at the mouth of the well, market value if not sold at the mouth of the well."  Lease Language Chart at 1 (Defendants' Hearing Ex. 125).

### c.    The Named Plaintiffs' Royalty Provisions.

221.    Abraham owns a royalty interest in three leases in Colorado, each of which contains the same two-prong royalty clause that provides:

> on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells  the royalty shall be one-eighth of the amount realized from such sale

Expert Report of Kris L. Terry ¶¶ 10-11, at 4-5 (dated January 27, 2014)(Defendants' Hearing Ex. 71).

222.    Abraham does not own any royalty or overriding royalty interests that burden WPX Production wells that produce drip condensate in the San Juan Basin.  See Ward April Depo. at 19:6-9 (Ward).

223.    H Limited owns an overriding royalty interest in 2.5%

of the value, based on the field market price at the well, of all oil and/or gas that may be produced, saved, and marketed, except that used for operating or development purposes on said lease or unavoidably lost from any wells that may be hereafter drilled by assignee or its assigns on the assigned land pursuant to said lease.

Tr. at 299:12-300:14 (Gallegos, Harvey).  See Contract of Reservation and Agreement to Reassign (dated October 20, 1984)(Plaintiffs' Hearing Ex. 95); Overriding Royalty Language Used in Various Assignments at 1 (Defendants' Hearing Ex. 130)("Overriding Language Chart").

224.    H Limited's override applies to Tract 30 in the Mesa Verde participating area of the Rosa Unit -- a federal unit that WPX Production operates.  See Tr. at 183:4-185:6 (Gallegos, Hajny).

225.    H Limited owns another overriding royalty interest in "5 per cent of the sales price at the wells as produced of all of the oil, gas, natural gasoline and other products obtained from gas which may be produced, saved and marketed from the above described land." Overriding Royalty Agreement (dated September 18, 1952)(Defendants' Hearing Ex. 11).

226.    The overriding royalty requires royalty to be paid "at the same time and in the same manner as royalties payable to the State of New Mexico . . . ."  Overriding Language Chart at 1.

227.    Because the Rosa Unit in which H Limited owns interests does not produce condensate, H Limited does not own a royalty or overriding royalty interest in any WPX Production wells that produce condensate.  See Ward April Depo. at 18:9-19 (Ward).

### d.    The Meanings of the Leases' Varying Language.

228.    In the oil-and-gas industry, "net proceeds" and "amount realized" mean the same thing.  Tr. at 843:19-844:4 (Sheridan, Terry).

229.     In the oil-and-gas industry, the term "gas used in the manufacture of gasoline or other product therefrom" refers to the decrease in the volume of natural gas that occurs when the entrained liquefiable hydrocarbons are extracted through processing.  Tr. at 841:2-13 (Sheridan, Terry).

230.     In some states, the terms "proceeds" and "market value" do not necessarily mean the same thing in the oil-and-gas industry.  Tr. at 920:3-13 (McArthur).

231.     In the oil-and-gas industry, "proceeds" refers to the amount of money that the lessee realizes from the sale of gas.  Tr. at 882:6-22 (Gallegos, Terry); id. at 843:19-844:4 (Sheridan, Terry).

232.     In the oil-and-gas industry, "market value" or "prevailing market rate" refers to the price received, not by any one lessee, but by other lessees from the sale of gas of similar quality, in the same location, taking into account pressure, marketing outlets and other market factors.  See Tr. at 846:10-22 (Sheridan, Terry).

233.     Gas' market value may be calculated independently of proceeds, and may be greater or less than the proceeds from sale of gas depending upon particular contract prices and changes in the market for the sale and purchase of gas.  See Tr. at 882:6-22 (Gallegos, Terry).

234.     In some quarters of the oil-and-gas industry, specifically in Texas, royalty has been paid differently depending on whether it is payable on market value or proceeds.  See Tr. at 918:17-25 (Gallegos, McArthur); id. at 918:1-6 (McArthur)(stating that the two variations do not necessarily produce a different price, but that "[t]hey have slight differences in deductions").

235.     In some quarters of the oil-and-gas industry, when used in a royalty clause, the term "at the well" or "at the mouth of the well," refers to the location and the condition of gas for

royalty valuation purposes, that is, the condition at the well, and not at a downstream sales point. See Tr. at 845:7-25 (Sheridan, Terry).

236.    In some quarters of the oil-and-gas industry, the term "as such," when used with reference to royalty based on "proceeds derived from the sale of gas, as such," means from the sale of the gas in its condition as it emerges from the well.  See Tr. at 833:9-18 (Sheridan, Terry).

237.    In contrast, other industry players use the phrase "gas as such" to distinguish gas that emerges from a gas well as opposed to casinghead gas, which emerges from an oil well.  See Tr. at 940:15-941:16 (McArthur).

238.    In some quarters of the oil-and-gas industry, when a lease requires the lessee to pay royalty on all "products," it expressly requires payment on both the residue gas and NGLs. Tr. at 893:14-19 (Terry).

239.    The New Mexico Energy, Minerals and Natural Resources Department, Oil Conservation Division, defines "gas" or "natural gas" as "a combustible vapor composed chiefly of hydrocarbons occurring naturally in a pool the division has classified as a gas pool." N.M.A.C. § 19.15.2.

240.    Some courts have held that "market-value" leases require royalty to be paid "based on the market value of unprocessed gas as it emerged from the ground ('at the well')." Abraham v. BP Am. Prod. Co., 685 F.3d 1196, 1199 (10th Cir. 2012).

241.    As the liquids market developed over time, lease language became more detailed to include the full array of products being developed.  See Tr. at 908:8-16 (McArthur).

242.    The double-pronged leases provide varying means of determining how royalties should be paid, depending on where the gas is sold and how the gas is used.  See 842:3-17 (Sheridan, Terry).

243.   For a period of time, WPX Production sold gas to an affiliate in sales at the well. See Tr. at 844:5-8 (Sheridan, Terry).

244.   The oil-and-gas industry has a self-evident incentive to develop trade usages for lease terms that are more favorable to the lessee than the lessor.

245.   Often, including in this case, the lessor of an oil-and-gas lease is not someone within -- or someone familiar with the trade usage of -- the oil-and-gas industry.  See Owen L. Anderson, Royalty Valuation: Should Royalty Obligations Be Determined Intrinsically, Theoretically, or Realistically?, 37 Nat. Resources J. 611, 611-12 (1997)("[S]eldom [could a] lessor engaged in the oil and gas business . . . be regarded as a 'merchant' knowledgeable about oil and gas production and marketing practices.  Typically, the lessor is a farmer or a laborer, someone engaged in an unrelated business or profession, or a retired person.").

246.   As the leases are predominantly form contracts, few leases were the product of meaningful negotiation.   See Tr. at 865:17-866:9 (Sheridan, Terry); id. at 904:7-905:1 (McArthur)("[T]here were eight lease forms that appeared 25 or more times in the 502 leases in the class"); id. at 907:25-908:1 (McArthur)("And the wording in the forms doesn't vary, other than the percent sometimes.").

247.   The only terms that frequently involved meaningful negotiation were the magnitude of the fractional royalty share and the length of the primary term, "which is the period in which the lessee has to drill."  Tr. at 923:13-24 (McArthur).  See Tr. at 864:5-9 (Terry); id. at 868:3-21 (Sheridan, Terry); id. at 870:1-4 (Terry).

248.   Approximately forty of the class leases have alterations to the royalty clauses, demonstrating that, at least with respect to the royalty clause, some leases involved individual negotiation.  See Tr. at 870:19-23 (Terry).

- 46 -

249.    The federal government provides detailed instructions about how working interest owners must pay royalty interests -- i.e., what costs can be deducted, how value must be calculated, et cetera -- on land it owns and that Indian tribes own.   See generally 30 C.F.R. § 1206 (titled "product valuation," and containing subparts on "Indian oil," "federal oil," "federal gas," and "Indian gas").

250.    The Defendants used to pay their federal government royalties in the same manner they pay the class -- the keep-whole methodology -- but a federal audit in the mid-1990s forced the Defendants to change their practices.   See Anderson, 306 F.R.D. at 342.

### 5.    The Overriding Royalty Interests.

251.    An overriding royalty is typically carved out from the working interest owner's share.   See Beach Depo. at 13:12-14 (Beach).

252.    One common way an override can be created is when a royalty owner assigns its lease to a new lessee and reserves an overriding royalty in the lease.   See Tr. at 792:12-16 (Terry).

253.    Further overriding royalty interests can arise in the same lease when the original overriding royalty owner "subsequently assigns a portion of his override, which is characterized as an assignment of a[n] overriding royalty interest."   Tr. at 792:16-22 (Terry).

254.    Another common way to create an overriding royalty interest is when a lessee assigns an interest and retains an overriding royalty interest, and then the second lessee creates another override when it assigns the instrument.   See Tr. at 793:2-8 (Terry).   This situation produces an "override stacked upon override, which creates a greater percentage of total override."   Tr. at 793:6-8 (Terry).

255.    Overriding royalty interests generally are not created through the use of form contracts.   See Tr. at 790:14-18 (Sheridan, Terry).

256.    Overriding royalty interests often are created in individualized circumstances and business transactions, and the agreements contain unique royalty valuation terms.  See Tr. at 800:14-18 (Terry); id. at 809:15-18 (Terry)("[T]he various parties to these agreements really were fairly creative in the types of obligations that they decided would pertain to their interest.").

257.    There is no standardization in the overriding royalty interest terms, because overriding royalty instruments are not generic like leases.  See Tr. at 807:9-10 (Terry); id. at 808:6-14 (Terry).

258.    The Court has a list of some of the textual provisions found in the class overriding royalties.  See Overriding Language Chart at 1-12.  The list is illustrative, not exhaustive, of all the overriding royalty provisions among the class.  See Tr. at 802:3-7 (Terry)(explaining that the summary of overriding royalty instruments "certainly does not include all instruments at issue").

259.    Many of the overriding interests are "carved out, not of the private leases, but out of state and federal leases."  Tr. at 802:12-15 (Terry).

260.    Like the royalty provisions, no overriding royalty instruments explicitly provide that the working interest owner is not required to pay royalty on NGLs.  See Tr. at 924:22-925:5 (McArthur).

261.    In addition to its interests in the approximately 500 private leases in which class members own royalty and overriding royalty interests, the Defendants also own working interests and pay unique royalty interests on 229 federal oil-and-gas leases and eighty-six state leases in the San Juan Basin.  See Tr. at 802:1-804:13 (Sheridan, Terry).

262.    There are also some overriding royalty interests that provide that payments be made on the same formula that the State of New Mexico uses -- effectively making them "same

as state" clauses.  Tr. at 815:13-816:9 (Sheridan, Terry).  New Mexico changed its form lease over time.  See Tr. at 816:14-17 (Terry).

263.   The Plaintiffs' override categorization includes some instruments that create overriding royalty interests owned by persons who are not members of the proposed class, including four instruments that create overriding royalty interests in the Fruitland coal formation. See Tr. at 791:21-792:2 (Terry).

264.   There are overriding royalty instruments subject to the class claims that disclaim the duty of the lessee to market oil or gas from the subject lands.  See Overriding Language Chart at 11-12.

**6.   The Defendants' Royalty-Distribution System.**

265.   The Defendants use a different royalty-payment system for wells on their own gathering system, i.e., the Williams Four Corners gathering system, than the one they used for wells on an independent, third-party gathering system, the non-affiliated Products System.  See Tr. at 96; id. at 189; id. at 606-609; id. at 897-899; Tysseling Report at 16 & n.9.

266.   The Defendants did not vary their payouts to the class on the basis of the individual leases' language.  See Tr. at 151-153; id. at 359-360; id. at 412-413.

267.   The generally applicable master equation that the Defendants use to determine royalty payouts is: (Price • Wellhead Volume) - Applicable Post-Production Deductions = Royalty Value.  See Tr. at 446:8-447:18 (Berge, Tysseling).

268.   To determine the amount that each royalty owner is owed, the Defendants multiply the Royalty Value by the royalty owner's fractional interest.  See Tr. at 446:19-447:18 (Berge, Tysseling).

269.   The Colorado wells are not subject to deductions for gathering and processing costs.  See Ward Nov. Depo. at 52-55. (Ward).

270.   For New Mexico wells, the applicable post-production deductions are described below.

### a.   Payments on NGLs, Including Drip Condensate.

271.   The Defendants pay the class members' royalties on the basis of MMBtus at the wellhead, known as a keep-whole basis.  See Tr. at 151:12-13 (Hajny); id. at 483:7-15 (Griffin).

272.   This practice of paying a per-MMBtu-at-the-wellhead royalty compensates the class members partially, but not fully, for the value of entrained liquefiable hydrocarbons.  See Tr. at 151:16-22 (Hajny).

273.   Gas with a higher content of liquefiable hydrocarbons has a higher MMBtu factor than gas with a low NGL content; thus, paying on the basis of MMBtus at the wellhead results in higher payments for wet gas -- which will ultimately yield NGLs -- than for the same volume of dry gas.  See Tr. at 484:20-485:1 ("If a gas is rich in natural gas liquids, it will have a higher Btu factor.  And because it has a higher Btu factor, then it will receive a higher payment. . . .  [T]he real question is whether they're being compensated enough for those liquids." (emphasis added)); id. at 544:24-545:21 (Gallegos, Griffin).

274.   NGLs, however, are more valuable than a thermally equivalent quantity -- i.e., an equal MMBtu amount -- of natural gas, so this payment mechanism results in the class members being paid less than they would be if they were paid their royalty share of the sold NGLs and the residue natural gas separately.  See Tr. at 152:15-153:11 (Gallegos, Hajny).

275.   For example, consider a volume of gas A, which is dry gas and has 90 MMBtus of energy at the wellhead, and an identical volume of gas B, which is wet gas and has 120 MMBtus of energy at the wellhead.  Gas B will, downstream of the wellhead, yield NGLs whose market value, when added to the market value of the residue -- i.e., dry, post-processing -- gas B, be worth greater than one-third more than gas A, despite that the gas B only had one-third more

energy at the wellhead.  The Defendants, however, only pay one-third more royalty for gas *B* than for gas *A*, effectively treating an MMBtu of natural gas as financially equivalent to an MMBtu of NGLs -- even though the Defendants sell an MMBtu of NGLs for a higher price than they sell an MMBtu of natural gas.[17]

276.    The Defendants do not pay royalties on drip condensate or processed NGLs -- except to the extent that, when what will become drip condensate or NGLs are entrained in the gas at the wellhead, it causes the gas to have a higher MMBtu factor.  See Ward April Depo. at 15:2-21 (Ward); id. at 97:12-15 (Gallegos, Ward).

277.    The processor -- a Williams entity -- "keep[s] all the liquids," Ward April Depo. at 92:4-8 (Gallegos, Ward), because WPX Production entered into the keep-whole contract, see Ward April Depo. at 140:23-24 ("[WPX Production] do[es]n't get the liquids because we have a contract, a keep-whole contract.").

---

[17]The Defendants' keep-whole methodology effectively compensates the class members for the value that NGL-rich gas would have if it were sold, as gas, from the wellhead, even though the Defendants often do not sell it that way, but rather process it and sell the removed NGLs at higher value.  See Field Depo. at 16:7-10 (Field); Tysseling Report at 20.  If 1 MCF of gas contains $(c + d)$ MMBtus at the wellhead, where $c$ MMBtus come from the entrained liquefiable hydrocarbons and $d$ MMBtus come from the methane, the Defendants only pay the lessee $x (c + d)$ dollars, where $x$ is the price, in \$/MMBtu, of gas, rather than $(y \cdot c) + (x \cdot d)$ dollars, where $y$ is the price, in \$/MMBtu, of NGLs.  Hajny used an analogy to explain:

> [L]et's say, we had a bucket and it was full of 10 pounds of precious metal: Gold, silver, and copper, let's say.  Well, most people would take that 10 pounds of stuff and they would take out the gold.  And they would sell that for the price of gold; they would take out the silver and sell that for the price of silver; and they would take out the copper then, and sell that for the price of copper, and they would get that value for the 10 pounds of stuff.
>
>         Well, in a keep whole arrangement what happens is the gold and silver is taken out and it's replaced with copper.  And so then the copper is sold, 10 pounds of copper are sold at that value.

Tr. at 152:15-153:4 (Hajny).

278.    The Defendants disburse division orders to the Plaintiffs and proposed class members that ask them to review and confirm the information on the division order and alert the Defendants if there is a problem.  See Beach Depo. at 16:8-17 (Beach).

279.    The royalty owners' signature on the division order serves as an acknowledgement that the royalty owners have reviewed the information.  See Beach Depo. at 16:8-17 (Beach).

280.    WPX Production's revenue department uses the information in the division order to compile a revenue deck on which WPX Production distributes royalty payments.  See Beach Depo. at 17:1-7 (Beach).

281.    Neither the revenue decks nor the division orders reveal how the oil-and-gas lease directs royalty to be paid, e.g., on proceeds or market value.  See Beach Depo. at 22:1-15 (Beach); Ward Nov. Depo. at 55:15-56:16 (Ward).

282.    To obtain the named Plaintiffs' lease and other documents relating to them, Beach spent two weeks to retrieve the documents from the lease records department.  See Beach Depo. at 28:7-25 (Beach); id. at 32:4-35:4 (Beach).  Those documents, including the lease, were not already filed or preserved in one place.  See Beach Depo. at 34:14-17 (Beach).

283.    There are two exceptions to this keep-whole payment scheme: for two wells committed to the 372K gathering contract, the Defendants pay royalty on the basis of NGLs: the Sanchez and San Juan 32-8 Unit No. 33A, both of which are completed in the Mesa Verde formation.[18]  See Ward April Depo. at 44:10-45:14 (Ward); Ward Nov. Depo. at 113:10-114:4

---

[18]The Plaintiffs asserted that these leases on which WPX Production "pay[s] the royalty owners on the liquids" "aren't on the Williams Four Corners system and they're not on the Enterprise system."  Tr. at 1015:23-1016:3 (Gallegos).  Contrary to this statement, these wells are on the Williams Four Corners system.  Ward's testimony and supplemental documentation

(Ward); Ward Nov. Depo. at 120:7-24 (Ward).  There are approximately ninety-nine royalty and overriding royalty owners in the proposed class that receive NGL payment for production from the 32-8 Unit No. 33A well.  See Ward April Depo. at 45:1-14 (Ward); Email from Sheryl Ward, WPX Production, to Robert Sutphin, counsel for WPX Production (dated Nov. 27, 2013)(Defendants' Hearing Ex. 70).

284.    Moreover, there are approximately ten wells committed to the December 2013 Contract (Plaintiffs' Hearing Ex. 205) for which WPX Production pays royalty owners on refined NGLs.  Ward April Depo. at 160:22-162:21 (Ward).

285.    To calculate federal royalties, WPX Production uses "accounting for comparison."  Mathis Depo. at 6:5-9:23 (Mathis, Sutphin).  WPX Production compares the value of processed gas -- residue gas' value after processing plus NGL value after processing -- with the value of unprocessed gas -- the wellhead-adjusted Btu -- and uses the higher of the two figures.  See Mathis Depo. at 6:5-9:23 (Mathis, Sutphin).

286.    For unprocessed gas, however, WPX Production pays federal royalties on the wellhead-adjusted Btu basis under the same keep-whole scheme that it uses to pay the proposed class members' royalties.  See Mathis Depo. at 6:5-9:23 (Mathis, Sutphin).

287.    Currently (and going back to 2008),[19] WPX Production takes into account a well's actual gas flow -- i.e., whether it flows to a processing plant and is processed -- in paying

---

demonstrates that they are committed to the 372K contract with Williams Four Corners.  See Ward Nov. Depo. at 113:10-114:5 (Ward); Plaintiffs Hearing Ex. 15.

[19]Before July, 2011, WPX Production calculated federal royalties as if all production committed to the J99M contract was processed.  See Mathis Depo. at 9:24-10:19 (Mathis, Sutphin).  From July, 2011 to February, 2014, WPX Production calculated federal royalties as if all production committed to the J99M contract was unprocessed.  See Mathis Depo. at 9:24-10:19 (Mathis, Sutphin).  This change occurred because the J99M contract changed the gas' delivery point from the Ignacio processing plant to the Milagro treating plant.  See Mathis Depo.

federal royalties on production committed to a WFC gathering agreement.  See Mathis Depo. at 6:5-9:23 (Mathis, Sutphin).

> b.  **Cost Deductions.**

288.    For royalties paid on New Mexico production committed to a gathering contract with Williams Four Corners and its predecessors, WPX Production deducts a uniform cost of service ("COS") charge per Mcf from each New Mexico class member on the Williams Four Corners gathering system, regardless of the actual costs attributable to each well of rendering the gas into marketable condition.  See Ward Nov. Depo. at 27:16-29:13 (Ward).

289.    Williams Four Corners computes the COS charge and relays it to WPX Production, who assesses it against the royalty in lieu of the actual charges that WPX Production incurs for gathering.  See Ward April Depo. at 27:13-29:2 (Ward).

290.    The COS charge does not contain any costs associated with processing.[20]  See Ward April Depo. at 43:19-25 (Ward).  Accordingly, WPX Production does not assess any actual

---

at 9:24-10:19 (Mathis, Sutphin).  Effective with February, 2014 production, WPX Production calculates federal royalties based on actual gas flow.  See Mathis Depo. at 11:3-18 (Mathis, Sutphin); id. at 21:12-17.  WPX Production's federal royalty filings reflect this change as far back as May 2008, because federal regulations allow WPX Production to re-file its royalty calculations back only six years.  See Mathis Depo. at 11:9-18 (Mathis).  WPX Production made this correction after it determined that some gas was processed, while other gas was not.  See Mathis Depo. at 57:22-58:15 (Mathis).

By instituting this change, WPX Production must make higher royalty payments for the years that it paid federal royalty on the basis of unprocessed gas, because the royalty payment increased once WPX Production recognized the value of the entrained NGLs.  See Mathis Depo. at 30:3-8 (Gallegos, Mathis).

[20]The Plaintiffs do not introduce evidence demonstrating that the COS charge involves costs for processing the gas as opposed to solely gathering it.  Griffin testified that the processing fee was distinct from the gathering charge.  See Tr. at 584:4-11 (Griffin).  Furthermore, the Plaintiffs agree that the cost should apply to "both [] the keep-whole method and the whole-stream method."  Tr. at 581:16-18 (Gallegos).  Accordingly, because the Plaintiffs have not introduced any contradictory evidence, the Court concludes that the COS charge does not contain costs associated with processing.

processing charges under its keep-whole methodology.  See Ward April Depo. at 28:6-9 (Ward); id. at 30:1-8 (Ward); id. at 25:10-26:5 (Ward); id. at 43:19-21 (Ward)(explaining that royalty owners "do not bear any processing costs because they are charged the cost of service, which is a gathering charge"); id. at 122:19-123:10 (explaining that WPX Production does not pay a natural gas processors' tax for Williams Four Corners gathered wells).

291.    The Defendants do not deduct certain post-production costs for the Colorado royalty owners.  See Ward Nov. Depo. at 54:22-55:14 (Ward).

292.    The Defendants assess the same COS charge against the federal government that they do against private lessors; the class COS charge is calculated pursuant to 30 C.F.R. § 1206.157(b), which regulates the expenses that working interests owners of federal land may deduct when the gas is sent to an affiliate.  See Ward April Depo. at 29:2-20 (Ward).

293.    The COS charge does not include a component for any marketing expenses that WPX Production incurs; WPX Production does not pass on marketing expenses to the royalty owners.  See Field Depo. at 16:11-15 (Field).

294.    WPX Production deducts federal and state taxes from royalty payouts, in keeping with the law.  See Ward Nov. Depo. at 53:20-54:2 (Ward).

295.    WPX Production does not assess a COS charge on the non-Williams Four Corners wells; rather, it passes on a proportional share of the charge that the independent gatherer invoices to it.  See Ward April Depo. at 46:2-22 (Ward).

296. For gas processed on the Enterprise system, Enterprise charges WPX Production fees for plant fuel, taxes, transportation, and fractionation.[21]  See Ward April Depo. at 45:15-46:22 (Ward).

297. In determining the royalty payments for WPX Production's gas committed to third parties like Enterprise, WPX Production deducts a proportional share of all actual charges that third parties assess.  See Response to Interrogatory. 1, at 10-11 (Doc. 146-5); Ward Nov. Depo. at 73:25-75:18 (Ward).  Consequently, these deductions should apply to the whole-stream method, which compensates royalty owners on the basis of the NGL and residue value.

### c. **Payments of the Basis of Index Price.**

298. WPX Production receives revenue for its NGLs based on the OPIS Mont Belvieu index price -- an oil index -- for well condensate.  See Dolan Depo. at 32:9-22 (Dolan).

299. For natural gas, the Defendants use the index price in the first-of-the-month Platt's Inside FERC San Juan Gas Market Report for El Paso Natural Gas Company.  See Ward Nov. Depo. at 50:12-14 (Ward).

300. An independent company, Platt's, calculates the index and publishes it in Inside FERC Natural Gas Report.  See Tr. at 860:12-861:24 (Sheridan, Terry).

301. This index price is based upon actual reported sales and purchases of dry gas to be delivered by the seller at the El Paso pipeline location in the San Juan Basin in the particular month for which the index price is published.  See Tr. at 861:4-18 (Sheridan, Terry).

---

[21]The Plaintiffs represented to the Court that WPX Production pays royalty owners on 100% of the NGLs that Enterprise processes.  See Tr. at 606:11-16 (Gallegos).  They cite an incomplete portion of Ward's November Deposition.  Although Ward initially stated that "we pay royalty on 100 percent," of the NGLs, she continued on to testify that WPX Production "automatically recognizes if a well is under the 33 percent fee or the 14 percent fee . . . and it deducts those processing fees from the royalty owners."  Ward Nov. Depo. at 75:13-18 (Ward).  Ward's clarification reveals that WPX Production deducts the processing fee as a monetary fee. See Tr. at 610:16-612:15 (Griffin).

302.    This price reflects the average arm's length sale price of pipeline-quality gas, not wellhead gas that includes entrained liquefiable hydrocarbons.  See Tr. at 862:16-24 (Sheridan, Terry); id. at 931:3-22 (McArthur)("Williams used the indexed price for methane, dry gas, not what's paid for liquids when they're sold in the marketplace.").

303.    As the index price reflects an average, some producers obviously obtain higher prices than the index price.  After WPX Production's marketing department became independent, one of its goals was to obtain higher-than-index prices.  Field Depo. at 15:24-16:25 (Field, Gallegos); id. at 43:18-24 (Field, Gallegos).  Large producers can potentially obtain better prices by committing large gas volumes for longer terms.  See Tr. at 931:8-932:20 (Gallegos, McArthur).

304.    Natural gas is regularly sold and purchased by unrelated sellers and buyers at the index price.  See Field Depo. at 39:1-13 (Field).

305.    Within the oil-and-gas industry, it is generally believed that the index price reflects the market value of residue gas delivered at the designated location in the month of publication.  See Field Depo. at 61:2-4 (Field).

306.    In comparison, no such publicly available pricing mechanism exists for gas at the wellhead.  See Tr. at 745:22-746:1 (Emory, Gallegos).  There are no sales of gas at the wellhead to third parties during the class period.  See Tr. at 746:25-747:2 (Emory); id. at 755:15-18 (Emory, Sutphin).

**7.    WPX Production's Contracts for Production and Processing.**

307.    Three types of processing contracts are used in the San Juan Basin: (i) keep-whole contracts; (ii) percentage of liquids contracts; and (iii) fee-based contracts.  See Dolan Depo. at 26:7-27:1 (Dolan).

308.    There are several production conditions that parties consider in determining the type of contract to use.  See Tr. at 685:6-19 (Emory).  Gas composition and flow rate, which vary among wells, are primary production conditions that parties consider.  See Tr. at 689:2-693:22 (Emory).  A well's proximity to a gathering system is another production condition that impacts the costs necessary to connect to a gathering system.  See Tr. at 695:2-697:25 (Emory).

309.    Gas containing .5 or less Gpm contains primarily ethane, which is the least valuable NGL and is often not extracted.  See Tr. at 691:11-692:19 (Emory).

310.    ConocoPhillips also has working interests in the San Juan Basin, and pays its burdening royalty owners for gas proceeds and NGL proceeds.  See Tr. at 237:13-25 (Abraham, Gallegos).  ConocoPhillips provides royalty owners with monthly statements that state the amount of royalty attributable to gas, NGLs, and condensate.  See Tr. at 237:13-25 (Abraham, Gallegos); id. at 307:15-17 (Harvey).  BP similarly indicates how much of a royalty owner's payment is attributable to gas, NGLs, and condensate.  See Tr. at 238:18-24 (Abraham, Gallegos); id. at 307:15-17 (Harvey).

311.    Nevertheless, Williams Four Corners has "keep whole" contracts with producers in addition to WPX Production, including large unaffiliated producers like ConocoPhillips, BP, XTO, and Devon, as well as, with smaller independent producers.  See Tr. at 681:9-15 (Emory, Sutphin).

312.    Under one of WPX Production's other gathering and processing contracts, Enterprise Gathering charges WPX Production a fourteen percent processing fee for gas processed at the Chaco plant, in addition to processing-related shrinkage.  See Tr. at 165:5-10 (Hajny); id. at 201:1-203:3 (Berge, Hajny); Gas Dedication, Gas Gathering, and Production Area

Services Agreement between El Paso Field Services Co. and WFS Gas Resources Co. at 2-4, D-2 (dated February 1, 1996)(Defendants' Hearing Ex. 30)("1996 Gathering Agreement").

313.     Under another WPX Production contract, the processing fee is twenty percent of the liquids, which leaves WPX Production with eighty percent of the liquids.  See Ward April Depo. at 143:7-13 (Gallegos, Ward); Gas Gathering, Processing, Dehydrating and Treating Agreement between Williams Four Corners, LLC and WPX Energy Production, LLC § 1.9, at 3 (dated December 9, 2013)(Plaintiffs' Hearing Ex. 204)("2013 Gathering Agreement").

314.     WPX Production was not an original party to one of the processing contracts that the Plaintiffs challenge: the February 2008 keep-whole contract between Williams Four Corners and Thompson Engineering.  See Tr. at 681:16-683:11 (Emory); Gas Gathering, Processing, Dehydrating and Treating Agreement between Williams Four Corners LLC and Thompson Engineering (dated February 1, 2007)(Defendants' Hearing Ex. 49)("Thompson Contract"). WPX Production acquired Thompson Engineering's interests in the wells committed to the contract, and assumed Thompson's position under the contract.  See Tr. at 681:16-683:11 (Emory).

### 8.     Potential Damage-Calculation Models.

315.     The Defendants have maintained data, information systems, and invoices from Williams Four Corners to WPX Production for Williams Four Corners' gathering and processing services.  See Tr. at 419:10-420:17 (Gallegos, Tysseling); Tysseling Report at 4.  Data within the Defendants' information systems track and report natural gas content, NGL content, and condensate content.  See Tysseling Report at 4-6.

316.     The invoices list the wells that were gathered and processed under the J99, the 372K, and the J99M agreements.  See Tr. at 419:10-423:15 (Gallegos, Tysseling).  These invoices provide the volumes delivered to the Ignacio, Kutz, and Lybrook plants.  See Tr. at

419:10-423:15 (Gallegos, Tysseling); id. at 430:10-21 (Tysseling); Williams Four Corners LLC Invoice for August 2009 to WPX Gas Resources regarding J99 (Plaintiffs' Hearing Ex. 22); Williams Four Corners LLC Invoice for January 2012 to WPX Gas Resources regarding 372K (Plaintiffs' Hearing Ex. 23).

317.    Williams Four Corners also issued WPX Production a monthly liquids report for every well under the two gathering contracts.  See Tr. at 427:5-430:6 (Gallegos, Tysseling).  This information uses meter information to provide the total Gpm per well, the liquids products contained in a well's production, and the plant recovery factors.   See Tr. at 427:5-430:6 (Gallegos, Tysseling)(stating that the "data provides both the gross Mcf produced from the well and the gross MMBtus produced from the well in that production month"); id. at 428:21-429:21 (Gallegos, Tysseling); id. at 433:9-23 (Gallegos, Tysseling).

318.    The data reveal where and at what price Williams Four Corners sold the NGLs. Specifically, the data shows: (i) whether the NGLs were sold in the local market from the Ignacio plant or instead fractionated at the Mont Belvieu, Texas fractionation facility; (ii) the value of the NGLs; and (iii) whether the liquids were subject to certain transportation and fractionation charges.  See Tr. at 431:4-433:23 (Gallegos, Tysseling).

319.    Even if wells produce different amounts of liquids, the data that the Defendants maintain accounts for those differences.  See Tr. at 430:20-21 (Tysseling); id. at 429:22-430:2 (Gallegos, Tysseling).   WPX Production's automated accounting system processes royalty payments to private owners and federal and state royalty owners, despite variations in production volumes and liquid content.  See Ward Nov. Depo. at 45:3-49:9 (Ward).

320.    The Plaintiffs can input the Defendants' own information into automated algorithms to determine the precise amount of damages to which the proposed class is entitled. See Tysseling Report at 25.

321.    Even though the Plaintiffs can determine the amount of entrained liquefiable hydrocarbons possible of being extracted from each well, not all NGLs entrained in the gas are ultimately extracted from the gas.  See Tr. at 666:2-668:2 (Emory, Sutphin); Ward April Depo. at 96:5-9 (Ward)("[N]ot all of it is processed.  Some of that gas, it cannot physically go to the Ignacio plant and be processed.").  Because some of the gas is bypassed from processing, determining the amount of extracted NGLs produced from each well requires a well-by-well flow analysis.  See Tr. at 716:24-717:8 (Emory).

322.    The Plaintiffs' damages formula, however, purports to calculate the damages for failure to pay royalty on all NGLs capable of being extracted, regardless of whether all of the gas was actually processed.  See Emory Report ¶ 66, at 33 (Tysseling's calculations presume that all Class Wells are physically processed at one of the WFC gas processing plants."); Tr. at 429:8-14 (Gallegos, Tysseling)(explaining that Tysseling calculated damages using the invoices, which state only "the theoretical volumes that would be recovered from the wellhead" and do not note whether the gas was actually processed).  Accordingly, if the Plaintiffs demonstrate that they should be compensated for NGL value regardless of whether the gas was processed, the processing issue is not relevant to the damages calculation.

323.    The Plaintiffs' damages formula relies on a fourteen percent of NGLs processing fee, but WPX Production has paid processing fees of thirty-three percent, twenty-seven percent, and fourteen percent.  See Ward April Depo. at 46:23-57:23 (Ward).  For the entire class period,

the weighted average processing fee for WPX gas committed to an Enterprise processing contract was approximately twenty-nine percent.  See Ward April Depo. at 46:23-57:23 (Ward).

324.   The Plaintiffs' damages formula takes into account some, but not all, of the costs associated with extracting the NGLs.  Specifically, it calculates the cost associated with isolating the NGLs at each plant and takes into account a processing fee.  See Tr. at 435:5-20 (Gallegos, Tysseling); id. at 417:1-418:8 (Gallegos, Tysseling); Hajny Report at 4-5; at 451:3-452:10 (Berge, Tysseling)(stating that the formula does not account for the fractionation costs related to separating the NGLs into their constituent parts, taxes, or plant fuel).

325.   In calculating royalty payments for WPX Production's gas committed to third parties, WPX Production deducts a proportional share of all actual charges that third parties assess, which can include plant fuel, taxes, transportation, and fractionation.  See Response to Interrogatory. 1, at 10-11 (Doc. 146-5); Ward Nov. Depo. at 73:25-75:18 (Ward); Ward April Depo. at 45:15-46:22 (Ward).  Consequently, at least some of the deductions should apply to the whole-stream method, which compensates royalty owners on the basis of the NGL value and residue value separately.[22]  Although these deductions should apply, the Court cannot determine with certainty whether the processing fee includes any of these costs, or instead, whether those costs are deducted on top of the processing fee.[23]

---

[22]The Plaintiffs suggested at the hearing that Griffin "double-counted" the plant fuel and processing deductions.  In other words, the Plaintiffs contended that Griffin not only monetized the deductions and subtracted the value, but also reduced the volume of gas.  See Tr. at 580:5-24 (Gallegos, Griffin).  One can account for the deduction by subtracting the monetary value of plant fuel or by subtracting a volume of fuel.  See Ward April Depo. at 41:2-9 (Ward).  Both methods yield the same result.  See id. at 38:16-43:6 (Ward).  To the extent that plant fuel is not included in the processing fee, Griffin's testimony and calculations reveal that he solely subtracted the value of the plant fuel and did not double-count the deduction.  See Tr. at 587:1-6 ("[W]e treated it as a cost and did not reduce the volumes.  You could have reduced the volumes and gotten to the same answer.").

326.     These costs are specific to each processing plant, as some plants are more efficient than others, and to each applicable gathering agreement.  See Emory Report ¶ 66, at 33-34.

327.     When Griffin compared the whole-stream method with the keep-whole method, his calculations revealed that some proposed class members would receive higher royalty payments if WPX Production paid on the basis of the keep-whole method.[24]  See Tr. at 511:16-

---

[23]Ward's testimony that royalty owners are charged a proportional share of these costs did not indicate whether each one of these costs were included in the processing fee or deducted separately on top of the percentage processing fee.  See Ward Nov. Depo. at 73:25-75:18 (Ward); Ward April Depo. at 45:15-46:22 (Ward).  She stated that, as it relates to processing, WPX Production "deduct[s] the actual charges that we are charged by the vendor service," which would "include processing costs for processing services.  It would include processors' tax, also transportation and fractionation, . . . and production tax," and plant fuel.  Ward April Depo. at 46:2-18 (Ward).  Ward demonstrates that these costs are for "processing services," which suggests that they may be included in the processing percentage fee.  Regardless, the Court cannot ascertain whether these additional costs should be included in the whole-stream calculations, and, if so, how much they should be.  Tysseling stated that Griffin included these additional costs without providing documentation to support these specific costs.  See Tysseling Report ¶ 14, at 7.

[24]Regarding the 383 non-unit wells, Griffin's analysis revealed that thirty-eight percent of the non-unit wells resulted in more royalty value under a keep-whole method.  See Tr. at 511:16-513:23 (Griffin); Individual Well Summary Assuming Constant 14% NGL Processing Fee (Defendants' Hearing Ex. 144)("Individual Well Summary").  Regarding the 1,254 unit wells, Griffin's analysis revealed that four of the twenty-three participating areas resulted in more royalty value under a keep-whole methodology.  See Tr. at 513:24-515:5 (Griffin); Unit Summary Assuming Constant 14% NGL Processing Fee at 1 (Defendants' Hearing Ex. 145)("Unit Summary").
     The Plaintiffs dispute Griffin's calculations for three primary reasons.  The Court disagrees with the Plaintiffs' first objection, but agrees with the last two objections.  First, the Plaintiffs argue that Griffin's keep-whole calculations erroneously omit deductions for processing costs, taxes, and plant fuel.  See Plaintiffs' Findings ¶ 66, at 23.  They contend that these costs were incurred under both methods, so the deductions should apply under both methods.  See Plaintiffs' Findings ¶ 66, at 23.  Regardless whether Williams Four Corners incurred processing costs, WPX Production does not pass these processing costs on to the royalty owners under its keep-whole methodology, because under this agreement, Williams Four Corners keeps all the liquids, so it bears the processing costs.  See Ward April Depo. at 28:6-9 (Ward); id. at 30:1-8 (Ward); id. at 25:10-26:5 (Ward); id. at 43:19-21 (Ward)(explaining that royalty owners "do not bear any processing costs because they are charged the cost of service,

---

- 63 -

which is a gathering charge").   Accordingly, Griffin's keep-whole calculations appear to be correct.

Second, the Plaintiffs argue that Griffin's whole-stream calculations omit the value for the NGL sales from the Ignacio plant.   See Plaintiffs' Findings at 22-23.   These sales include approximately ninety-two to ninety-six million gallons of NGLs.   See Plaintiffs' Findings at 22-23.   The Plaintiffs' damages expert, Tysseling, asserted that Griffin's calculation ignored this volume of Ignacio NGL sales and the accompanying $129 million sales value.   See   Tr. at 432:19-433:3 (Tysseling); Tysseling Report ¶ 16, at 7.   Tysseling further asserted that Griffin improperly deducted transportation and fractionation costs for those volumes.   See Tysseling Report ¶ 16, at 7.   In his supplemental report, Griffin acknowledges that he used incorrect prices initially, but he explains that he updated his analysis to include the correct sales prices for the Ignacio sales, and that he removed the transportation and fractionation deductions for those sales. See Letter from James M. Griffin, expert for the Plaintiffs, to Brad Berge, Plaintiffs' counsel (dated May 1, 2014)(Defendants' Hearing Ex. 143).   Furthermore, Griffin explained that the gallons sold at Ignacio "w[ere] not omitted.   The assumption was that those gallons -- that those gallons went down to Mont Belvieu, and I had attached a transportation fee to those."   Tr. at 534:10-17 (Griffin).   Even if Griffin properly accounted for all processed NGLs, the Court cannot accept his conclusion that the keep-whole method performs better for some wells in light of the Plaintiffs' argument that they should be paid on all NGLs produced from the well, regardless whether those NGLs were extracted.   See Tr. at 433:13- (Tysseling)(explaining that the class should be paid on the "wellhead volumes" of NGLs, even though the wellhead volumes do not indicate whether those NGLs were extracted).   Accordingly, the Plaintiffs believe they are entitled to a higher payment than Griffin calculates under the whole-stream method.   Griffin's comparison, therefore, does not appropriately reflect how the Plaintiffs argue that they should be paid under the whole-stream method.

Griffin's calculation contains other problems, which prevent the Court from concluding that the keep-whole method performs better for some wells.   The Plaintiffs attack Griffin's calculation for undervaluing the residue gas.   See Tysseling Report ¶ 16, at 8.   They explain that Griffin used index prices to calculate the applicable damages under the whole-stream method, even though they allege that they should be compensated on actual sales prices, which are higher than the index.   See Tysseling Report ¶ 16, at 8.   In light of the Plaintiffs' allegations that their royalty payments should not be based on an index price, Griffin's use of an index price in comparing the two royalty payment methods does not adequately reflect the potential difference between the two methods.   If WPX Production paid royalty as the Plaintiffs argue that it should, and the costs that Griffin deducts were improper, the whole-stream method could yield higher results than the keep-whole method for all class members.   The Plaintiffs also note that Griffin's whole-stream calculation did not take account for the fact that many of the 383 stand-alone wells are in Colorado, which does not deduct post-productions costs from royalty payments.   See Tr. at 556:1-5 (Griffin).

Additionally, Griffin charges the same gathering charge under both methods, even though WPX Production does not assess a COS charge on the non-Williams Four Corners gathered wells.   See Ward April Depo. at 46:2-22 (Ward).   Instead, it passes on a proportional share of the charge that the independent gatherer invoices to it.   See Ward April Depo. at 46:2-22 (Ward).   In contrast with this method, Griffin deducts the same COS charge for gathering under both the keep-whole method and the whole-stream method.   See Summary Well Production Data and

513:23 (Griffin); Individual Well Summary Assuming Constant 14% NGL Processing Fee (Defendants' Hearing Ex. 144)("Individual Well Summary"); See Tr. at 513:24-515:5 (Griffin); Unit Summary Assuming Constant 14% NGL Processing Fee at 1 (Defendants' Hearing Ex. 145)("Unit Summary").  If WPX Production paid royalty as the Plaintiffs argue that it should -- on the basis of actual sales prices rather than index prices, and the costs that Griffin deducts were improper or overstate the deduction, the whole-stream method would yield higher results than the keep-whole method for all class members.  Overall, the Court cannot conclude that the keep-whole method produces higher royalty payments for certain class members.

328.  Under the Plaintiffs' proposed damages calculation, which pays royalties for NGLs regardless whether those NGLs were extracted through processing, each class member will benefit from the whole-stream calculation that the Plaintiffs propose.  See Tr. at 415:20-24 (Tysseling)(asserting that "all class members will benefit . . . when natural gas liquids values are included in their royalty payments").

---

Analysis (Plaintiffs' Hearing Ex. 331).  Griffin could not identify the source of the gathering fees and fuel deduction under the whole-stream calculation.  See Tr. at 587:7-25 (Gallegos, Griffin)("I'm still trying to figure it out, and I didn't get a definitive answer, but we really think that -- I really think that it was based on the cost of service.").  The Court does not know how the COS charge compares to the proportional share of gathering charges that royalty owners pay under the non-Williams Four Corners gathered wells.  Regardless, the charge is not identical. See Ward April Depo. at 46:2-22 (Ward).  Consequently, the gathering charges in Griffin's whole-stream calculation may overstate the deduction, thereby making the whole-stream calculation appear to pay less to royalty owners.  In sum, the Court cannot be certain that various deductions and NGL volumes accurately reflect how the royalty owners argue they should be paid under the proposed whole-stream method.  In light of Griffin's assertion that the keep-whole method performed better by a small percentage, see Tr. at 575:6-576:10 (Gallegos, Griffin), the Court cannot conclude that the keep-whole method produces higher royalty payments for certain class members.

## PROCEDURAL BACKGROUND

The Court will outline the basic factual allegations and legal arguments underlying the Plaintiffs' case, as well as the Defendants' responses to those arguments. The Court will also briefly describe the witnesses each side presented at the hearing, in addition to the witness' testimony. The Court will later make conclusions of law to rule on the Motion.

### 1.     The Pleadings.

1.     In ruling on a class certification motion, the Court does not accept the facts alleged in the pleadings as true, but must find all facts bearing on the question of certification, even if those facts also bear on the merits of the substantive claims. The Court is cognizant that it must not decide the merits at this stage of the case and expressly does not decide the merits of the case. The above findings of fact are tentative and made solely to allow the Court to decide whether class certification is appropriate.

### a.     The Complaint.

2.     The Plaintiffs filed a proposed class action in federal court on August 28, 2012. See Class Action Complaint, filed August 28, 2012 (Doc. 1)("First Complaint"). After several rounds of amended pleadings, the Plaintiffs filed the current iteration of their Complaint -- the FAC -- on October 31, 2013. See FAC at 1. The Plaintiffs allege that they are present and former landowners who own royalties and overriding royalties that burden oil-and-gas leases and wells in the San Juan Basin. See FAC ¶ 25, at 8. They assert that the Defendants underpaid their royalties by: (i) substituting NGLs with "less valuable residue gas in calculating royalty payments"; and (ii) basing the royalty payments on the price of the gas sold in affiliate transactions. FAC ¶ 20, at 7. They seek to obtain class status under rule 23 to represent themselves and other royalty owners. See FAC ¶ 25, at 8.

3.     The Plaintiffs allege numerous claims, but they do not seek to certify all of them as class claims.  First, they allege that WPX Production breached their royalty contracts by failing to pay royalty on NGLs.[25]  See FAC ¶¶ 72-75, at 20.  Second, the Plaintiffs contend that WPX Production breached the covenant of good faith and fair dealing by "intentionally reduc[ing] financial value to which the plaintiffs and the class members are entitled" by failing to pay royalty on all production.  FAC ¶¶ 76-79, at 20-21.  Third, they assert that WPX Production breached the implied duty to market by failing to market NGLs, "and in doing so obtain the best terms and prices for the benefit of the plaintiffs and members of the class."  FAC ¶ 87, at 22.  Fourth, they allege that the Defendants "combined and conspired to cause WPX to unlawfully breach its Royalty agreements with plaintiffs and members of the putative class by failing to pay and/or underpaying Royalty on residue gas, [and] NGLs."  FAC ¶ 91, at 23.  Fifth, the Plaintiffs argue that the Defendants violated the New Mexico Oil and Gas Proceeds Payment Act, N.M. Stat. Ann. § 70-10-1 ("NMPPA").  FAC ¶¶ 102-104, at 25-26.  The Plaintiffs also assert claims, which they do not seek to certify, for declaratory judgment, accounting, and injunction.  See FAC ¶¶ 96-101, at 24-25.

### b.     The Answer.

4.     WPX Production answered the Third Amended Complaint on October 16, 2013.  See Answer of WPX Energy Production, LLC to Plaintiffs' Third Amended Class Action Complaint, filed October 16, 2013 (Doc. 89)("WPX Answer").  WPX Production denies almost all of the Plaintiffs' allegations, except the jurisdictional and background facts about the parties.  See WPX Answer ¶¶ 1-88, at 1-7.  WPX Production asserts sixteen affirmative defenses for: (i)

---

[25]The Plaintiffs initially alleged that WPX Production breached their contracts by failing to pay on both NGLs and drip condensate, but the Plaintiffs later dropped their allegation that WPX Production failed to pay on drip condensate.  See Plaintiffs' Findings at 36; Tr. at 1003:25-1004:3 (Gallegos).

failure to state a claim upon which relief may be granted; (ii) WPX Production has fully performed pursuant to its contract with the Plaintiffs and any proposed class members; (iii) the Plaintiffs' claims are not sustainable as class action claims, and the Plaintiffs lack standing to bring these claims; (iv) the Plaintiffs' claims are barred by the statute of limitations, or alternatively, by the doctrine of laches; (v) the Plaintiffs' ratification and acquiescence of a continuing course of performance bar their claims; (vi) the doctrines of waiver and estoppel bar the Plaintiffs' claims; (vii) the doctrine of accord and satisfaction bars the Plaintiffs' claims; (viii) the express lease terms and "other written instruments governing the relationships among the parties" bar the Plaintiffs' claims; (ix) the existence of an adequate legal remedy bars the Plaintiffs' equitable claim for an accounting; (x) WPX Production has the right to offset any underpayments with overpayments as a recoupment or offset; (xi) some of the "plaintiffs' claims premised upon implied contractual obligations do not extend to holders of overriding royalty interests as a matter of law"; (xii) the Court may not grant relief absent a showing of express breach of contract on the Plaintiffs' claim for breach of the implied duty of good faith and fair dealing; (xiii) the Plaintiffs may not recover under the NMPPA without showing that they are "entitled to an alleged underpayment of royalty"; (xiv) the Plaintiffs fail to state with particularity the circumstances constituting fraudulent concealment; (xv) the Plaintiff's claim for equitable tolling based on fraudulent concealment is not suitable or sustainable as a class action claim; and (xvi) the Plaintiffs' claim for punitive damages is unconstitutional.  See WPX Answer ¶¶ 1-16, at 7-9.

5.      Williams Four Corners and Williams Energy Resources responded on October 16, 2013.  See Answer of Williams Four Corners, LLC and Williams Energy Resources, LLC to Plaintiffs' Third Amended Class Action Complaint, filed October 16, 2013 (Doc. 90)("Williams

Answer").   Like WPX Production, they also denied nearly all of the Plaintiffs' allegations against them.   See Williams Answer ¶¶ 1-89, at 1-9.   They also asserted many of the same affirmative defenses.   See Williams Answer ¶¶ 1-12, at 9-10.

6.      No party has filed an answer to the FAC after the Court granted the Plaintiffs leave to file it.

    **2.      The Motion.**

7.      In the Motion, the Plaintiffs challenge WPX Production's royalty payment on the "production gathered to and processed by WFC."   Plaintiffs' Memorandum Brief in Support of Renewed Motion for Class Certification at 9, filed January 13, 2014 (Doc. 117)("Brief").   They assert that commonality under rule 23 exists here.   See Brief at 13.   First, they argue, the Defendants paid royalties in the same manner regardless of a royalty owner's lease language. See Brief at 13.   Second, they note that the leases' royalty terms "fall into a small number of repeated categories."   Brief at 13.   The Plaintiffs contend that commonality exists, because "[n]one of the leases have language that authorizes WPX to fail to report and pay royalties on NGLs."   Brief at 14.   See Brief at 17 ("[N]o lease type negates the payment claims here.").   They assert that, because each lease requires payment on all production, all proposed class members "possess the same interest and suffer the same injury."   Brief at 17.   They adopt McArthur's list of common questions, which include:

> a.      Whether Williams Four Corners, LLC (WFC) and/or Williams Energy Resources, LLC (WER) obtains and sells the NGLs and condensate produced by WPX from leases subject to class royalty and overriding royalty agreements, and, if so, an accounting for the value of the royalty share of the NGLs and condensate sold;
>
> b.      Whether WPX breached the leases and overriding royalty agreements by failing to pay royalty on NGLs and condensate production from the leases subject to the royalties;

c.   Whether the royalty instruments authorize WPX to deduct postproduction expenses when paying royalty;

d.   Whether allowable post-production expenses, assuming there are any, charged by WPX are actual and reasonable;

e.   Whether the monthly payment statements to royalty owners are misleading and show bad faith in representing that royalty is paid on "Total Production" when in fact no royalty is paid on production of NGLs and condensate;

f.   Whether the monthly payment statements provided by WPX to the royalty owners are materially misleading because they (a) do not report value for NGLs; (b) do not report value for condensate; (c) deduct expenses of gathering and processing allocable to NGLs in the gas stream while providing no royalties on that production; and (4) reflect netback deductions that are improper;

g.   Whether the monthly payment statements provided by WPX to the royalty owners are intentionally misleading or issued with gross negligence;

h.   Whether WPX has breached the royalty agreements and its duty to get the best price reasonably possible for production under the duty to market by acquiescing in or participating in "keep whole" gathering and processing arrangements with affiliates;

i.   Whether WPX has paid overriding royalty interest owners with same-as-federal interests the same as it pays the federal government lessor;[3]

j.   Whether WPX uses and has used a single royalty computation and payment methodology for all private Colorado royalty owners;

k.   Whether WPX uses and has used a single royalty computation and payment methodology for all Private New Mexico royalty owners;

l.   Whether WPX has used differing royalty computations and payment methodologies based on the particular wording of the payment clauses in any of the royalty and overriding royalty agreements;

m.   Whether any of the royalty agreements authorize WPX to avoid paying royalty on all gas and all liquid hydrocarbons produced from leases burdened by class royalties and overriding royalties;

n.   Whether any of the royalty agreements authorize WPX to substitute less valuable volumes of residue gas for more valuable NGLs in paying royalty and overriding royalty;

o.   Whether any of the royalty agreements authorize WPX to contract with WFC to allow WFC to take possession of and dispose of NGLs and

condensate that are subject to the rights of royalty owners without paying royalty and overriding royalty on that production;

p.    Whether WPX acted in bad faith and breached its duty of good faith and fair dealing in paying royalty and overriding royalty;

q.    Whether damages for royalty underpayment can be calculated on a class wide basis;

r.    Whether equitable and declaratory relief should be granted to establish WPX's ongoing royalty obligation to the class and for an accounting by WFC of the proceeds of sales on all hydrocarbons produced from leases burdened by class royalties and overriding royalties.

Report of John Burritt McArthur at 13-14, filed January 13, 2014 (Doc. 118-13)("McArthur Expert Report").

8.    Regarding typicality, the Plaintiffs assert that their contractual claims are the same as the class members' claims, and that the implied covenants "are implied in law and relate to all owners' agreements."  Brief at 18.  As for adequacy, the Plaintiffs explain that Abraham and H Limited "have significant stakes in the San Juan Basin oil and gas industry," and "are committed to vigorously prosecuting this lawsuit."  Brief at 19.

9.    They next explain that the common issues predominate.  <u>See</u> Brief at 19. Although they admit that "variations in the wording" exist, they maintain that all leases nonetheless "*uniformly require payment on all hydrocarbons produced; that means Royalty must be paid on NGLs and oil.*"  Brief at 19 (emphasis in original).  The Plaintiffs note that they can calculate damages using a class-wide formula, "which supports certification of the class."  Brief at 20.

10.    Regarding rule 23(b)'s superiority requirement, they explain that a class action is the best method to try the case, because "Individual Royalty owners typically are unable to pursue their claims on an individual basis," as it would be too expensive.  Brief at 20.  They note: "The class here will number about nineteen hundred, the great majority of whom own small

individual claims," which they could not individually prosecute and finance.   Brief at 20.
Moreover, the Plaintiffs note that the class action would be manageable.  See Brief at 21.  They
contend that WPX Production's royalty payment computer system "allows for identification of
class members and their addresses permitting notification to the class."  Brief at 21.

    **3.**    **The Response.**

11.    The Defendants argue that the Plaintiffs do not satisfy rule 23's requirements.
See Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification, filed
February 17, 2014 (Doc. 139)("Response").  Regarding adequacy and typicality, the Defendants
assert that the "Plaintiffs' royalty provisions account for only two of the 15 different types of
royalty clauses found in WPX's leases."  Response at 5.  The Defendants further argue that these
lease variations alter WPX Production's payment obligations, which therefore destroys
commonality.  See Response at 6-7, 11.  They observe that the Court must also consider extrinsic
evidence to determine whether each lease includes a duty to pay royalties on extracted NGLs.
See Response at 15-16.  Furthermore, the Defendants contend that the different lease language
and extrinsic evidence defeats rule 23's predominance requirement.  See Response at 23.

12.    In addition to the lease variations, the Defendants argue that the varying gas
composition defeats commonality.  See Response at 7; id. at 14.  They explain that some gas is
processed, while other gas is not, and the Plaintiffs' class action includes only gas which is
processed with NGLs extracted.  See Response at 7-8.  They argue that the Court must identify
"which gas must be processed and which does not . . . on a well-by-well basis."  Response at 7.
They explain that determining which wells' gas is processed is "even more difficult for wells
connected to gathering systems that can deliver the gas *either* to the Milagro Plant, where NGLs
are not extracted, or to another WFC plant, where NGLs are extracted," which must be done on a
month-by-month basis.  Response at 8 (emphasis in original).

13.     Regarding the Plaintiffs' implied covenant claims, the Defendants argue that the Plaintiffs seek to create a new implied duty as an "offshoot" of the implied duty to market. Response at 19-20.  They argue that the Court can create an implied duty "only 'in the absence of any expressed [covenant] on the subject.'"  Response at 18 (quoting Libby v. De Baca, 1947-NMSC-007, ¶ 6, 179 P.2d 263)(citation and quotation marks omitted).  Here, the Defendants argue, the contract language addresses the issues that the implied duties address.  See Response at 18-19.

14.     The Defendants further note that questions of "individual damage calculations will inevitably overwhelm questions common to the class," thereby defeating predominance. Response at 25.  Specifically, they argue that WPX Production's keep-whole contracts do not damage some class members.  See Response at 25.  They argue that "[d]etermining which class members benefitted in which months for which wells requires an analysis incapable of a class-wide approach."  Response at 26.  According to the Defendants, some proposed class members benefit from the challenged payment method also demonstrates that the Plaintiffs' claims are not typical of the class' claims.  See Response at 28-29.

15.     Next, the Defendants explain why the Court cannot certify the Plaintiffs' remaining claims.  See Response at 33-38.  First, the Defendants maintain that the Court cannot certify the Plaintiffs' claim for breach of the duty of good faith and fair dealing.  See Response at 32-33.   They assert that the Court must consider extrinsic evidence and conduct an individualized inquiry "into what each royalty and overriding royalty interest owner expected when entering into the particular royalty instrument."  Response at 33.  Second, the Defendants contend that the Court cannot certify the Plaintiffs' claim for violation of the NMPPA, because "there can be no class PPA claim for penalty interest on underpayments" unless they can allege

"a potentially successful claim for underpayment of royalties," which the Plaintiffs cannot do here.  Response at 36.  Finally, the Defendants assert that the Court cannot certify the Plaintiffs' civil conspiracy claim, because the choice-of-law analysis defeats commonality and predominance.  See Response at 37-38.

### 4. **The Reply.**

16.     The Plaintiffs replied on March 3, 2014.  See Plaintiffs' Reply in Support of Renewed Motion for Class Certification, filed March 3, 2014 (Doc. 155)("Reply").  In response to the Defendants' argument that varying contractual language prevents class certification, the Plaintiffs contend that the lease language does not affect class certification where the Defendants pay royalties without reference to the lease language, all leases require payment on all production, and there is little to no extrinsic evidence that would entangle the Court in individual issues.  See Reply at 2-3; id. at 7 (arguing that "[t]hese facts together support certification").

17.     Regarding their implied-duty-to-market claim, the Plaintiffs clarify that they assert no new or expanded duty.  See Reply at 8-9.  Instead, the Plaintiffs contend, they "simply allege that defendant WPX has a duty to market, which it has violated," and which "is well established in New Mexico law."  Reply at 9.  They argue that the Court need not consider extrinsic evidence.  See Reply at 8-9.

18.     The Plaintiffs next argue that variations between the wells do not preclude class damages calculation, because routine computer systems can account for those differences.  See Reply at 4.  The Plaintiffs contend that the whole-stream valuation method is better for all proposed class members, because the Defendants' calculation ignores a large quantity of gas and adds "nonexistent expenses."  Reply at 5.

19.     The Plaintiffs assert that their claims are typical of the class' claims, because all proposed class members advance claims "for failure of WPX to make royalty payments on NGLs

and condensate, and failure of WPX to pay royalty on the actual revenue received for sales of processed gas."  Reply at 11.

20.     As to the other claims, the Plaintiffs contend first that the Court can certify the Plaintiffs' good-faith-and-fair-dealing claim.   See Reply at 12-13. They argue that the Defendants misread New Mexico precedent, and that New Mexico law does not require the Court to "factually glean[] the parties' intentions in each case."  Reply at 13.

21.     Second, the Plaintiffs explain that the Court may certify their claim under the NMPPA, because "outdated and superseded division orders" do not supersede their lease agreements and relieve the Defendants' of their responsibilities under the NMPPA.  Reply at 14-15.

22.     Finally, the Plaintiffs explain that only New Mexico and Colorado law will apply to their conspiracy claims, which shows that no extensive choice-of-law analysis will preclude class certification.  See Reply at 16-17.

**5.     The Class Certification Hearing.**

23.     The parties began the hearing by giving brief opening statements.  See Tr. at 83:9-146:1 (Court, Gallegos, Sheridan).

24.     In their opening, the Plaintiffs predominantly argued that their experts can calculate class-wide damages, see Tr. at 106:16-22 (Gallegos), and that common issues predominate, because the Defendants pay all royalties using a common payment method and because all royalty agreements require the Defendants to pay royalty on all production, see Tr. at 106:23-107:3 (Gallegos).

25.     In the Defendants' opening, the Defendants mainly argued that the Court must examine the extrinsic evidence relating to each contract to determine how the contracting parties

intended royalty payments to be made, which would overwhelm the Court with individual issues and prevent common issues from predominating.  See Tr. at 111:14-127:15 (Court, Sheridan).

<b>a.      The Plaintiffs' First Witness: David Hajny.</b>

26.     David Hajny obtained his Bachelor's Degree in accountancy from New Mexico State University and a Master's Degree in taxation from Baylor University.  See Tr. at 147:8-12 (Gallegos, Hajny).  After finishing his education in 1982, Hajny worked as a Certified Public Accountant at: (i) Peat Marwick in El Paso, Texas; (ii) then at Coopers and Lybrand in Philadelphia, Pennsylvania; and (iii) at KPMG in Albuquerque, New Mexico.  See Tr. at 147:13-17 (Hajny).  After leaving KPMG in 1997, Hajny worked for Cinco General Partnership, which produces oil and gas in wells in the San Juan Basin.  See Tr. at 147:21-25 (Hajny).  Almost ten years ago, Hajny began working at the Albuquerque accounting firm Reynolds Hicks and Company, where he has performed "a significant amount of oil and gas work."  Tr. at 148:10-16 (Hajny).  Hajny has served as an expert witness in federal court, where he testified regarding these plaintiffs' damages calculation.  See Tr. at 148:24-149:13 (Gallegos, Hajny).

27.     Hajny calculated a measure of damages for the Plaintiffs' claim, which: (i) deducted a fourteen-percent processing fee for processing the NGLs; and (ii) used an estimated 5.5% payment as the "class royalty burden" -- the class members' ownership percentage of WPX Production's share of the plant liquids.  Tr. at 160:22-170:6 (Gallegos, Hajny).  See id. at 417:4-24 (Gallegos, Tysseling).  Hajny testified that, because of a lack of sufficient discovery at this point, he did not have enough information to calculate how much the Defendants' royalty payment system, which paid royalty using an index price rather than the actual sales price, had underpaid the Plaintiffs.  See Tr. at 174:14-176: 8 (Gallegos, Hajny).  Despite his current lack of information, Hajny testified that the Court could easily manage the distribution of a class award

to each individual plaintiff by allocating the class members a pro rata share of the class award based on each class member's ownership interest.  See Tr. at 192:9-194:16 (Gallegos, Hajny).

> b.      **The Plaintiffs' Second Witness: Steve Abraham.**

28.      S. Abraham, a named Plaintiff and proposed class representative, testified that he has lived in the Albuquerque area his entire life.  See Tr. at 226:16-25 (Abraham, Gallegos).   S. Abraham testified that his royalty interests came from his grandmother, Hazel Abraham, who acquired three mineral deeds in 1955.  See Tr. at 231:19-25 (Abraham).  S. Abraham explained how H. Abraham left these mineral interests to her four children, who deeded those interests to S. Abraham's aunt in 1967.  See Tr. at 231:19-25 (Abraham).  When S. Abraham's aunt died in 1995, those interests were distributed to S. Abraham, his brother, and his sister's trust.  See Tr. at 232:1-5 (Abraham).

29.      On cross-examination, the Defendants questioned S. Abraham whether the subsequent documents that S. Abraham's predecessors in interest executed, including the: (i) Department of Interior Decision (dated July, 1952)(Defendants' Hearing Ex. 10); and (ii) the Division Order (dated June 17, 1960)(Defendants' Hearing Ex. 17), provided insight into how royalty should be paid, see Tr. at 254:14-259:23 (Abraham, Sheridan).  S. Abraham answered that the Department of Interior Decision and Division Order stated that royalty should be paid on "natural gas and components thereof . . . [on] the price at the wellhead."  Tr. at 256:16-25 (Abraham, Sheridan)(quoting Defendants' Hearing Ex. 17).  The Defendants also asked whether those subsequent documents demonstrated that S. Abraham's predecessors in interest possibly understood that: (i) the working interest owner might base the royalty payment on gas sales to affiliates, see Tr. at 258:22-259:8 (Abraham, Sheridan); and (ii) the parties understood that royalty would be based on the price of gas at the wellhead, id. at 262:15-23 (Sheridan).  S. Abraham stated that the documents suggest that the working interest owner's affiliate might also

- 77 -

be a natural gas purchaser, but not necessarily that the royalty would be based on a sale to an affiliate.  See Tr. at 258:7-259:17 (Abraham, Sheridan).

### c.    The Plaintiffs' Third Witness: Haila Harvey.

30.    H. Harvey, a named Plaintiff and proposed class representative, testified that she has lived in Santa Fe, New Mexico for the past eight years.  See Tr. at 292:10-13 (Gallegos, Harvey).  She stated that H Limited formed in 1996 and owns the mineral interests that Francis Harvey, her father, assembled.  See Tr. at 294:3-295:3 (Gallegos, Harvey).  H. Harvey explained that H Limited primarily owns overriding royalty interests on wells in Tracts 30 and 42 of the San Juan Basin's Rosa Unit, which is in the Mesa Verde participating area.  See Tr. at 298:15-304:22 (Gallegos, Harvey); id. at 308:16-18 (Gallegos, Harvey).

31.    On cross-examination, the Defendants suggested that documents that H Limited's predecessors in interest executed indicate that the predecessors understood that royalty would be paid on the gas price at the wellhead.  See Tr. at 319:4-320 (Harvey, Sheridan)(discussing Defendants' Hearing Ex. 14 and Ex. 21).  H. Harvey agreed that the documents, which were executed with the benefit of legal representation, affirmed that the settlement price "for natural gas and components thereof shall be the price at the wellhead."  Tr. at 328:17-329:4 (Harvey, Sheridan).  H. Harvey further testified that H Limited had previously negotiated changes to division orders in the past.  See Tr. at 333:7-12 (Harvey, Sheridan).

### d.    The Plaintiffs' Fourth Witness: John Burritt McArthur.

32.    McArthur obtained his Bachelor's Degree from Brown University in 1975, his Master's Degree in Economics from the University of Connecticut in 1978, his law degree from the University of Texas in 1984, his Master's in Public Administration from Harvard in 1993, and his Ph.D. in public policy from the University of California, Berkeley.  See Tr. at 341:19-

342:5 (Gallegos, McArthur).  The bulk of his legal work has involved the oil-and-gas industry.

See Tr. at 342:9-13 (McArthur).  His major published articles on royalty payments include: (i)

The Mutual Benefit Implied Covenant for Oil and Gas Royalty Owners, 41 N.M. Nat. Res. J. 795

(2001); (ii) The Precedent Trap and the Irrational Persistence of the Vela Rule, 39 Houston L.

Rev. 979 (2002; (iii) A Minority of One? The Reasons to Reject the Texas Supreme Court's

Recent Abandonment of the Duty to Market in Market-Value Leases, 37 Tex. Tech L. Rev. 271

(2005); (iv) The Class Action Tool in Oil Field Litigation, 45 Kan. L. Rev. 1 (1996); (v) Anti-

trust in the New [De]regulated Natural Gas Industry, Energy L.J. 1 (1997); and (vi) a

forthcoming book entitled Oil and Gas Implied Covenants in the 21st Century that Jurist

Publications will publish.  Tr. at 342:21-344:2 (McArthur).  McArthur described his experience

in both litigating and testifying in royalty disputes in New Mexico and around the country.  See

Tr. at 344:21-350:25 (Gallegos, McArthur).

33.    McArthur testified to his two main conclusions: (i) that the leases' linguistic

differences are largely irrelevant to payment; and (ii) that all leases require payment on all

production.  First, he stated that, after reviewing all 503 leases, he determined that "the great

majority of the leases had variations of the two basic pricing terms": (i) one category that

requires payment on the "proceeds" the lessee receives for selling the lessor's gas -- or "amount

realized" or "amount received"; and (ii) one category that requires payment on the "market

value" or "market price."  Tr. at 351:12-353:8 (Gallegos, McArthur).  McArthur noted that the

leases at issue are form leases that the oil-and-gas industry commonly uses.  See Tr. at 357:8-19

(McArthur)(stating that most of the leases used a form known as Producers' 88 and that the

leases were "not crafted separately for each lessee").  McArthur explained that, on the other

hand, the overriding royalty instruments did not use a common form, even though the overriding

royalties used the same repetitive language.  See Tr. at 357:24-358:8 (McArthur).  McArthur stated that there were approximately six categories of overriding royalty language.  See Tr. at 358:15-359:3 (Gallegos, McArthur).  McArthur further stated that WPX Production did not recognize any of the language variation, instead opting to pay all of the proposed class members using the same keep-whole method.  See Tr. at 360:1-8 (Gallegos, McArthur).  Nevertheless, McArthur added, the linguistic differences do not implicate pricing issues, and under the industry's practice, those differences are not significant.  See Tr. at 364:20-366:10 (Gallegos, McArthur).

34.    Second, McArthur stated that, outside of this case, some leases he has seen expressly state that no implied covenants apply to the lease, and some royalty provisions expressly exclude payment on NGLs or condensate.  See Tr. at 362:22-363:6 (McArthur). McArthur further explained that there is an industry practice of using the word "gas" in a royalty agreement to mean "gas and its components or constituents."  Tr. at 369:21-23 (McArthur). Accordingly, McArthur testified that, when a royalty agreement requires royalty payment on "all oil and gas," it requires the lessee "to pay on all the products you get from the production stream."  Tr. at 373:15-20 (McArthur).  McArthur noted that none of the royalty instruments address the use of an index price in a transaction between affiliated companies as a basis for royalty payment.  See Tr. at 383:17-22 (Gallegos, McArthur).

### e.    The Plaintiffs' Fifth Witness: John Tysseling.

35.    Tysseling obtained his Bachelor's Degree in economics and philosophy from the University of New Mexico in 1978, his Master's Degree in economics from the University of New Mexico in 1979, and his Ph.D. in economics in 1986, with an emphasis on applied natural resource economics and natural resources law.  See Tr. at 406:2-8 (Tysseling).  In 1985, he joined the New Mexico State Land Office, where he established a royalty management division

which worked on royalty policy issues, integrated all aspects of royalty management within the State Land Office, and developed an oil-and-gas information system that managed the State of New Mexico's production, royalty, and tax interests.   See Tr. at 406:25-407:8 (Tysseling). During his tenure at the State Land Office, Tysseling testified before the Federal Energy Regulatory Commission and other state commissions regarding interstate market reforms in the oil-and-gas industry.  See Tr. at 407:15-24 (Gallegos, Tysseling).  In 1992, Tysseling began his own economic consulting business focusing on energy and natural resource issues, particularly those involving oil and gas.  See Tr. at 408:8-11 (Tysseling).  Since that time, Tysseling has testified in class certification proceedings regarding the management ability of class actions.  See Tr. at 408:18-25 (Tysseling).  Tysseling also investigated damages associated with failure to properly pay natural gas royalties and royalties on natural gas liquids for the Department of Justice, which was representing the Minerals Management Service of the Department of Interior. See Tr. at 409:18-25 (Tysseling). Currently, Tysseling works in Albuquerque for Moss Adams LLP, a private consulting firm based in Seattle, Washington.  See Tr. at 410:15-19 (Tysseling).

36.     Tysseling first testified that all class members will benefit from having NGL values included in their royalty payments.  See Tr. at 415:20-24 (Gallegos, Tysseling).  Tysseling explained that "damages can be calculated on a class-wide basis related to the failure to pay on natural gas liquids."  Tr. at 414:14-16 (Tysseling).  Tysseling stated that he applied a 5.5% royalty burden, which is the amount that the proposed class members were entitled to be paid, see Tr. at 417:4-24 (Gallegos, Tysseling), and reduced the damages to account for a fourteen percent processing fee for the New Mexico royalty owners, see Tr. at 417:1-418:8 (Gallegos, Tysseling).

37.     Tysseling then described his process.  He reviewed eighty-four months' worth of invoices from Williams Four Corners to WPX Production for Williams Four Corners' gathering and processing services.  See Tr. at 419:10-420:17 (Gallegos, Tysseling).  He stated that the invoices provided a means for him to determine: (i) which WPX Production wells produced the gas that Williams Four Corners processed under the J99 contract; (ii) the portion of the gas processed that is attributable to WPX Production's working interest on the particular well; and (iii) the gallons per thousand cubic feet ("gpm") for each of the NGL products attributable to WPX Production's interest in each well.  Tr. at 420:13-422:8 (Gallegos, Tysseling); id. at 427:15-21 (Tysseling)(stating that the "data provides both the gross Mcf produced from the well and the gross MMBtus produced from the well in that production month"); id. at 428:21-429:21 (Gallegos, Tysseling); id. at 433:9-23 (Gallegos, Tysseling).  Tysseling noted that, even if wells produce different amounts of liquids, the data that the Defendants provided to him accounts for those differences.  See Tr. at 430:20-21 (Tysseling).

38.     Finally, Tysseling described his summary of the NGL production from each of the three processing plants at issue in Plaintiffs' Hearing Ex. 227.  See Tr. at 430:24-431:8 (Gallegos, Tysseling).  Plaintiffs' Hearing Ex. 227 also reveals the sales proceeds that Williams Four Corners obtained for the NGL sales.  See Tr. at 432:6-18 (Gallegos, Tysseling).  He described how the Defendants' expert omits the full value of WPX Production gas volume in the Defendants' damages calculation.  See Tr. at 434:2-10 (Gallegos, Tysseling).[26]  In sum, Tysseling concluded that the class would be entitled to a preliminary damages amount of approximately $9 million of NGLs, which includes a deduction for a 5.5% royalty burden and a

---

[26]This calculation relates solely to propane and gasoline, and omits the butane content, because: (i) "it's small;" and (ii) "it was discontinuous" during the time period at issue.  Tr. at 434:6-10 (Tysseling).

fourteen-percent processing fee.  See Tr. at 437:6-17 (Gallegos, Tysseling).   On cross-examination, Tysseling conceded that his calculations did not take into account certain deductions like taxes and certain fractionation costs.  See Tr. at 438:9-13 (Tysseling).

> **f.**      **The Plaintiffs' and Defendants' Witnesses by Deposition.**

39.      Both the Plaintiffs and the Defendants designated portions of Mark Beach's video deposition to be played at the hearing.  Beach works for WPX Production in Broken Arrow, Oklahoma.  See Deposition of Mark Beach at 4:13-25 (Beach)(taken November 15, 2013)("Beach Depo.").  He explained that WPX Production maintains oil-and-gas leases and overriding royalty agreements in various files.  See Beach Depo. at 10:2-11 (Beach).  Beach then described his two-week process of finding the named Plaintiffs' original lease documents and other related documents.  See Beach Depo. at 28:7-34:16 (Beach).  He stated that, although he believed that he found most of the lease documents creating the named Plaintiffs' interests, he did not know whether he found every one.  See Beach Depo. at 53:13-14 (Beach).

40.      Jefferson Paul Dolan also testified by video deposition.  Dolan currently works as director of infrastructure services for WPX Production in Tulsa, Oklahoma, where he manages a group of commercial representatives that negotiate gathering and processing contracts.  See Deposition of Jefferson Paul Dolan at 4:7-14 (taken February 10, 2014) (Dolan)("Dolan Depo."); id. at 15:19-16:8 (Dolan).  He has formerly worked as an engineer and as a project developer for Williams Field Services and Williams Production Company, where he also engaged in gas marketing.  See Dolan Depo. at 5:13-7:11 (Dolan); id. at 9:2-25 (Dolan).  Dolan explained that the December 9, 2013 gathering and processing between WPX Production and Williams Four Corners, which he negotiated, was not a keep-whole contract.  See Dolan Depo. at 20:8-24:25 (Dolan).  He described how one of his goals in negotiating the contract was to retain the NGL

value of the gas.   See Dolan Depo. at 25:8-25 (Dolan).   He also described the Williams companies' 2011 spin-off and restructuring.   See Dolan Depo. at 46:18-48:12 (Dolan).

41.   Frank Field testified by video deposition next.   He works as a natural gas trader for WPX Production, but he also provides services for WPX Energy Marketing and has formerly worked for various Williams affiliates.   See Field Depo. at 4:7-5:22 (Field); id. at 11:2-23 (Field).   Field explained WPX Productions' marketing process.   See Field Depo. at 17:19-19:19 (Field); id. at 43:1-47:3 (Field).   He stated that, as a gas trading manager, his goals were to "sell and market the products," to "maximize the value of the price that we receive," and "to try to make a profit" by selling the gas at a higher price than the index price.   Tr. at 17:19-19:19 (Field).

42.   The parties designated portions of Sheryl Ward's November, 2013 and April, 2014 depositions.   Ward works for WPX Production in Tulsa, where she is responsible for distributing royalties and working interests to private royalty owners.   See Deposition of Sheryl Ward at 4:19-8:2 (taken November 13, 2013)("Ward Nov. Depo.").   Ward first described the proposed class' composition: the number of royalty and overriding royalty owners in each state. See Ward April Depo. at 1:1-14:16 (Sutphin, Ward).   She then explained WPX Production's royalty payment system.   See Ward April Depo. at 14:17-48:25 (Sutphin, Ward).

43.   Finally, the Defendants designated portions of Julie Mathis' deposition.   See Julie Mathis Deposition (taken June 5, 2014)("Mathis Depo.").   Mathis serves as WPX Productions' accounting director.   See Mathis Depo. at 3:17-25 (Mathis, Sutphin).   Mathis explained how WPX Production calculated its federal royalty obligations.   See Mathis Depo. at 6:5-9:25 (Mathis, Sutphin).   She stated that WPX Production used the "accounting for comparison methodology," under which WPX Production compares the value of processed gas -- i.e., the

value of residue gas after processing, plus the value of NGLs after processing -- with the value of unprocessed gas -- i.e., the wellhead-adjusted Btu -- and uses the higher of the two figures. Mathis Depo at 6:22-8:15 (Mathis, Sutphin).

g.      **The Defendants' First Witness: James Griffin.**

44.      Griffin received his Bachelor's Degree in Mathematics and Economics from Southern Methodist University, and his Ph.D. from the University of Pennsylvania.  See Tr. at 477:4-6 (Griffin).  For the past thirty years, Griffin has served as an economics and public policy professor at the George Bush School at Texas A&M University, specializing in energy economics.  See Tr. at 477:8-13 (Berge, Griffin).  Griffin has published more than fifty articles in peer-reviewed academic journals and eight books, including a leading textbook on energy economics -- Energy Economics and Policy, and sits on the editorial board of three journals specializing in energy economics.   See James M. Griffin Curriculum Vitae (dated January 2014)(Defendants' Hearing Ex. 79)("Griffin CV"); Tr. at 478:18-22 (Griffin).

45.      Griffin first asserted that no common injury exists among all the class members, because "some wells are better off under the existing keep-whole method," while other wells "would be better off under the whole-stream method."  Tr. at 481:14-20 (Griffin).   Griffin explained that "about 38 percent of the wells . . . were actually worse off with the whole-stream approach," because the whole-stream approach benefits the royalty owner only when the well is relatively rich in NGLs.  Tr. at 505:23-8 (Griffin)("If you don't have a well that's relative rich in NGLs, it's costly to go through this procedure of processing it, splitting out the NGLs, and then incurring the expenses of transporting them and fractionating them.").  Griffin performed a well-by-well analysis on each class well to determine which wells were "better off under the existing keep-whole method."  Tr. at 513:9-17 (Griffin).  See Griffin Supplement: Individual Well Summary Assuming Constant 14% NGL Processing Fee (Defendants' Hearing Ex. 144).  He

observed that, after deducting a processor's tax and plant fuel costs, the proposed class members would benefit from using the whole-stream method only during certain time periods where the NGL price was unusually high.  See Tr. at 508:1-25 (Griffin).

46.     On cross-examination, however, Griffin agreed that the whole-stream method would benefit all class members if Griffin did not include certain deductions.  See Tr. at 528:1-9 (Gallegos, Griffin).  Although Griffin maintained that certain fees must be deducted under the whole-stream method, he could not identify the source of the gathering fee and fuel cost used in his calculations.  See Tr. at 587:7-25 (Gallegos, Griffin)("I'm still trying to figure it out, and I didn't get a definitive answer, but we really think that -- I really think that it was based on the cost of service.").  Griffin also admitted that his initial calculations slightly -- but not materially -- "overstated the expenses" involved in transporting some of the NGLs to a fractionation facility. Tr. at 578:4-14 (Gallegos, Griffin).

### h.     The Defendants' Second Witness: John Emory.

47.     Emory received his bachelor's degree in mechanical engineering from Michigan State University and a Master's in Business Administration from Cleveland State University.  See Tr. at 630:2-5 (Emory).  He has worked in the oil-and-gas industry for approximately thirty-four years, holding positions in engineering, business, and consulting.  See Tr. at 630:8-631:22 (Emory).  As a midstream participant, Emory negotiated gathering and processing agreements.  See Tr. at 632:5-7 (Emory).  Currently, he works for the Dallas-based consulting firm Pearson, Watson, Millican, where he advises clients on negotiating gathering and processing contracts, and on royalty and gas valuations issues in San Juan Basin related litigation.  See Tr. at 631:23-25 (Emory); id. at 634:12-636:24 (Sutphin, Emory).

48.     To support his opinion that this case is not amenable to a common damages model, Emory testified that not all gas is processed for NGL removal and that some gas is merely

treated for carbon dioxide removal.  See Tr. at 672:18-21 (Emory).  Emory testified that his research revealed which wells' gas flowed to which specific plant.  See Tr. at 653:16-656:1 (Emory, Sutphin).  This determination enabled him to identify how much of the class wells' gas was processed, and how much of the gas was instead treated at the Milagro plant or bypassed around a processing plant.  See Tr. at 662:3-8 (Emory); id. at 664:20-665:4 (Emory, Sutphin); id. at 667:6-9 (Emory, Sutphin).  He testified that eight to ten percent of the class well volumes were bypassed around the Ignacio plant, and a total of around sixty to sixty-five percent of the gas was not processed, whereas eighty to ninety percent of the named Plaintiffs' gas was not processed. See Tr. at 667:23-669:2 (Emory, Sutphin).  In sum, he stated that "not all of the wells that are on Plaintiffs' proposed class list are actually being processed at one of the Williams Four Corners gas processing plants."  Tr. at 672:18-21 (Emory).

49.     On cross examination, Emory testified that each well's meter enables a person to determine whether a class well was being allocated liquids in a particular month.  See Tr. at 718:7-20 (Emory, Gallegos).  He further agreed that he could ascertain the actual amount of liquids extracted and the amount of liquids allocated to a particular well, even if those liquids were not actually processed.  See Tr. at 719:6-19 (Emory, Gallegos).

50.     Second, Emory testified that "a significant number of the wells that are on Plaintiffs' proposed class well list are commingled wells, where there is actually a conventional formation and a Fruitland coal-bed formation commingled."  Tr. at 672:13-18 (Emory).  Emory explained that this commingling requires the Court to identify which liquids are allocable to the conventional formation as opposed to the coal-bed formation.  See Tr. at 672:21-24 (Emory). Emory stated that, to determine which gas is conventional gas, the Plaintiffs would have to rely on decades-old gas sampling, or instead, perform a new time-intensive analysis.  See Tr. at

678:3-5 (Emory).  The Defendants later identified thirteen class wells that produced from one or more conventional formations that combined production from the Fruitland coal.  <u>See</u> Commingled Well List at 1-7 (Defendants' Hearing Ex. 139).

51.     Based on Emory's experience in the midstream industry, he explained that reasonably prudent operators must consider "a number of different factors," which are "really unique to any given well and the circumstances associated with that well."  Tr. at 9-19 (Emory). He described these factors as including: (i) a well's NGL composition; (ii) the volume of gas a well produces; (iii) a well's proximity to a gathering system connection;[27] (iv) the commercial terms involved in a gathering agreement for a particular well; and (v) the overall economics associated with extracting the liquids.  <u>See</u> Tr. at 689:7-19 (Emory); <u>id.</u> at 695:5-15 (Emory); <u>id.</u> at 698:4-699:7 (Emory, Sutphin).  Emory concluded that determining whether an operator acted reasonably requires a well-by-well analysis, because these factors vary drastically between wells. <u>See</u> Tr. at 752:6-9 (Emory, Sutphin).  On cross-examination, Emory admitted that, even though wells have numerous differences between them, producers typically do not make gathering and processing agreements for one well; they make the contracts based on a whole package of wells. <u>See</u> Tr. at 704:17-705:20 (conceding that contracts are typically entered into "with a number of wells, or a given area").

### i.     The Defendants' Third Witness: Kris Terry.

52.     Terry obtained her bachelor's degree in history from the University of Oklahoma in 1976, and her law degree from the University of Oklahoma in 1979.  <u>See</u> Tr. at 782:12-21

---

[27]The class wells "are already connected to the Williams Four Corners system, so there is a certain advantage of already being connected."  Tr. at 697:4-6 (Emory).  Specifically, WPX Production would not have to lay flow lines or pipelines to connect and gather the gas to a pipeline, nor would it have to consider various individual issues, like the size of the pipe, the pressure, the type of terrain the pipe must cross, and other expenses involved in connecting a well to a pipeline system.  <u>See</u> Tr. at 695:20-696:6 (Emory).

(Sheridan, Terry).  She then worked for Fina Oil and Chemical Company, where she served as the exploration-and-production manager for natural gas contracting, and negotiated natural gas contracts when the natural gas industry was undergoing a fundamental restructuring because of federal deregulation.  See Tr. at 783:1-785:11 (Sheridan, Terry).  Since 1989, Terry has served as President of Kris Terry & Associates, Inc., where she performs consulting services in the oil-and-gas industry.  See Tr. at 781:3-25 (Sheridan, Terry). She advises producers in negotiating gathering and purchasing agreements with midstream companies.  On natural gas sales contract, she helps companies evaluate merger prospects based on the target company's existing oil-and-gas prospects, and she advises companies in litigation.  See Tr. at 781:20-782:7 (Sheridan, Terry).  She has testified as an expert witness in numerous oil-and-gas disputes in state court and federal court, often on issues relating to royalty language.  See Tr. at 785:12-25 (Terry).

53.     Terry testified that some overriding royalty instruments relate to parties that are not in the class.  See Tr. at 791:4-7 (Sheridan, Terry).  Specifically, she stated that: (i) "six instruments that were retained by Williams Production Company, Northwest Pipeline, or El Paso, [] are now in the hands of WPX," Tr. at 791:10-15 (Terry); (ii) four overriding royalty instruments "relate to Fruitland coal gas," Tr. at 791:21-792:2 (Sheridan, Terry); (iii) one instrument is an assignment of a networking interest, see Tr. at 792:5-6 (Terry); (iv) five instruments are assignments of "existing overriding royalty interests and therefore, not the original assignment that created the override," Tr. at 793:13-17 (Terry); and (v) eighty-six instruments are "corrections of a previous assignment," which "supersede that original assignment," Tr. at 794:4-7 (Terry).  She argued that, to determine what has been reserved, one must "go back to the original instrument that creates this interest."  Tr. at 793:18-21 (Terry).  She disagreed with the Plaintiffs' classifications, stating that some overriding instruments modified

the override to pay royalty in the same manner as the federal government's payments and arguing that the Plaintiffs "lumped together" different types of leases into the same category. Tr. at 795:15-21 (Terry). See id. at 796:8-9 (Terry); id. at 826:11-17 (Terry).

### j.    The Closing Arguments.

54.    The parties gave their closing arguments on July 14, 2014. See Tr. at 999:1. The Court will summarize each of the parties' arguments.

### i.    The Plaintiffs' Closing.

55.    The Plaintiffs emphasized that the Defendants failed "to pay royalty to the class members across the board" on NGLs, and failed "to pay royalty on the actual sales proceeds for processed gas." Tr. at 1003:7-13 (Gallegos). The Plaintiffs clarified that they dropped their claim for nonpayment of royalty on condensate, as the facts in this case did not support that claim. See Tr. at 1003:25-1004:3 (Gallegos).

56.    The Court asked the Plaintiffs how certification in Anderson would impact the Plaintiffs' case. See Tr. at 1005:3-12 (Court). The Plaintiffs observed that Anderson contains many claims that their case does not include. See Tr. at 1005:17-25 (Gallegos). They argued that their case was sufficiently different from Anderson to allow the Court to certify a class here, even if it could not do so in Anderson. See Tr. at 1007:6-16 (Gallegos). The Plaintiffs then summarized the applicable law and notable testimony from the class certification hearing. See Tr. at 1007:18-1019:3 (Gallegos).

57.    The Plaintiffs further explained how they could calculate a class-wide damages measure for the failure to pay NGLs claim, as well as the underpayment of processed gas claim. See Tr. at 1017:5-1018:19 (explaining that, while the Plaintiffs did not have all of the data necessary to calculate damages for the underpayment of processed gas, they proposed to find the

difference between "what the gas actually sold for" and "one month's revenue as attributed on index to WPX").

58.     Regarding typicality, the Plaintiffs argued that H Limited's interests are typical of the class' interests, because it owns interests in a federal unit well, and "everybody in federal units is paid in this same kind of an acreage allocation method."  Tr. at 1013:5-13 (Gallegos). Similarly, they asserted that S. Abraham's interests are typical of the Colorado royalty owners' interests, because he owns royalties in Colorado.  See Tr. at 1013:14-19 (Gallegos).

59.     The Plaintiffs conceded that "there are times when the gas is bypassed and not processed," but maintained that the bypass was "[i]rrelevant," because WPX Production "allocated" NGLs to the well that produced those NGLs each month.  Tr. at 1022:25-1023:5 (Gallegos).  The Plaintiffs explained that, in other words, WPX Production determined the amount of NGLs that each well produced in any given month, regardless whether the gas from that well was processed.  See Tr. at 1030:15-1031:8 (Gallegos).

60.     Finally, the Plaintiffs stated that their "class definition [] calls for a couple modifications . . . .  [W]e also propose that the class definition speak to the gas and liquids processed at the various plants, or if not processed, the gas is or has been allocated natural gas liquids . . . ."  Tr. at 1033:2-16 (Gallegos)(emphasis added).   After the hearing, they acknowledged that they "were not aware of the issue raised by defendants, i.e., that conventional gas from some WPX wells is not processed, until defendants served their expert reports." Plaintiffs' Response in Opposition to Defendants' Motion to Determine Class Certification Based on the Class Definition Contained in Plaintiffs' Fourth Amended Complaint at 6, filed September 29, 2014 (Doc. 232)("Response Supporting Class Definition Modification").  They therefore asked the Court to modify the class definition, because modification is necessary and

will conform to the evidence presented.  See Response Supporting Class Definition Modification at 5-7.  The Defendants objected that they "spent thousands of hours building their respective cases around the definition" in the FAC.  Motion to Determine Class Certification Based on the Class Definition Contained in Plaintiffs' Fourth Amended Complaint, filed September 10, 2014 (Doc. 222)("Class Definition Motion").  They argued that the Plaintiffs' "new definition is an eleventh hour attempt to expand their putative class to avoid the consequences of WPX's unrebutted evidence that first, a significant amount of WPX gas is not subject to the class claims, and second, the definition contained in Plaintiffs' Fourth Amended Complaint renders the class unascertainable."  Class Definition Motion at 1.  The parties later agreed, however, that the Court should use the FAC's class definition without any further modifications.  Agreed Order on Class Definition at 1-2.

## ii.      The Defendants' Closing.

61.     The Defendants opened by explaining that the Plaintiffs' main argument for certification on their breach-of-contract claim for failure to pay on NGLs rested on the following: (i) WPX Production pays royalties in a uniform fashion; and (ii) all of the leases require payment on all production.  See Tr. at 1035:20-25 (Sheridan).  The Defendants argued that "all production" includes only the gas as it emerges from the well and not the later-extracted NGLs.  Tr. at 1037:3-1038:13 (Sheridan).  They cite numerous cases standing for the proposition that, although "gas" may include all constituent elements, the word does not require payment on the processed plant products.  Tr. at 1038:15-1042:15 (Sheridan).

62.     Next, the Defendants spent the majority of their time explaining how the implied duty to market did not include an expanded duty to process and market NGLs.  See Tr. at 1057:7-1062:17 (Court, Sheridan).  They argued that the duty is more limited.  They asserted

that, were the Court to conclude that the duty to market includes a duty to market NGLs, the Court would have to consider extrinsic evidence for each royalty agreement.  See Tr. at 1058:2-1071:7 (Court, Sheridan).

63.     The Defendants concluded that "Emory's testimony demonstrates beyond any question that the plaintiffs cannot meet the requirements of ascertainability of the class."  Tr. at 1071:18-21 (Sheridan).

### iii.     The Plaintiffs' Rebuttal.

64.     On rebuttal, the Plaintiffs clarified that their case "is not a marketable condition case."  Tr. at 1073:2-3 (Gallegos).  They emphasized that the implied-duty-to-market claim at issue involves the same implied duty described in "good old Darr versus Eldridge and Libby versus De Baca."  Tr. at 1073:4-7 (Gallegos)(underline added).  The Plaintiffs also emphasized that "[y]ou can't inject a product into the pipelines without processing," which means that all of the gas is processed and yields NGLs.  Tr. at 1076:5-10 (Gallegos).

65.     They argued that no lease negated the duty to pay royalty on the NGLs.  See Tr. at 1078:17-25 (Gallegos).  They further asserted that "all production" "means the components of the gas as it's processed."  Tr. at 1080:4-7 (Gallegos).

### 6.     The Supplemental Filings.

66.     The Defendants filed several notices regarding supplemental authority, all of which the Court considered in reaching its opinion.  The Court also considered these cases' subsequent histories on appeal or remand.  On February 20, 2014, the Defendants advised the Court of "Fitzgerald v. Chesapeake Operating, Inc., Case No. 111,566, as issued on February 14, 2014," in which the "Oklahoma Court of Civil Appeals reversed the trial court's decision to certify a class of royalty owners who claimed that Chesapeake had underpaid royalties on oil and gas production.  Defendants' Notice of Supplemental Authority, filed February 20, 2014 (Doc.

142).  Second, on May 12, 2014, the Defendants advised the Court of <u>Lauren v. PNC Bank,</u> <u>N.A.</u>, 296 F.R.D. 389 (W.D. Pa. 2014), which stands "for the proposition that a putative class representative lacks standing to bring class-wide claims, including common law claims, under state laws that bear no causal relationship to that plaintiff's injury."  Notice of Supplemental Authority on Motion to Dismiss for Lack of Standing, filed May 12, 2014 (Doc. 193).  On September 25, 2014, the Defendants advised the Court of <u>EQT Production Co. v. Adair</u>, 764 F.3d 347 (7th Cir. 2014), in which the Fourth Circuit "vacated class certification in five natural gas royalty class actions."  Defendants' Notice of Supplemental Authority in Support of Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification, filed September 25, 2014 (Doc. 231).

67.     On June 27, 2016, the Defendants advised the Court of additional authorities supporting their position.  <u>See</u> Defendants' Notice of Supplemental Authorities in Opposition to Plaintiffs' Renewed Motion for Class Certification, filed June 27, 2016 (Doc. 246)("Supplemental Notice").  They informed the Court that it "must be 'reticent to expand state law without clear guidance from its highest court.'"  Supplemental Notice at 2 (quoting <u>Aclys</u> <u>Int'l v. Equifax</u>, 438 F. App'x 689, 693 (10th Cir. 2011)).  They cited various cases explaining that the Court must "ascertain and apply the most recent statement of state law by the state's highest court."  Supplemental Notice at 2 (quoting <u>Proctor Gamble Co. v. Haugen</u>, 222 F.3d 1262 (10th Cir. 2000).

68.     The Plaintiffs responded that the Defendants may not "submit additional argument on an issue under the guise of submitting supplemental authority."  Plaintiffs' Response to Defendants' Notice of Supplemental Authorities in Opposition to Plaintiffs' Renewed Motion for Class Certification, filed June 29, 2016 (Doc. 247)("Supplemental

Response").  They "ask the Court to ignore the legal argument in the Response."  Supplemental

Response at 1.

## CONCLUSIONS OF LAW

Having made its findings of fact, the Court issues the following legal conclusions, first

outlining the law and then analyzing the facts at hand.  Part I outlines the law regarding class

certification.  Part II outlines the NMPPA's relevant provisions.  Part III contains the Court's

analysis.

## I.      LAW REGARDING CERTIFYING CLASS ACTIONS UNDER RULE 23(b)(3).

1.       Rule 23 sets forth the requirements for certifying a class action under the federal

rules.  See Fed. R. Civ. P. 23.  All classes must satisfy: (i) all the requirements of rule 23(a); and

(ii) one of the three sets of requirements under rule 23(b), where the three sets of requirements

correspond to the three categories of classes that a court may certify.  See Fed. R. Civ. P. 23(a)-

(b).  The plaintiff[28] bears the burden of showing that the requirements are met, see Rex v. Owens

ex rel. Okla., 585 F.2d 432, 435 (10th Cir. 1978); Pueblo of Zuni v. United States, 243 F.R.D.

436, 444 (D.N.M. 2007)(Johnson, J.), but, in doubtful cases, class certification is favored, see

Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968)("[T]he interests of justice require that in a

doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the

class action."); Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968)("[W]e hold that

. . . rule [23] should be given a liberal rather than a restrictive interpretation, and that [denying

certification] is justified only by a clear showing to that effect . . . .").  In ruling on a class

certification motion, the Court need not accept the representations of either party, but must

---

[28]Technically, it is the party seeking certification, i.e., the movant, who bears the burden of proof, and defendants may also move for class certification.  See William B. Rubenstein, Newberg on Class Actions § 7:20 (5th ed.).  As a practical matter, however, motions for class certification are made almost exclusively by plaintiffs.

independently find the relevant facts to a preponderance of the evidence.[29]  See Rutstein v. Avis

Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000)("Going beyond the pleadings is

necessary, as a court must understand the claims, defenses, relevant facts, and applicable

substantive law in order to make a meaningful determination of the certification issues.").  "In

determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs

have stated a cause of action or will prevail on the merits, but rather whether the requirements of

Rule 23 are met."  Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir. 1982).  See

Vallario v. Vandehey, 554 F.3d 1259, 1267 (10th Cir. 2009)("We, of course, adhere to the

principle that class certification does not depend on the merits of a suit.").  Still, the Court must

conduct a rigorous analysis of the rule 23 requirements, even if the facts that the Court finds in

its analysis bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard.  A party seeking class
> certification must affirmatively demonstrate his compliance with the Rule -- that
> is, he must be prepared to prove that there are in fact sufficiently numerous

---

[29]As the Court has previously noted, Tenth Circuit precedent suggests that the Court must
show some level of deference to the Complaint's factual allegations when ruling on a rule 23
motion: "The Court must accept a plaintiff's substantive allegations as true, but it "need not
blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and
factual issues presented by plaintiff's complaints."  In re Thornburg Mortg., Inc. Sec. Litig., 912
F. Supp. 2d 1178, 1120 (D.N.M. 2012)(Browning, J.)(citing Shook v. El Paso Cnty., 386 F.3d
963, 968 (10th Cir. 2004); J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v.
Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)).  Since the Court's statement in In re Thornburg
Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued a case stating that district
courts should apply a "strict burden of proof" to class certification issues.  Roderick, 725 F.3d
1213, 1218 (10th Cir. 2013).  This request is consistent with the general trend in the federal
judiciary towards using an ordinary preponderance standard to find facts at the class certification
stage.  See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d
196, 202 (2d Cir. 2008); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3d Cir. 2008);
William B. Rubenstein, Newberg on Class Actions § 7:21 (5th ed.)(tracing the shift in the case
law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard,
and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities
Litigation -- a statement that earlier versions of the treatise espoused).  Thus, although the Tenth
Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class
certification analyses, it most likely will, and the Court will employ that standard here.

> parties, common questions of law or fact, etc.   We recognized in [General
> Telephone Co. of the Southwest v.] Falcon that "sometimes it may be necessary
> for the court to probe behind the pleadings before coming to rest on the
> certification question," and that certification is proper only if "the trial court is
> satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been
> satisfied.   Actual, not presumed, conformance with Rule 23(a) remains
> indispensable."  Frequently that "rigorous analysis" will entail some overlap with
> the merits of the plaintiff's underlying claim.  That cannot be helped.  The class
> determination generally involves considerations that are enmeshed in the factual
> and legal issues comprising the plaintiff's cause of action.  Nor is there anything
> unusual about that consequence: The necessity of touching aspects of the merits in
> order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar
> feature of litigation.

Wal-Mart, 131 S. Ct. 2541, 2551-52 (2011)(Scalia, J.).  In a subsequent, seemingly contradictory

admonition, however, the Supreme Court cautioned district courts not to decide the merits of the

case at the class certification stage:

> Although we have cautioned that a court's class-certification analysis must be
> "rigorous" and may "entail some overlap with the merits of the plaintiff's
> underlying claim," Rule 23 grants courts no license to engage in free-ranging
> merits inquiries at the certification stage.  Merits questions may be considered to
> the extent -- but only to the extent -- that they are relevant to determining whether
> the Rule 23 prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1194-95 (2013)(Ginsburg, J.).

To reconcile these two directives, the Court will find facts for the purposes of class certification

by the preponderance of the evidence, but will allow the parties to challenge these findings

during the subsequent merits stage of this case.   This approach is analogous to preliminary

injunction practice, and many circuits have endorsed it.  See Abbott v. Lockheed Martin Corp.,

725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313

(3d Cir. 2008); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).  Because of

the res judicata effect a class judgment has on absent parties, a court may not simply accept the

named parties' stipulation that class certification is appropriate, but must conduct its own

independent rule 23 analysis.  See Amchem Prods., Inc. v. Windsor, 521 U.S. at 620-22.  In

taking evidence on the question of class certification, the Federal Rules of Evidence apply, albeit in a relaxed fashion.  See Anderson, 306 F.R.D. at 378 n.39.

      **1.**      **Requirements Applicable to All Classes: Rule 23(a).**

      2.      All classes must satisfy the prerequisites of rule 23(a):

      **(a)**      **Prerequisites**.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

            **(1)**      the class is so numerous that joinder of all members is impracticable;

            **(2)**      there are questions of law or fact common to the class;

            **(3)**      the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

            **(4)**      the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a)] are clearly met."  Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988).  "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'"  Shook v. El Paso Cnty., 386 F.3d 963, 968 (10th Cir. 2004)(quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161 (1982))(citing Reed v. Bowen, 849 F.2d at 1309).  These four requirements are often referenced as numerosity, commonality, typicality, and adequacy, respectively.

      **a.**      **Numerosity.**

      3.      Rule 23(a)(1) requires that the putative class membership be sufficiently large to warrant a class action, because the alternative of joinder is impracticable.  Some courts have held that numerosity may be presumed at a certain number; the Tenth Circuit, however, "has never

adopted such a presumption." Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006). "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *7 (D.N.M. Aug. 21, 2010)(Browning, J.)(quoting Rex v. Owens, 585 F.2d 432, 436 (10th Cir. 1978)). Cf. Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 624 (5th Cir. 1999)(finding that proposed class consisting of "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement"). In determining whether a proposed Class meets the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable." Neiberger v. Hawkins, 208 F.R.D. 301, 313 (D. Colo. 2002)(citation omitted). See Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 884 n.1 (6th Cir. 1997)(noting that rule 23(a)(1) is not a "'strict numerical test'"; holding, however, that where class comprises over 1,100 persons, suggestion that joinder is not impractical is "frivolous")(citation omitted); Robidoux v. Celani, 987 F.2d 931, 936 (2nd Cir. 1993)("[T]he difficulty in joining as few as 40 putative class members should raise a presumption that joinder is impracticable." (citation omitted)). "Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required." Cook v. Rockwell Int'l Corp., 151 F.R.D. 378, 384 (D. Colo. 1993). See Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993)("Impracticable does not mean impossible."). The Court has previously found that joinder of "several hundred tenants and homeowners" would be impracticable, and thus the proposed class met rule 23(a)(1)'s numerosity requirement. Lowery v. City of Albuquerque, 273 F.R.D. 668, 683 (D.N.M. 2011)(Browning, J.). At the other end of

the spectrum, the Court found that a class of 6,100 members, in a securities action, was so numerous that joinder was impracticable.   See Lane v. Page, 272 F.R.D. 558, 574 (D.N.M. 2011)(Browning, J.).   See also Thompson v. Jiffy Lube Intern., Inc., 250 F.R.D. 607, 620 (D. Kan. 2008)(Brown, J.)(finding that the numerosity requirement is met by a proposed class seeking injunctive relief that constituted "at least tens of millions of members," and by a proposed class seeking damages that constitutes at least 4,900 members).

> **b.**     **Commonality.**

4.     Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2) (emphasis added).  Even "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist."  In re Intelcom Group Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996).  See Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."  (citations omitted)).  A single common question will suffice to satisfy rule 23(a)(2), but the question must be one "that is central to the validity of each one of the claims."  Wal-Mart, 131 S. Ct. at 2551.

5.     "The commonality requirement has been applied permissively in securities fraud litigation."   In re Initial Pub. Offering Sec. Litig., 227 F.R.D. 65, 87 (S.D.N.Y. 2004). "Securities cases often involve allegations of common courses of fraudulent conduct, which can

be sufficient to satisfy the commonality requirement."  5 Jerold S. Solovy, Ronald L. Marmer, Timothy J. Chorvat & David M. Feinberg, Moore's Federal Practice § 23.23[4][b], at 23-77 (3d ed. 2004).  "Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met."  In re Oxford Health Plans, Inc. Sec. Litig., 191 F.R.D. 369, 374 (S.D.N.Y. 2000).  Accord Initial Pub. Offering, 227 F.R.D. at 87 ("In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied.").

6.     The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in Wal-Mart, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer.  See Wal-Mart, 131 S. Ct. at 2550-52.  In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination.  See 131 S. Ct. at 2547.  Wal-Mart, however, had no centralized company-wide hiring or promotion policy, instead opting to leave personnel matters to the individual store managers' discretion.  See 131 S. Ct. at 2547-48.  The plaintiffs argued that, although no discriminatory formal policy applied to all proposed class members, "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class member] the victim of one common discriminatory practice."  131 S. Ct. at 2548.  The Supreme Court disagreed that such a theory constitutes a common question under rule 23(a)(2).

> The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class."  Rule 23(a)(2).

That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'"  Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009).  For example: Do all of us plaintiffs indeed work for Wal-Mart?  Do our managers have discretion over pay?  Is that an unlawful employment practice?  What remedies should we get?  Reciting these questions is not sufficient to obtain class certification.  Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," Falcon, 102 S. Ct. at 2364.  This does not mean merely that they have all suffered a violation of the same provision of law.  Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company.  Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.  Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

> What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Wal-Mart, 131 S. Ct. at 2550-51 (emphasis in original)(quoting Nagareda, supra, at 132).  In

EQT Production Co. v. Adair, the Fourth Circuit stated:

> We first review the aspects of the district court's analysis that apply to all five royalty underpayment classes.

> At bottom, the district court believed that both the commonality and predominance requirements of Rule 23 were satisfied by the same basic fact: the defendants employed numerous uniform practices related to the calculation and payment of CBM royalties.  These common practices are not irrelevant to Rule 23(b)'s predominance requirement.  But we hold that the district court abused its discretion by failing to consider the significance of this common conduct to the broader litigation.

> The district court identified numerous common royalty payment practices. For example, it noted that EQT sells all of the CBM it produces in Virginia to an affiliate, EQT Energy, and that "all royalty owners within the same field have

been paid royalties based on the same sales price for the CBM."  With respect to CNX, it noted that CNX "has uniform policies and procedures which governed its calculation of CBM revenues," and that "it has deducted severance and license taxes when calculating royalties since January 1, 2004."

That the defendants engaged in numerous common practices may be sufficient for commonality purposes.  As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).

764 F.3d at 366 (citations omitted).

7.      In <u>Wal-Mart</u>, Justice Scalia stated: "Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay."  131 S. Ct. at 2546.  From this observation, he then concluded:

Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims.  And because the necessity of that litigation will prevent backpay from being "incidental" to the classwide injunction, respondents' class could not be certified even assuming, arguendo, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

<u>Wal-Mart</u>, 131 S. Ct. at 2561.  Thus, the common question or questions cannot be "incidental" nor can the plaintiff submit a long list of "incidental" questions or issues, and say that they predominate over the real issues to be used.

### c.      **Typicality.**

8.      Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims.  <u>See</u> Fed. R. Civ. P. 23(a)(3).  The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest.  <u>See</u> <u>Baby Neal ex rel. Kanter v. Casey</u>, 43 F.3d 48, 57 (3d Cir. 1994); <u>Nicodemus v. Union Pac. Corp.</u>, 204 F.R.D. 479, 490 (D. Wyo. 2001).  The Supreme Court of the United States has noted that "[t]he commonality and typicality

requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Sw. v. Falcon, 457 U.S. at 157 n.13.  "Provided the claims of Named Plaintiffs and putative class members are based on the same legal or remedial theory, differing fact situations of the putative class members do not defeat typicality." DG v. Devaughn, 594 F.3d 1188, 1198 (10th Cir. 2010)(citing Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)).  "[L]ike commonality, typicality exists where . . . all putative class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." DG v. Devaughn, 594 F.3d at 1199.  Factual differences among some of the proposed class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988).  See Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975)("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of Plaintiffs and the other putative class members are based on the same legal or remedial theory.").  Accordingly, differences in the amount of damages will not defeat typicality.  See Harrington v. City of Albuquerque, 222 F.R.D. 505, 511 (D.N.M. 2004)(Hansen, J.).  "The United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact." Gianzero v. Wal-Mart Stores Inc., No. CIV 09-00656 REB/BNB, 2010 WL 1258071, at *3 (D. Colo. Mar. 29, 2010)(citing Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982)("In determining whether the typicality and commonality requirements have been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient.")); Adamson v. Bowen, 855 F.2d at 676 ("[D]iffering fact situations of putative class members do not defeat typicality

under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory." (citations omitted)).

### d. **Adequacy.**

9. Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement protects the due-process interests of unnamed proposed class members -- who are bound by any judgment in the action. See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 379 n.5 (1996)(characterizing adequacy of representation as a constitutional requirement); Lile v. Simmons, 143 F. Supp. 2d 1267, 1277 (D. Kan. 2001)("Due process requires that the Court 'stringently' apply the competent representation requirement because putative class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings."). "The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a)." Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d 1286, 1294 (D.N.M. 2006)(Armijo, J.). See Cobb v. Avon Prods., Inc., 71 F.R.D. 652, 654 (W.D. Pa. 1976)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests . . . ."). The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002). In considering this second question, the experience and competence of the attorney representing the class may inform the court's analysis. See Lopez v. City of Santa Fe, 206 F.R.D. at 289-90. Although Tenth Circuit precedent suggests that the adequacy-of-counsel

analysis is conducted as a part of the rule 23(a)(4) inquiry, this analysis has likely now been moved entirely to rule 23(g).[30]  This difference matters little, except that now district courts should not refuse to certify a class on the basis of inadequacy of counsel alone.

10.   The Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the putative class members." E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)(quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)).  Courts have found that intra-class conflicts "may negate adequacy under Rule 23(a)(4)." Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 315 n.28 (5th Cir. 2007)(holding that the district court erred in certifying a class without evaluating intra-class conflicts).  See Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)(finding that representation was inadequate where the class included those "who claim harm from the very acts from which other putative class members benefitted"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 344 (4th Cir. 1998)(holding that the current franchisees, who had an interest in the continued viability of the franchiser had an inherent conflict with former franchisees, whose only interest was in the maximization of damages); Alston v. Va. High Sch. League, Inc., 184 F.R.D. 574, 579 (W.D. Va. 1999)(ruling that a class of all high school female athletes could not be certified -- even if the alleged conduct of the defendant school system was discriminatory -- when some female athletes did not share the same goals or interests as the named female plaintiffs, because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment).

---

[30]The 2003 amendments to rule 23 created rule 23(g), entitled "class counsel."  Fed. R. Civ. P. 23(g).  This subsection contains its own adequacy-of-counsel analysis.  See Fed. R. Civ. P. 23(g)(1)-(2).

11.     On the other hand, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.  Beyond that straightforward proposition, defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition."  7A Charles Alan Wright, Arthur A. Miller & Mary K. Kane, Federal Practice & Procedure § 1768, at 389-93 (3d ed. 2005).  "Though a plaintiff cannot be an adequate representative if he or she has a conflict of interest with putative class members, not every potential disagreement between a class representative and the putative class members will stand in the way of a class suit."  Lowery v. City of Albuquerque, 273 F.R.D. at 680 (citation omitted).

### 2.     **Rule 23(b).**

12.     Once the court finds that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)."  Adamson v. Bowen, 855 F.2d at 675.  See DG v. Devaughn, 594 F.3d at 1199 ("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23.").  Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

> **(b)     Types of Class Actions.**  A class action may be maintained if Rule 23(a) is satisfied and if:
>
> **(1)**     prosecuting separate actions by or against individual putative class members would create a risk of:
>
> **(A)**     inconsistent or varying adjudications with respect to individual putative class members that would establish incompatible standards of conduct for the party opposing the class; or

**(B)** adjudications with respect to individual putative class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

**(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

**(3)** the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

**(A)** the putative class members' interests in individually controlling the prosecution or defense of separate actions;

**(B)** the extent and nature of any litigation concerning the controversy already begun by or against putative class members;

**(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *11 (D.N.M. Aug. 21, 2010)(citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

- 108 -

13.     The three categories of class actions -- really four, as rule 23(b)(1) contains two subcategories, known as (b)(1)(A) and (b)(1)(B) class actions -- are not of equal utility.  Class actions under (b)(1) can be certified only in very particular circumstances.  Class actions under (b)(2) are broadly available, but are only capable of seeking injunctive or declaratory relief, and not damages.  Far and away the most controversial class action category, (b)(3), can be brought for class-wide damages, injunctive relief, declaratory relief, or any combination thereof.  Class actions under (b)(3) always require notice to all proposed class members of certification of the class, and those individuals must be given the opportunity to opt out if they so desire.  See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. at 812 ("[W]e hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court.").  The other class action categories, however, are ordinarily mandatory, and neither notice nor opportunity to opt out needs to be given.  See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. at 811 n.3 (limiting the constitutional requirement of an opt-out notice "to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments").  The Court will focus on the most important form of class action, the (b)(3) damages class action.[31]

---

[31]The Court will briefly address the other class-action types.  Rule 23(b)(1) contains two subcategories of class action, (b)(1)(A) actions and (b)(1)(B) actions; a class need satisfy the requirements of only one to be certified.  See Fed. R. Civ. P. 23(b)(1).  Class actions under (b)(1)(A) are designed to avoid the situation in which a defendant subject to suit by multiple plaintiffs is ordered to undertake incompatible courses of conduct as a result of the non-centralized nature of the adjudication.  See Fed. R. Civ. P. 23(b)(1)(A).  "Incompatible" means more than simply inconsistent.  A situation in which, for example, a defendant was ordered to pay $10,000.00 to a plaintiff in one case, was ordered to pay ten million dollars to another plaintiff in an identical or similar case, and was found to not be at fault at all in yet another case, may be inconsistent, but it does not create "incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  Such alleged inconsistency is a normal and

expected part of the system of individualized adjudication used by the judiciary to apply a uniform set of laws to varied factual settings.  What (b)(1)(A) is designed to avoid is injunctive or declaratory "whipsawing," in which, u.g., one court orders a school district to close an underperforming inner-city school and bus its students to suburban schools, and another court orders the district to keep the school open and bus suburban students in to the school.

Class actions under (b)(1)(B) serve a similar role, but apply when varying adjudications would result in practically -- rather than legally -- incompatible judgments.  See Fed. R. Civ. P. 23(b)(1)(B).  Rule (b)(1)(B) applies when the defendant has possession or control of a *res* -- a pot of money or thing that constitutes the relief that the proposed class seeks -- and the relief sought by all the individual members of the proposed class would more than exhaust the *res*.  For example, if a Ponzi scheme operator took ten billion dollars of investors' money, and, upon law enforcement's discovery of the scheme, had only six billion dollars remaining, then the individual investors' claims to recover their rightful share would add up to four billion dollars more than existed in the *res*.  Thus, the court might certify a (b)(1)(B) class action to ensure that the custodian of the *res* does not pay out the entire *res* to the first investors to file suit, but, instead, distributes the *res* fairly among all investors.

The two subcategories of (b)(1) class action have other things in common as well.  Both exist, in a sense, for the benefit of the defendant -- at least relative to (b)(2) and (b)(3) class actions -- and are rarely brought, in part because plaintiffs have little incentive to bring them.  In the (b)(1)(B) example, each investor hopes to recover the full value of his or her investment, not a 60% value, and thus is incentivized to file as an individual.  In the (b)(1)(A) example, the plaintiff seeking to close down the school (i) does not care about the inconsistent obligations of the school district, and (ii) would rather not be joined in a class action with plaintiffs who want to keep the school open.  Last, (b)(1) class actions, along with (b)(2) class actions, are mandatory: if certified, no person covered under the class definition may opt out of it or pursue his or her own individual claim.  As such, no notice needs to be given to the class members that they are part of ongoing litigation, although the certifying court may elect to direct notice in appropriate circumstances.  See Fed. R. Civ. P. 23(c)(2)(A).

Class actions under (b)(2) provide for injunctive or declaratory relief when a defendant has "acted or refused to act on grounds that apply generally to the class."  Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  Nagareda, supra, at 132.  In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.  Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

Wal-Mart, 131 S. Ct. at 2557 (emphasis in original).  The (b)(2) class action was invented for the purpose of facilitating civil rights suits, and much of its use is in that field today.  See William B.

14.    To satisfy rule 23(b)(3), the court must find "that the questions of law or fact

common to the members of the class predominate over any questions affecting only individual

_____

Rubenstein, Newberg on Class Actions § 4:26 (5th ed.)("Newberg").  The (b)(2) class action allows civil rights litigants to advocate on behalf of all similarly situated individuals, such as a disenfranchised black voter representing a class of all black voters within an unconstitutionally drawn district or a jail inmate representing all inmates in an overcrowding case.  Anyone familiar with the nation's seminal civil rights cases, however, knows that many of them are not brought as class actions, which raises a question:

> [W]hy would anyone ever bring one?  . . .  Th[is] inquiry is generated because if an individual litigant pursues an individual case for injunctive relief and prevails, she can generally get all of the remedy that she needs without going through the hurdles of certifying a class.  For example, to return to Brown v. Board of Education, once Linda Brown prevailed on her race discrimination claim, her remedy -- a desegregated school -- was hers to pursue.  Although that remedy would affect many other persons not a part of her litigation, hence making class certification appropriate, there is no requirement that to secure that remedy, she had to file a class action.
>
> Nonetheless, social change advocates tend to pursue class certification under Rule 23(b)(2) for several reasons.  First, and perhaps most importantly, Linda Brown will likely graduate from school long before her case ends; if hers is simply an individual action, it will become moot and risk dismissal.  Class certification, however, constitutes an exception to the mootness doctrine in certain circumstances.  Second, the scope of the plaintiff's relief is likely augmented by certifying a class.  It is arguable that all that Linda Brown would have been able to secure as a remedy for her individual claim was a desegregated school for herself, not for students throughout the entire school district; there is some relationship between the scope of the class and the scale of the remedy.  Third, it is often the case that the attorneys pursuing civil rights actions are doing so as public interest lawyers paid by an organization like the NAACP Legal Defense Fund or the American Civil Liberties Union (ACLU); they may therefore have a financial incentive to pursue a class's case rather than a series of individual cases as they have limited resources, and the economies of scale may argue for a class action suit.  Most generally, many civil rights cases are brought as class suits because the attorneys and clients pursuing them conceptualize their efforts in group, not individual, terms.  Thus, while an individual civil rights plaintiff might be able to secure the relief that she seeks without a (b)(2) class, a series of factors may encourage the pursuit of one.

Newberg § 4:26 (footnotes omitted).  Like (b)(1) class actions, (b)(2) class actions are mandatory -- individuals covered under the class definition may not opt out -- and do not require notice to be given to the class.  See Fed. R. Civ. P. 23(c)(2)(A).

members, and that a class action is <u>superior</u> to other available methods for the fair and efficient

adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3) (emphases added).  Rule 23(b)(3)

provides that "[t]he matters pertinent to these findings include": (i) the interest of members of the

class in individually controlling the prosecution or defense of separate actions; (ii) the extent and

nature of any litigation concerning the controversy already commenced by or against members of

the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the

particular forum; and (iv) the difficulties likely to be encountered in the management of a class

action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

### i.       The Predominance Requirement.

15.      Rule 23(b)(3)'s first requirement is that questions common to the class

predominate over those that are individualized.  <u>See</u> Fed. R. Civ. P. 23(b)(3).  A question is

common when "the same evidence will suffice for each member to make a prima facie showing,"

<u>Blades v. Monsanto Co.</u>, 400 F.3d 562, 566 (8th Cir. 2005)(citing <u>In re Visa</u>

<u>Check/MasterMoney Antitrust Litig.</u>, 208 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is

"susceptible to generalized, class-wide proof," <u>In re Nassau Cty. Strip Search Cases</u>, 461 F.3d

219, 227 (2d Cir. 2006).  A question is individual when "the members of a proposed class will

need to present evidence that varies from member to member," <u>Blades v. Monsanto Co.</u>, 400

F.3d at 566.  Although a case need not present only common questions to merit certification, and

the presence of some individual questions does not destroy predominance, the rule 23(b)(3)

predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the

latter requires only that a common question or questions exist; the former requires that the

common question or questions predominate over the individual ones.  <u>See Amchem Prods., Inc.</u>

<u>v. Windsor</u>, 521 U.S. 591, 623-24; <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 912 F. Supp. 2d at

1225 ("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s

commonality requirement.").  As the Tenth Circuit, addressing a Title VII claim, put it:

> The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote,
> failure to train, unequal pay, disrespectful treatment, etc.) each require
> independent legal analysis, and similarly challenge the predominance requirement
> of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).
>
> . . . .
>
> Although we do not rest our decision upon Rule 23(a), cases that interpret
> that the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs'
> inability to satisfy Rule 23(b)(3)'s 'far more demanding' requirement that
> common issues predominate.

Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(Ebel, J.)(footnote omitted).

16.     The predominance question applies to both macro damages -- the total class

damages -- and to the micro damages -- the individual damages.  In Comcast Corp. v. Behrend,

133 S. Ct. 1426 (2013), the Supreme Court held that it could not accept the regression model

which the plaintiffs' expert had developed as evidence that damages were susceptible of

measurement across an entire class -- as rule 23(b)(3) requires.  The plaintiffs argued four

theories of antitrust violations; one theory was that Comcast Corp.'s activities had an antitrust

impact, because Comcast Corp.'s activities reduced the level of competition from "overbuilders,"

companies that build competing cable networks in areas where an incumbent cable company

already operates.  The district court found, among other things, that the damages resulting from

overbuilder-deterrence impact could be calculated on a classwide basis.  To establish such

damages, the plaintiffs relied solely on the testimony of Dr. James McClave.  Dr. McClave

designed a regression model which compared actual cable prices in the Philadelphia "Designated

Market Area" with hypothetical prices that would have prevailed but for Comcast Corp.'s

allegedly anticompetitive activities.  The model calculated damages of $875,576,662.00 for the

entire class.   As Dr. McClave acknowledged, however, the model did not isolate damages resulting from any one theory of antitrust impact.   The district court nonetheless certified the class.

17.     The Third Circuit affirmed the district court decision.   The Third Circuit concluded that the plaintiffs "provided a method to measure and quantify damages on a classwide basis," finding it unnecessary to decide "whether the methodology was a just and reasonable inference or speculation."   133 S. Ct. at 1433 (quoting 655 F.3d 182, 206 (3d Cir. 2011)).   The Supreme Court granted certiorari on the question "[w]hether a district court may certify a class action without resolving whether the plaintiff class had introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis."   133 S. Ct. at 24.   Justice Scalia criticized the Court of Appeals' reluctance to entertain arguments against the plaintiffs' damages model "simply because those arguments would also be pertinent to the merits determination . . . ."   133 S. Ct. at 1433.   Justice Scalia said that

> it is clear that, under the proper standard for evaluating certification, respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis.   Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.

Comcast Corp. v. Behrend, 133 S. Ct. at 1433.   Justice Scalia stated that, under the Third Circuit's logic, "at the class-certification stage, *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be.   Such a proposition would reduce rule 23(b)(3)'s predominance requirement to a nullity."   133 S. Ct. at 1433 (emphasis in original).

18.     It is clear that Comcast Corp. v. Behrend applies to classwide damages.  It is less clear that Comcast Corp. v. Behrend's language applies to the determination of individual damages.  There are three ways that the Court could deal with Comcast Corp. v. Behrend and the determination of individual damage awards.  First, the Court could decide that Comcast Corp. v. Behrend applies only to classwide damages and is not controlling at all in the determination of individual damages.  Second, the Court could decide that everything that Justice Scalia said about classwide damages also applies to the determination of individual damages.  Third, the Court could decide that Justice Scalia said some things relating to the determination of individual damages, but not the same things that apply to classwide damages.  As to the first option, while much could be said of limiting Justice Scalia's opinion to classwide damages -- even from the language of the opinion and from the wording of the question presented -- the Court is reluctant to say that it has nothing to say that might be relevant to the determination of individual damages awards.  Some of Justice Scalia's concerns about admissible evidence to determine damages -- whether classwide or individual damage awards -- still seems relevant to whether damages are classwide or individual.  While Justice Scalia was not addressing the determination of individual damage awards, some of what he said -- and how he said it -- causes the Court to be cautious in determining a methodology for calculating individual damage awards.  On the other hand, the Court is not convinced that it should or even can apply Comcast Corp. v. Behrend's language to the individual determination of damages as it does to classwide damages.  The dissent stated that "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal."  133 S. Ct. at 1437 (Ginsburg, J., dissenting).  Justice Scalia did not refute this proposition, and the Court has no reason to think the dissent's statement -- which is accurate -- does not remain good law.  Accordingly, just because each plaintiff and class

member may get a different amount and there has to be a separate calculation of each plaintiff's damages does not defeat class certification.

19.     What the Court thinks that Comcast Corp. v. Behrend says that is relevant to the individual determination of damages is threefold.  First, at the class certification stage, the Court cannot ignore how individual damages, if any are appropriate, are to be decided.  In other words, the Court cannot ignore the possible complexities of the individual damages determinations in making the predominance calculation.  A class can have individual damage calculations, but the Court has to look at the issues of individual damages calculations at the class certification stage. Second, the methodology for all class members needs to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification stage in the predominance analysis.  In other words, if the Court is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class.  Third, even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member.  The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class members that they do not create for other class members or groups.  The predominance analysis must identify precisely the common issues and uncommon issues that application of the class methodology or methodologies raise, and then determine whether, in the total issue mix, the common issues predominate over the individual ones.

20.     A defendant's desire to assert individual counterclaims,[32] does not typically defeat predominance.  See Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 810 (1985); Allapattah Servs, Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003).   A defendant's desire to assert individual affirmative defenses also often does not defeat predominance, see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members."), but this statement is less true after Wal-Mart.[33]   Other recurring individual issues present more serious challenges to predominance, such as: (i) the

---

[32]Generally speaking, counterclaims, even common ones, are not permitted against absent class members at all.

[33]Limitations defenses are an especially common breed of affirmative defense. Limitations defenses generally present common questions, rather than individual ones, because a limitations defense's merits rest on two facts: (i) the date on which the statute of limitations accrued; and (ii) the date on which the action was filed.  Fact (ii) is a common issue in virtually every class action, because the entire class gets credit for the filing date of the class action complaint.  Fact (i) may not be truly common, but it might be, if, for example, the discovery rule delays accrual of a statute of limitations until the cause of action is discovered, and all class members' causes of action are discovered at the same time, or if a single act by the defendant breached contracts with all class members at once.

Even if the question is individual -- for example, if a class is defined as only encompassing preexisting filed claims, or if the discovery rule might delay the accrual of the statute for some class members but not others -- it still typically does not defeat predominance.

Although   a   necessity   for   individualized   statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier.  In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.   As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3).   Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.46[3] (3d ed. 1999)).   See Newberg § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

prima facie element of reliance or due diligence in common-law fraud and other cases;[34]

(ii) differences in the applicable law in a multi-state, state law-based class actions,[35] see Castano

---

[34]The advisory committee's notes to rule 23 state that

> a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes (citations omitted).

> Despite the generalized concern about the individual nature of the misrepresentations and/or reliance inquiry in fraud cases, there are at least three recurring situations in which courts have found common issues predominant in fraud cases: (1) those in which reliance is common across the class; (2) those in which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance.

Newberg § 4:58.  Reliance may be a common issue when the same misrepresentation is made to the entire class; some circuits have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized.  See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)("[T]he Third, Fourth, Fifth, Sixth, and Seventh Circuits . . . have held that oral misrepresentations are presumptively individualized."); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(certifying class where class definition was narrowed to include only those who had received written communications from defendant).  The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company -- are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.

> We have found a rebuttable presumption of reliance in two different circumstances.  First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance.  Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public.  The public information is reflected in the market price of the security.  Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

_____

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008)(citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972); Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988)).

[35]In In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002), Judge Easterbrook, in a pre-Wal-Mart/Comcast opinion, stated:

> No class action is proper unless all litigants are governed by the same legal rules.  Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3).  Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or products-liability suits may not proceed as nationwide classes

288 F.3d at 1015.   Judge Easterbrook then discussed how variations in tires defeat class treatment:

> Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable.  Lest we soon see a Rule 23(f) petition to review the certification of 50 state classes, we add that this litigation is not manageable as a class action even on a statewide basis.  About 20% of the Ford Explorers were shipped without Firestone tires.  The Firestone tires supplied with the majority of the vehicles were recalled at different times; they may well have differed in their propensity to fail, and this would require sub-subclassing among those owners of Ford Explorers with Firestone tires.  Some of the vehicles were resold and others have not been; the resales may have reflected different discounts that could require vehicle-specific litigation.   Plaintiffs contend that many of the failures occurred because Ford and Firestone advised the owners to underinflate their tires, leading them to overheat.  Other factors also affect heating; the failure rate (and hence the discount) may have been higher in Arizona than in Alaska.  Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any discount) and some never will be resold.  Owners who wring the last possible mile out of their vehicles receive everything they paid for and have claims that differ from owners who sold their Explorers to the second-hand market during the height of the publicity in 2000.  Some owners drove their SUVs off the road over rugged terrain, while others never used the "sport" or "utility" features; these differences also affect resale prices.

> Firestone's tires likewise exhibit variability; that's why fewer than half of those included in the tire class were recalled.  The tire class includes many buyers who used Firestone tires on vehicles other than Ford Explorers, and who therefore were not advised to underinflate their tires.

> . . . .

v. Am. Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996); and (iii) the need to determine individual

personal injury damages, which presents such a challenge to predominance that class

certification of mass tort claims is now exceedingly rare, see Amchem Prods., Inc. v. Windsor,

521 U.S. at 625.

21.    There is little uniform guidance on how to assess when common issues

predominate over individual ones, and the Court's statements to this point have, obviously, done

more to disavow various tempting but fallacious rules than they have to set forth a usable

standard.

---

When courts think of efficiency, they should think of market models rather than central-planning models.

Our decision in Rhone-Poulenc Rorer made this point, and it is worth reiterating: only "a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions" (51 F.3d at 1299) will yield the information needed for accurate evaluation of mass tort claims.

. . . .

No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism.  Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court. See BMW v. Gore, 517 U.S. at 568-73; Szabo (reversing a nationwide warranty class certification); Spence v. Glock, G.m.b.H., 227 F.3d 308 (5th Cir. 2000) (reversing a nationwide tort class certification); Larry Kramer, Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547, 579 (1996); Linda S. Mullenix, Mass Tort Litigation and the Dilemma of Federalization, 44 DePaul L. Rev. 755, 781 (1995); Robert A. Sedler, The Complex Litigation Project's Proposal for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty, 54 La. L .Rev. 1085 (1994).  Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

In re Bridgestone/Firestone, Inc., 288 F.3d at 1018-20.

22.     There is currently a split of authority between the United States Court of Appeals over the proper way to analyze predominance -- with the Seventh and Sixth Circuits on one side and the Third, Tenth and Eleventh Circuits on the other.  The Honorable Richard A. Posner,[36] United States Circuit Judge for the Seventh Circuit, concludes that the predominance inquiry boils down to "a question of efficiency."  Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  Judge Posner poses the predominance question as: "Is it more efficient, in terms both of economy of judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?"  Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  In Butler v. Sears, Roebuck & Co., the Seventh Circuit reversed a district court's denial of certification of a class of washing-machine owners who alleged that Sears' washing machines were prone to cultivate mold and affirmed the district court's certification of the same class to pursue a claim that the machines' control units were defective.  See 702 F.3d at 360-61.  The Seventh Circuit certified the class -- which spanned six states -- to pursue its mold claim under state breach-of-warranty law:

> A class action is the more efficient procedure for determining liability and damages in a case such as this, involving a defect that may have imposed costs on tens of thousands of consumers yet not a cost to any one of them large enough to justify the expense of an individual suit.  If necessary a determination of liability could be followed by individual hearings to determine the damages sustained by each class member (probably capped at the cost of replacing a defective washing machine -- there doesn't seem to be a claim that the odors caused an illness that might support a claim for products liability as distinct from one for breach of warranty).  But probably the parties would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines.  The class action procedure would be efficient not only in cost, but also in efficacy, if we are right that the stakes in an individual case would be too small

---

[36] Judge Posner is not only the most widely referenced legal authority alive -- he is the most-cited legal scholar of all time.  See Fred R. Shapiro, The Most-Cited Legal Scholars, 29 J. Legal Stud. 409, 424 (2000).

to justify the expense of suing, in which event denial of class certification would preclude any relief.

. . . .

[T]he district court will want to consider whether to create different subclasses of the control unit class for the different states.  That should depend on whether there are big enough differences among the relevant laws of those states to make it impossible to draft a single, coherent set of jury instructions should the case ever go to trial before a jury.

Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  Along with numerous other class actions pending appeal before the Supreme Court, the Supreme Court vacated Butler v. Sears, Roebuck & Co., and remanded it to the Seventh Circuit "for reconsideration in light of Comcast Corp. v. Behrend."  Butler v. Sears, Roebuck & Co., 727 F.3d at 797 (7th Cir. 2013).  On reconsideration, the Seventh Circuit reaffirmed its prior decision, again in an opinion written by Judge Posner:

Sears thinks that predominance is determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance.  That's incorrect.  An issue "central to the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment.  Wal-Mart, 131 S. Ct. at 2551.  That was said in the context of Rule 23(a)(2), the rule that provides that class actions are permissible only when there are issues common to the members of the class (as of course there are in this case).  But predominance requires a qualitative assessment too; it is not bean counting.  In Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, 133 S. Ct. at 1196, the Court said that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class," and in Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997), it said that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  And in In re Inter-Op Hip Prosthesis Liability Litigation, 204 F.R.D. 330, 345 (N.D. Ohio 2001), we read that "common issues need only predominate, not outnumber individual issues." . . .

As we noted in Carnegie v. Household Int'l., Inc., 376 F.3d 656, 661 (7th Cir. 2004), "the more claimants there are, the more likely a class action is to yield substantial economies in litigation.  It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30. . . .  The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (emphasis in original).  The present case is less extreme: tens of thousands of class members,

each seeking damages of a few hundred dollars. But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.

There is a single, central, common issue of liability: whether the Sears washing machine was defective. Two separate defects are alleged, but remember that this class action is really two class actions. In one the defect alleged involves mold, in the other the control unit. Each defect is central to liability. Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of subclasses. See, e.g., Johnson v. Meriter Health Services Employee Retirement Plan, 702 F.3d at 365 (10 subclasses).

Butler v. Sears, Roebuck & Co., 727 F.3d at 801-02.[37]

---

[37]In addition to articulating the Seventh Circuit's construction of the predominance inquiry, Judge Posner addressed Comcast Corp. v. Behrend's impact on the Seventh Circuit's case:

So how does the Supreme Court's Comcast decision bear on the rulings . . . in our first decision?

Comcast holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges. Comcast was an antitrust suit, and the Court said that "if [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." "[A] methodology that identifies damages *that are not the result of the wrong*" is an impermissible basis for calculating class-wide damages. Id. at 1434 (emphasis added). "For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (*a theory of liability that is not capable of classwide proof* )." And on the next page of its opinion the Court quotes approvingly from Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed.2011), that "the first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact *of that event*." (emphasis the [Supreme] Court's). None of the parties had even challenged the district court's ruling that class certification required "that the damages resulting from . . . [the antitrust violation] were measurable 'on a class-wide basis' through use of a 'common methodology.'"

- 123 -

23.     The Sixth Circuit handled essentially the same case -- a class action against Sears for defective washing machines -- in In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 678 F.3d 409 (6th Cir. 2012), and also elected to certify the mold-based claim.[38]

_____

Unlike the situation in Comcast, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit.

Sears argues that Comcast rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency."  But in support of its argument Sears cites only the statement in the dissenting opinion in Comcast that "economies of time and expense" favor class certification, -- a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority must disapprove of.

Sears compares the design changes that may have affected the severity of the mold problem to the different antitrust liability theories in Comcast.  But it was not the existence of multiple theories in that case that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact -- the injury -- of which the plaintiffs were complaining. In contrast, any buyer of a Kenmore washing machine who experienced a mold problem was harmed by a breach of warranty alleged in the complaint.

Furthermore and fundamentally, the district court in our case, unlike Comcast, neither was asked to decide nor did decide whether to determine damages on a class-wide basis.  As we explained in McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491-92 (7th Cir. 2012), a class action limited to determining liability on a class-wide basis, with separate hearings to determine -- if liability is established -- the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed

Bulter v. Sears, Roebuck & Co., 727 F.3d at 799-800 (emphasis in Butler v. Sears, Roebuck & Co. but not Comcast Corp. v. Behrend, except as noted)(citations omitted).

[38]The Sixth Circuit's class "did not involve the other claim in [the Seventh Circuit's] case, the control unit claim."  Butler v. Sears, Roebuck & Co., 727 F.3d at 802.

> [W]e have no difficulty affirming the district court's finding that common questions predominate over individual ones and that the class action mechanism is the superior method to resolve these claims fairly and efficiently.   This is especially true since class members are not likely to file individual actions because the cost of litigation would dwarf any potential recovery.   See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997)(finding that in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all' ").   Further, [as] the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(b)(3)(A).

In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 678 F.3d at 421 (citation omitted).   That case was also vacated after Comcast Corp. v. Behrend, and, like the Seventh Circuit, the Sixth Circuit reaffirmed its prior decision, fleshing out the predominance inquiry in more detail than it had done in its prior opinion:

> Whirlpool does not point to any "fatal dissimilarity" among the members of the certified class that would render the class action mechanism unfair or inefficient for decision-making.   Instead, Whirlpool points to "a fatal similarity -- [an alleged] failure of proof as to an element of the plaintiffs' cause of action."   That contention, the Supreme Court instructs, "is properly addressed at trial or in a ruling on a summary-judgment motion.  The allegation should not be resolved in deciding whether to certify a proposed class."   Tracking the Supreme Court's reasoning, we conclude here that common questions predominate over any individual ones.   Simply put, this case comports with the "focus of the predominance inquiry" -- it is "sufficiently cohesive to warrant adjudication by representation."

In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 722 F.3d 838, (7th Cir. 2013)(citations omitted).   The Seventh Circuit and Sixth Circuit, thus, define predominance in much the same way: if the district court can design a mechanism for trying the case that is fair to the defendants and more efficient than individual litigation of the same dispute, then predominance is satisfied.   See Butler v. Sears, Roebuck & Co., 727 F.3d at 802.   This styling of the predominance inquiry is in keeping with that given, many years earlier, by a leading class-action treatise:

[A] court addressing predominance must determine whether the evidence about the putative class representative's circumstances and the opposing evidence from the defense will enable a jury to make across-the-board "yes" or "no" factual determinations that fairly resolve the claims of the entire class. Where the right to recover for each class member would "turn . . . on facts particular to each individual plaintiff," class treatment makes little sense. If the resolution of the common issues devolves into an unmanageable variety of individual issues, then the lack of increased efficiency will prohibit certification of the class.

> The predominance and efficiency criteria are of course intertwined. When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class. When there are no predominant issues of law or fact, however -- as in the instant case -- class treatment would be either singularly inefficient, as one court attempts to resolve diverse claims from around the country in its own courtroom, or unjust, as the various factual and legal nuances of particular claims are lost in the press to clear the lone court's docket.

McLaughlin on Class Actions § 5:23 (11th ed.)(emphases added)(omission in original)(footnotes omitted).

24.     Although the Seventh Circuit and the Sixth Circuit may agree about the definition of predominance, the Third, Tenth, and Eleventh Circuits stake out a different test.

> "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." Common issues of fact and law predominate if they "'ha[ve] a direct impact on every class member's effort to establish liability' *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member." If "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)."

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 (11th Cir.)(emphasis in original)(citations omitted).[39]     The Eleventh Circuit, however, imposes a

_____

[39]The Eleventh Circuit first adopted this test -- relying on district court decisions -- in 2004 in Klay v. Humana, Inc., and gave renewed articulations of the test in 2009 in Vega v. T-

different, more rigorous, second step: the district court's trial plan must spend more time adjudicating the common questions than it does adjudicating the individual questions.  The Eleventh Circuit's test may not be the greatest -- the Court sees little reason why negative-value

---

Mobile USA, Inc., and in 2010 in Sacred Heart Health Systems, Inc. v. Humana Healthcare Services, Inc.  In each case, the Eleventh Circuit made some reference to additionally adopting a Fifth Circuit rule-of-thumb test:

> An alternate formulation of this test was offered in Alabama v. Blue Bird Body Co., 573 F.2d 309 (5th Cir. 1978).  In that case, we observed that if common issues truly predominate over individualized issues in a lawsuit, then "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered."  Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important.  Alabama v. Blue Bird Body Co., 573 F.2d at 322 ("If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.").  If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

Klay v. Humana, Inc., 382 F.3d at 1255.  See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 ("In practical terms, while '[i]t is not necessary that all questions of fact or law be common,' 'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.'"); Vega v. T-Mobile USA, Inc., 564 F.3d at 1270 (quoting the above portion of Klay v. Humana, Inc.).

The Fifth Circuit, however, was not setting forth a test for when predominance is satisfied so much as a test for when an issue is common versus individualized.  The Fifth Circuit's full quote -- without the Eleventh Circuit's alterations -- is:

> We only point out that in a situation wherein one seeks to represent a nationwide class in order to obtain redress for harm done from a nationwide conspiracy consideration should be given to whether the addition or subtraction of any of the plaintiffs to or from the class will have a substantial effect on the substance or quantity of evidence offered.  If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.

State of Alabama v. Blue Bird Body Co., Inc., 573 F.2d at 322 (emphasis added)(footnote omitted).

cases that can be fairly and efficiently adjudicated via class action should not be certified[40] -- but

it is commendable in that it <u>is</u> a test that district courts can use, rather than yet another

---

[40]In fairness to the Eleventh Circuit, Judge Posner's test merges the predominance and superiority inquiries -- effectively reading out predominance -- in negative-value cases. Thus, the Eleventh Circuit's test is truer to rule 23's text than Judge Posner's. "Predominate," the word that rule 23 uses, means "[t]o be of greater power, importance, <u>or quantity</u>; be most important or outstanding." <u>The American Heritage Dictionary of the English Language</u> 1032 (William Morris ed., New College ed. 1976)(emphasis added). Rule 23's text thus arguably suggests a direct comparison of common and individual issues, and not -- as Judge Posner suggests -- an indirect comparison that decides the predominance question on the basis of a fancy economic analysis. There are, however, two other rule 23 provisions whose impact on predominance is not often discussed: (i) the issue class-action clause, <u>see</u> Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); and (ii) the subclassification clause, <u>see</u> Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). These provisions are indeed unfortunate for those who wish to read rule 23 as containing the seeds of its own destruction. Rule 23(c)(4) allows for adjudication of common issues, even if these issues do not add up to a common claim. Rule 23(c)(5) allows for collective adjudication, even if it falls short of being completely "classwide" adjudication. Judge Posner's test explicitly admits of subclasses and issue classes. Even if it had not, their impact in Judge Posner's analysis would be obvious: the district court uses the tools of subclassification and issue classification -- along with other management tools, such as polyfurcation -- to design a class-action management plan, and then decide whether the plan is more or less efficient than separate trials.

The impact that these provisions have on the Eleventh Circuit's approach is less clear. The Eleventh Circuit's best discussion of subclasses comes from <u>Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.</u>:

> [W]e cannot accept the district court's proposal to use subclasses corresponding to the hospitals' six categories of payment clauses. We recognize the long and venerated practice of creating subclasses as a device to manage complex class actions, but the six subclasses proposed here mask a staggering contractual variety. The sixth proposed subclass -- a miscellaneous residue of numerous payment clauses that are insusceptible of ready classification -- alone is fatal to predominance. When this "potpourri" subclass, as Humana has termed it, is broken down into its disparate component parts, the illusion of uniformity gives way to nearly thirty subclasses.
>
> Common sense tells us that "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate," <u>Manual for Complex Litigation</u> § 21.23 (4th ed. 2004); <u>see also</u> <u>Harding v. Tambrands Inc.</u>, 165 F.R.D. 623, 630 (D. Kan. 1996)("The potential for numerous different subclasses weighs against a finding of predominance of common issues."). Here,

———————————————————

the necessary recourse to a "miscellaneous" subclass readily indicates the lack of a predominant question.

Ultimately, after examining the many individualized payment clauses contained in the network agreements, we perceive a "distinct possibility that there was a breach of contract with some class members, but not with other class members." Subclasses are no answer to this problem, meaning that the efficiency of a class action will be lost entirely unless the hospitals are allowed "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights. The hospitals, however, may not lawfully "amalgamate" their disparate claims in the name of convenience. The Rules Enabling Act, 28 U.S.C. § 2072 -- and due process -- prevents the use of class actions from abridging the substantive rights of any party. Yet, from the record before us, an abridgment of the defendant's rights seems the most likely result of class treatment. By glossing over the striking differences in the material terms of the agreements, the district court created an "unnecessarily high risk," of such unlawful results, and thereby abused its discretion.

601 F.3d at 1176 (citations omitted). These statements imply that, but for the sixth "category" of payment clauses -- really a catchall for all contracts that did not fit into one of the five real categories -- the class would be certifiable. The only "abridgement of the defendant's rights" that the district court's plan would produce would be the "'amalgamat[ion]'" of different contractual language into a single category -- the sixth category. 601 F.3d at 1176. That case, thus, leaves open the question whether subclassification and issue certification can aid in satisfying predominance, or if these techniques are separate from the predominance inquiry.

The Fifth Circuit staked out a clear answer to this question in its much-discussed Castano v. American Tobacco Co. case, deciding the issue in a way one might expect:

Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action. A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

84 F.3d at 745 n.21 (citations omitted). This logic is hardly unassailable. Namely, the result of reading rules 23(c)(4) and (c)(5) as bearing on the predominance inquiry would not be "automatic certification in every case where there is a common issue," because superiority must still be satisfied. 84 F.3d at 745 n.21. If a proposed class action is superior -- e.g., if it lacks the

value to be brought on an individual basis -- and individual issues can be pared away via rules 23(c)(4) and (c)(5) then it is not clear why certification "could not have been intended" by the rule.  84 F.3d at 745 n.21.  Moreover, it is a poor reading of the rule's text.  Presumably, even if rules 23(c)(4) and (c)(5) are mere "housekeeping rule[s]," they would still alleviate "likely difficulties in managing a class action."  84 F.3d at 745 n.21; Fed. R. Civ. P. 23(b)(3)(D). Because rule 23 directs that "[t]he matters pertinent to these findings [predominance and superiority] include: . . . the likely difficulties in managing a class action," the Court, if it were writing on a clear slate would think that rules 23(c)(4) and (c)(5) would play a part in the predominance determination, Fed. R. Civ. P. 23(b)(3), and that this result thus "could not have been intended."  84 F.3d at 745 n.21.

The Fifth Circuit's approach attracted the adherence of a revered jurist on the Fourth Circuit -- although not the Fourth Circuit itself.  The Honorable Paul V. Niemeyer, United States Circuit Judge for the Fourth Circuit, endorsed the Fifth Circuit's view in an opinion concurring in part and dissenting in part from an opinion in which the Fourth Circuit adopted the opposing view:

> Despite the overwhelming predominance of these individualized issues and claims over the common issue that the majority now certifies for class treatment, the majority has adopted an inventive approach to Rule 23 that allows certification of a class where the predominance requirement of Rule 23(b)(3) is admittedly unmet in the context of the case as a whole.  According to the majority, to require the certified issue in this case to predominate over the individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3).  In doing so, the majority glorifies Rule 23(c)(4)(A) -- a housekeeping rule that authorizes a court to certify for class treatment "particular issues" in a case that otherwise satisfies Rule 23(a) and 23(b) -- with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s requirements no longer need be applied to "[a]n action," see Fed. R. Civ. P. 23(b), but rather to any single issue, no matter how small.

> Not only does the majority's approach expand Rule 23 beyond its intended reach, but it also creates a direct conflict with the Fifth Circuit which has held:

>> A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.

Castano v. American Tobacco Co., 84 F.3d 734, 745 n.21 (5th Cir. 1996).

Gunnells v. Healthplan Servs., Inc., 348 F.3d at 446-47.  Despite Judge Niemeyer's concern with creating a Circuit split, the Second Circuit, the Ninth Circuit, and, of course, the Seventh Circuit

meaningless recitation, see CGC Holding Co. LLC v. Broad & Cassel, 773 F.3d 1076 (10th Cir.

2014)("[T]he predominance prong 'asks whether the common, aggregation-enabling, issues in

the case are more prevalent or important than the non-common, aggregation defeating, individual

issues.'" (quoting Newberg § 4:49)), circular axiom, see, e.g., Amchem Prods., Inc. v. Windsor,

521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are

---

have all held that subclasses can be used to satisfy predominance concerns since at least 2001,
two years before Gunnells v. Healthplan Services, Inc.  See Zinser v. Accufix Research Inst., Inc.
253 F.3d at 1189-90, 1192 n.8.  See Robinson v. Metro-North Commuter R.R., 267 F.3d 147,
167-69 (2d Cir. 2001); Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999).
        The Eleventh Circuit has refrained from taking a side on this question:

> Some have been critical of the piecemeal certification of class action
> status for claims within a case.  See Gunnells v. Healthplan Servs., Inc., 348 F.3d
> 417, 446-47 (4th Cir. 2003)(Niemeyer, J., dissenting)(arguing that the
> predominance requirement in Fed. R. Civ. P. 23(b) applies to the action as a
> whole, not to individual subclasses or claims); Castano v. Am. Tobacco Co., 84
> F.3d 734, 745 n. 21 (5th Cir. 1996)("The proper interpretation of the interaction
> between [Fed. R. Civ. P. 23] subdivisions (b)(3) and (c)(4) is that a cause of
> action, as a whole, must satisfy the predominance requirement of (b)(3) and that
> (c)(4) is a housekeeping rule that allows courts to sever the common issues for a
> class trial.").   We did not directly address the propriety of such partial
> certification in Klay.

Borrero v. United Healthcare of N.Y., Inc., 610 F.3d 1296, 1310 n.5 (11th Cir. 2010)(alterations
in original).  The Tenth Circuit also appears to have refrained from taking a side:

> Plaintiffs urge us to consider a "hybrid" certification whereby the liability
> stage might be certified for class treatment under Rule 23(b)(2) even if the
> damages stage does not qualify for such treatment.  See Robinson v. Metro-North
> Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001).  Compare Lemon v. Int'l
> Union of Operating Engr's, Local No. 139, AFL-CIO, 216 F.3d 577, 581 (7th Cir.
> 2000), and Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999),
> with Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420-22 (5th Cir. 1998).  We
> do not need to rule on a hybrid possibility because in the instant case, the liability
> stage does not satisfy either Rules 23(b)(2) or 23(b)(3).  The district court's ruling
> that plaintiffs did not allege a sufficient policy, practice or pattern of
> discrimination to warrant class treatment for liability determination is not an
> abuse of discretion.

Monreal v. Potter, 367 F.3d at 1237 n.12 (Ebel, J.).

sufficiently cohesive to warrant adjudication by representation."), obvious guidepost, see Reed v. Bowen, 849 F.2d at 1309 ("Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'"), self-evident comparison, see Monreal v. Potter, 367 F.3d at 1237 ("[T]he predominance criterion of Rule 23(b)(3) [i]s 'far more demanding' tha[n] the Rule 23(a) commonality requirement[.]"  (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24)), or worthless slogan, see Marcus v. BMW of N. Am., LLC, 687 F.3d at 600 (exhorting district courts to examine claims "'through the prism' of Rule 23(b)(3)").

25. The Tenth Circuit followed the Eleventh Circuit's approach in CGC Holding Co., LLC v. Broad and Cassel.

Predominance regularly presents the greatest obstacle to class certification, especially in fraud cases. Accordingly, the issues disputed in this case are not unusual. And given our obligation to ensure that the district court did not err in conducting its rigorous analysis, we must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate. Here, that task requires us to survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not. Stated another way, consideration of how the class intends to answer factual and legal questions to prove its claim -- and the extent to which the evidence needed to do so is common or individual -- will frequently entail some discussion of the claim itself.

In this context, it is worth reiterating that our review on appeal is limited. For the purposes of class certification, our primary function is to ensure that the requirements of Rule 23 are satisfied, not to make a determination on the merits of the putative class's claims. But it is impractical to construct "an impermeable wall" that will prevent the merits from bleeding into the class certification decision to some degree. So, although class certification does not depend on the merits of the suit, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims."

With these legal principles in mind, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." For this limited purpose, we consider the proposed class's claim for a RICO conspiracy.

ii.    **The Superiority Requirement.**

26.    The second requirement for certifying a (b)(3) class is superiority, which means that a class action would be superior to -- not merely just as good as or more convenient than -- all other available procedural mechanisms, including: (i) individual actions by class members; (ii) ordinary joinder rules, see Fed. R. Civ. P. 18-20; (iii) multidistrict litigation, see 28 U.S.C. § 1407; (iv) multiparty multiforum litigation, see 28 U.S.C. § 1369; and (v) the use of bellwether cases.   The superiority requirement thus sets a high bar, but there are two ways that a proposed class can get an immediate leg up on certification, both of which involve rendering the aforementioned procedural devices impractical for the task at hand.

27.    First, the suit can consist of so-called negative value claims -- claims in which the cost of litigation exceeds the likely recovery, rendering them economically non-viable without aggregation.   These claims are the heart and soul of the class action, as the Supreme Court recently reaffirmed:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.   A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

Amchem Prods., Inc. v. Windsor, 521 U.S. at 617 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)).   The class action absolves absent plaintiffs of the otherwise prohibitive obligations of having to hire their own attorneys, devote time and energy to their own discovery, and potentially testify on their own behalf.

28.    Second, the class may consist of such a large volume of similar cases that the judiciary would be overwhelmed if it had to treat each separately.   While this consideration militates against individual treatment and counsels towards aggregation, the court must carefully

consider whether another mass-aggregation form -- such as multidistrict litigation -- might be better suited to the task.

29.    In addressing whether a proposed class action is superior to other available methods of adjudicating the controversy, courts start with the four factors that rule 23(b)(3)(A)-(D) enumerates, although those factors are not exhaustive.  See Fed. R. Civ. P. 23 advisory committee's notes ("Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings."); Amchem Prods., Inc. v. Windsor, 521 U.S. at 615-16 ("Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria."). The first factor, "the class members' interests in individually controlling the prosecution . . . of separate actions," closely tracks the money value of the individual cases.  Fed. R. Civ. P. 23(b)(3)(A).  When individual actions are practical, they are preferred; the United States has a "deep-rooted historic tradition that everyone should have his own day in court," and adjudicating individual disputes is the core activity of our judicial scheme.  Martin v. Wilks, 490 U.S. 755, 762 (1989)(quoting 18C Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman, Catherine T. Struve, Federal Practice  Procedure, Jurisdiction & Related Matters § 4449, at 417 (1981)).  The proposed class members' emotional connection to the case may also be relevant: the stronger the attachment, the more reticent the court should be to certify the case.  See Vassalle v. Midland Funding, LLC, 708 F.3d 747, 758 (6th Cir. 2013); Abby v. City of Detroit, 218 F.R.D. 544, 549-50 (E.D. Mich. 2003).  Another recurring issue that arises in relation to this factor is when the statute sued under provides greater remedies for individual suits than for class suits, either by imposing a damage cap for class actions which does not apply to individual actions, or by granting statutory damages to individual plaintiffs while requiring class plaintiffs to prove actual damages.  See, e.g., Fair

Debt Collection Practices Act, 15 U.S.C. § 1692k(2)(B) (capping individual damages at $1,000 and class action damages at $500,000); Truth in Lending Act, 15 U.S.C. § 1640(a) (capping individual damages at $5,000 and class action damages at $500,000).  Although claims under these statutes may be more lucratively brought as individual actions, courts should assess the real-world likelihood that class members would bring their own actions, which implicates another factor the court should consider: the likelihood that proposed class members know they have a claim, and whether they are savvy enough to pursue it.[41]  See Hicks v. Client Servs., Inc., 257 F.R.D. 699, 701 (S.D. Fla. 2009)(finding superiority because "class members [most likely do not] understand the provisions well enough to know that it may be financially worthwhile to spend the time and effort to litigate these matters").  As the Honorable Loretta A. Preska, Chief United States District Judge for the Southern District of New York, wrote:

> [W]hile the potential for higher individual recoveries exists, realizing that potential requires assuming that each putative class member is aware of her rights, willing to subject herself to all the burdens of suing and able to find an attorney willing to take her case.  Those transaction costs are not insubstantial and have prompted other courts in this Circuit to conclude that litigating as a class is superior.

Kalish v. Karp & Kalamotousakis, LLP, 246 F.R.D. 461, 464 (S.D.N.Y. 2007).  See Jancik v. Cavalry Portfolio Servs., LLC, No. CIV 06-3104 MJD/AJB, 2007 WL 1994026, at *11

---

[41]It is often the case that a plaintiff would receive greater remuneration -- damages or settlement less attorneys' fees and other expenses of litigation -- from an individual action than he would from his proportional share of the class recovery.  If the number of proposed class members likely to file individual claims ($n$), multiplied by the likely remuneration each would receive from an individual action ($i$), exceeds the entire class' recovery less attorneys' fees and expenses ($c$), then the Court will be hesitant to find superiority.  Thus, if $n \cdot i > c$, the Court will not generally certify a (b)(3) class.  The Court should bear in mind, however, that $n$ includes only those individuals who: (i) would, in the event of certification, become class members, i.e., they would not opt out; and (ii) would, nonetheless, in the event the class was not certified, file an individual action.  Thus, $n$ is likely to be a small number in most cases.

(D. Minn. July 3, 2007)("[T]he truth is that the putative plaintiffs in this case are not likely to know their rights and are therefore not likely to pursue these claims on their own.").

30.     The second enumerated (b)(3) factor, "the extent and nature of any litigation concerning the controversy already begun by . . . class members," is closely linked to the first factor.  Fed. R. Civ. P. 23(b)(3)(B).  The advisory notes to the rules state that "[t]he court is to consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit.  In this connection the court should inform itself of any litigation actually pending by or against the individuals."   Fed. R. Civ. P. 23 advisory committee's notes (citations omitted).  This passage suggests that the extent to which proposed class members -- or individuals who would otherwise be proposed class members but for being specifically excluded from the definition by virtue of their individual claims -- have already filed individual claims is probative evidence of the extent to which they will continue to file individual claims in the event of certification denial, and indicates a higher "interest[] in individually controlling the prosecution."   Fed. R. Civ. P. 23(b)(3)(A).  It is also probative evidence whether the claims are truly negative value or whether the plaintiffs' counsel is merely representing that they are to enhance his argument for certification.

31.     In evaluating the (b)(3)(A) and (b)(3)(B) factors, the court must keep in mind a powerful fact that counsels strongly in favor of finding superiority: (b)(3) class actions give all proposed class members the opportunity to opt out of inclusion in the class.  See Fed. R. Civ. P. 23(c)(2)(B).  The individual actions that rule 23(b)(3)(B) directs the court to consider would not be swept under the class action's umbrella, nor would certification interfere with the litigation autonomy of any proposed class member who plans to file an individual claim but has yet to do so.  The sole group that rule 23(b)(3)(A) and (b)(3)(B) protects consists only of those individuals

who (i) have not yet filed an individual action, (ii) but are identifiable by proposed class counsel as having a claim, (iii) who are sent notice of their claim, (iv) who still, upon receiving notice, fail to meet with an attorney to file an individual claim or even to opt out of the class, and (v) only later develop an interest in pursuing an individual claim, and find themselves unable to do so because of the res judicata effect that a class action has on its members.  As a practical matter, in most instances, this group contains few people, if any.  Individuals interested in litigating their claims individually will most likely have already filed suit; at the very latest, receipt of the class notice will spur them into action, and they will opt out of the class.  For this reason, the Court believes that concerns about (b)(3) class actions' intrusions into litigant autonomy are overblown and even somewhat paternalistic.

32.     The Court does not write off the rule 23(b)(3)(B) factor entirely, however, as it does provide one piece of useful, specific guidance.  The rule speaks not only of assessing the "extent . . . of any litigation . . . already begun" -- presumably meaning the raw number of cases filed relative to the size of the proposed class -- but also of the "nature of any litigation . . . already begun."  Fed. R. Civ. P. 23(b)(3)(B).  The Court interprets this language to mean that it must look at what procedural forms the already-filed cases have taken.  For example, if a group of asbestos plaintiffs file for class certification, the court should decline to certify on the ground that asbestos cases are consolidated in multidistrict litigation in the United States District Court for the Eastern District of Pennsylvania.  See In re Asbestos Prods. Liability Litig. (No. VI), MDL No. 875 (E.D. Pa.)(Robreno, J.).  Furthermore, the Court concludes that, if a class has already been certified to pursue certain claims, redundant classes should generally not be

certified.[42]   See Newberg § 4:70 ("[I]f a *class action* case is already pending, certification of

another class suit might not be sensible or superior to the current litigation posture." (emphasis

---

[42]The Court makes this statement confidently as it relates to "horizontally" competing class actions: the Court should always strive to avoid having multiple overlapping or competing class actions certified in the underlined federal court system.  It is less clear how to handle a putative class action when there are one or more class actions pending in state court(s) whose outcome would have res judicata impact on the Court's proposed class members.  Although the presence of vertically competing class actions certainly bears on the superiority determination, the Court must carefully evaluate such circumstances on a case-by-case basis.  The Court can envision a scenario in which numerous heavily overlapping class actions languished across multiple state courts without making progress, and in which the Court is capable of expeditiously certifying and resolving a nationwide class action, and, in such circumstances, superiority might be met.

Under the Anti-Injunction Act, federal courts generally may not stay or enjoin state court cases on the ground that they would interfere with a proposed class action or even a certified class action.  See 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.").  There are possible exceptions, however, including that, pursuant to the All Writs Act, 28 U.S.C. § 1651, a district court may enjoin state court proceedings which would interfere with an imminent settlement agreement.  See In re Diet Drugs, 282 F.3d 220, 233-39 (3d Cir. 2002)(Scirica, J.).  In the seminal case of In re Diet Drugs, the Honorable Anthony J. Scirica, United States Circuit Judge for the Court of Appeals for the Third Circuit, noted that, although in personam cases may generally proceed in parallel in state and federal courts, a fully-formed and imminent settlement in a federal case constituted the equivalent of a res, thus permitting the federal court to enjoin the state court from entertaining litigation which could destroy the settlement:

> [C]ourts have analogized complex litigation cases to actions in rem.  As one court reasoned, "the district court had before it a class action proceeding so far advanced that it was the virtual equivalent of a res over which the district judge required full control."   In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d 328, 337 (2d Cir. 1985).  See also Wesch v. Folsom, 6 F.3d 1465, 1470 (11th Cir. 1993); Battle v. Liberty Nat'l Life Ins. Co., 877 F.2d 877, 882 (11th Cir. 1989)("[I]t makes sense to consider this case, involving years of litigation and mountains of paperwork, as similar to a res to be administered.").  The in rem analogy may help to bring into focus what makes these cases stand apart.  In cases in rem, "the jurisdiction over the same res necessarily impairs, and may defeat, the jurisdiction of the federal court already attached."   Kline v. Burke Const. Co., 260 U.S. 226, 229 (1922).  Similarly, where complex cases are sufficiently developed, mere exercise of parallel jurisdiction by the state court may present enough of a threat to the jurisdiction of the federal court to justify issuance of an injunction.  See In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d at 337 (noting such cases, like cases in rem, are ones in which "it is intolerable to have

- 138 -

conflicting orders from different courts").  What is ultimately important, in any event, is that in both kinds of cases state actions over the same subject matter have the potential to "so interfer[e] with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide the case."  Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. 281, 295 (1970).

In re Diet Drugs, 282 F.3d at 235 n.12.  See Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1202 (7th Cir. 1996)(holding that a federal injunction is proper "[w]here a litigant's success in a parallel state court action would make a nullity of the district court's [discovery] ruling, and render ineffective its efforts effectively to manage the complex litigation at hand"); Carlough v. Amchem Prods., 10 F.3d 189, 203 (3d Cir. 1993)(affirming an injunction against a state-court class action where the "the stated purpose of the [state] suit [was] to challenge the propriety of the federal class action").  Cf. In re Corrugated Container Antitrust Litig., 659 F.2d 1332, 1335 (5th Cir. 1981)(affirming an injunction against a South Carolina class action where the state court enjoined the defendants -- which also were defendants in a federal multidistrict suit -- from entering any settlement that contained any release of claims under South Carolina law, thereby "clearly interfer[ing] with the [federal] multidistrict court's ability to dispose of the broader action pending before it").  But see In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig., 134 F.3d 133 passim (3d Cir. 1998)(Becker, J.)(refusing to enjoin a Louisiana state court from approving a class settlement, even though a similar proposed class was pending certification in federal multidistrict litigation, because: (i) the federal court lacked personal jurisdiction over the absent class members, given that the federal class had not yet been certified nor notice served on the absent class members; (ii) the Full Faith and Credit Clause of the Constitution, and the Rooker-Feldman doctrine, barred review of the state court's approval of the settlement, because approval had already been finalized and final judgment entered; and (iii) the Anti-Injunction Act would have barred the federal court from enjoining the state court even if the state court's judgment were not finalized, as protecting the viability of a pre-certification class action is not "necessary in aid of [the federal court's] jurisdiction," nor is it necessary "to protect or effectuate its judgments").  In light of General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, it is generally safe to assume that a district court may never enjoin a state court from certifying or going forward with an overlapping class when the federal court has not yet certified and noticed its own class.

    As a practical matter, many of the questions raised relating to competing state and federal class actions have been obviated by the passage of CAFA, which has resulted in most truly nationwide class actions being immediately removable to federal court, see 28 U.S.C. § 1332(d), which defendants do so reliably that plaintiffs have begun filing them in federal court, rather than filing them in state court and waiting for them to be removed, see Emery G. Lee III & Thomas E. Willging, The Impact of the Class Action Fairness Act of 2005 on the Federal Courts 1-2 (Federal Judicial Center ed., 2008).  Although CAFA's primary effect has been to make superiority determinations easier by placing limitations on state court class actions that could overlap with federal class actions, it also raises novel questions, such as whether and when the court -- in light of CAFA's explicit purpose to push more multistate class actions into federal court -- should conclude that the availability of a state court aggregation device destroys superiority of a proposed federal class action.

- 139 -

in original)).   Subsequent proposed classes should either be defined to avoid class member-overlap with previously certified classes or else should assert different claims.[43]

33.   The third rule 23(b)(3) factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," which can be split into two prongs: (i) whether aggregation is desirable; and (ii) whether the particular court at issue is a desirable forum to adjudicate the aggregated dispute.   Fed. R. Civ. P. 23(b)(3)(C).   The first prong, whether aggregation is desirable, is considered a recitation of the general superiority inquiry; all of the aforementioned factors and considerations apply, and courts should, additionally, consider the interest of judicial economy -- from this perspective, the more cases that can be aggregated, the better.   See Newberg § 4:71.   The second prong is whether the particular court at issue is a desirable forum for the litigation.   Some issues that reliably influence the determination of this prong include: (i) the geographic convenience of the parties, witnesses, and class counsel, see Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1191-92 (9th Cir. 2001); (ii) the locus of the harm, as well as any other events forming the basis of the action, see Winkler v. DTE, Inc., 205 F.R.D. 235, 245 (D. Ariz. 2001); (iii) the location of the bulk of the proposed class, see Macarz v. Transworld Sys., Inc., 193 F.R.D. 46, 57 (D. Conn. 2000); and (iv) whether the defendant is located in the forum state, see In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004).   "The particular court at issue" does not refer only to the desirability of the United States District Court for the District of New Mexico, or even of the Albuquerque

---

[43]If a class has already been certified relating to a matter, and a new plaintiff seeks both (i) certification of a larger class than was previously certified and (ii) to assert claims for which the previous class was not certified, then the new plaintiff could avoid overlap between the new and old class actions by splitting the new class into different classes or subclasses.   The claims contained in the already-certified class action could be asserted in the proposed class action only by individuals excluded from the already-certified class' definition.   Claims not included in the already-certified class action could be asserted by the entirety of the proposed class, including those individuals who are also members of the already-certified class.

division, but, rather, the prong's inquiry extends all the way down to the level of the individual district judge.  For example, if a district judge has already made several pre-certification preliminary rulings, see Klay v. Humana, Inc., 382 F.3d 1241, 1271 (11th Cir. 2004); if he or she has other, similar actions consolidated in his court, see Beaulieu v. EQ Indus. Servs., Inc., No. 5:06-CV-00400-BR, 2009 WL 2208131, at *23 (E.D.N.C. July 22, 2009); In re Relafen Antitrust Litig., 218 F.R.D. 337, 347 (D. Mass. 2003); or even if he or she possesses particular expertise at handling the claims alleged by the proposed class, the judge may weigh those facts in favor of a finding of superiority.

34.     The fourth, final, and most important[44] factor a court must consider in assessing superiority is the extent to which the court will be able to manage the class action, if certified, through pre-trial litigation and trial, accurately adjudicating the class' claims -- in particular the individual issues -- and fairly distributing relief among the class members.  See Fed. R. Civ. P. 23(b)(3)(D).  The manageability factor "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. at 164.  The principal concern in a manageability inquiry is individualization.  The size of a proposed class, on its own, does not affect manageability; increasing the size of a proposed class only hurts manageability if it introduces new proposed class members with individual issues.  See Carnegie v. Household Int'l, Inc., 376 F.3d 656, 660-61 (7th Cir. 2004)(Posner, J.).  As such, several courts have held that, if the predominance requirement is met, then the court should not decline to certify the class on manageability grounds alone.

---

[44]Newberg writes that the "manageability factor . . . is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication.  Indeed, the superiority discussion has, to this point, been playing *Hamlet* without the prince, and now, it is time to usher the prince onstage."  Newberg § 4:72.

The predominance analysis has a tremendous impact on the superiority analysis for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability.

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d 1159, 1184 (11th Cir. 2010)(internal citations and quotation marks omitted).  See Klay v. Humana, Inc., 382 F.3d 1241, 1272 (11th Cir. 2004)("[W]here a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions.").

35.    When it comes to designing a fair management plan for trying a class action, district courts have myriad tools which can be customized to suit the needs of individual cases: "[W]hen a judge becomes convinced that a case is 'complex,' procedural innovation often replaces procedural conservatism."  Jay Tidmarsh & Roger H. Trangsrud, Modern Complex Litigation 34 (2d ed. 2010).  Most techniques that are truly "procedural" are fair game: cases can be bifurcated,[45] trifurcated, or polyfurcated; trials can be conducted in multiple stages or phases; and, provided that each defendant's overall monetary liability can be ascertained, the sometimes difficult question of how to distribute said damages among the class can be addressed with less formality.[46]

---

[45]"Vertical" polyfurction, which is what is typically meant when bifurcation is discussed, is so named because the separately tried elements build on top of each other, and a negative verdict in one trial obviates the need for the second trial.  For example, if the jury comes back for the defendant on a liability-only trial, then there is no need for a trial on damages.  Vertical polyfurcation also often requires that the separate trials be performed in a certain sequence.  "Horizontal" polyfurcation is so named because the trials do not build on one another, but rather sit analytically side-by-side.  "Severance" is similar to the criminal procedural maneuver in which a defendant whose case is joined to be tried with another defendant's or defendants' petitions the court for his or her own separate trial.  Fed. R. Crim. P. 14(a), 12(b)(3)(D).

[46]Defendants have a due-process right to have any damages against them proven in court. The question of how to distribute those damages among the class, however, does not implicate

the defendants' rights at all, and, thus, that process can be conducted in a non-adversary fashion, with the court supervising the class counsel's administration of an approved damages-distribution scheme.  The judicial oversight and scrutiny that should apply to this process is more analogous to a rule 23(e) settlement review than it is to a trial.  The relevant inquiry at the certification stage is one of superiority: whether the class would be better off with an imperfect damages-distribution scheme or with another available procedural device -- in negative value cases, this question often equates to asking whether something is better than nothing.

District courts have leeway to be creative when it comes to devising processes for managing the distribution of class damages.  The Court is willing to go along with innovative and cost-effective mechanisms for distributing class damages, even if they are imperfect, especially when the alternative is denying certification.  One device of increasing popularity that the Court is loath to use, however, is cy pres relief.

> The cy pres doctrine is an equitable doctrine under which courts "distribute unclaimed portions of a class-action judgment or settlement funds to a charity that will advance the interests of the class."  Black's Law Dictionary 444 (9th ed. 2009).  It derives from the French expression "*cy pres comme possible*," which means "as near as possible," and developed out of the law of trusts.

> . . . .

> The Court has a basic disagreement with the application of this doctrine for several reasons: (i) class actions are disputes between parties and the money damages should remain among the parties, rather than be distributed to some third party; (ii) it is unseemly for judges to engage in the selection of third[-]party beneficiaries and to distribute class action damages to third parties; (iii) judges are often not in the best position to choose a charitable organization that would best approximate the unpaid class members' interests; and (iv) the doctrine encourages charitable organizations, and plaintiffs' lawyers, to lobby the court for cy pres awards.

Lane v. Page, 862 F. Supp. 2d 1182, 1230-31 (D.N.M. 2012)(Browning, J.)(citations omitted). See In re Thornburg Mortg., Inc. Sec. Litig., 885 F. Supp. 2d 1097, 1105-12 (D.N.M. 2012)(Browning, J.)(denying a joint request by the class representatives and the defendants to distribute much of the class damages to the Center for Civic Values).  The Tenth Circuit has never discussed cy pres relief in detail, see United States v. State of New Mexico, 536 F.2d 1324, 1326 (10th Cir. 1976)(mentioning without elaboration, in a non-class action, that the district court had "refused to apply the doctrine of cy pres") -- but many scholars, see Martin H. Redish, Peter Julian & Samantha Zyontz, Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis, 62 Fla. L. Rev. 617, 641 (2010); Myriam Gilles & Gary B. Friedman, Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers, 155 U. Pa. L. Rev. 103 (2006); Sam Yospe, Cy Pres Distribution in Class Action Settlements, 2009 Colum. Bus. L. Rev. 1014 (2009), the *Wall Street Journal*, see Krueger & Serotta, supra, and the *Washington Post*, see Editorial, supra, at A20, have raised questions about its constitutionality, its compliance with the Rules Enabling Act, 28 U.S.C.

36.     Techniques that merely presume away substantive elements that a plaintiff normally has to prove, or that would impair a defendant's due-process rights, however, are impermissible.  In particular, the Supreme Court has expressly disavowed "trials by statistics" or "trials by formula," either as to liability or damages.  Wal-Mart, 131 S. Ct. at 2561.  A trial by statistics involves a small but representative sample of class members presenting evidence on individual questions in their own cases and then inviting the jury to extrapolate its conclusions from the sample to the entire class.  See Wal-Mart, 131 S. Ct. at 2561.  For example, counsel for a class of 5,000 might present fifty class members' cases in the same way he would if he or she were trying them individually.  Counsel would additionally present expert testimony that those fifty class members were representative of the class -- generally meaning that they were selected at random -- and that both (i) the proportion of the sample to which the defendant is liable, and (ii) the damage inflicted on the average individual in the sample, could be generalized to the entire class to a certain confidence interval and level.[47]  The defendants might put on their own

---

§ 2072, or both.  See also Robles v. Brake Masters Sys., Inc., No. CIV 10-0135 JB/WPL, 2011 WL 9717448, at *16-17 (D.N.M. Jan. 21, 2011)(Browning, J.).  The Court would be more likely to let unused or undisbursable funds escheat to the state or revert to the defendant -- although reversion undermines the deterrent value of the class action -- than it is to use cy pres relief.  If the fund is disbursed under a claim system, and the total of the claims does not exhaust the entire fund, the Court would likely first look to distributing the unclaimed funds to the claimants on a pro rata basis.

Still, the fact that cy pres relief is a commonly used method of distributing class damages underscores the point that courts need not approach the distribution of class damages with the same perfectionism with which they approach adversarial proceedings.  Even if the distribution is not completely fair -- if, for instance, a class member who sustained $100 in damage receives the same distribution as another class member who sustained $800 -- it is still better than cy pres relief, which gives the entire pot of damages to an interloper.

[47]A confidence interval for a proportion estimate is also known as a "margin of error."  It is the "plus or minus" figure often displayed next to the proportion estimate in, e.g., public polling data.  See, e.g., Confidence Intervals, Yale University Department of Statistics, http://www.stat.yale.edu/Courses/1997-98/101/confint.htm; Confidence Interval, Wikipedia, http://en.wikipedia.org/wiki/Confidence_interval; Margin of Error, Wikipedia, http://en.wikipedia.org/wiki/Margin_of_error (collectively, "CI/CL Websites").  A confidence level is the percent

sample, attack the representativeness of the plaintiffs' sample, or put on non-randomly selected class members whose cases were weak; they would almost certainly also present evidence defending against the individual cases of the plaintiffs' sample.  The jury, if it bought into the plaintiff's theory, might decide that the defendant was liable to twenty members of the sample for a total of $100,000.00, extrapolate from the sample to the entire class, and award the class ten million dollars in damages.[48]

37.    The Supreme Court bars this method of trying cases, because it violates the defendant's right to have each element of each claim asserted against it by each class member specifically proven.  See Wal-Mart, 131 S. Ct. at 2561.[49]  When issues are truly common,

---

certainty that the actual proportion fall within the margin of error of the stated estimate.  See CI/CL Websites.  For example, if Gallup, Inc. says that 39% of Americans -- with a confidence interval of $^{+}/-$ 3% and a confidence level of 95% -- approve of President Barack H. Obama's job performance, then there is less than a 5% chance that the actual percentage of Americans who approve of President Obama's performance falls outside of the 36% to 42% range.

Even with the same sampling data, a confidence interval can be improved at the expense of confidence level and vice versa.  See CI/CL Websites.  For example, Gallup, Inc. might be able -- and the Court has not conducted the actual calculations -- to display the same data as having a $^{+}/-$ 8% margin of error and a 99% confidence level, or a $^{+}/-$ 1% margin of error and a 90% confidence level.  The use of a 95% confidence level, however, is a scientific and industry standard.

[48]The class contains 100 times as many individuals as the sample, and ten million dollars is 100 times $100,000.00.  The mathematics work out the same way if one considers only the twenty meritorious class members: the twenty sample class members were determined to be owed an average of $5,000.00 apiece, which, multiplied by the expected 2,000 meritorious class members in the entire class, again comes to ten million dollars.

The class could then devise a way, subject only to judicial approval, to divide up the ten million dollars -- or whatever remained of it after deducting class counsel's expenses and fees -- among the class.  That plan might include an equal division among class members of $2,000.00 apiece, or an attempt to administratively determine the relative levels of harm suffered by each class member and distribute the damages proportionately.

[49]The Supreme Court based its holding -- or, more precisely, its dicta -- disclaiming trials by formula on the Rules Enabling Act, 28 U.S.C. § 2072(b), stating that trials by statistics effectively alter the substance of the law being applied, but there may additionally be Due Process concerns under the Fifth Amendment to the Constitution of the United States.  See Wal-Mart, 131 S. Ct. at 2561 (citing Ortiz v. Fireboard Corp., 527 U.S. 815, 845 (1999)).

multiple class members' claims -- or at least elements thereof -- can be specifically proven in one fell swoop; that this common determination can be done forms the basis of the class action. Truly individual issues, on the other hand, must be adjudicated individually and not by statistical inference.[50]

38.     In formulating a workable trial plan, the Court must also ensure that it does not run afoul of the Seventh Amendment.  The Seventh Amendment contains two clauses:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, [(i)] the right of trial by jury shall be preserved, and [(ii)] no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

_____

[50]While the Court fully agrees with Justice Scalia that courts cannot sacrifice the defendant's rights for the economic convenience of the plaintiffs, the Court is not convinced that it, as Wal-Mart seems to suggest, should forego the advantages of class certification merely to convenience the defendant in carrying burdens which the defendant would have to carry even if the litigation was conducted individually.  If the defendant ordinarily bears the burden to produce certain evidence or prove certain allegations, that the burden might be exceptionally inconvenient for it do so on an individual basis against an enormous number of class members should not, in the Court's opinion, weigh against class certification.  For example, if a defendant is sued in a breach-of-contract class action in which 1,000 class members allege that the defendant was not properly performing a term in an identical form contract executed between the defendant and every class member, the defendant might wish to introduce individualized parol evidence -- such as oral communications contemporaneous with the signing of the written instrument explaining the disputed term -- or inject individual issues into the case by asserting affirmative defenses.   In the Court's opinion, the defendant would be free to pursue these strategies, but, just as it would in 1,000 individual suits, it must discover and present proof against each individual class member to whom these theories apply.  In the Court's view, just as plaintiffs cannot conduct trials by statistics, the defendant could not put one-hundred class members on the stand to testify to waiver and then expect anything more than a ten-percent decrease in class damages as a result.  Although this burden may seem unfair to the defendant, the defendant would have to expend the same energy and resources if the 1,000 suits were brought individually.  That such suits might never be brought -- because they would not be economically viable for the plaintiffs or because the plaintiffs are not aware of their claims -- should not, in the Court's view, excuse the defendant of its ordinary litigation burdens.  In short, the issues that should most cut against a finding of predominance are those individual questions that would ordinarily be the plaintiff's burden to answer at trial: elements of the prima facie case and individualized rebuttals of any common affirmative defenses that the defendant asserts.  The Court must, however, faithfully and fully apply Supreme Court and Tenth Circuit law.  The Court concludes that Comcast Corp. v. Behrend and Wal-Mart require the Court to count time spent adjudicating individual affirmative defenses against the predominance finding.

U.S. Const. amend. VII.

39.    These clauses are known as the trial-by-jury clause and the reexamination clause,

respectively, and bifurcation has been challenged under both.  Plaintiffs often dislike bifurcation,

because it lowers their odds of success by excluding damages evidence from the liability phase --

evidence of the plaintiff's injuries that is often evocative -- and necessitating that they win two

trials instead of one.  They have, accordingly, argued that bifurcation -- a procedural innovation

which post-dates the Founding -- violates the trial-by-jury clause.  Whatever the merits of this

argument, the Supreme Court has rejected it:

> [W]e are not now concerned with the form of the ancient rule.   It is the
> Constitution which we are to interpret; and the Constitution is concerned, not with
> form, but with substance.  All of vital significance in trial by jury is that issues of
> fact be submitted for determination with such instructions and guidance by the
> court as will afford opportunity for that consideration by the jury which was
> secured by the rules governing trials at common law.  Beyond this, the Seventh
> Amendment does not exact the retention of old forms of procedure.  It does not
> prohibit the introduction of new methods for ascertaining what facts are in
> issue . . . .

Gas. Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 498 (1931).  The only restriction that

the trial-by-jury clause places on trial-separation schemes is that, when a case contains both legal

and equitable issues -- the former of which must be submitted to a jury and the latter of which a

judge can decide -- the judge may not rule on the equitable issues before trial in such a way as to

preclude the jury from trying the legal issues.  See Beacon Theatres, Inc. v. Westover, 359 U.S.

500, 510-11 (1959).

> The court should take care when deciding which issues may and should be
> severed for separate trial and the order in which to try them[, as] the right to trial
> by jury on legal claims may not (except under "the most imperative
> circumstances") be lost by a prior determination of equitable claims.

Manual for Complex Litigation § 11.632, at 122.

40.     The reexamination clause presents more formidable difficulties to polyfurcation. Relatively few appellate judges have invalidated lower-court judgments or class-management plans on this ground, by far the most famous being Judge Posner:

> [T]he district judge . . . exceeded his authority [at] the point at which his plan of action proposes to divide the trial of the issues that he has certified for class-action treatment from the other issues involved in the thousands of actual and potential claims of the representatives and members of the class.  Bifurcation and even finer divisions of lawsuits into separate trials are authorized in federal district courts.  And a decision to employ the procedure is reviewed deferentially. However, as we have been at pains to stress recently, the district judge must carve at the joint.  Of particular relevance here, the judge must not divide issues between separate trials in such a way that the same issue is reexamined by different juries.  The problem is not inherent in bifurcation.  It does not arise when the same jury is to try the successive phases of the litigation.  But most of the separate "cases" that compose this class action will be tried, after the initial trial in the Northern District of Illinois, in different courts, scattered throughout the country.  The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact.  This would be obvious if the second finder of fact were a judge.  But it is equally true if it is another jury.  In this limited sense, a jury verdict can have collateral estoppel effect.
>
>         The plan of the district judge in this case is inconsistent with the principle that the findings of one jury are not to be reexamined by a second, or third, or *n*th jury.  The first jury will not determine liability.  It will determine merely whether one or more of the defendants was negligent under one of the two theories.  The first jury may go on to decide the additional issues with regard to the named plaintiffs.  But it will not decide them with regard to the other class members. Unless the defendants settle, a second (and third, and fourth, and hundredth, and conceivably thousandth) jury will have to decide, in individual follow-on litigation by class members not named as plaintiffs in the <u>Wadleigh</u> case, such issues as comparative negligence -- did any class members knowingly continue to use unsafe blood solids after they learned or should have learned of the risk of contamination with HIV? -- and proximate causation.  Both issues overlap the issue of the defendants' negligence.  Comparative negligence entails, as the name implies, a comparison of the degree of negligence of plaintiff and defendant. Proximate causation is found by determining whether the harm to the plaintiff followed in some sense naturally, uninterruptedly, and with reasonable probability from the negligent act of the defendant.  It overlaps the issue of the defendants' negligence even when the state's law does not (as many states do) make the foreseeability of the risk to which the defendant subjected the plaintiff an explicit ingredient of negligence.  A second or subsequent jury might find that the

defendants' failure to take precautions against infection with Hepatitis B could not be thought the proximate cause of the plaintiffs' infection with HIV, a different and unknown blood-borne virus. How the resulting inconsistency between juries could be prevented escapes us.

In re Rhone-Poulenc Rorer, Inc., 51 F.3d at 1302-03 (citations omitted).

41.     By and large, other courts have not accepted Judge Posner's Seventh Amendment concerns with polyfurcation. The Tenth Circuit has not addressed the Seventh Amendment's impact on polyfurcation. The Court nonetheless concludes it can make three statements confidently on the issue. First, Seventh Amendment concerns are sidestepped entirely when the same jury is used for both phases of the trial. See In re Rhone-Poulenc Rorer, Inc., 51 F.3d at 1303 ("The problem is not inherent in bifurcation. It does not arise when the same jury is to try the successive phases of the litigation."); Manual for Complex Litigation § 11.632, at 122 ("Generally, when issues are severed for separate trials, they should be tried before the same jury unless they are entirely unrelated."). Second, the Court must be cautious that no subsequent jury disturbs any issue that a prior jury definitively decided -- and the Court will use the test from the collateral-estoppel analysis to determine whether a prior jury definitively established an issue.[51] This requirement does not imply a need to "carve at the joint" -- whatever that means[52] -- but merely to do as the Seventh Amendment says, and prevent "reexamination." Third, most minor reexamination issues -- i.e., issues submitted to different juries that overlap somewhat -- can be

---

[51]The Seventh Amendment defines collateral estoppel's contours. See, e.g., SEC v. Monarch Funding Corp., 192 F.3d 295, 304 (2d Cir. 1999)(cited by Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 410 F. App'x 151, 159 (10th Cir. 2011)(unpublished)).

[52]The Tenth Circuit has never used this term. It seems to imply that every case only has certain points at which it can be bifurcated, e.g., if a claim contains elements A through E, but the "joint" is between C and D, then the case cannot be bifurcated into a trial on A and B and a separate trial on C through E. Maybe the Court is reading too much into the metaphor. In the Court's view, however, separate trials for A and B and C through E would be acceptable, so long as the C-through-E jury respects the prior jury's findings on A and B.

resolved by instructing the subsequent jury to adhere to the prior jury's findings and by carefully crafting the verdict form to reflect the prior jury's findings. See In re Paoli R.R. Yard PCB Litig., 113 F.3d 444, 452 n.5 (3d Cir. 1997); EEOC v. Foster Wheeler Constructors, Inc., No. 98-C-1601, 1999 WL 528200, at *3 (N.D. Ill. July 13, 1999)(Coar, J.)("[A] well-constructed bifurcation scheme, used in tandem with clear instructions to the juries can delineate the roles of the two juries in order to avoid reexamination of any factual issues . . . ."); Steven S. Gensler, Bifurcation Unbound, 75 Wash. L. Rev. 705, 735-37 (2000).

### 3. Oil-and-Gas Class Actions.

42.     Oil-and-gas wells are often drilled on land owned by entities or individuals other than the oil company that performs the drilling.  The landowners execute mineral leases or deeds with the oil companies, dividing the estate up into a royalty interest, which the landowner-lessor owns, and a working interest, which the oil company-lessee owns.  The lessee builds wells on the leased land and connects them to a gathering system -- a system of small pipelines that collect oil and gas from a large number of wells in a region -- which then carries it to a plant for treatment or processing.  When the lessee sells the oil or gas, it then pays the lessors a fraction of the proceeds, known as a royalty, which effectively serves as "rent" for the use of the leased land. Royalty owners sometimes contend that their lessees are underpaying their royalty, either by deducting impermissible costs from the proceeds -- a lessee can typically deduct post-production costs, but not production costs, from the sale proceeds before dividing off royalties -- or by paying on an amount that does not reflect the true sale proceeds.  The relationship between lessors and lessee is fundamentally a contractual one, but there is also positive law -- case law and statutes -- supplying default terms and contractual gap-fillers.  Each lessor's monthly royalty is typically small and, thus, lessors have little practical recourse for royalty underpayment in

individual litigation.  They will, instead, band together with other landowner-lessors with whom

a given oil company-lessor contracts -- often other lessors on a single gathering system or within

a region -- and sue the oil company via class action.  These class actions have a prodigious

history in the state courts, where they were traditionally brought -- because oil-and-gas royalty

law is principally state law -- before CAFA's passage.  See, e.g., Phillips Petrol. Co. v. Shutts,

472 U.S. at 799.  These actions present recurring issues, and, as certification reversals are both

more common[53] and more instructive than affirmances, the Court will focus on cases where

appellate courts concluded that a proposed class failed to satisfy rule 23's requirements.  But see

---

[53]Before rule 23(f)'s interlocutory-appeal provision was added, the Courts of Appeals could only rule on class certification (i) after a final judgment issued in the case, which, given the class actions' high settlement rate, was rare; or (ii) by way of a writ of mandamus, in which case the Courts of Appeals would not generally issue an opinion unless they granted the writ and ordered decertification.  See, e.g., In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293 (7th Cir. 1995).  Even now, most circuits interpret rule 23(f) in such a way that they will only hear an interlocutory appeal if it appears the certification decision was erroneous:

> We apply a five-factor test to assess the appropriateness of granting a Rule 23(f) petition.  The relevant factors are:
>
> > (1) whether the certification ruling is likely dispositive of the litigation; (2) whether the district court's certification decision contains a substantial weakness; (3) whether the appeal will permit the resolution of an unsettled legal question of general importance; (4) the nature and status of the litigation before the district court (such as the presence of outstanding dispositive motions and the status of discovery); and (5) the likelihood that future events will make appellate review more or less appropriate.
>
> We consider these factors on a holistic basis, but the court should grant the petition, notwithstanding the other factors, "[w]here a district court's certification decision is manifestly erroneous and virtually certain to be reversed on appeal."

EQT Prod. Co. v. Adair, 764 F.3d 347, 356-57 (4th Cir. 2014)(citations omitted).  These standards -- rule 23(f) and, formerly, the mandamus standard -- result in the Courts of Appeals appearing to reverse a higher proportion of class certifications that they actually do.  A district court's decision to certify a class or deny certification is reviewed for abuse of discretion.  See Vallario v. Vandehey, 554 F.3d 1259, 1264 (10th Cir. 2009).

Karen E. Kahle & Denielle M. Stritch, Grouping the Marcellus Payout: Use of Class Actions in Royalty Litigation Concerning Post-Production Cost Deductions, 88 N.D. L. Rev. 699 (2012).

43.     The Tenth Circuit's only cases on rule 23(a) and (b)(3)'s application to oil-and-gas royalty cases[54] came in two companion cases issued on July 9, 2013, Roderick and Chieftain Royalty Co. v. XTO Energy, Inc., 528 F. App'x 938 (10th Cir. 2013)(unpublished),[55] which were

---

[54]Unsurprisingly, given that the Tenth Circuit's geographic footprint encompasses such oil-rich states as Oklahoma, New Mexico, and Colorado, the Tenth Circuit has dealt with a number of other oil-and-gas royalty class actions, but those cases addressed questions other than the front-end certification inquiry.  See, e.g., Eatinger v. BP Am. Prod. Co., 528 F. App'x 859 (10th Cir. 2013)(unpublished)(McKay, J., joined by Kelly & Matheson, JJ.)(holding that the execution of a class-action settlement mooted the appeal of royalty owners who had been excluded from the class definition); Abraham v. BP Am. Prod. Co., 685 F.3d at 1196 (Kelly, J., joined by Murphy & Hartz, JJ.)(reversing, after a class-action trial, the district court's decisions to admit evidence of the defendant's transition to a uniform same-as-fed payment methodology and to grant judgment as a matter of law on two lease forms); Pelt v. Utah, 539 F.3d 1271 (10th Cir. 2008)(Robinson, J., joined by Murphy & Lucero, JJ.)(holding that plaintiffs were not bound by conclusions in a prior class action to which they were not parties); Elliott, 407 F.3d at 1091 (Murphy, J., joined by Seymour & McKay, JJ.)(making a number of substantive holdings and ruling that an intervention was timely and proper); S. Ute Indian Tribe v. Amoco Prod. Co., 151 F.3d 1251 (10th Cir. 1998)(en banc)(Seymour, C.J.)(holding that Indian tribes that owned mineral rights in coal also owned the rights to the accompanying coalbed methane), rev'd by 526 U.S. 865; Craig v. Champlin Petrol. Co., 435 F.2d 933, 939 (10th Cir. 1971)(overturning the district court's clearly erroneous factual finding that "a market exists for . . . gas in 1965 at the contract price established in 1960").

[55]Chieftain Royalty Co. v. XTO Energy, Inc. is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Chieftain Royalty Co. v. XTO Energy, Inc., as well as Skinner v. Uphoff, 175 F. App'x 255 (10th Cir. 2006), Baldauf v. Garoutte, 137 F. App'x 137 (10th Cir. 2005), Laboratory Corp. of America Holdings v. Metabolite Laboratories, Inc., 410 F. App'x 151 (10th Cir. 2011), and In re Kahn,

both written by the Honorable Paul J. Kelly, Jr.,[56] United States Circuit Judge for the Tenth Circuit, and joined by the Honorable Scott M. Matheson, Jr.,[57] United States Circuit Judge for the Tenth Circuit, and the Honorable Monroe G. McKay, Senior United States Circuit Judge for the Tenth Circuit.  In Roderick, a class of individuals owning interests in a total of roughly 650 leases and over 300 wells across ten well fields in Kansas brought a class action against XTO Energy for breach of contract, unjust enrichment, and an accounting.  See 725 F.3d at 1215.  The district court certified the class on the basis of a single common issue, "whether XTO's uniform payment methodology breached the implied duty of marketability under Kansas law," which the district court deemed to predominate over individual issues.  725 F.3d at 1217.  On appeal, the Tenth Circuit decertified the class on two grounds.

44.     First, the Tenth Circuit stated that the district court had failed to consider variations in lease language at all, relying instead on the implied duty of marketability.  See 725 F.3d at 1216.  This failure constituted an abuse of discretion, because the duty of marketability obtains only "[a]bsent a contract providing to the contrary," and, thus, can be negated by express lease language.  725 F.3d at 1216 (alteration in original)(quoting Sternberger v. Marathon Oil Co., 894 P.2d 788, 800 (Kan. 1995)).  The plaintiffs had not reviewed any of the class leases, and

---

133 F.3d 932 (10th Cir. 1998), all have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[56]Judge Kelly is a subject-matter expert in oil-and-gas law, having practiced for many years with one of New Mexico's oldest firms, the vaunted Hinkle Firm, now Hinkle Shanor LLP, in Roswell and Santa Fe, New Mexico, known for its representation of oil companies.

[57]Westlaw lists the third member of the panel as being the Honorable Charles E. Matheson, then-Chief United States Bankruptcy Judge for the District of Colorado.  The Court thinks it more likely that the Judge Matheson on the panel was the Tenth Circuit judge, because: (i) the official published opinion states that the case is "[b]efore Kelly, McKay, and Matheson, Circuit Judges"; and (ii) the Court does not believe that Article I judges can, or do, sit on federal appellate panels.

XTO Energy reviewed only one-fifth of them, categorizing them by royalty type, "several of which negate[d] the IDM [implied duty of marketability] completely or in part (i.e., by providing for certain express deductions)." 725 F.3d at 1216. Second, the Tenth Circuit held that applying Kansas' implied duty to market requires determining the point at which gas from each well becomes marketable, declaring that "[o]nce gas is in marketable condition, the IDM is satisfied -- regardless of whether a market exists at that location . . . [and] gas may be marketable *at the well*." 725 F.3d at 1219 (emphasis in original). Importantly, the Tenth Circuit did not hold that the class could not be certified, and, to the extent that the Court reads such things into judicial opinions, it implied the opposite. Rather, it held that the district court's inquiry -- and the form in which it certified the class -- was inadequate, and gave the district court multiple leads for conducting a new rule 23 analysis on remand. See 725 F.3d at 1219 ("On remand, the [plaintiffs] could, for example, create a chart classifying lease types, and although we express no opinion as to the merits, the district court could decide that no lease type negates the IDM." (citing Foster v. Merit Energy Co., 282 F.R.D. 541, 551 n.12 (W.D. Okla. 2012))); id. at 1219 ("On remand, the district court should consider whether and to what extent marketability affects commonality."  (footnote omitted)).

45.     In the unpublished companion case, Chieftain Royalty v. XTO Energy, Inc., the Tenth Circuit applied Roderick's holding to a much larger class action composed of lessors for 14,300 leases and 2,300 wells in Oklahoma. See 528 F. App'x at 940. Again, Judge Kelly noted that "approximately 13,568 leases have yet to be examined by XTO Energy -- let alone by Chieftain or the district court," and that this omission was "particularly significant because unlike the plaintiff in Roderick, Chieftain admits that some leases expressly abrogate -- and one

even negates -- the IDM."   528 F. App'x at 942-43.   Judge Kelly added one interesting

elaboration on the Roderick holding:

> [T]he district court acknowledged the significance of lease language variations
> when it stated that "the express terms of the various leases will necessarily have to
> be evaluated . . . to determine whether the [IDM] has been abrogated."  However,
> the district court decided the issue was "capable of resolution at the summary
> judgment stage of this litigation."
>
>          To be sure, the legal effect of lease language is a merits question that is
> likely "capable of resolution at the summary judgment stage."  However, it is also
> an issue that bears directly on Rule 23's criteria.  As the Supreme Court has
> emphasized, "[e]valuation of many of the questions entering into determination of
> class action questions is intimately involved with the merits of the claims."
> Therefore, the district court must address the lease language issue as it relates to
> Rule 23 *before* certifying the class.

528 F. App'x at 942 (alteration in original)(emphasis in original)(citations omitted).

46.      Other Circuits have also analyzed oil-and-gas royalty class actions, although, the

Tenth Circuit did not cite any of them in the companion cases discussed above.  The Court

suspects that the Tenth Circuit did not want to rely too heavily on cases issued before Wal-Mart.

One influential case that discusses rule 23's application to oil-and-gas royalty cases in the post-

Wal-Mart era is EQT Production Co. v. Adair.  The Honorable Albert Diaz, United States Circuit

Judge for the Fourth Circuit, joined by the Honorable J. Harvie Wilkinson III and Barbara M.

Keenan, United States Circuit Judges for the Fourth Circuit, vacated a district court's

certification of five closely related oil-and-gas royalty class actions and remanded them for

further analysis.  See 764 F.3d at 352.  That case was primarily about mineral-rights ownership --

namely, whether certain coal-rights owners also held title to the coalbed methane under the

leased premises -- but it also addressed royalty underpayments.  See 764 F.3d at 347-365

(addressing the coalbed methane ownership issue).  Judge Diaz pointed out three individual

issues that the district court failed to consider and that weighed against predominance.  First, the

case addresses the issue of intra-class variations in lease language; the Fourth Circuit's rationale

parallels the Tenth Circuit's, going into more detail in some areas:

> [T]he mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement. The predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation.   Even a plethora of identical practices will not satisfy the predominance requirement if the defendants' common conduct has little bearing on the central issue in the litigation -- in this case, whether the defendants underpaid royalties.  Absent such a relationship, there is no basis for concluding that individual issues will not predominate.

> We believe the district court placed an inordinate emphasis on the sheer number of uniform practices without considering whether those practices are relevant to assessing the defendants' ultimate liability.   Some of the common practices that the district court identified -- e.g., the fact that EQT sold all of its CBM into one of two interstate pipelines -- have little relevance to the validity of the defendants' royalty payment practices.

> The district court did identify common practices that may be pertinent to the predominance inquiry -- e.g., the fact that "EQT calculated all royalties based on the same methodology."  But the district court's analysis fell short because it never analyzed why those common practices were sufficient to ensure that the class members' common issues would predominate over individual ones.

> The defendants have highlighted a number of uncommon practices that might cause individual issues to predominate.  For example, EQT notes that it calculates royalties in different ways for different class members, depending on where the CBM is produced.  Its method of calculating royalties -- and the deductions it applies -- have also changed over time.  CNX submitted evidence that it takes different deductions depending on where it sells the CBM, and that its deduction calculations sometimes vary between and even within wells during different time periods.

764 F.3d at 366-67 (citations omitted).  These statements support the Court's conclusion that the

predominance inquiry is neither a quantitative inquiry comparing the number of common

questions to the number of individual questions, nor a cursory inquiry asking whether the

defendants generally subjected the class members to the same factual treatment by the

defendants or whether their claims are subject to the same legal standard.  Rather, it is a

manageability inquiry that requires the Court to determine whether common legal issues, susceptible to common evidence, exist in the right places to try the case in a way that is fair to all parties.  Second, the Fourth Circuit pointed out that the district court would "likely need to consider" course-of-performance evidence.  764 F.3d at 370-71.  Third, it stated that "the district court should reevaluate the implications of the defendants' statute of limitations defense for Rule 23's predominance requirement."  764 F.3d at 371.  The plaintiffs' claims were facially time-barred, but they pled fraudulent concealment to toll the statute, and the Fourth Circuit held that, "[a]lthough a defendant's conduct is not irrelevant, attention must also be paid to the plaintiff's knowledge and actions," and, "[i]n this context, a plaintiff's knowledge typically requires individual evidence."  764 F.3d at 370.

47.   After determining that the facts that oil-and-gas companies engaged in numerous common practices may be sufficient for commonality purposes, the Fourth Circuit in <u>EQT Production Co. v. Adair</u> made it clear that such common practices are not enough to satisfy the predominance requirement:

> But the mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement.  The predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation.  <u>See</u> <u>Amchem Prods.</u>, 521 U.S. at 623 (noting that the predominance inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy").  Even a plethora of identical practices will not satisfy the predominance requirement if the defendants' common conduct has little bearing on the central issue in the litigation -- in this case, whether the defendants underpaid royalties.  Absent such a relationship, there is no basis for concluding that individual issues will not predominate.
>
> We believe the district court placed an inordinate emphasis on the sheer number of uniform practices without considering whether those practices are relevant to assessing the defendants' ultimate liability.  Some of the common practices that the district court identified -- <u>e.g.</u>, the fact that EQT sold all of its CBM into one of two interstate pipelines -- have little relevance to the validity of the defendants' royalty payment practices.

The district court did identify common practices that may be pertinent to the predominance inquiry -- e.g., the fact that "EQT calculated all royalties based on the same methodology."  But the district court's analysis fell short because it never analyzed why those common practices were sufficient to ensure that the class members' common issues would predominate over individual ones.

The defendants have highlighted a number of uncommon practices that might cause individual issues to predominate.  For example, EQT notes that it calculates royalties in different ways for different class members, depending on where the CBM is produced. Its method of calculating royalties -- and the deductions it applies -- have also changed over time. CNX submitted evidence that it takes different deductions depending on where it sells the CBM, and that its deduction calculations sometimes vary between and even within wells during different time periods.

. . . .

Although the district court recognized the problem of lease language variation, it did not see it as a barrier to class certification in any of these cases. In our view, however, these variable terms will make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis.

. . . .

Yet, as the defendants note, the district court failed to discuss course of performance evidence entirely.

Second, the district court should reevaluate the implications of the defendants' statute of limitations defense for Rule 23's predominance requirement.

764 F.3d at 366-68, 70 (footnote omitted)(citation omitted).

48.     The Fourth Circuit, like the Tenth Circuit, never held that the five putative classes were intractably or irredeemably uncertifiable -- just that the district court did not ask all the necessary questions.[58]

_____

[58]Unlike the Tenth Circuit, however, the Fourth Circuit implied that the case might be doomed: "In our view, however, these variable [royalty] terms will make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis." EQT Prod. Co. v. Adair, 764 F.3d at 367-68.  The Fourth Circuit left open the

- 158 -

We do not decide today whether the disparate practices identified by the defendants are sufficient to defeat the predominance requirement. On remand, the district court may well conclude that the defendants' common conduct is sufficient to ensure the predominance of common issues over individual ones. But it was an abuse of discretion for the district court to focus only on the number of common practices without considering the significance of the defendants' disparate conduct in the broader litigation.

EQT Prod. Co. v. Adair, 764 F.3d at 367. The case is littered with instructions to the district court for improving its rule 23 analysis on remand. See, e.g., EQT Prod. Co. v. Adair, 764 F.3d at 367 ("We also remand for the district court to . . . consider how variations in the defendants' royalty obligations to the class members implicate the commonality and predominance inquiries in [certain of the five classes]."); 764 F.3d at 371 ("Where the proper balance lies in the superiority analysis we leave to the district court on remand as part of its broader consideration of the other Rule 23(b)(3) factors."). In its conclusion, the Fourth Circuit summed up its holding:

> We ultimately hold that the district court's analysis lacked the requisite rigor to ensure the requirements of Rule 23 were satisfied by any of the certified classes. On remand, the district court may conclude that one or more subclasses should be certified. It may also find that class certification should be denied entirely. At this point, we only conclude that certification was premature.
>
> We recognize that there are numerous CBM owners in Virginia who haven't received a penny of CBM royalties and others who may have gotten less than their due. We are not unsympathetic to their plight.
>
> But sympathy alone cannot justify certification under Rule 23. We therefore vacate the district court's grant of the plaintiffs' motions for class certification, and remand the case for further proceedings consistent with this opinion

764 F.3d at 371.

---

possibility, however, that the classes might be certifiable: "On remand, after reviewing the leases in this case, the plaintiffs may be able to show that there are a limited number of lease forms, such that the validity of the defendants' conduct can be assessed on a subclass basis." 764 F.3d at 369.

III.    **LAW REGARDING THE NMPPA.**

49.    The NMPPA sets forth a derivative remedy that the New Mexico Legislature provides to oil-and-gas royalty owners.  It will not lie absent a demonstration of a lessee's breach of an underlying agreement with, or duty to, an interest owner.  See Elliott, 407 F.3d at 1120 ("[I]n order to maintain a Payment Act claim, Elliott must allege a potentially successful claim for underpayment of royalties or theory of liability showing that it is 'legally entitled to such payments.'" (quoting N.M. Stat. Ann. § 70-10-3)).

50.    The NMPPA provides a specific time frame in which lessees on oil-and-gas lessees must pay royalty interest owners for proceeds they receive:

> The oil and gas proceeds derived from the sale of production from any well producing oil, gas or related hydrocarbons in New Mexico shall be paid to all persons legally entitled to such payments, commencing not later than six months after the first day of the month following the date of first sale and thereafter not later than forty-five days after the end of the calendar month within which payment is received by payor for production unless other periods or arrangements are provided for in a valid contract with the person entitled to such proceeds.

N.M. Stat. Ann. § 70-10-3.   Working interest owners who fail to make payments within § 70-10-3's timeframe incur eighteen-percent interest on the "unpaid balance due," unless one of the four exceptions in § 70-10-5 applies:

> A.    the payor fails to make payment in good-faith reliance upon a title opinion by a licensed New Mexico attorney making objection to the lack of good and marketable title of record in the party claiming entitlement to payment and furnishes a copy thereof to such party for curative action required thereby;
>
> B.    the payor receives information that in his good-faith judgment brings into question the entitlement of the person claiming the right to the payment to receive the payment or that has rendered the marketable title of record unmarketable or that may expose the payor to the risk of multiple liability or liability to third parties if the payment is made;
>
> C.    the total amount of oil and gas proceeds in the possession of the payor owed to the owner of the oil and gas proceeds making claim to payment is less than one hundred dollars ($100) at the end of any month; or

- 160 -

   D.  the party entitled to payment has failed or refused to execute a reasonable division or transfer order acknowledging the proper interest to which he claims to be entitled and setting forth a mailing address to which payment may be directed.

N.M. Stat. Ann. § 70-10-5.  Additionally, the lessee need not pay interest on unpaid balances if the lessee, has not received from the operator or lessee arranging for the sale of oil and gas "the name, the address, and the percentage of interest of each person to whom payment is to be made, as well as proof of marketable title" to the oil and gas to be sold.  N.M. Stat. Ann. §§ 70-10-3.1 and -5 (providing that a lessor does not incur the eighteen-percent penalty on unpaid balances if payments are made in accordance with § 70-10-3's time period and the lessor "has been furnished with the information required by Section 70-10-3.1").

## ANALYSIS

   The Court will deny the Motion.  To be certified under rule 23(b)(3), a class must meet all four of rule 23(a)'s requirements -- numerosity, commonality, typicality, and adequacy -- and both of rule 23(b)(3)'s requirements -- predominance and superiority.  Additionally, the class must be identifiable.  First, excluding some of the wells on the Plaintiffs' Class Well List to conform to the Plaintiffs' class definition makes the class unascertainable.  Second, although the underpayment claims satisfy rule 23(a)'s other requirements, they lack commonality under rule 23(a)(2).  Third, the underpayment claims do not satisfy rule 23(b)(3)'s predominance requirement, although they would satisfy the superiority requirement.  Last, the NMPPA and conspiracy claims fail both rule 23(a)'s and 23(b)(3)'s requirements.

**I. BECAUSE THE COURT CANNOT DETERMINE WHETHER SOME OF THE GAS FLOWED TO THE NAMED PROCESSING PLANTS FOR NGL EXTRACTION, THE PROPOSED CLASS IS NOT ASCERTAINABLE.**

   51. Before the Court analyzes whether the proposed class meets rule 23's requirements, the Court must identify the class based on the evidence introduced at the class

certification hearing.   See EQT Prod. Co. v. Adair, 764 F.3d at 358 ("We have repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'")(quoting Hammond v. Powell, 462 F.2d 1053, 1055 (4th Cir. 1972)).   The Plaintiffs' class definition includes those leases that produce oil and gas that "is or has been delivered to processing plants for extraction and marketing of natural gas liquids from the gas at the Ignacio Plant in La Plata County, Colorado, the Kutz Plant in San Juan County, and the Lybrook Plant in Rio Arriba County, New Mexico."   FAC ¶ 25, at 8 (emphasis added).   In the Plaintiffs' own expert's words, this definition requires that gas from the class wells flow to the named processing plants for NGL extraction and marketing.   See Tr. at 360:22-361:4 (McArthur).

52.     Rule 23(c) requires the Court to "define the class and the class claims, issues, or defenses."   Fed. R. Civ. P. 23(c)(1)(B).   Specifically, the Court must include "a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified."   Wachtel v. Guardian Life Ins. Co., 453 F.3d 179, 187 (3d Cir. 2006).   Another "essential" prerequisite to a rule 23(b)(3) class action is that the "class must be currently and readily ascertainable based on objective criteria."   Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 592-93 (3d Cir. 2012).   See EQT Prod. Co. v. Adair, 764 F.3d at 358 ("A class cannot be certified unless a court can readily identify the class members in reference to objective criteria.");   John v. Nat. Sec. Fire & Cas. Co., 501 F.3d 443, 445 (5th Cir. 2007); In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 30 (2d Cir. 2006); Crosby v. Social Sec. Admin. of the U.S., 796 F.2d 576, 580 (1st Cir. 1986). See also Chiang v. Veneman, 385 F.3d 256, 271 (3d Cir. 2004)(holding that "defining a class by reference to those who 'believe' they were discriminated against undermines the validity of the class by introducing a subjective criterion into what should

be an objective evaluation"), abrog. on other grounds by In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 318 n.18 (3d Cir. 2008); Agostino v. Quest Diagnostics, Inc., 256 F.R.D. 437, 478 (D.N.J. Feb. 11, 2009); 1 William B. Rubenstein et al., Newberg on Class Actions, § 3:2-3:3 (5th ed.); 7A Charles Alan Wright et al., Federal Practice and Procedure § 1760 (3d ed. 2005).  "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate."  Marcus v. BMW of N. Am., LLC, 687 F.3d at 593.

53.    The ascertainability requirement serves several important objectives.  First, it eliminates "serious administrative burdens that are incongruous with the efficiencies expected in a class action" by insisting on the easy identification of class members.  Marcus v. BMW of N. Am., LLC, 687 F.3d at 593 (quoting Sanneman v. Chrysler Corp., 191 F.R.D. 441, 446 (E.D. Pa. Mar. 2, 2000)(Van Antwerpen, J.)).  Second, it protects absent class members by facilitating the "best notice practicable" under rule 23(c)(2) in a rule 23(b)(3) action.  See Manual for Complex Litigation, § 21.222 (4th ed. 2004).  Third, it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable.  See Xavier v. Phillip Morris USA, Inc., 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011)(Alsup, J.)("Ascertainability is needed for properly enforcing the preclusive effect of final judgment.  The class definition must be clear in its applicability so that it will be clear later on whose rights are merged into the judgment . . . ."); 1 William B. Rubenstein et al., Newberg on Class Actions, § 3:1 (5th ed.).

54.    The proposed class raises problematic ascertainability issues.  Despite defining the class to include those leases whose gas was delivered to the Ignacio, Kutz, and Lybrook plants for NGL extraction and sale, the Plaintiffs have not presented sufficient evidence identifying which class members fit this definition.  In fact, the Plaintiffs concede that some of

the gas was not processed for NGL extraction and marketing.  See Tr. at 1022:25-1023:5 (Gallegos)(acknowledging that "there are times when the gas is bypassed and not processed"). After unsuccessfully attempting to modify their class definition to include leases whose gas is not processed,[59] the Plaintiffs later argued that the failure to process all of the gas is "[i]rrelevant," because WPX Production "allocated" NGLs to the well that produced those NGLs each month.  Tr. at 1022:25-1023:5 (Gallegos).  By allocating NGLs to the well, the Plaintiffs mean that Williams Four Corners determined the amount of NGLs that each well produced in any given month on the liquids detail spreadsheet, even if the gas from that well was not processed.  See Tr. at 1030:15-1031:8 (Gallegos); id. at 757:23-759:11 (Emory).  Although the spreadsheet determines the amount of liquids that each well produced, it does not note whether those hydrocarbons were extracted as NGLs through processing, which is part of the Plaintiffs' class definition which they agreed the Court should use to determine whether to certify a class. See Tr. at 719:6-15 (Emory, Gallegos); id. at 720:6-15 (Emory, Gallegos); Ward Nov. Depo. at 52:3-53:4 (Ward)("We do not get information on whether the gas was processed at all or if there were natural gas liquids."); Ward Nov. Depo. at 45:17-46:33 (Ward).  Subsequently, the Plaintiffs admitted that including the phrase "or if not processed, the gas is or has been allocated natural gas liquids" would "expan[d] the class definition" and would be "inconsistent with other terms of the definition and inappropriate."  Plaintiffs' Position on Defendants' Motion to

---

[59]Throughout the class certification hearing, all witnesses relied on the class definition in the FAC.  See Tr. at 873:10-17 (Gallegos, McArthur)(asserting that the Plaintiffs' claims are based on "the conventional gas that's gathered on the Williams system, and goes to the three plants: The Ignacio, Kutz, and . . . Lybrook"); id. at 360:21-361:4 (Condon, McArthur).  During closing arguments, after the close of evidence, the Plaintiffs stated that their "class definition [] calls for a couple modifications . . . . [W]e also propose that the class definition speak to the gas and liquids processed at the various plants, or if not processed, the gas is or has been allocated natural gas liquids . . . ."  Tr. at 1033:2-16 (Gallegos)(emphasis added).  The Plaintiffs later agreed, however, that the Court "should determine the motion for class certification based on the definition" in the FAC.  Agreed Order on Class Definition at 1.

Determine Class Certification Based on the Class Definition Contained in Plaintiffs' Fourth Amended Complaint at 1-2, filed September 23, 2015 (Doc. 242)("Plaintiffs' Position on Class Definition").  Accordingly, only the leases whose gas is delivered to the named processing plants for NGL extraction and marketing are part of the Plaintiffs' class definition.  See FAC ¶ 25, at 8.

55.     The Plaintiffs did not identify by a preponderance of the evidence which leases' gas is or has been processed at the named processing plants, and therefore, which interests burdening leases and wells are part of the Plaintiffs' proposed class.  The Plaintiffs assumed that, when a contract named a delivery point for the gas, the gas would be processed at that plant.  The Defendants demonstrated, however, that a well's contractual dedication to a particular plant does not determine whether the well's gas flows to that plant.  See Emory Report ¶ 45, at 25; Tr. at 649:10-650:1 (Emory, Sutphin).    The Williams Four Corners gathering systems are interconnected, which allows various gathering line segments to flow to different gathering systems and more than one plant.  See Tr. at 649:1-9 (Emory, Sutphin).  Gas from a well may not flow to the plant associated with the gathering system to which the well is connected.  See Emory Report at ¶ 44, at 24.  The actual gas flow depends on "system interconnections and natural flow hydraulics resulting in volumes of commingled gas being delivered to different WFC's plants . . . ."  Emory Report ¶ 44, at 24.  Furthermore, gas flow changes from year-to-year based on the following factors: (i) wells produce at different rates and decline in production over time; (ii) wells are added to or removed from the gathering systems; and (iii) the piping system changes or expands.  See Tr. at 665:18-25 (Emory).  Because gas flow changes over time, a month-by-month study is the only way to ascertain where gas actually flowed on a month-by-month basis.  See Tr. at 716:24-717:8 (Emory, Gallegos).

56.     To determine whether a well's gas was processed at one point in time, Emory performed a detailed flow analysis for three years.  See Tr. at 672:2-12 (Emory, Sutphin)("[I]f you're interested in determining which ones are actually processed, you'd have to look at it on a well-by-well basis, and go through the analysis that I've done, over time to determine which wells and which gas, therefore, is processed at one of the plants.").  Emory's analysis provides results only for 2007, 2011, and part of 2013.  See Class Well Gas Acutally [sic] Processed by WFC (Defendants' Hearing Ex. 119)("Processing Table").  After analyzing gas flow in 2007, 2011, and 2013, Emory determined how much of the gas at issue physically flowed to a processing plant and was processed for NGL extraction at various points in time.  See Tr. at 649:10-650:9; Emory Report ¶¶ 46-48, at 25-6.[60]  Given that the contract does not require gas to be processed -- or even processed at any one plant -- the Plaintiffs do not show by a preponderance of the evidence that each lease's gas is or has been delivered to one of the named processing plants for extraction.

57. For WPX-operated and WFC-gathered production at issue in this case:[61]

---

[60]The Plaintiffs mischaracterize Emory's testimony.  In both closing argument and in the Plaintiffs' Findings, the Plaintiffs assert that Emory testified that he could not determine whether the NGLs were processed.  In response to the question, "You don't know whether that's because the NGLs were actually processed or not; you can't tell us one way or the other, can you?" the Plaintiffs represent that Emory responded, "I can't tell if these wells were processed or not**.**  No, I **can't** tell that."  Plaintiffs' Findings at 22.  See Tr. at 1031:9-13 (Gallegos).  Emory actually testified: "I can't tell if these wells are processed or not**?**  No, I **can tell that**."  Tr. at 719:20-24 (Emory, Gallegos).  Emory repeatedly confirmed that his database could ascertain whether a class well's gas was processed for those years in his study.  See Tr. at 715:18-716:2 (Emory, Gallegos)("I can do that in my database.").

[61]The following information is derived from the Processing Table (Defendants' Hearing Ex. 119).  Notably, Emory could not determine whether the gas flowing on Trunk N, TRKNEAST, and TRKNWEST flowed to the Milagro treatment plant or to the Ignacio processing plant.  See Emory Report at 26 n.20.  Because he was unable to make this determination, he assumed for purposes of his analysis that these trunks would flow equally to Ignacio and to Milagro.  See Emory Report at 26 n.20.  If the gas on these trunks instead flowed to the Milagro facility, it would not be part of the class.  The Plaintiffs did not introduce

a.  In 2007:

    i.  34% flowed to the Ignacio, Kutz and Lybrook plants, and was processed for NGL removal;

    ii.  42% flowed to the Milagro plant and was not processed;

    iii.  10% flowed to the Ignacio plant, but was not processed for NGL removal, because it was bypassed;

    iv.  16% flowed either to the Milagro plant and was not processed, or to the Ignacio plant and was processed;

b.  In 2011:

    i.  23% flowed to the Ignacio, Kutz and Lybrook plants, and was processed for NGL removal;

    ii.  53% flowed to the Milagro plant and was not processed;

    iii.  8% flowed to the Ignacio plant, but was not processed for NGL removal, because it was bypassed;

    iv.  16% flowed either to the Milagro plant and was not processed or to the Ignacio plant and was processed;

c.  In 2013:

    i.  26% flowed to the Ignacio, Kutz and Lybrook plants, and was processed for NGL removal;

    ii.  49% flowed to the Milagro plant and was not processed;

    iii.  9% flowed to the Ignacio plant, but was not processed for NGL removal, because it was bypassed;

    iv.  16% flowed either to the Milagro plant and was not processed, or to the Ignacio plant and was processed.

58.    Because the Plaintiffs' class definition consists only of those wells whose gas flowed to the Ignacio, Kutz, or Lybrook plants and was processed to remove NGLs, the class claims cannot contain the gas that did not flow to those plants or was bypassed around the

---

sufficient evidence to demonstrate that the gas on these trunks flowed to the Ignacio plant for processing. See Emory Report at 26 n.20.

processing unit.  Although the Plaintiffs attempted to address this problem by moving to modify their class definition to "bring within the class all royalty owners injured by defendants' keep whole royalty methodology," they later agreed that the Court should use the FAC's class definition.[62]  Response Supporting Class Definition Modification.  See Agreed Order on Class Definition at 1.  Consequently, the class' claims do not include the portion of gas that was not processed.  See Plaintiffs' Position on Class Definition (conceding that including the phrase "or if not processed, the gas is or has been allocated natural gas liquids" would "expan[d] the class definition" and would be "inconsistent with other terms of the definition and inappropriate").

59.     That the Court cannot determine where one substantial category of gas flowed renders the class unascertainable.[63]   Three gathering trunks, Trunk N, TRKNEAST, and TRKNWEST, can flow gas either to the Milagro treating plant or to a processing plant.  See Tr. at 658:18-661:18 (Emory); id. at 712:1-713:7 (Emory); Emory Report at 26 n.20.   Sixteen percent of the production flowed on these trunks for each period sampled in the class period.  See Tr. at 660:24-661:18 (Emory).  Neither the Court nor the parties can ascertain whether the class wells whose gas flowed on the Trunk N, TRKNEAST, and TRKNWEST gathering lines flowed

---

[62]In their Response Supporting Class Definition Modification, the Plaintiffs argued that the "modified class definition will encompass the entire class," thereby suggesting that the FAC's definition does not include all of the proposed class members.  Response Supporting Class Definition Modification at 4.  They further acknowledged that they "were not aware of the issue raised by defendants, i.e., that conventional gas from some WPX wells is not processed, until defendants served their expert reports."   Response Supporting Class Definition Modification at 6.  They therefore asked the Court to modify the class definition, because modification is necessary and will conform to the evidence presented.  See Response Supporting Class Definition Modification at 5-7.  Eventually, however, the Plaintiffs agreed that the Court should use the FAC's class definition.  See Agreed Order on Class Definition at 1-2.

[63]Unlike in Anderson, where the Court observed that individual issues surrounding which gas was processed did not prevent class certification, the Plaintiffs here tie their class definition to the gas being processed at certain plants.  The Court cannot ignore this issue.

to the Milagro plant for treatment or to a processing plant, because valves and piping do not dictate the flow; natural flow hydraulics and pressures dictate the flow.  See Tr. at 658:18-661:18 (explaining that the gas on these trunks is "not valved or piped to specifically flow one way or the other," and that Williams Four Corners could not determine whether the gas flowed to Ignacio for processing or to Milagro for treatment); id. at 712:1-713:7 (Emory); Emory Report at 26 n.20.  Moreover, the systems operator -- Williams Four Corners -- does not maintain the flow data and cannot otherwise identify the plants to which the wells on these trunks flow.  See Tr. at 658:18-661:18 (Emory); Emory Report at 26 n.20.

60.    The Plaintiffs have not demonstrated by a preponderance of the evidence whether any gas flowing on Trunk N, TRKNEAST, and TRKNWEST was delivered to the Ignacio, Kutz and Lybrook plants for NGL processing and extraction.  There were "327 class wells, as defined by Plaintiffs, or identified by Plaintiffs, affected by" the inability to determine whether the gas was processed.  Tr. at 661:14-18 (Emory, Sutphin).  The Court cannot omit these wells to ascertain the new class, because the Plaintiffs have not identified the proposed class members owning interests in wells from which gas flowed on Trunk N, TRKNEAST, and TRKNWEST.[64] Moreover, even if the Court could identify which proposed class members owned interests in the

---

[64]The Court cannot identify an administratively feasible alternative to the class definition. After the Plaintiffs attempted to alter the class definition during closing arguments at the class certification hearing, the Defendants objected that they "spent thousands of hours building their respective cases around the definition" in the FAC.  Motion to Determine Class Certification Based on the Class Definition Contained in Plaintiffs' Fourth Amended Complaint, filed September 10, 2014 (Doc. 222)("Class Definition Motion").  They argued that the Plaintiffs' "new definition is an eleventh hour attempt to expand their putative class to avoid the consequences of WPX's unrebutted evidence that first, a significant amount of WPX gas is not subject to the class claims, and second, the definition contained in Plaintiffs' Fourth Amended Complaint renders the class unascertainable."  Class Definition Motion at 1.  The parties later agreed that the Court should use the FAC's class definition without any further modifications. Agreed Order on Class Definition at 1-2.

wells whose gas flowed on Trunk N, TRKNEAST, and TRKNWEST, the Court hesitates to omit twenty percent of the named wells. Doing so would significantly alter the Plaintiffs' case. It would change their damages calculation, their numerosity count, and various other elements of their case, after they explicitly agreed that the Court should use the FAC's class definition with no changes or modifications, and it would require individualized inquiries that might defeat predominance.[65] See Agreed Order on Class Definition at 1-2. Identifying which proposed class members own interests in the wells whose gas flowed on Trunk N, TRKNEAST, and TRKNWEST is not an easily ascertainable issue. Doing so is an individualized, time-consuming inquiry.

61.    Similarly, determining whether the gas that flowed on Trunk N, TRKNEAST, and TRKNWEST was processed would be exhaustively time-consuming and would require more information. "If a class cannot be ascertained in an economical and 'administratively feasible' manner, significant benefits of a class action are lost." Carrera v. Bayer Corp., 727 F.3d 300, 307 (3d Cir. 2013). "'Administrative feasibility' means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry." Carrera v. Bayer Corp., 727 F.3d at 307-08. Some courts have held that where nothing in company databases shows or could show whether individuals should be included in the proposed class, the class definition fails. See Clavell v. Midland Funding LLC, 2011 WL 2462046, at *4 (E.D. Pa. June 21, 2011)(Dalzell, J.); Sadler v. Midland Credit Mgmt., Inc., 2008 WL 2692274, at *5 (N.D. Ill. July 3, 2008)(Pallmeyer, J.); In re Wal-Mart Stores, Inc. Wage & Hour Litig., 2008

---

[65]Although the class is not ascertainable, in Part II, the Court will nevertheless analyze whether a class can be certified were the Court to omit the wells.

WL 413749, at *8 (N.D. Cal. Feb. 13, 2008)(Armstrong, J.); Deitz v. Comcast Corp., 2007 WL

2015440, at *8 (N.D. Cal. July 11, 2007)(Alsup, J.).

62.　　In EQT Production Co. v. Adair, the Fourth Circuit held that the class could not

be certified, because the class membership was not ascertainable.  See 764 F.3d at 359-60.  The

Fourth Circuit noted that some class members were easy to identify, but others "could be

determined by reference to local land records."  764 F.3d at 359.  Even though the plaintiffs

could feasibly sort through the land records to identify the class members, the Fourth Circuit

concluded that it would "be a complicated and individualized process," which "pose[s] a

significant administrative barrier to ascertaining the ownership classes."  764 F.3d at 359.  The

Fourth Circuit directed the district court to "give greater consideration to the administrative

challenges it will face when using land records to determine current ownership . . . ."  764 F.3d at

360.

63.　　Here, no existing database can identify the proposed class.  Moreover, it is not

feasible for the Court to identify which wells' gas was processed in each year.  Doing so is an

individual and time-consuming inquiry.  The Plaintiffs "may not merely propose a method of

ascertaining the class without any evidentiary support that the method will be successful."

Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d Cir. 2013).  Accordingly, the Plaintiffs have not

shown that the proposed class is ascertainable.

## II.　　THE UNDERPAYMENT CLAIMS DO NOT SATISFY RULE 23(a)(2)'S COMMONALITY REQUIREMENT.

64.　　Rule 23(a) sets forth the requirements that apply to all class actions in the federal

courts: numerosity, commonality, typicality, and adequacy.　The underpayment claims do not

satisfy the commonality requirement.

A. **EVEN IF THE CLASS WERE ASCERTAINABLE, THE UNDERPAYMENT CLAIMS DO NOT SATISFY RULE 23(a)(2)'S COMMONALITY REQUIREMENT, BUT THEY WOULD OTHERWISE SATISFY RULE 23(a).**

65.     Rule 23(a) lists the requirements that apply to all class actions in the federal courts: numerosity, commonality, typicality, and adequacy.  The underpayment claims satisfy all but commonality.

1.    **At 1,715 Class Members, the Class is Sufficiently Numerous to Satisfy Rule 23(a)(1)'s Numerosity Prerequisite.**

66.     Although it is said that there is "no set formula," Rex v. Owens, 585 F.2d at 436, nor "strict numerical test," Bittinger v. Tecumseh Prods. Co., 123 F.3d at 884 n.1, for determining when a class is sufficiently numerous for joinder to be impracticable, the reality is that a per se numerosity threshold seems to exist somewhere south of 150 proposed class members, see, e.g., Mullen v. Treasure Chest Casino, LLC, 186 F.3d at 624 (holding that "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement").  In the Plaintiffs' Findings, they assert that "there are approximately 1,715 class members," Plaintiffs' Findings ¶ 5, at 26, while in the Motion, they argue that there are "about 1900 royalty and overriding royalty owners," Motion at 18.  The Plaintiffs did not explain why they altered the number of proposed class members.  They may have subtracted some[66] proposed class members under the two excluded 372K wells, on which WPX Production pays royalty owners for the value of the refined NGLs.  The "Defendants do not challenge numerosity," Motion at 18, so the Court has little information about how the Plaintiffs arrived at the number.  Even if the Court

---

[66]The Court must subtract up to 99 proposed class members who own interests on these excluded wells.  Some of these well owners may own wells committed to other gathering contracts and could thus remain class members.

subtracted an additional ninety-nine proposed class members, however, the class clears rule 23(a)(1)'s bar.[67]

67.     Here, individual litigation is not realistic, as joinder is impracticable. "Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required." Cook v. Rockwell Int'l Corp., 151 F.R.D. 378, 384 (D. Colo. 1993)(Kane, J.).  If, hypothetically, the Court were to force the Plaintiffs to join each class member as a full-fledged, jointly represented[68] party under rule 20, the Plaintiffs would suffer that litigational hardship.  Counsel's communication with his clients would, of necessity, still resemble that of class counsel and class member, and not that of attorney and client.  This observation is not to say that a class counsel cannot effectively communicate with his class outside of rule 23's notice requirements; he can. The internet has made it feasible to correspond regularly with class members and keep them informed of the litigation's progress.  In a case where plaintiffs' counsel represents over 1,000

---

[67]If the Court were to exclude the 327 class wells whose gas may not have been processed at the Ignacio, Kutz, or Lybrook plants for NGL extraction, the Court does not know how many proposed class members this exclusion would eliminate.  It could be that many of the proposed class members have interests in other wells whose gas is processed at the named processing plants.  The Court recognizes that the party seeking certification bears the burden of establishing each of rule 23's elements by a preponderance of the evidence.  See Marcus v. MBW of N. Am., LLC, 687 F.3d at 591.  Moreover, "actual, not presumed, conformance" with rule 23 requirements is "indispensable."  Gen. Tele. Co. of Sw. v. Falcon, 457 U.S. at 160. Nevertheless, if the Court reduced the proposed class members by 20% -- the percentage of wells the issue affects -- the class would still contain more than 1,000 proposed members, which satisfies rule 23(a)(1)'s requirements. See Robidoux v. Celani, 987 F.2d 931, 936 (2nd Cir. 1993)("[T]he difficulty in joining as few as 40 putative class members should raise a presumption that joinder is impracticable."  (citation omitted)); Lowery v. City of Albuquerque, 273 F.R.D. at 683 (concluding that that joinder of "several hundred tenants and homeowners" would be impracticable, and determining that the proposed class met rule 23(a)(1)'s numerosity requirement).

[68]It is unlikely that class members would retain their own, separate counsel to prosecute their individual claims.

clients -- whether as joined parties or a certified class -- he cannot share secret information with his clients, he probably cannot obtain their unanimous permission to settle, and, to act in their best interests, he probably must represent the class' whole rather than its parts.  Even if the Court could manage this number of plaintiffs under rule 20, it would eschew rule 23's built-in protections for absent plaintiffs.  In short, joinder would cause a severe litigational hardship.  See Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993)("Impracticable does not mean impossible.").  The class clears rule 23(a)(1)'s numerosity hurdle.

### 2.   Common Questions of Law and Fact Exist, But They Are Not Sufficient to Satisfy Rule 23(a)(2)'s Commonality Requirement.

68.    Incidental common questions of law and fact exist in this case, but none satisfy Wal-Mart's requirements for commonality.   After Wal-Mart, a common question must be "capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," or, to use the more popular phraseology, it must be prone "to generate [a] common *answer*[] apt to drive the resolution of the litigation."[69] Wal-Mart, 131 S. Ct. at 2551 (emphasis in original).  In this case, common questions do not abound.   The Court will analyze commonality for the underpayment claims, the NMPPA claim, and the conspiracy claim separately.

69.    Regarding the underpayment claims, the Defendants paid all class royalties and overriding royalties under a uniform policy, with the exception of two of the wells committed to

---

[69]Wal-Mart casts doubt on Judge Kyle's statement in In re Potash Antitrust Litigation that rule 23 "does not require that common issues be dispositive or significant."  159 F.R.D. at 699.  The Court concludes that Justice Scalia's opinion has put a rigorous analysis into rule 23(a)(2).  If the common issue is not disputed, it may not really be a common question.  If it is not disputed, it is a phantom issue, and the Court should not rely upon it as a common question.  Consequently, the Second Circuit's opinion in In re Nassau County Strip Search Cases, which states that the fact that the answer to a common issue is not disputed does not affect its commonality, is likely no longer good law after Wal-Mart.

the 372K gathering contract, which the Court excludes from the class.[70]  See Ward April Depo.

at 15:2-7 ("[T]o calculate royalties, it is pretty much the same methodology for the WFC

gathered wells.  We would take the wellhead volume times a price and then deduct any

applicable post-production deductions.").  This policy valued production from all wells

committed to Williams Four Corners under a keep-whole method.  This uniform policy, which

calculates and pays the class' royalties without regard to variations in lease language, is a

common issue[71] of fact, and it forms one half of the Plaintiffs' underpayment claims.  The

---

[70]More than 100 proposed class members are paid royalties and overriding royalties on
processed NGLs from production committed to Williams Four Corners gathering contracts: the
Sanchez and San Juan 32-8 Unit No. 33A, both of which are completed in the Mesa Verde
formation. The Plaintiffs acknowledged during their closing argument that "there is [sic] a
couple leases that aren't on the Williams Four Corners system and they're not on the Enterprise
system . . . [for which WPX] pay[s] the royalty owners on the liquids." Tr. at 1015:23-1016:3
(Gallegos).  Although the Plaintiffs are correct that WPX Production pays royalty owners on the
liquids for these wells, Ward's testimony clarifies that the wells are on the Williams Four
Corners' system, and are committed to the 372K contract.  See Ward Nov. Depo. at 113:10-
114:5 (Ward); Ward April Depo. at 44:2-45:14 (Ward); Ward Nov. Depo. at 110:15-23 (Ward);
id. at 112:13-19 (Ward); id. at 113:10-114:4 (Ward); id. at 120:7-24 (Ward).  WPX Production
pays ninety-nine class members royalties and overriding royalties based on refined NGLs for the
production from the 32-8 Unit No. 33A well.  See Ward April Depo. at 44:2-45:14 (Ward); Ward
Nov. Depo. at 110:15-23 (Ward); id. at 112:13-19 (Ward); id. at 113:10-114:4 (Ward); id. at
120:7-24 (Ward); Email from Sheryl Ward, WPX Production, to Robert Sutphin, counsel for
WPX Production (dated Nov. 27, 2013)(Defendants' Hearing Ex. 70).  Additionally, there are
approximately ten wells committed to the Williams Four Corners December 9, 2013 gathering
and processing contract for which royalty owners receive payment on refined NGLs.  See Ward
April Depo. at 160:22-161:11 (Ward); id. at 162:17-21 (Ward); Dec. 2013 Gathering Contract
(Plaintiffs' Hearing Ex. 205).  The class members with interests on these wells do not share the
underpayment claims with the remainder of the class.  Accordingly, even if the Court certified a
class, the Court would omit these class members.  The Plaintiffs' premier common issue -- that
WPX Production's uniform payment method failed to pay royalties on refined NGLs -- does not
apply to these wells.  A "class 'must not be defined so broadly that it encompasses individuals
who have little connection with the claim being litigated.'"  Roderick v. OXY USA, Inc., 2016
WL 3423133, at *4 (D. Kan. June 22, 2016)(Melgren, J.)(quoting 7A Charles Alan Wright &
Arthur R. Miller, Federal Practice and Procedure § 1760, 142-44 (3d ed. 2005)).

[71]The Court uses "issue" rather than "question," because the Defendants have agreed that
the answer to the question "whether the Defendants paid royalties differently depending on
variations in the lease language" is no.  A common question needs to be unresolved or actually

underpayment claims, at base, consist of two input inquiries and one output result: (i) how were the class members entitled to be paid by the Defendants, which is a mixed legal and factual question that requires looking to the language in the leases and any implied-in-law terms; (ii) how did the Defendants actually pay the class members, which is a factual question that requires looking to the evidence; and (iii) what is the numerical difference, if any, between (ii) and (i), which determines damages.  See Morrison v. Anadarko Petroleum Corp., 280 F.R.D. 621, 625 (W.D. Okla. 2012)(Miles-LaGrange, C.J.)("[T]he determination of whether a royalty underpayment occurred requires a comparison of the amount that the royalty owner actually received to the amount the royalty owner should have received.").  Issue (ii) is common, but it is undisputed, and thus, incidental.  Like the Court explained in Anderson, the issue of how the Defendants pay royalties is not merely "capable of" producing a common answer, Wal-Mart, 131 S. Ct. at 2545; it has already been given one.  The Court thus does not conclude, after Wal-Mart, that the Defendants' uniform payment policy is the common question that satisfies rule 23(a)(2). See EQT Prod. Co. v. Adair, 764 F.3d at 366 ("That the defendants engaged in numerous common practices may be sufficient for commonality purposes."  (emphasis added)).  Issue (i) -- how were the class members entitled to be paid by the Defendants -- is the important one in this case, and it is an individualized inquiry.

---

disputed going into the merits phase to count as a common question and satisfy the commonality requirement.  Such a rule may have the perverse impact of favoring certification of cases with more open, unresolved cases over otherwise identical cases with more agreed-upon facts;  at the very least, class-action plaintiffs may seek to delay all merits adjudications until after the class-certification stage, and may not agree to factual stipulations -- even favorable ones -- on questions common to the class.  The Court is convinced that Justice Scalia wanted to end the old practice of a plaintiff listing a host of "common questions" -- issues that were largely undisputed -- to convince the court that many common issues existed, and to overlook the real "questions" that the court had to decide.

70.     Specifically, regarding the Plaintiffs' claim that the Defendants breached their contracts by failing to pay royalty on NGLs, McArthur frames the primary questions as uniform across the entire class: whether all of the leases require payment on all production, and whether WPX Production paid on all production.  See Tr. at 381:5-13 (McArthur); Tr. at 1080:3-4 (Gallegos)(contending that breach of contract lies, because the royalty agreements uniformly require payment on all production).  The Plaintiffs overlook, however, the individual questions that the Court must address before a jury can answer the Plaintiffs' two questions.  To determine whether the royalty agreements require payment on all production in the method that the Plaintiffs seek, the Court must ask the question as to each of the different lease forms.  The question, therefore, is not common to all proposed class members.

71.     The Plaintiffs argue that the Court need not inquire into each different lease form.  Through their expert -- McArthur -- they contend that each lease, by requiring payment on "gas," requires payment on the NGLs later extracted.  Tr. at 369:21-23 (McArthur)("There is certainly an industry practice that's reflected in a number of places that 'gas' means gas and its components or constituents.").  See Tr. at 379:12-19 (McArthur)(stating that "all of the leases, all of the overrides require payment on oil and gas . . . that in this industry mean you have to pay on gas and all the constituents, which would mean liquids."); id. at 1080:4-7 (asserting that "payment on all production" requires payment on "the components of the gas as it's processed"); id. at 1080:20-21 (Gallegos)(contending that "gas as produced includes natural gas liquids").  Accordingly, the Plaintiffs contend, the individual lease language variations are irrelevant, and the Court can determine whether WPX Production underpaid royalties without looking to other lease language.  See Motion at 13-15.

72.     That each lease requires payment on "gas" does not give rise to a common question if other lease language clarifies the scope of the duty to pay royalties on "gas." Here, other lease language identifies where in the production line the royalty on that "gas" is to be paid. The Defendants contend that this language destroys commonality, because some leases require royalty payment on processed gas, while other language requires payment on unprocessed gas. See Tr. at 1042:25-1043:7 (Sheridan). For instance, the Defendants argue that, if the lease requires royalty payments on gas "at the well," royalty should be paid differently than a royalty provision that requires payment on "proceeds" of gas. Tr. at 1037:3-23 (Sheridan). According to the Defendants, even if "gas" includes all components of gas, other lease language creates material differences on how WPX Production must account for those components, all of which affect commonality. See Tr. at 1037:3-1042:8 (Sheridan)(describing: (i) Carter v. Exxon Corp., 842 S.W.2d 393 (Tex. Ct. App. 1992), which stated that the "[t]he inclusion of the words 'at the well' in the royalty provision specifies that royalties are owed for gas that is produced in its natural state, not on the components of the gas that are later extracted"; (ii) Abraham v. BP Am. Prod. Co., 685 F.3d 1196, 1199 (10th Cir. 2012)(stating that "market-value" leases require royalty to be paid "based on the market value of unprocessed gas as it emerged from the ground ('at the well')"); and (iii) Emery Resource Holdings, LLC v. Coastal Plains Energy, Inc., 915 F. Supp. 2d 1231, 1237 (D. Utah 2012)(Warner, M.J.)(stating that, under a "proceeds received by the lessee at the well" lease, the "parties intended for the royalty value to be determined based on the gas as it is produced from the wells and not at some point downstream")). Accordingly, even if all of the leases require payment on NGLs, that fact alone does not establish that all leases could similarly require payment on the value of the processed gas and NGLs. See Tr. at 398:22-399:8 (McArthur, Sheridan)(agreeing that, if some leases require WPX Production to pay

royalties based on unprocessed gas, while others require royalty payment on the value of processed gas, there "would be a dissimilar result").  The Court must address the lease language to make this determination.  Thus, although many of the leases likely require payment on the refined NGLs, the Plaintiffs have not shown that the Court can ignore the other lease language in ascertaining how all of the leases required WPX Production to pay royalties.

73.   Only if the word "gas" requires WPX Production to pay royalty on the value of processed gas would there be a common question whether WPX Production breached each of the leases.  McArthur and Terry disagree whether "gas" includes the processed and refined NGLs. To the extent an expert's testimony bears on the Court's determination of commonality, the Court must determine whether McArthur's testimony about the word "gas" and its meaning are persuasive, or instead, whether the Defendants' expert's testimony is more believable.  See Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011)(stating that the district court must "judg[e] the persuasiveness of the evidence presented," rather than determining that an expert's opinion is "merely admissible"); Sher v. Raytheon Co., 419 F. App'x 887, 890 (11th Cir. 2011)(finding that the "district court erred as a matter of law by not sufficiently evaluating and weighing conflicting expert testimony on class certification").  Determining which expert's testimony correctly defines the word "gas" is key to certification.  See Chieftain Royalty Co. v. XTO Energy, Inc., 528 F. App'x at 942 (stating that "the district court must address the lease language issue as it relates to Rule 23 *before* certifying the class," even though it "is a merits question," because "it is also an issue that bears directly on Rule 23's criteria" (emphasis in original)(citing Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 (1978)).  McArthur agreed that, if the Court determines that some leases provide for royalty payment based on the price of unprocessed gas, while others call for the payment on the value of processed gas and NGLs,

there "would be a dissimilar result" that could partially preclude the class' certification.  Tr. at 398:22-399:8 (McArthur, Sheridan)("If the Court concluded that, I would think it wouldn't certify that claim for the first group.").  Because this issue is essential to determining whether the class claims are common, the Court must determine which expert's testimony is more persuasive.  See Am. Honda Motor Co., Inc. v. Allen, 600 F.3d 813, 816 (7th Cir. 2010)("The court must also resolve any challenge to the reliability of information provided by an expert if that information is relevant to establishing any of the Rule 23 requirements for class certification.")(per curiam).  Notably, the Plaintiffs bear the burden of demonstrating commonality.  See Roderick, 725 F.3d at 1217.  They "must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  Wal-Mart, 131 S. Ct. at 2551 (emphasis in original).

74.    In contrast to McArthur, Terry testified that, although "gas" includes all components of gas as they emerge from the well, "gas" does not indicate that royalties must be paid on the extracted NGLs extracted downstream after processing on which the Plaintiffs argue that they should be paid royalties.  Tr. at 835:22-23 (Terry)(explaining that "gas" refers to "gas as a vapor, as it's produced in its unprocessed state at the well"); id. at 833:9-18 (Gallegos, Terry)(explaining that gas "as such" language requires payment on "gas as it emerges from the ground in its natural state"); Terry Report ¶ 29, at 9 (stating that, because "all of the royalty clauses provide for royalty on gas," none of the royalty clauses "expressly provide for royalty on the proceeds received on the value of refined natural gas liquids products extracted from gas through processing").  She compared another royalty agreement, which stated that royalty should be paid on "two-and-a-half percent of all of the oil, gas, natural gasoline, and other products obtained from gas," to show that the royalty owner on this agreement contemplated being paid

on "additional products obtained from gas."  Tr. at 801:13-19 (Terry).  See Burns v. Exxon
Corp., 158 F.3d 336 (5th Cir. 1998)(concluding that a lease that requires royalty on "gas . . .
produced from said land and sold or used off the premises . . . the market value at the well," did
"not entitle[ the royalty owners] to receive royalties based upon the value of the processed plant
products").  Thus, while she agreed that "gas" includes all components produced from the well,
she maintained that "gas" did not require producers to process and pay royalties on the processed
components.  See Tr. at 836:17-23 (Terry); id. at 837:2-4 (Terry)(stating that, "[i]f the entrained
liquefiable hydrocarbons are not extracted through processing," they "remain in the form of gas
and go down the pipeline").  In conclusion, the evidence suggests that "gas" refers to the gas
produced at the wellhead rather than the processed products.

75.    Because "gas" does not necessarily mean processed gas, the question whether
WPX Production underpaid royalties for all class members requires the Court to consider each
lease variation, some of which may not require WPX Production to pay royalties on the value of
the processed and refined products.  In short, there is "litigious uncertainty" about the potentially
material differences between proposed class members' claims.  Foster v. Merit Energy Co., 272
F.R.D. at 559.

> [I]n determining whether the Rule 23(a) commonality requirement has been
> satisfied in the case at bar, it is necessary to look only for "litigious uncertainty," .
> . . with respect to *potentially* material differences between the representative
> plaintiff's facts and the facts on which the claims of other members of the
> proposed class would stand or fall if their claims were adjudicated on *their* merits
> . . . .

Foster v. Merit Energy Co., 272 F.R.D. at 559 (emphasis in original).

76.    The Plaintiffs do not show that the varying lease language is irrelevant.
Determining whether all leases require payment on NGLs requires the Court to ask whether each

lease variation requires payment on processed gas and refined NGLs in both New Mexico and Colorado.  Accordingly, the breach-of-contract claims require an individualized inquiry.

77.     Regarding the Plaintiffs' claims for breach of the duty to market[72] and the duty of good faith and fair dealing, they argue that WPX Production violates the implied duty to market when it "does not market NGLs for the mutual benefit" of the royalty owners, Brief at 17, and violates the covenant of good faith and fair dealing by "intentionally failing to pay Royalty on . . . the valuable NGLs on which plaintiffs should be but are not paid royalty," FAC ¶ 78, at 21. See Reply at 8-9.  The Court reviewed each lease and determined that no lease expressly negated

---

[72]As the Court has previously noted, the implied duty to market's requirement to market the products for the royalty owner's mutual benefit does not conflict with a lease's royalty provision terms, whether market value leases, proceeds leases, or other lease forms.  See Anderson Living Tr. v. ConocoPhillips Co., LLC, CV 12-0039, Memorandum Opinion and Order at 36-47, filed March 1, 2016 (Doc. 177), 2016 WL 1158341 (D.N.M. March 1, 2016)(Browning, J.)("ConocoPhillips MOO"); id. at 42 (stating that Davis v. Devon Energy Corp. "suggests that a lease's pricing clause does not conflict with the duty to market's implication").  Davis v. Devon Energy Corp. makes clear that an individualized inquiry is "inapplicable to a determination of whether the [duty to market] may be implied in each royalty agreement."  2009-NMSC-048, ¶ 34, 218 P.3d at 85.  The lease language can, however, be important to determining whether the lessee breached the duty to market.  The Court has explained: "[T]he duty to market may be implied in all leases, but lease language can affect the determination whether the lessee breached the duty to market and how the lessor can recover." ConocoPhillips MOO at 46 n.22.  In Davis v. Devon Energy Corp., there was no need to determine each member's royalty interest, because the defendants allegedly violated the duty to market by failing to pay on post-production costs.  Here, determining whether WPX Production breached the duty to market requires a determination of each member's royalty interest.

Although the Supreme Court of New Mexico in Davis v. Devon Energy Corp. stated that individualized issues are irrelevant for certifying a Rule 1-023(B)(2) class if the defendant "acted . . . or failed to perform a legal duty . . . on grounds generally applicable to all class members," 2009-NMSC-048, ¶ 17, this case involves claims under federal rule 23(b)(3) rather than state Rule 1-023(B)(2).  Moreover, WPX Production did not necessarily fail to perform a legal duty "on grounds generally applicable to all class members," because some class members were entitled to be paid on different royalty interests or at different points in the production line.  Accordingly, lease language is relevant to determining what royalty interest each class member owned.

the implied duty to market.[73]  See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d at 1220 (directing the district court on remand to determine whether the leases negated the implied duty to market).  As each lease contains the duty to market and the duty to deal in good faith, the Plaintiffs assert that a common question exists: whether WPX Production failed to sell the hydrocarbons as a reasonably prudent operator by "acquiescing in or participating in 'keep whole' gathering and processing arrangements with affiliates," which allowed the affiliate to take all of the more valuable NGLs.  McArthur Expert Report at 11.  See Tr. at 1073:8-15 (Gallegos)(asserting that WPX Production's gas sales at index prices violates the duty to market and the duty of good faith and fair dealing).  Calculating royalty payments based on the sale of gas at index prices, even to affiliates, does not in itself violate the implied duty to market.  See Garfield v. True Oil Co., 667 F.2d 942, 945-46 (10th Cir. 1982); Anderson Living Tr. v. ConocoPhillips Co., LLC, 952 F. Supp. 2d 979, 1035 (D.N.M. 2013)(Browning, J.)(stating that affiliate sales in and of themselves do not violate the duty to market); ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶¶ 66-68, 299 P.3d 844, 860-61.  What violates the duty to market is marketing the products at less-than-reasonable sales prices that do not mutually benefit the royalty owners and the lessee alike, whether sold to an affiliate or an unaffiliated entity.[74]  See Libby v. De Baca, 1947-NMSC-007, ¶ 7, 179 P.2d at 265 (stating that

---

[73]The Plaintiffs' implied-duty-to-market claim does not include an argument that the Defendants improperly deducted certain costs from the proposed class' royalty payments.  See Tr. at 922:4-14 (Gallegos, McArthur)(asserting that "the deduction practices which Williams described . . . is not being challenged").

[74]Although affiliate transactions present the lessor with an easier opportunity to base royalties on less-than-reasonable sales prices that do not mutually benefit the lessors, affiliate sales in and of themselves do not violate the duty to market.

the duty to market requires the lessee to "market the product," "having in mind his own interest as well as that of the lessor").

78. The Plaintiffs are not challenging the use of affiliate contracts in general. Rather, they allege that these particular affiliate contracts systematically failed to market the NGLs and sold the gas in a way that did not "hav[e] in mind [the lessee's] own interest as well as that of the lessor."[75] Libby v. De Baca, 1947-NMSC-007, ¶ 7, 179 P.2d at 265. The leases do not negate the duty to act as a reasonably prudent operator in selling the products. It is therefore a common question whether the keep-whole scheme violates the implied duty to market by marketing the products under its keep-whole scheme. It is not, however, the type of common question sufficient to satisfy rule 23(b)'s commonality requirement, because it is not the only question necessary to determine the Plaintiffs' claims and it will not necessarily produce common answers. Even if a reasonably prudent operator would not have marketed the products using the keep-whole scheme, the Plaintiffs suffer harm only if the keep-whole scheme deprived them of their royalty interest. See Darr v. Eldridge, 1959-NMSC-093, ¶ 14 (stating that the duty to market requires the lessee to "make diligent efforts to market the production in order that the lessor may realize on his royalty interest")(emphasis added). The duty to market does not define the lessor's royalty interest; the lease's royalty provision does that. The Plaintiffs, therefore, cannot establish that WPX Production failed to market the NGLs if the proposed class members

---

[75]The Plaintiffs allege that, under both the implied-duty-to-market claim and the claim for breach of the duty of good faith and fair dealing, WPX Production breached the duties by failing to market and pay the Plaintiffs on the NGLs. See FAC ¶ 78, at 21 (alleging that WPX Production breached the duty of good faith and fair dealing by "intentionally failing to pay Royalty on all production, combining with Williams and allowing Williams to take for its financial benefit the valuable NGLs on which plaintiffs should be but are not paid royalty"); id. ¶ 87, at 22 (asserting that WPX Production breached the duty to market by "fail[ing] and refus[ing] to market NGLs and condensate and in doing so obtain the best terms and prices for the benefit of plaintiffs and members of the class").

were not entitled to the processed NGLs under their royalty provisions.  A royalty owner who does not own a royalty interest in refined NGLs extracted from the gas through processing cannot make out a prima facie claim against the lessee for breach of an implied duty to market such liquids for the royalty owner's benefit. See El Paso Natural Gas Co. v. American Petrofina Co. of Texas, 733 S.W.2d 541, 550 (Tex. Ct. App. 1986)(stating that the duty to market in good faith "is based on the assumption that the operator is marketing something that belongs to the royalty owners"); Foster v. Merit Energy Co., 282 F.R.D. 541, 557 (W.D. Okla. 2012)(explaining that the "geographic specifics" defining where in the production line royalty is to be paid "can be significant")

79.     The determination that "gas" includes all hydrocarbons does not answer the necessary question: whether each proposed class member was entitled to be paid on the refined and processed NGLs by virtue of being entitled to all hydrocarbons.  The answer will likely be "yes" for some class members, but it might be "no" for other class members whose royalty provisions entitled them to royalties valued on the gas at the wellhead.  The Court would have to ask the issue for each lease form.  Accordingly, the common answer to one question the Plaintiffs ask does not "generate common *answers* apt to drive the resolution of the litigation" on a classwide basis.  Wal-Mart, 131 S. Ct. 2551 (emphasis in original).  See Foster v. Merit Energy Co., 272 F.R.D. at 547.

80.     Like with the breach-of-contract claims, the Plaintiffs argue that they can prove that all class members are entitled to be paid on the NGLs, because their royalty agreements all require payment on "gas," which includes all entrained liquefiable hydrocarbons.  As explained above, however, the Court concludes that "gas" likely means the unprocessed state from which the gas emerges from the well.  Because the lease language is not irrelevant, the Plaintiffs cannot

show on a classwide basis that all proposed class members are entitled to be paid on processed NGLs, because some class members' royalties were valued on gas at the well.  It is very likely that some, if not many, class members were entitled to be paid on NGLs.  To determine which class members were entitled to be paid on the NGLs, however, the Court must examine each lease.   Accordingly, although the implied duty to market applies in every class lease, to demonstrate that WPX Production violated that duty by failing to pay royalties on NGLs, the Plaintiffs must establish the right to NGL payment under the various lease forms.  See Roderick, 725 F.3d at 1218 (stating that plaintiffs bear the "burden to affirmatively demonstrate commonality on the implied duty of marketability").  The issue is therefore not common.  In other words, although WPX Production has a common duty to sell the products for the lessors' mutual benefit, determining whether WPX Production complied with that duty may vary between lease forms.

81.   Although the Plaintiffs raise numerous other questions, these questions are not all common to the class or not "central to the validity of each one of the claims."  Wal-Mart, 131 S. Ct. at 2551.  Some of these questions include:

a.  Whether the monthly payment statements to royalty owners are misleading and show bad faith in representing that royalty is paid on "Total Production" when no royalty is paid on production of NGLs and condensate;

b.  Whether the monthly payment statements that WPX Production provided to the royalty owners are materially misleading because they (a) do not report value for NGLs; (b) do not report value for condensate; (c) deduct expenses of gathering and processing allocable to NGLs in the gas stream while providing no royalties on that production; and (4) reflect netback deductions that are improper;

c.  Whether the monthly payment statements provided by WPX Production to the royalty owners are intentionally misleading or issued with gross negligence;

d.  Whether WPX Production has breached the royalty agreements and its duty to get the best price reasonably possible for production under the duty to market by acquiescing in or participating in "keep whole" gathering and processing arrangements with affiliates;

e.  Whether WPX Production has paid overriding royalty interest owners with same-as-federal interests the same as it pays the federal government lessor;

f.  Whether WPX Production uses and has used a single royalty computation and payment methodology for all private Colorado royalty owners;

g.  Whether WPX Production uses and has used a single royalty computation and payment methodology for all private New Mexico royalty owners;

h.  Whether WPX Production has used differing royalty computations and payment methodologies based on the particular wording of the payment clauses in any of the royalty and overriding royalty agreements;

i.  Whether any of the royalty agreements authorize WPX Production to avoid paying royalty on all gas and all liquid hydrocarbons produced from leases burdened by class royalties and overriding royalties;

j.  Whether any of the royalty agreements authorize WPX Production to substitute less valuable volumes of residue gas for more valuable NGLs in paying royalty and overriding royalty;

k.  Whether any of the royalty agreements authorize WPX Production to contract with Williams Four Corners to allow Williams Four Corners to take possession of and dispose of NGLs and condensate that are subject to the rights of royalty owners without paying royalty and overriding royalty on that production;

l.  Whether WPX Production acted in bad faith and breached its duty of good faith and fair dealing in paying royalty and overriding royalty;

m. Whether damages for royalty underpayment can be calculated on a class wide basis;

n.  Whether equitable and declaratory relief should be granted to establish WPX Production's ongoing royalty obligation to the class and for an accounting by Williams Four Corners of the proceeds of sales on all hydrocarbons produced from leases burdened by class royalties and overriding royalties;

o.  Whether the combination between Williams Four Corners and WPX Production to enter into, to perform, and to abide by the keep-whole agreements before the July, 2011 spin-off constitutes a civil conspiracy.

See Report of John Burritt McArthur at 13-14.

82.     These questions do not resemble questions that have been held -- pre-<u>Wal-Mart</u> and at the Court of Appeals-level -- to be common questions in other cases, including: (i) whether an employer engaged in a pattern of racketeering activity that depressed the wages of all employees, <u>see</u> <u>Williams v. Mohawk Indus., Inc.</u>, 568 F.3d 1350 (11th Cir. 2009); (ii) whether an employer engaged in racial discrimination in the setting of wages, <u>see</u> <u>Parra v. Bashas', Inc.</u>, 536 F.3d 975, 980 (9th Cir. 2009); (iii) whether a health-care plan created a backlog of unprocessed claims, <u>see</u> <u>Gunnells v. Healthplan Servs., Inc.</u>, 348 F.3d 417, 425 (4th Cir. 2003); and (iv) whether a product produced by the defendant was defective, <u>see</u> <u>Butler v. Sears, Roebuck & Co.</u>, 727 F.3d 796, 801 (7th Cir. 2013).

83.     The primary question in this case -- how the Plaintiffs were entitled to be paid -- is not sufficiently similar to the common questions in those cases to give the Court comfort that the primary question in the case is a common question.  In those cases, the common questions answered the main issues in the case.  Here, the primary issue is how much the Plaintiffs should have been paid -- on the refined NGL values or the raw gas values, and the Defendants' practices do not answer that question in a common way.  Moreover, most of these common questions, in the pre-<u>Wal-Mart</u> era, could theoretically be broken into more specific questions that no longer encompass the entire class.  None of them, on its own, definitively establishes a claim, even if answered in the affirmative.  Justice Scalia had these sort of questions in his crosshairs in <u>Wal-Mart</u>.  In sum, the Plaintiffs have not demonstrated commonality.  <u>See</u> <u>Roderick</u>, 725 F.3d at 1218 ("[I]t is not the defendant who bears the burden of showing that the proposed class does not comply with Rule 23, but [rather] the plaintiff who bears the burden of showing that the class does comply with Rule 23.")(quoting <u>Thorn v. Jefferson-Pilot Life Ins. Co.</u>, 445 F.3d 311, 321 (4th Cir. 2006)(emphases omitted)).

**3.    The Class Representatives' Claims Are, in All Important Respects, Identical to the Absent Class Members' Claims, and They Will Vigorously Prosecute the Action, Thus Satisfying Rule 23(a)(3)'s Typicality Prerequisite and 23(a)(4)'s Adequacy Prerequisite.**

84.     Because the parties address typicality and adequacy together, the Court will do so also.  See Motion at 18; Response at 26 ("Plaintiffs Cannot Satisfy Rule 23's Typicality and Adequacy Requirements."); Reply at 10 ("Plaintiffs Satisfy Typicality and Provide Adequate Representation.").  Typicality is satisfied, because the class representatives bring the same causes of action and present comparable factual circumstances as the absent class members.  See DG v. Devaughn, 594 F.3d at 1199 ("[L]ike commonality, typicality exists where . . . all putative class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances.").  Here, no absent class member asserts any cause of action that one of the class representatives does not assert.  The Defendants argue that typicality is lacking for two reasons.  First, they contend, the Plaintiffs lack standing to assert the proposed claims.  See Response at 27-28.  Second, they assert, the class is unavoidably conflicted.  See Response at 28-29.

85.     Regarding standing, the Defendants explain that the named Plaintiffs "are parties to only two of the many different types of royalty clauses at issue," and have not "established the right to pursue a claim on behalf of their predecessors-in-interests or on behalf of *any* former owner."  Response at 27 (emphasis in original).  First, in response to the Defendants' Motion to Dismiss Claims for Plaintiffs' Lack of Standing, filed February 12, 2014 (Doc. 131), the Court previously ruled that the named Plaintiffs have standing, as each one demonstrates individual standing and does not attempt to acquire standing by virtue of bringing a class action.  See Memorandum Opinion, filed April 25, 2016 (Doc. 245)(concluding that "the Plaintiffs demonstrate the requirements for standing under Article III of the Constitution of the United

States of America").  Moreover, there is no reason that the named Plaintiffs must possess leases that contain every category of textual royalty to make their claims typical of the class.  See Anderson, 306 F.R.D. at 442 (rejecting the defendants' argument that the class representatives have to possess every category of lease form to adequately represent the class members).  The named Plaintiffs assert the same contractual claims against the Defendants as the proposed class members: (i) failure to pay royalties on NGLs; (ii) NMPPA violations; and (iii) engaging in an unlawful conspiracy.  See Motion at 18.  They also assert the same implied covenant claims for breach of the duty of good faith and fair dealing, and for breach of the duty to market, both of which are implied in law in all of the proposed class members' agreements.  See Motion at 18; Davis v. Devon Energy Corp., 2009-NMSC-048, ¶¶ 32-33, 218 P.3d at 85.  All of the proposed class members share these claims, regardless of the variations in lease language.

86.     Further, the named Plaintiffs represent the varying factual scenarios.  There are Colorado representatives and New Mexico representatives.  See Tr. at 294:3-295:3 (Gallegos, Harvey); id. at 231:2-7 (Abraham, Gallegos).  The representatives have interests in Williams Four Corners-gathered conventional wells whose gas is processed at the named processing plants.  See Tr. at 231:2-7 (Abraham, Gallegos); See Tr. at 298:15-304:22 (Gallegos, Harvey); id. at 308:16-18 (Gallegos, Harvey).  Both named Plaintiffs have significant stakes in the San Juan Basin.  The Defendants contend that the named Plaintiffs are not typical of the class, because only a small portion of their gas is processed.

> Class representatives, however, can still have factual circumstances that differ from those of the bulk of the absent portion of the class, or their claims could be subject to defenses that do not apply to many absent class members, and, in extreme cases, this dissimilarity might make the proposed class representatives unsuitable under rule 23(a)(3).

Anderson, 306 F.R.D. at 440-41.   The discrepancy in processing is not an extreme case. Moreover, the Court must exclude that portion of gas that was not processed from the Plaintiffs' claims.   "Factual differences in the claims of the class members should not result in a denial of class certification where common questions of law exist.   As we have stated previously, every member of the class need not be in a situation identical to that of the named plaintiff."   Milonas v. Williams, 691 F.2d at 938.

87.    Regarding the Defendants' challenge that the class is conflicted, the Court does not ascertain any conflict on the evidence presented.   The Plaintiffs therefore meet their burden of establishing that the class representatives' claims are typical of the class.   See Gonzales v. City of Albuquerque, 2010 WL 4053947, at *9 (D.N.M. Aug. 21, 2010)(Browning, J.)(noting that "the Plaintiffs bear the burden of showing lack of conflict").   The Defendants contend that typicality is lacking, because "some class members benefit from the very royalty payment method that Plaintiffs challenge."   Response at 28.   Of course, "a plaintiff cannot maintain a class action when his interests are antagonistic to, or in conflict with, the interests of the persons he would seek to represent."   Gonzales v. City of Albuquerque, 2010 WL 4053947, at *9 (quoting Albertson's, Inc. v. Amalgamated Sugar Co., 503 F.2d 459, 463 (10th Cir. 1974)). Accordingly, if the relief that the Plaintiffs seek would harm some proposed class members, the Plaintiffs' claims would not be typical of the class and the named Plaintiffs would not adequately represent the class.   See Gonzales v. City of Albuquerque, 2010 WL 4053947, at *17 (denying class certification of an employee class where the former employees' claims conflicted with the current employees' interests). Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)(finding representation inadequate where the proposed class included those "who claim harm from the very same acts from which other members of the class have benefitted").   Based

on the evidence presented, however, the Plaintiffs demonstrate that the lawsuit not will harm some of the proposed class members.

88.    As the Court explained in the factual section, the Defendants' proposed damages calculation includes costs that the Plaintiffs allege should be excluded from the damages calculation.  See supra, note 24, at 63-65.  Under the Plaintiffs' damages calculation, which pays royalties for NGLs regardless whether those NGLs were extracted through processing, each class member will benefit from the whole-stream calculation that the Plaintiffs propose.  See Tr. at 415:20-24 (Tysseling)(asserting that "all class members will benefit . . . when natural gas liquids values are included in their royalty payments"); id. at 415:20-24 (Gallegos, Tysseling)(agreeing that his investigation "indicate[s] that all class members will benefit" when the refined NGL values are included in their royalty payments).

89.    The Defendants attempt to discredit the Plaintiffs' evidence by arguing that the Plaintiffs' damages calculation must account for various costs.[76]  When these costs are applied, the Defendants explain, not all class members benefit from the whole-stream method.  The evidence presented, however, does not demonstrate that the whole-stream calculation must include all of the costs that Griffin deducted in addition to the processing fee.  Hajny agreed that some additional costs would apply to the extent they relate to processing, see Tr. at 202:6-8 (Hajny), but he did not know whether the processing fee included the cost of dehydration, plant fuel, transportation, or fractionation.  See Tr. at 201:16-20 (Hajny)("I'm not familiar enough with how the plants calculate dehydration, as far as if that's in the 14 percent or not.").  See Tr. at 215:9-218:20 (Hajny).  Although Hajny agreed that, if the cost "shows up as a deduction or

---

[76]In determining the royalty payments for WPX Production's gas committed to third parties, WPX Production deducts all actual charges that third parties assess.  See Ward Nov. Depo. at 73:25-75:18 (Ward).  Consequently, at least some deductions should apply to the whole-stream method.

charge" from Enterprise, it "would be charged back to the royalty owners," Tr. at 202:19-203:3 (Hajny), the Court cannot determine which deductions apply and whether those deductions apply to royalty payments calculated under various contracts.  Because the Court cannot determine which deductions apply on the evidence presented, Griffin's comparison does not demonstrate that some proposed class members would be harmed under the whole-stream method.

90.     Furthermore, Griffin's analysis may have overstated some of the applicable deductions.  Griffin's analysis includes the COS charge under both the whole-stream method and the keep-whole method, even though WPX Production does not assess a COS fee to royalty owners that are paid on refined NGLs.  Even if the royalty owners pay a proportional share of a gathering cost, it is not the identical cost as the COS charge, which suggests that some of Griffin's deductions may be overstated under the whole-stream method.  The variability of these costs are extremely significant to the comparison between the whole-stream method and the keep-whole method.  See supra, notes 23-24, at 63-65; Tr. at 464:13-14 (Tysseling)("You can adjust any of these numbers and have an effect on the bottom line.").  When these costs are lessened or removed, the whole-stream method provides all class members with higher royalty payments.  Finally, the Defendants' evidence is directed at wells, not at class members who likely receive royalties from multiple wells in various locations.  In sum, the Plaintiffs introduced persuasive evidence that all class members will benefit under the whole-stream method. Griffin's comparison between the whole-stream method and the keep-whole method does not discredit the Plaintiffs' assertions.  The Court cannot soundly conclude that the keep-whole method provides some proposed class members with higher royalty payments.  Accordingly, there is no class conflict.  The named Plaintiffs are therefore typical of the other class members.

91.     As for adequacy, "[t]he Tenth Circuit has identified two questions relevant to the adequacy-of-representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on behalf of the class." Gonzales v. City of Albuquerque, 2010 WL 4053947, at *17 (citing Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88). In relation to the first inquiry, the Defendants contend that a class conflict exists, because there are "hundreds of wells whose royalty owners are better off under the keep whole method of royalty valuation." Tr. at 1072:7-11 (Sheridan). As the Court concluded above, however, the Plaintiffs have met their burden to show that all proposed class members will benefit. They introduced persuasive evidence that all class members would benefit. See Tr. at 415:20-24 (Tysseling)(asserting that "all class members will benefit . . . when natural gas liquids values are included in their royalty payments"). Given that Griffin may have overstated or included too many deductions under the whole-stream method, Griffin's comparison does not show that some of the proposed class members would fare better under the keep-whole method than they would under the Plaintiffs' proposed method. Because Griffin's damages calculations do not discredit the Plaintiffs' evidence that all class members will benefit, the Court concludes that the class representatives will adequately represent the class.

92.     As for the second inquiry, the class representatives will vigorously prosecute this action on the absent class members' behalf. Abraham has previously served as a class representative in an oil-and-gas class action, meaning that at least one other judge has already deemed him an adequate representative in a case very similar to this one. See Tr. at 240:9-241:4 (Abraham, Gallegos); Abraham v. BP Am. Prod. Co., 685 F.3d 1196 (10th Cir. 2012). Abraham understands the burdens involved in being a named plaintiff and agrees to actively participate in

this case, attending depositions, mediations, hearings, the trial, and any other negotiations involved.  <u>See</u> Tr. at 241:18-242:11 (Abraham, Gallegos); <u>id.</u> at 244:22-25 (Abraham, Gallegos).  Similarly, H. Harvey understands her role as class representative, has been deposed, has testified at class certification hearings, has attended court sessions, and is willing to serve as class representative.  <u>See</u> Tr. at 308:19-310:20 (Gallegos, Harvey).  The class representatives are competent, informed, and savvy regarding the applicable law and this case's facts.  Moreover, neither the Court nor the Defendants question the experience and ability of Plaintiffs' counsel to adequately represent the class.  <u>See</u> Plaintiffs' Findings ¶ 11, at 28 (noting that the "Defendants do not contest the adequacy of plaintiffs' counsel").  In conclusion, the "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).

### B.   EVEN   IF   THE   CLASS   WERE   ASCERTAINABLE,   THE UNDERPAYMENT CLAIMS DO NOT SATISFY RULE 23(b)(3).

93.      The proposed class does not satisfy rule 23(b)(3)'s predominance requirement.  Individual issues predominate over common ones.  The class satisfies, however, the superiority requirement.

### 1.   <u>Because the Court Would Spend More Time Adjudicating Individual Questions Than Common Questions, the Underpayment Claims Fail Predominance.</u>

94.      "Predominance regularly presents the greatest obstacle to class certification." <u>CGC Holding Co. v. Broad and Cassel</u>, 773 F.3d at 1087.  This axiom holds true in this case.  As the Tenth Circuit has instructed, to determine predominance, the Court must "*characterize* the issues in the case as common or not, and then *weigh* which issues predominate."  <u>CGC Holding Co., LLC v. Broad & Cassel</u>, 773 F.3d at 1087 (emphasis in original).  "The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual."  <u>Seabron v. Am. Family Mut. Ins. Co.</u>, 2013 WL 3713652, at *7 (D. Colo. July 16,

2013)(Martinez, J.)(citing In re Visa Check/Master Money Antitrust Litig., 280 F.3d 124, 136-40 (2d Cir. 2001)).  "If, to make a prima facie showing on a given question, the members of the proposed class will need to present evidence that varies from member to member, then it is an individual question." Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005).  See Messner v. Northshore Univ. Healthsystem, 669 F.3d 802, 815 (7th Cir. 2012).

95.    The proposed class fails the Tenth Circuit's predominance test.  The common evidence in this case includes: (i) evidence about the Defendants' payment methodology, which is likely to be minimal; (ii) industry-custom-and-usage evidence shedding light on the meaning of all of the class leases, which is quasi-common; (iii) course-of-performance evidence, which is essentially the same as (i); (iv) evidence about gathering and processing contracts in the San Juan Basin; and (v) evidence about the relative NGL and residue gas prices during the class period.

96.    The individualized evidence in this case includes: (i) industry-custom-and-usage evidence regarding the meaning of specific royalty provisions -- e.g., "proceeds," "market value," "gross proceeds," "net proceeds" -- which all class members do not share; (ii) the various leases' differing language; (iii) parol evidence concerning negotiations and oral agreements contemporaneous to the execution of certain class leases;[77] (iv) evidence about which wells' gas was processed; (v) evidence regarding the extent to which the commingled wells contain Fruitland coal gas or gas belonging to interests other than WPX Production; and (vi) the individual damages evidence -- which includes analyses of which wells' gas tends to travel to which plants, various plants' efficiency levels and bypass rates over time, and what costs are attributable to which individual wells.  Weighing the individualized evidence against the

---

[77]The Court doubts that much of this evidence exists, however, and assigns a low weight to it in the predominance calculus.

common evidence, the Court will spend the majority of its time hearing individualized evidence and adjudicating individual questions.

97.     The common issues and evidence surrounding them will not dominate the Court's time.  See Gene & Gene LLC v. BioPay LLC, 541 F.3d 318, 326-29 (5th Cir. 2008)(stating that a trial court must look beyond defendant's common course of conduct to consider "how a trial on the merits would be conducted if a class were certified" (quotation omitted)).  Evidence about the Defendants' payment methodology and the parties' course of performance would consume a small part of the trial.  The parties do not dispute the methodology that WPX Production used to pay the proposed class members.  This payment method serves as the parties' course of performance.  In all likelihood, the parties would introduce little evidence regarding WPX Production's payment methodology.  Because this evidence could so easily be proven at trial, it would not consume a large portion of the case.  WPX Production likely has records memorializing its payment methodology, which the Plaintiffs could easily use to prove the methodology through a single witness.  In short, these two common issues would take up a minute portion of the case.

98.     Regarding industry custom evidence, the evidence is common for all leases with the same language.  Many of the leases contain similar wording.  The Court can therefore use common industry custom evidence to prove what the lease language means.  Nevertheless, the leases do not all share the same language.  Rather, they can be grouped into a number of categories, each containing differing language.  Because the language's meaning could materially differ between categories, the variations require individual consideration, which cut against a predominance finding.

99.     Next, to prove whether WPX Production's keep-whole scheme fairly marketed the product, the parties would introduce evidence of gathering and processing agreements that other producers in the San Juan Basin used.  See Gas Gathering, Processing, Dehydrating and Treating Agreement between Williams Four Corners, LLC and WPX Energy Production, LLC § 1.9, at 3 (dated December 9, 2013)(Plaintiffs' Hearing Ex. 204)("2013 Gathering Agreement"); Gas Dedication, Gas Gathering, and Production Area Services Agreement between El Paso Field Services Co. and WFS Gas Resources Co. at 2-4, D-2 (dated February 1, 1996)(Defendants' Hearing Ex. 30)("1996 Gathering Agreement"); Gas Gathering, Processing, Dehydrating and Treating Agreement between Williams Four Corners LLC and Thompson Engineering (dated February 1, 2007)(Defendants' Hearing Ex. 49)("Thompson Contract").  This evidence would include not only the contracts, but also expert testimony to explain the relevant contractual provisions and how the different provisions work together.  See Tr. at 165:5-10 (Hajny); id. at 201:1-203:3 (Berge, Hajny).  This evidence would be common to all proposed class members. Moreover, the Plaintiffs could use the evidence to establish what number constitutes a reasonable processing fee, what deductions should be taken from the Plaintiffs' proposed damages calculation, and how a reasonably prudent operator would market the products.

100.     Notably, however, the Court will spend a significant amount of time determining which wells' gas "is or has been delivered to processing plants for extraction and marketing of natural gas liquids from the gas at the Ignacio Plant . . . , the Kutz Plant . . . , and the Lybrook Plant."  FAC ¶ 25, at 8.  As the Court explained in Part I of the Analysis, gas that has not "been delivered to [the named] processing plants for extraction and marketing of natural gas liquids" is not included in the class claims.  FAC ¶ 25, at 8.  Determining which wells are in the class and how much gas should be included in the Plaintiffs' damages calculation are individual inquiries.

In addition to excluding the portion of gas that was not processed, the Plaintiffs' claims exclude wells that produce gas from the Fruitland coal formation.  See Agreed Order on Class Definition at 1-2; Tr. at 94:9-13 (Gallegos)("We don't have a claim that has anything to do with the coal gas, with the Fruitland formation gas.").  Furthermore, the Court must identify those proposed class members who were paid on the value of the refined NGLs and exclude them from the underpayment on NGLs claim.  See supra note 66, at 172.  These determinations impact not only the Court's ability to ascertain the class, but also to calculate class damages.  The Court can ascertain class damages only after excluding the gas that is not a part of the Plaintiffs' claims -- the unprocessed gas and the wells that produce gas from the Fruitland coal formation.  The class damages calculation, therefore, weighs against predominance.  Although the Plaintiffs may use a simple mathematic formula to calculate damages, the individual issues needed to get there will consume a significant amount of time.  Determining which gas was processed requires an expert to study flow patterns for the years involved in the class action.  See Tr. at 672:2-12 (Emory, Sutphin)("[I]f you're interested in determining which ones are actually processed, you'd have to look at it on a well-by-well basis, and go through the analysis that I've done, over time to determine which wells and which gas, therefore, is processed at one of the plants.").  This task requires an expert to explain this evidence.  The Plaintiffs' expert will then be subject to cross-examination and possibly competing expert testimony if any conflicts between the experts exist.

101.    Excluding the wells that produce Fruitland coal gas is also an individual issue, as experts would have to ascertain from which formation the gas was produced.  "An engineering analysis would need to be made as to the estimated composition of the conventional production versus the CBM production based on the composition of the commingled stream."  Emory Report ¶ 28, at 16.  See Tr. at 678:3-5 (Emory).  The Plaintiffs repeatedly emphasized that their

class excludes gas produced from the Fruitland coal formation.  <u>See</u> Tr. at 94:9-13 (Gallegos)("We don't have a claim that has anything to do with the coal gas, with the Fruitland formation gas."); <u>id.</u> at 87:3-9 (explaining that the class does not consist of Fruitland coal gas); <u>id.</u> at 88:21-89:3 (explaining that "Fruitland coal gas [has] very little liquids," but that the Plaintiffs' case excludes Fruitland coal gas, because "the concentration in this case will be on the liquids"); Plaintiffs' Findings ¶ 28, at 9 (stating that the class wells "eliminate[e] Fruitland coal wells").  The Plaintiffs' Class Well List, however, includes some commingled wells that produce Fruitland coal gas.  <u>See</u> Tr. at 675:7-22 (Emory); 726:4-12 (Emory); 760:21-761:9 (Emory).  The Defendants identified 282 commingled wells, meaning those wells that produce from two or more formations into a single well bore.  <u>See</u> Tr. at 672:11-675:6 (Emory); Table of Commingled and Dual Completion Wells at 1 (Defendants' Hearing Ex. 117).  Of the 282 commingled wells, thirteen wells have a Fruitland Coal completion in addition to at least one conventional completion.  <u>See</u> Commingled Well List at 1-7 (Defendants' Hearing Ex. 139).  Because the Plaintiffs' class definition excludes wells that produce Fruitland coal gas, the Court must determine whether the thirteen wells produce Fruitland Coal gas or instead whether to omit the wells altogether.  The Plaintiffs have not presented any evidence to determine whether the thirteen wells actually produce Fruitland coal gas.  They argue only that the number of wells with a Fruitland coal completion is not significant.  <u>See</u> Plaintiffs' Findings ¶ 64, at 22.  The Court cannot readily ascertain "in an economical and 'administratively feasible' manner" whether the thirteen commingled wells with a Fruitland coal gas completion produce Fruitland coal gas.  <u>Carrera v. Bayer Corp.</u>, 727 F.3d at 307.  The better option might be to exclude the wells entirely to avoid a distinct inquiry into each of the thirteen wells.  Regardless, making this determination is an individual issue.

102.    Although several common issues exist, they will not predominate over the individualized ones.   The majority of the trial, as well as the majority of the time the Court spends preparing for trial and managing the case, will be spent resolving individual issues.   In addition to the time spent determining who is in the class and how much gas is subject to the Plaintiffs' claims, the parties would likely spend considerable time presenting testimony on the meaning of each of the textual royalty provisions.   As multiple class members share the same royalty provisions, these issues are not truly individual.   They are "categorical" or "quasi-common."   Regardless of their label, they are not common, and given that subclassification will not substitute for the entire class' satisfaction of rule 23(b)(3)'s requirements, they weigh against predominance.   But see EQT Prod. Co. v. Adair, 764 F.3d at 363 ("[T]he plaintiffs may be able to identify a finite number of variations in deed language, such that the ownership question is answerable on a subclass basis.").[78]   The central issue here involves what payment methodology WPX Production should have applied.   The Court must resolve this issue by examining the lease language, which describes the royalty interest on which each proposed class member should be

---

[78]As the Court has previously discussed, the Fourth Circuit allows predominance to be achieved through the use of subclasses, in contrast with other circuits.  See supra note 40, at 128-31.  See also Castano v. American Tobacco Co., 84 F.3d at 745 n.21:

> Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action.   A district court cannot manufacture predominance through the nimble use of subdivision (c)(4).   The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

84 F.3d at 745 n.21 (citations omitted).

paid.  Because there is no common unifying description that entitles each royalty owner to be paid on processed NGLs, the Court cannot determine on a class-wide basis whether WPX Production violated the duty to market through its common payment scheme.  Accordingly, for all of the underpayment claims, the Court might need to apply a different legal standard for each lease form.

103.    Lease language variation posed the central problem for class certification in EQT Production Co. v. Adair.  See 764 F.3d at 367.  There, the Fourth Circuit instructed the district court on remand to "consider how variations in the defendants' royalty obligations to the class members implicate the commonality and predominance inquiries," and even noted that these lease variations would "make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis."  764 F.3d at 367-68.  Like in EQT Prod. Co. v. Adair, these same concerns pervade this case, because of the leases' varying language and the different industry custom and usage evidence needed to identify each proposed class members' royalty interest and determine how they should be paid.

104.    The Court's management plan highlights how the individual issues would predominate over the common ones.  Under the plan, the Court would divide the class into segments on the basis of the potential of a different legal standard applying or different factual circumstances existing: (i) between Colorado wells and New Mexico wells; and (ii) among the nine textual formulations the Court has identified among the class leases' royalty provisions.  Case law makes clear that the Court cannot ignore variations in contractual language.[79]  See, e.g.,

---

[79]Notably, "the Supreme Court has indicated that courts do not bear any obligation" to "suggest[] subclassing as a possible solution to Rule 23(b)(2) problems."  Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso, 543 F.3d 597, 607 (10th Cir. 2008).  The district court does not "bear the burden of constructing subclasses.  That burden is upon the [party seeking certification]

EQT Prod. v. Adair, 764 F.3d at 363; Roderick, 725 F.3d at 1218-19; Chieftain Royalty Co. v. XTO Energy, Inc., 528 F. App'x at 942-44.  With each segmentation the Court must determine in which category each lease belongs, thereby creating an individual issue.

105.    Like the Court did in Anderson, the Court again produced a spreadsheet that divides the leases into nine categories, where each lease within any category contains a materially textually identical royalty provision.  See Roderick, 725 F.3d at 1219 ("On remand, the Trust could, for example, create a chart classifying lease types . . . .").[80]  See EQT Prod. Co. v. Adair, 764 F.3d at 369 ("[A]fter reviewing the leases in this case, the plaintiffs may be able to show that there are a limited number of lease forms, such that the validity of the defendants' conduct can be assessed on a subclass basis.").  The Court separated the one-prong and two-prong leases into separate categories, but only where relevant.  The Defendants contend that the

---

and it is he who is required to submit proposals to the court."  United States Parole Comm'n v. Geraghty, 445 U.S. 388, 408 (1980).

[80]Taking heed of Roderick's clear command -- and borrowing its chart idea -- the Court will treat all textual formulations separately until they are shown to be substantively identical. The Plaintiffs have not met their burden of showing that the textual formations are insignificant.

> [F]rom what we are told, there are roughly 430 leases which have yet to be examined by the Trust or the district court. . . .
>
> . . . .
>
> [T]he district court concluded that individual testimony regarding parties' intent or the circumstances of lease formation would be unnecessary.  The district court did not, however, consider whether language within the four corners of each lease would need to be examined individually.  And while Farrar [a Kansas state-court case] appears to have disclaimed the "need for individualized examination of lease . . . language," Farrar is not dispositive.  First, Farrar did not involve Fed. R. Civ. P. 23.  Second, Farrar's conclusion must be evaluated in light of Wal-Mart and Comcast, particularly given the fact that Farrar upheld certification despite finding some leases "expressly abrogate[d] the implied covenant."

Roderick, 725 F.3d at 1218-19 & n.4 (citations omitted).

two prongs are important.  The Plaintiffs have not shown that the Court can disregard all of the second prongs.  Notably, however, WPX Production sells no gas at arm's length at the wellhead.  Accordingly, the Court ignored those double-pronged provisions that provided for payment on gas sold at the well.  The Court retained the double-pronged provisions that provided for payment on gas sold or used off the premises or in the manufacture of products therefrom.  These determinations are individual ones that the Court must make to certify this class.

106.     Category A consists of leases that pay royalty on the basis of "market value at the well" or "market price at the well," and includes 120 leases.  Category B contains leases that pay royalty on the basis of "proceeds at the mouth of the well," and contains 8 leases.  Category C includes leases that pay on "proceeds, as such," and includes 210 leases.  Category D contains a lone lease that pays on "gross proceeds," with no reference to the well or mouth of the well, and no indication that it should be paid on net proceeds.  Category E also includes a single lease that pays on "net proceeds at the well."  Category F consists of leases that pay on "gross proceeds for gas used off the premises," but "if used in the manufacture of gasoline, the prevailing market rate," and includes 11 leases.  Category G includes those leases that pay on the "market value at the well of the gas sold or used, provided that on gas sold, the market value shall not exceed the amount received for such gas computed at the mouth of the well," and contains 78 leases.  Category H includes those leases that pay on "market value at the well if sold or used to manufacture products," after "deducting post-production costs," and includes 23 leases.  Finally, category I consists of leases that pay based on "gross proceeds received for gas sold, used off the premises or in the manufacture of products therefrom, but in no event more than the actual

amount received," and includes 34 leases.  Illegible leases are placed in category X.[81]  Not all of the categories contain both New Mexico and Colorado leases.

| New Mexico Leases | | | | | Colorado Leases | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | C | E | F | G | A | B | C | D | F | G | H | I |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |

107.    Even if the New Mexico and Colorado textual variations share the same meaning, the Court would still need to segment the class by the state in which the well sits, because: (i) Colorado recognizes the marketable-condition rule, while New Mexico does not, meaning that a different legal standard applies between the two segments; and (ii) the Defendants assess a COS charge on the wells in New Mexico, but not in Colorado, meaning that the two segments are in different factual circumstances.  The Court and the parties would be required to make individual determinations of each and every lease to place them in the correct segment.

108.    The illegible leases are outside of the Court's management framework, but the Court could include them in the class under a few situations.  First, if the parties produce legible copies of the leases, the Court could include the leases in the existing categories.  Second, if the parties produced evidence of the leases' likely text, the Court could again include those leases into categories.  Such evidence might include legible leases with identical royalty clauses that a particular lessor executed at the same time that he executed the illegible lease.  The Court could find that the illegible lease has the same royalty provisions as the two contemporaneously executed leases.  Third, even if the parties presented no individualized evidence on the leases' meanings, the Court would interpret them to mean something, as the Defendants do not have

---

[81]The Court examined the illegible leases individually and agrees that they are illegible.

license to pay however they want.  Determining these leases' meanings requires individualized determinations.

109.    Given the lease language obligations and the variations in state law, this class action could involve up to thirteen different legal standards for the jury to apply, which would be manageable if the Court did not have to confront the considerable number of other individualized issues already discussed.  Although the Court doubts that thirteen standards will ultimately apply, the Plaintiffs have not, by a preponderance of the evidence, established that the Court's doubts are well-founded.  The same payment terms appear in each lease: (i) "proceeds, as such"; (ii) "proceeds";  (iii)  "net proceeds";  (iv) "gross  proceeds";  (v) "market  value  at  the  well" or "market price at the well"; and (vi) "amount realized."   Many of these terms may have the same meaning as other terms, and all of them may mean the same thing in New Mexico as they do in Colorado, at least with respect to the basic payment methodology; permissible deductions differ between the states.   Nevertheless, the Plaintiffs have not, by a preponderance of the evidence, established that the terms are the same.  If the Court certified the class action, it would maintain the separate categories for three reasons: (i) class certification is not the time to decide the case's merits, and the royalty provisions' meanings are merits issues;[82] (ii) practically, it would be easier to winnow the categories down later in the case than it is to separate out differences after certification; and (iii) if the Court cannot ascertain a lease term's meanings as a

---

[82]The Court will, however, for the parties' benefit, give its inclinations about what some of the royalty terms mean, based on existing case law and the terms' plain meanings. "Proceeds," generically, refers to the amount the Defendants receive from selling the hydrocarbons, and not any index or market price.  ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶¶ 16, 24, 299 P.3d at 850, 852-53.  This term forbids paying NGL royalty on a keep-whole basis.   "Net proceeds" permits post-production cost deductions -- but not production-cost deductions -- in New Mexico, ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶¶ 16, 24, 299 P.3d at 850, 852-53.  "Gross proceeds" forbids the deduction of costs.  Rogers v. Westerman Farm Co., 29 P.3d at 897.

matter of law, then the jury must decide them as a matter of fact.  This last point prevents the Court from interpreting the leases based on the evidence the parties have presented to date. It does not necessarily mean that the jury would have to find and apply each of the different standards.  It means that, if the Court is unable to collapse any of the current segments together before trial as a matter of law, the jury would have to, first, find all of the legal standards and, second, apply however many remained.[83]  The Court would likely, however, be able to discern some of the leases' meanings during the parties' pre-trial motion practice.

110.   That the Court may be able to winnow the different standards down does not, however, weigh in favor of predominance.  At the class certification stage, the Court must determine predominance.  The Court should not certify the class on the basis that the common issue might predominate at some point down the road.  The Court must determine predominance now.  The Court will have to spend a significant amount of time determining which wells are in the class and how much gas should be included in the Plaintiffs' damages calculation.  When the Court also considers the potential different legal standards governing the various claims, the individual issues predominate over the common ones.

111.   That the Defendants may introduce parol evidence to interpret the meaning of individual leases further cuts against predominance.  The Court doubts that a significant amount of this evidence exists, but the Defendants introduced several division orders at the class certification hearing, which they argue relate to the parties' course of performance and reveal what the parties intended.  See, e.g., Natural Gas Division Order for the San Juan 30-6 Unit, #31 (MD) Well signed by Oscar Abraham (dated June 17, 1960)(Defendants' Hearing Ex.

---

[83]The Court would predict that some of the legal standards would be similar to one another.  Presently, the Plaintiffs have not established, by a preponderance of the evidence, that this will be the case.

17)(providing that the gas and components thereof are to be valued on "the price at the wellhead"); Northwest Pipeline Corporation Natural Gas Division Order for Royalty Interests Under Northwest Pipeline Corporation Leases in Unit Agreements executed by Michael Abraham, Mary Abraham, and Joseph Abraham (dated December 19, 1977)(Defendants' Hearing Ex. 22)(stating that the "settlement price hereunder for natural gas and components thereof shall be the price at the wellhead").  Such evidence weighs against predominance.  If the Defendants presented parol evidence, the Court would have to make individual determinations about each lease's meaning.  While the other issues the Court has described already defeat predominance, parol evidence that would cause even more lease variations and standards counsels further against certification.  The Court may have to consider parol evidence to determine if the meaning of individual leases is ambiguous.  If the Court found ambiguity, it would permit the parties to present evidence at trial to determine the meaning of these individual leases.  The jury would be required not only to apply many different legal standards to the different lease segments, but also determine the individual leases' meanings.

112.   Even if the Court focused solely on the implied duty to market, the individual issues involved here would predominate.  As explained earlier in more depth, knowing that all leases require payment on all production does not answer whether WPX Production failed to market the products on which the proposed class members were entitled to be paid.  See Morrison v. Anadarko Petroleum Corp., 280 F.R.D. 621, 625 (W.D. Okla. 2012)(Miles-LaGrange, C.J.)(concluding that identical royalty payment formula did not resolve whether the lessee underpaid royalties "in one stroke," because varying points of valuation in the class members' leases "will generate different answers based upon the particular lease").  Because the Plaintiffs have not shown by a preponderance of the evidence that the word "gas" entitled each

royalty owner to the processed and refined NGLs, the Court must ascertain the royalty interest that each proposed class member owned before it can determine whether WPX Production failed to market the products that each proposed class member owned.  The leases require payment at varying points in the production line, meaning that those with some leases require payment on the processed NGLs, while those with other leases -- like those that require royalty payment on the gas' value at the well -- do not.  See Morrison v. Anadarko Petroleum Corp., 280 F.R.D. at 625 (stating that "the market value 'at the well' will likely be determined by a market study . . . whereas numerous members of the putative class have leases with no valuation point," which creates "dissimilarities amongst the putative class members' oil and gas leases [and] impedes the generation of common answers").  Similarly, knowing that the Defendants must sell the gas for the Plaintiffs' mutual benefit does not determine what the best price would be for royalty owners entitled to be paid on gas at varying points in the production stream.  Segmenting the class accordingly involves individual determinations dependent on lease language.  In conclusion, the Plaintiffs have not shown by a preponderance of the evidence that the common questions will predominate over the individual questions.

## 2.    The Class Action Device Would Be Superior to Individual Suits.

113.    The class-action device would be superior to individual actions for five main reasons.  First, the individual actions that could arise from this case have negative value.  A case has negative value when it would be uneconomical for the class members to bring individual claims.  Negative value does not correspond to a particular claimed dollar amount that applies in every case, e.g., every case in which the plaintiff requests more than $10,000.00 has positive value or every case in which the plaintiff requests less than $3,000.00 has negative value.  The Court must consider two additional factors to the dollar figure that the plaintiff may write in the complaint.  In the first consideration, the Court must multiply the case's potential damages by

the plaintiff's likelihood of success, thus calculating the case's expected value.  In the second consideration, the Court must subtract any disparity in litigation costs between the plaintiff and defendant, i.e., any expected litigation costs that the plaintiff will incur but the defendant will not.[84]  This calculation is how a rational plaintiff decides whether an individual case is worth pursuing, and that amount is what the Court is trying to discern.  If a case is for a half-million dollars, but has only a one-in-three chance of success, then a plaintiff will not pursue the claim if it will cost over $166,666.67 to litigate.[85]  The plaintiff might not pursue the case even if it were cheaper to do so, if the plaintiff could get a better return on his or her investment elsewhere.

---

[84]Here, the math gets a little complicated.  It is not true that the plaintiff can simply calculate the case's expected damages, add the defendant's litigation costs to take the case through trial, subtract the plaintiff's litigation costs to take the case through trial, and use that figure as the case's expected profitability.  If the case went to trial, the plaintiff would save no money on account of the defendant's litigation costs; subtracting the defendant's litigation costs presumes settlement, and the plaintiff only recoups any favorable disparity in the parties' litigation costs to the extent that such costs have not yet been incurred, i.e., the earlier the case settles, the better the deal should be.  The case would have to progress a little bit, however, for the defendants to verify that the plaintiff's substantive case has value, i.e., that the merits are as strong as the plaintiffs say they are.  If the parties had complete information at the point of filing, then the case's settlement value would be at its very highest at filing and would only go downhill from there.  Settlements include the value of avoided litigation costs, which are highest at the point of filing, when no litigation costs have yet been incurred.  In the real world, however, information is not complete, and acquiring it is not costless, and thus cases have to mature for settlement.  See generally Warren F. Schwartz & Abraham L. Wickelgen, Credible Discovery, Settlement, and Negative Expected Value Suits, 40 RAND J. Econ. 636 (2009).

Often, the plaintiff has to put more money into the case at earlier stages than the defendant does.  This fact reduces the case's value from the plaintiff's perspective, as the parties are less likely to avoid spending any given dollar in litigation costs if that dollar must be spent earlier in the case rather than later.  Thus, when a plaintiff's attorney values a prospective lawsuit, he or she must consider the timing of each side's litigation expenses, as well as the total amount.

[85]Again, when the Court refers to the cost of litigation, it is referring to the actual expected cost of litigating the case to disposition -- not necessarily through trial.  If there is a twenty-percent chance the case will settle after $50,000.00 in litigation costs are incurred, a sixty-percent chance that it will settle after $100,000.00 in litigation costs are incurred, and a twenty-percent chance that the case will go to verdict for a total of $200,000.00 in litigation costs, then the relevant figure for the case's expected litigation costs is $110,000.00.

114.    Here, even if the Plaintiffs had a one-hundred percent chance of prevailing at trial, their litigation costs would be high enough to make individual litigation uneconomical.  The discovery in this case has been voluminous and extensive.  Although a class member's individual case could be brought cheaper than this class action was -- for example, all leases other than the class member's own could be disregarded, and all discovery and argument related to class certification could be foregone -- it would still be expensive to pursue such a case.  The discovery surrounding the Defendants' gathering and processing operations, deductions, and payment methods would be required in individual litigation too, and such evidence constitutes the majority of this class action.  Royalty litigation is expensive to litigate, whether individually or as a class.  It could not be done very profitably in individual litigation.

115.    Second, potential class members cannot avail themselves of any other complex-litigation form.   "[J]oinder of all members is impracticable" under rule 20.  Fed. R. Civ. P. 23(a)(1).  Multiparty, multiforum jurisdiction does not exist, because "at least 75 natural persons have [not] died in [an] accident at a discrete location."  28 U.S.C. § 1369(a).  No multidistrict litigation presently exists for oil-and-gas royalty-underpayment cases.   The possibility for multidistrict litigation thus does not cut against finding superiority.

116.    Last, the Court has already stated that rule 23(b)(3)(B)'s dictate to consider the "nature of any litigation concerning the controversy already begun by . . . class members" requires the Court consider any other class actions that have already been certified.  Fed. R. Civ. P. 23(b)(3)(B).  Two other class actions have been filed that relate to this case: Anderson and Lindauer v. Williams Production RMT Co., filed in Colorado state court.  Neither of these cases cut against finding superiority.  The class members in Lindauer v. Williams Production RMT Co. have been excluded from the class definition in this case, there is no overlap in the class

definition, and there is thus no question of which class action will be superior for those individuals in both classes.  As for Anderson, that it is not yet certified takes it out of the Court's superiority calculus.  Moreover, the superiority inquiry asks whether "a class action is superior to other available methods" and not whether this particular class action is superior.  Fed. R. Civ. P. 23(b)(3) (emphasis added).  While the existence of an already certified class action may defeat the superiority of any subsequent putative class action, rule 23's text does not require the Court to compare the proposed class action at issue with every other potential pre-certification class action.

117.    Third, rule 23(b)(3)'s third factor, "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," cuts in favor of certification.  Fed. R. Civ. P. 23(b)(3).  Specifically, both prongs for this factor -- (i) the desirability of aggregation; and (ii) the desirability of the Court adjudicating the dispute -- cut in favor of certification.  First, because this is a negative value case, the first prong is satisfied.  Without aggregation, the Plaintiffs would have no economically feasible mechanism to try their case.  As for the second prong, the Court is a desirable forum.  The Court considers several factors to make this determination: (i) the geographic convenience of the parties, witnesses, and class counsel, see Zinser v. Accufix Research Inst., Inc., 253 F.3d at 1191-92; (ii) the locus of the harm, as well as any other events forming the basis of the action, see Winkler v. DTE, Inc., 205 F.R.D. at 245; (iii) the location of the bulk of the proposed class, see Macarz v. Transworld Sys., Inc., 193 F.R.D. at 57; and (iv) whether the defendant is located in the forum state, see In re Warfarin Sodium Antitrust Litig., 391 F.3d at 534.  Each factor cuts in favor of concluding that the Court is a desirable forum.

118.    The Plaintiffs' lead counsel is located in Albuquerque, while the Defendants' counsel is located in Santa Fe, New Mexico -- only a one-hour drive North.  All of the events leading to this case occurred in New Mexico or its northern neighbor, Colorado.  It is unclear where the bulk of the proposed class members reside, but, because the leases are all located in New Mexico or Colorado, at least some members likely reside in one of those two states.  Finally, while the Defendants are incorporated in Delaware, with their principal places of business in Oklahoma, they each own oil-and-gas leases in New Mexico.  These factors collectively weigh in favor of finding that the Court is a desirable forum.

119.    Fourth, this class action does not present insurmountable manageability issues.  In assessing superiority, the Court must consider the extent to which it will be able to manage the class action through pre-trial litigation and trial.  See Fed. R. Civ. P. 23(b)(3)(D).  The manageability factor "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. at 164.  This case does not present insurmountable manageability issues.

120.    After ascertaining which proposed class members are in the class and which gas is subject to the Plaintiffs' claims, i.e., which gas is processed, the Court would divide the class into segments on the basis of either the potential of a different legal standard applying or different factual circumstances existing: (i) between Colorado wells and New Mexico wells; and (ii) among the eight textual formulations the Court has identified among the class leases' royalty provisions.  The Court would thus segment the class as follows:

| **New Mexico Leases** | | | | | **Colorado Leases** | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **A** | **C** | **E** | **F** | **G** | **A** | **B** | **C** | **D** | **F** | **G** | **H** | **I** |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |

121.    As for the trial, the Court would prefer a single trial to multiple trials, but would consider dividing the case into parts pursuant to rule 42(b) if the parties requested it.  Overall, however, the case is manageable, and a class action would be superior to other forms of litigation.  In conclusion, although the class currently fails to satisfy rule 23's commonality and predominance requirements, it satisfies the remaining standards.

## III.    THE NMPPA CLAIMS ARE NOT CERTIFIABLE UNDER RULE 23.

122.    Like the other underpayment claims, the NMPPA claims similarly fail rule 23's demands.  In the FAC, the Plaintiffs note that the NMPPA "requires that WPX pay the plaintiffs and the class on a timely and accurate basis the proceeds derived from the sale of NGLs . . . ."  FAC ¶ 103, at 25.  They argue that WPX Production "fail[ed] to make such payments to plaintiffs as required."  FAC ¶ 104, at 26.  The Plaintiffs "do not challenge the timing of the payments," but instead allege that WPX Production breached § 70-10-3 "by failing to pay royalty on 'related hydrocarbons.'"  Reply at 15.

123.    Substantively, § 70-10-3 requires payors to pay royalty owners within a certain time period.  Section 70-10-3 provides that royalty owners are entitled to be paid "not later than forty-five days after the end of the calendar month within which payment is received by payor for production."  N.M. Stat. Ann. § 70-10-3.  If the payor cannot determine to whom to pay royalty, it must create a suspense account and keep the funds in suspense until the identity of the proper payee is ascertained; in-suspense funds accrue at an interest rate that is one-and-one-half percent higher than that set by the federal reserve bank of Dallas.  See N.M. Stat. Ann. § 70-10-4.  If the payor fails to pay in a timely fashion and that failure cannot be attributed to an excusable failure to ascertain the identity of the proper payee, then the payor owes eighteen-percent annual interest on the late payments.  See N.M. Stat. Ann. § 70-10-5.  Whether a failure

to pay is excusable -- and thus triggers § 70-10-4B's lower interest rate rather than § 70-10-5's higher, punitive interest rate -- is determined by whether "the payor has been furnished with the information required by Section 70-10-3.1."   N.M. Stat. Ann. § 70-10-5.   The section the Plaintiffs allege that WPX Production violated, § 70-10-3.1, is entitled "duty to locate" and provides:

> The oil and gas proceeds derived from the sale of production from any well producing oil, gas or related hydrocarbons in New Mexico shall be paid to all persons legally entitled to such payments, commencing not later than six months after the first day of the month following the date of first sale and thereafter not later than forty-five days after the end of the calendar month within which payment is received by payor for production unless other periods or arrangements are provided for in a valid contract with the person entitled to such proceeds.

N.M. Stat. Ann. 70-10-3.

124.   Like the NMPPA's other provisions, § 70-10-13 focuses on the timing of payment.   See First Baptist Church of Roswell v. Yates Petrol. Corp., 2015-NMSC-004, ¶ 14, 345 P.3d 310, 314 (Vigil, C.J.)(stating that § 70-10-3 involves situations in which the payor "failed to pay proceeds on time").   Nevertheless, the Plaintiffs allege that WPX Production violated the NMPPA by failing to pay on "related hydrocarbons."   Reply at 15.   Although § 70-10-3 itself does not require producers to pay on "related hydrocarbons," it requires producers to pay on "oil and gas," which § 70-10-2 defines to include "related hydrocarbons."   N.M. Stat. Ann. § 70-10-2.   Hence, if WPX Production did not pay royalty on "related hydrocarbons," it would violate the NMPPA.

125.   As the Court explained earlier, knowing that WPX Production must pay each class member on all "related hydrocarbons" does not provide the answer necessary to resolve the proposed class' claim: whether WPX Production must pay each proposed class member royalties on the value of the processed gas and the refined NGLs.   This inquiry is a separate one that

requires the Court first to determine what royalty interest each class member owns, and whether that royalty interest requires payment on refined NGLs.  Accordingly, the class is not common. Performing this inquiry is an individualized task that, when combined with the time the Court must spend to identify the class wells and identify which gas is subject to the Plaintiffs' claims, will lead the individual inquiries to predominate over the common ones.

126.   The NMPPA does not allow the Court to disregard royalty clauses in resolving NMPPA claims.  Although the Court may disregard contravening lease language regarding a lessee's duty to pay "interest on the oil and gas production proceeds that are held in suspense" under § 70-10-4, it may not do so here.  See First Baptist Church of Roswell v. Yates Petrol. Corp., 2015-NMSC-004, ¶¶ 9-20 (N.M. 2014)(Vigil, C.J.).  The NMPPA does not provide a royalty interest on which all lessors must be paid that trumps the royalty interest in the proposed class members' leases.  Accordingly, because the Plaintiffs argue that they were not paid the full royalty entitlement, the Court must still examine the leases to determine the royalty interest that the proposed class members owned.  For the same reasons that the other claims do not satisfy rule 23's commonality and predominance requirements, the NMPPA claim likewise does not satisfy the these requirements.

## IV.   THE PLAINTIFFS' CIVIL CONSPIRACY CLAIMS ARE NOT CERTIFIABLE UNDER RULE 23.

127.   In their civil conspiracy claim, the Plaintiffs allege that "all three defendants conspired to allow WPX to breach the royalty instruments by failing to pay royalty on NGLs." Reply at 15.  The Defendants contend that the Plaintiffs fail their burden of showing that common questions of law predominate on their conspiracy claim, because they do not present a sufficient choice-of-law analysis.  See Response at 37-38 (citing Porcell v. Lincoln Wood Products, Inc., 713 F. Supp. 2d at 1312 (noting that plaintiffs who fail to present a sufficient

- 216 -

choice-of-law analysis "have failed to meet their burden of showing that common questions of law predominate")).  See Nagareda, supra at 166 (stating that "the choice-of-law question will determine whether there are fatal dissimilarities within the class").  The Plaintiffs provide a brief choice-of-law analysis in their Reply.  See Reply at 16-17.  To fully explore whether the conspiracy claim is certifiable, the Court provides a thorough analysis below.

128.  The Supreme Court has instructed that,

> in multi-state class action suits, the substantive law of the forum state only may be applied (1) when the laws of the relevant states do not actually conflict or (2) where the forum state has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."

Woodard v. Fid. Nat. Title Ins. Co., 2008 WL 5737364, at *4 (D.N.M. Dec. 8, 2008)(Brack, J.)(quoting Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 818 (1985)).  If the laws of the relevant states conflict, and if the forum state lacks a significant state interest in the lawsuit, then the Court must resolve the conflicts in accordance with New Mexico's choice-of-law rules.  See Sun Oil Co. v. Wortman, 486 U.S. 717, 722 (1988); Fed. Ins. Co. v. Tri-State Ins. Co., 157 F.3d 800, 802 (10th Cir. 1998); Porcell v. Lincoln Wood Products, Inc., 713 F. Supp. 2d 1305, 1311-12 (D.N.M. 2010).

129.  New Mexico and Colorado conspiracy law contain similar elements.  In New Mexico,

> [c]ivil conspiracy consists of showing [i] that a conspiracy between two or more individuals existed; [ii] that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and [iii] that the plaintiff was damaged as a result of such acts. Unlike a conspiracy in the criminal context, a civil conspiracy by itself is not actionable, nor does it provide an independent basis for liability unless a civil action in damages would lie against one of the conspirators. Without an actionable civil case against one of the conspirators, however, an agreement, no matter how conspiratorial in nature, is not a separate, actionable offense.

Archuleta v. City of Roswell, 898 F. Supp. 2d 1240, 1248 (D.N.M. 2012)(Browning, J.)(quoting Seeds v. Lucero, 2005-NMCA-067, ¶ 18, 113 P.3d at 863-64 (internal quotations and citations omitted).  See Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC, 2006-NMCA-081, ¶ 21, 139 P.3d 201, 207 ("[A]n agreement by itself, without an independent, unlawful act, is not an improper means.").

130.     Colorado civil conspiracy requires there to be: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as the proximate result thereof." Stauffer v. Stegemann, 165 P.3d 713, 718 (Colo. App. 2006)(citing Nelson v. Elway, 908 P.2d 102 (Colo. 1995)), as modified on denial of reh'g (Nov. 2, 2006).  Like New Mexico, Colorado law requires that "underlying acts be unlawful and create an independent cause of action."   Double Oak Construction, LLC v. Cornerstone Development Intern., LLC, 97 P.3d 140, 146 (Colo. App. 2003).

131.     Although there are no major conflicts between the elements of two state's conspiracy definitions, they contain differences in application, and the Plaintiffs agree that the Court should apply "the laws of New Mexico and Colorado, just as the contract and implied covenant claims."  Reply at 16-17.  Moreover, New Mexico does not have a significant interest in providing relief for Colorado royalty owners who own property in Colorado on wells located in Colorado.  See Woodard v. Fid. Nat. Title Ins. Co., 2008 WL 5737364, at *4 (directing courts to apply New Mexico's law if New Mexico has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair").  Consequently, the Court will apply New Mexico's choice-of-law rules to determine which state's laws apply to which claims.

132.    For multi-state class actions, the Supreme Court of New Mexico directs court to apply New Mexico law if: (i) application of forum law is constitutional; or (ii) if New Mexico choice-of-law rules lead to the selection of New Mexico law.  See Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 15, 188 P.3d 1156; Ideal v. Burlington Resources Oil & Gas Co. LP, 2010-NMSC-022, ¶ 20, 233 P.3d 362, 369.  To resolve any conflicts between New Mexico law and potentially applicable foreign law, courts must resort to the Restatement (Second) Conflict of Laws, at least in multi-state contract class actions.  See Woodard v. Fid. Nat. Title Ins. Co., 2008 WL 5737364, at *4; Ferrell v. Allstate Ins. Co., 188 P.3d at 1156.  New Mexico's choice-of-law rules direct the Court to apply New Mexico law to the New Mexico property interests and Colorado law to the Colorado property interests.  See Ideal v. Burlington Resources Oil & Gas Co. LP, 2010-NMSC-022, ¶¶ 20-24, 233 P.3d 362, 369.  "The contractual duties imposed upon the parties to a deed of transfer of an interest in land are determined . . . by the local law of the state where the land is situated . . . ."  Ideal v. Burlington Resources Oil & Gas Co. LP, 2010-NMSC-022, ¶ 22, 233 P.3d 362 (quoting the Restatement (Second) Conflict of Laws § 190).  New Mexico has consistently held that a "grant or reservation of the underlying oil and gas, or royalty rights provided for in a mineral lease as commonly used in this state, is a grant or reservation of real property.  Mineral royalty retained or reserved in a conveyance of land is itself real property."  Uhden v. N.M. Oil Conservation Comm'n, 1991-NMSC-089, ¶ 8, 817 P.2d 721, 723.  See Johnson v. Gray, 1966-NMSC-020, ¶ 5, 410 P.2d 948, 950 ("It is well settled in this jurisdiction that a grant or reservation of the underlying oil and gas, or royalty rights therein, is a grant or reservation of real property[.]").  Colorado also concludes that royalty rights or other grants in a mineral lease are grants of real property.  See Hagood v. Heckers, 513 P.3d 208, 214 (Colo. 1973)(stating that an oil-and-gas lease is "an interest in real estate"); Maralex Resources,

Inc. v. Chamberlain, 320 P.3d 399, 403 (Colo. App. 2014)(noting the "ample authority characterizing an oil and gas lease as an interest in real property").   Accordingly, under New Mexico's choice-of-law rules, New Mexico law applies for the property interests in which the production occurred in New Mexico, and Colorado law applies for the property interests in which the production occurred in Colorado.   See Hart v. Oliver Farm Equip. Sales Co., 21 P.2d 96, 98 (1933)("The question of the priority of the mortgage lien as against plaintiff's attachment lien is to be determined . . . by the law of New Mexico, by virtue of its being not only the forum, but also the place where the property was situated at the time of the levy of attachment."). "[A]pplication of individual state's substantive law would have the advantage of minimizing possible constitutional concerns raised by the uniform application of forum substantive law to the claims of out-of-state class members."   Porcell v. Lincoln Wood Products, Inc., 713 F. Supp. 2d at 1312.   See Woodard v. Fid. Nat'l Title Ins. Co., 2008 WL 5737364, at *4 (observing that "simply applying New Mexico's substantive law to all claims [in a five-state class action] would violate the Due Process Clause and the Full Faith and Credit Clause").   Accordingly, the Court must apply the laws of two states.[86]   Although the choice-of-law analysis does not prevent certification, other issues do prevent the Court from certifying the conspiracy claims.

133.   The civil conspiracy claims are not certifiable for the same reasons that the contract and implied covenant claims cannot be certified.   The Plaintiffs' conspiracy "claim is

---

[86]The Defendants posit that Utah and Oklahoma law also might apply to the class claims. The Defendants' principal office is in Tulsa, Oklahoma.   See FAC ¶¶ 3-5, at 2-3.   The only connection Utah has to this case is that Northwest Pipeline Corporation installed the keep-whole arrangements in 1991, and it was a Utah-based corporation.   See Plaintiffs' Reply in Support of Their Motion for Leave to File Fourth Amended Class Action Complaint at 5 n.1, filed November 26, 2013 (Doc. 106)("FAC Reply").   Northwest Pipeline LLC's current place of business is Tulsa, Oklahoma.   See FAC Reply at 5 n.1 (citing Report from the Office of the Secretary of State).   Regardless of this tangential connection to Oklahoma, New Mexico choice-of-law rules require the Court to apply New Mexico and Colorado substantive law.

based on an underlying breach of contract and/or related implied covenants."  Reply at 16.

Although the Plaintiffs have provided the Court with few details about the unlawful act

underlying their conspiracy claim, they state that "[c]onspiracy to breach a contract with a third

party is a sufficient unlawful act."  Reply at 16.  See Ettenson v. Burke, 2001-NMCA-003, ¶¶

13-14, 17 P.3d 440, 446; Logixx Automation, Inc. v. Lawrence Michels Family Tr., 56 P.3d

1224, 1231 (Colo. App. 2002); Bituminous Cas. Corp. v. Hartford Cas. Ins. Co., 2013 WL

452374, at *10 (D. Colo. Feb. 6, 2013)(Daniel, J.); Jet Courier Serv., Inc. v. Mulei, 771 P.2d 486

(Colo. 1989)(stating that breach of the duty of loyalty would satisfy the unlawful act element).

The Plaintiffs do not explain the unlawful act underlying their conspiracy claims, which is

especially problematic considering that they state that civil conspiracies "impute liability to make

members of the conspiracy jointly and severally liable for the torts of any of its members," yet

they do not describe what tort the Defendants committed.  Reply at 16 (emphasis added).  They

could be alleging that the underlying unlawful act was tortious interference with contract, or they

could be arguing that the underlying act was the breach of contract itself.  See Reply at 15-17.

They do not state the unlawful act and do not provide the elements involved.  They bear the

burden of proving compliance with rule 23, but have not provided enough information on their

conspiracy claim to allow the Court to soundly conclude that the claim satisfies rule 23.

134.    Given the little information the Court has, the Plaintiffs' conspiracy claim does

not satisfy rule 23's requirements.  Like in the contractual context, the Defendants' course of

conduct applied to all New Mexico proposed class members.  See In re Home-Stake Production

Co. Sec. Litig., 76 F.R.D. 351, 369-70 (N.D. Okla. 1977)(Boldt, J.).  Proving the Defendants'

common behavior, however, would consume little trial time and could be done through one

witness.  Although the Court remains uncertain as to the alleged unlawful act underlying the

conspiracy claims, at a minimum, the Plaintiffs must show that the Defendants conspired to breach WPX Production's contracts with the proposed class members. Notably, the Plaintiffs do not all have the same contracts. Proving that the Defendants conspired to breach the varying contracts requires the Court to ascertain whether the Defendants' scheme breached each of the varying contracts. As the Court has explained, this inquiry is an individualized one. The Court must ascertain the royalty interest on which each proposed class member was entitled to be paid under the lease to determine whether the keep-whole scheme would violate the lease. The scheme may breach some contracts, but not others. If the Defendants did not breach some of the contracts, then the conspiracy claim must be dismissed as to those proposed class members. See Bauer v. College of Santa Fe, 2003-NMCA-121, ¶ 16, 78 P.3d 76 (stating that, where the underlying claim fails as a matter of law, there can be no derivative liability under the doctrine of civil conspiracy). This fact makes the conspiracy claims uncommon to the class. Moreover, to prove the conspiracy claim, the Plaintiffs must further show that the class members were damaged. See Archuleta v. City of Roswell, 898 F. Supp. 2d at 1248; Seeds v. Lucero, 2005-NMCA-067, ¶ 18, 113 P.3d at 863-64. Once again, some class members may be damaged, while others are not. The inquiry is therefore not common. Like with the underpayment claims, the individual inquiries necessary to determine whether an underlying unlawful act occurred and whether the proposed class members were damaged will predominate over the common issues.

135.    Concluding that the Court cannot soundly certify any of the Plaintiffs' claims under rule 23, the Court reiterates the comments it made in Anderson:

> 134.    Having reached the end of this analytical journey, the Court has a few parting concerns regarding its ruling in particular and the state of class-action law in general. The Court well understands that refusing to certify this class likely closes the courthouse doors to the Plaintiffs' claims forever. It may be true that each Plaintiff has suffered a cognizable wrong. Yet, the costs of proving such wrongs are so large and the reward for prevailing so small that the prospect of

- 222 -

thousands of individual actions is unfeasible. In a negative-value case, such as this, denying certification leaves the Plaintiffs out in the cold, thus violating the deeply rooted principle in American jurisprudence that "every wrong shall have a remedy." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 176-77 (2008)(Stevens, J., dissenting).

135.   That this case is manageable, would be a superior method of trying the Plaintiffs' claims than individual actions, and is likely the only avenue of relief for the Plaintiffs, are all factors that weigh heavily in favor of certifying this class. Supreme Court and Tenth Circuit precedent, however, ties the Court's hands. Those courts have repeatedly instructed that, when faced with class certification, district courts must rigorously enforce rule 23's commonality and predominance requirements -- separate and apart from the more plaintiff-friendly superiority test. The Court has done its best to faithfully apply that law. The Court is concerned, however, that appellate courts' increasing hostility towards class actions is a result of their largely unfounded belief that district courts cannot handle them. As the foregoing analysis demonstrates, trying class actions like this one takes some elbow grease and some creativity, but it is not impossible. District courts can, and often do, try cases that are at least as difficult as this one.

136.   At the end of the day, district court judges know whether they can try a case. If they determine that a class action is manageable and more efficient than other alternatives, appellate courts should give some deference to their judgment. Under this approach, efficiency, manageability, and superiority would drive the class-certification analysis, rather than commonality and predominance. Such an approach would be a more equitable and pragmatic way to determine class certification than the existing framework. The Court must follow binding precedent, however, and therefore has no choice but to deny certification.

Anderson, 306 F.R.D. at 461 (internal footnotes omitted).

    **IT IS ORDERED** that the Plaintiffs' Renewed Motion for Class Certification, filed

January 13, 2014 (Doc. 116), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Jake Eugene Gallegos
Michael J. Condon
Gallegos Law Firm, P.C.
Santa Fe, New Mexico

*Attorneys for the Plaintiffs*

Sarah Gillett
Dustin L. Perry
Hall Estill Hardwick, P.C.
Tulsa, Oklahoma

--and--

Christopher A. Chisman
Holland & Hart LLP
Denver, Colorado

--and--

Mark F. Sheridan
Bradford C. Berge
Robert J. Sutphin
John C. Anderson
Elisa C. Dimas
Holland & Hart LLP
Santa Fe, New Mexico

*Attorneys for the Defendants*