# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

STEVEN J. ABRAHAM, and
H LIMITED PARTNERSHIP
on behalf of themselves and others
similarly situated,

      Plaintiffs,

vs.                                       No. CIV 12-0917 JB/CG

WPX ENERGY PRODUCTION, LLC,
f/k/a WILLIAMS PRODUCTION COMPANY,
LLC; WILLIAMS FOUR CORNERS, LLC;
and WILLIAMS ENERGY RESOURCES,
LLC,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Motion to Alter or Amend

and to Reconsider Memorandum Opinion and Order [Doc. 252], filed September 15, 2016 (Doc.

255)("Motion to Amend"); and (ii) the Plaintiffs' Second Motion for Class Certification, filed

September 15, 2016 (Doc. 256)("Second Motion for Class Certification").  The Court held a

hearing on January 24, 2017.  The primary issues are: (i) whether the Plaintiffs may raise a new

class definition not in the Fourth Amended Complaint, filed October 31, 2013 (Doc. 96-1); (ii) if

the Court required the Plaintiffs to amend their Complaint before proposing a new class

definition, whether rules 15(a) and 16(b)(4) bar such an amendment; (iii) whether the Plaintiffs

previously waived their new class definition by proposing and withdrawing an older one;  (iv)

whether the new proposed class is ascertainable; (v) whether the new proposed class definition

creates commonality; and (vi) whether the new proposed class definition will allow common

issues to predominate over individual ones.  The Court concludes that (i) the Plaintiffs may raise

a new class definition not in the operative complaint; (ii) even if the Plaintiffs could not do so, rules 16(b)(4) and 15(a) would not bar the Plaintiffs from amending their complaint; (iii) the Plaintiffs have not previously waived their new class definition; (iv) the proposed class definition is ascertainable; (v) the proposed class definition does not create commonality; and (vi) common issues would not predominate over individual ones. Accordingly, the Court denies the Motion to Amend and the Second Motion for Class Certification.

## FACTUAL BACKGROUND

Plaintiffs Steven J. Abraham and H Limited Partnership filed this class action in August 2012 to recover damages for gas royalty underpayments that Defendant WPX Energy Production L.L.C.("WPX Energy") allegedly makes. Motion to Amend at 1. WPX Energy pays the plaintiff royalty owners on a payment method called the keep-whole payment methodology. See Motion to Amend at 1. This payment method "pays royalty on a well's volume of produced MMbtus (British Thermal Units) based on methane volume and omits royalty [payments] on the value of [Natural Gas Liquids]" or NGLs. Motion to Amend at 2. The Plaintiffs' major contention is that this payment method does not pay them royalties on the value of refined NGLs. See Motion to Amend at 1. Previously, the Plaintiffs moved the Court to certify them as a class, which the Court denied. See Abraham v. WPX Production Productions, LLC, 317 F.R.D. 169, 175 (D.N.M. 2016)(Browning, J.)("Abraham"). The Court denied the previous motion for class certification for several reasons. First,

> because the Plaintiffs' class definition includes only those wells whose gas is or has been processed at three specific processing plants, the Court cannot adequately ascertain the class. Second, because the Plaintiffs' class definition includes only that gas that was processed for natural gas liquid extortion and marketing, the Court must determine which gas was processed.

317 F.R.D. at 175. In other words, the Court held that the proposed class was not ascertainable.

See 317 F.R.D. at 254.

The Court further concluded that "how the Defendants should have paid the Plaintiffs . . . varies between leases" because of "textual variations among the leases." 317 F.R.D. at 175. The Court ruled that these factors destroyed two key requirements of class certification, commonality and predominance. See Fed. R. Civ. P. 23(a)(2), (b)(3). The Court also held, however, that the Plaintiffs met the other requirements for class certification. See Abraham, 317 F.R.D. at 175. Because the Court ultimately denied the Motion, the Plaintiffs have now filed a Motion to Amend and Second Motion for Class Certification.

## PROCEDURAL BACKGROUND

The Court will outline the basic allegations and legal arguments underlying the Plaintiffs' motions. The Court will also describe the Defendants' responses to those arguments. Finally, the Court will summarize the hearing on these motions.

1.      **The Motion to Amend.**

The Plaintiffs contend that the Court should alter or amend its opinion in Abraham based on a new proposed class definition. See Motion to Amend at 5. Specifically, the Plaintiffs have proposed the following new class definition:

> The class consists of all present and former owners of royalty and overriding royalty from August 2006 to the present whose instruments provide for payment on "proceeds" or on "market value at the well" by WPX Energy Production LLC and its corporate predecessors on production of natural gas from San Juan Basin conventional formations and whose royalty and overriding royalty has been calculated on a "keep-whole" method omitting payment on the value of the processed natural gas liquids portion of the production.

> The New Mexico subclass consists of present and former owners of royalty and overriding royalty that burden WPX Energy Production LLC oil and gas leases and wells in the San Juan Basin in New Mexico.

> The Colorado subclass consists of present and former owners of royalty and overriding royalty that burden WPX Energy Production LLC oil and gas leases

and wells in the San Juan Basin in Colorado.

The Class membership excludes the United States of America in its own right and as trustee for Indian tribes or Indian lessors and any other lessors for which an agency of the Secretary of Interior administers royalties. The class excludes the State Land Board of Colorado and the Commissioner of Public Lands of New Mexico and oil and gas leases issues by either of those states. The class excludes WPX Energy Production, LLC f/k/a Williams Production Company, LLC, Williams Four Corners, LLC and Williams Energy Resources, LLC and their predecessors, successors and affiliates.

Motion to Amend at 5-6. The Plaintiffs make several arguments why this class definition improves upon the original one. First, the Plaintiffs contend that, unlike in the original class definition, "the class members can be identified without regard to where their gas was processed, or whether it was processed on the WFC system." Motion to Amend at 6. The Plaintiffs assert, "[t]he class includes owners who are paid on the keep-whole methodology regardless of the circumstance of the gas processing." Motion to Amend at 6. They assert that "WPX records provide a database which can identify the class members." Motion to Amend at 6.

Next, the Plaintiffs argue that "the amended class definition addresses many of the Court's concerns about commonality," because, "[d]uring the relevant period, WPX has uniformly paid royalty and overriding royalty to the members of the putative class on a keep-whole method for production gathered and processed by WFC . . . ." Motion to Amend at 7. According to the Plaintiffs, this royalty payment system "calculates payment to class members despite variables in gas flow delivery to processing plants and whether in given instances some of the class wells' gas stream may not be processed." Motion to Amend at 7.

Regarding the issue of predominance, the Plaintiffs contend that "[c]ommon issues will predominate where the class is limited to those owners paid on proceeds and market value of gas at the well leases." Motion to Amend at 9. Specifically, they argue that, under the new class definition, "the Court must resolve the premier common issue, whether plaintiffs are entitled to

royalty on processed NGLs, as to only two lease forms," "proceeds" leases and "market value of gas at the well" leases. Motion to Amend at 9-10. The Plaintiffs' key contention is that, despite the Court previously categorizing all of the leases at issue into eleven categories (plus another for illegible leases), only two categories of leases exist under the Plaintiffs' new class definition, namely, "proceeds" leases and "market value" leases. Motion to Amend at 20; <u>Abraham</u>, 317 F.R.D. at 274-75. The Plaintiffs concede that the leases previously referenced as those in Categories B and F are excluded from their new class definition. <u>See</u> Motion to Amend at 20-21.[1]

Finally, the Plaintiffs assert that, given the new class definition, the Court should certify the Plaintiffs' claims for breach of the implied covenant to market. <u>See</u> Motion to Amend at 22. Their contention is that "WPX does not market the NGLs for the benefit of the class under the keep-whole methodology." Motion to Amend at 22. The Plaintiffs argue that this conduct breaches the implied covenant to market "as to all royalty owners who are entitled to processed NGLs under their royalty provisions." Motion to Amend at 22-23. According to the Plaintiffs, the two categories of leases in their proposed class -- proceeds and market value leases -- "entitle royalty owners to payment on processed NGLs." Motion to Amend at 23. The Plaintiffs conclude that, because those two lease categories are allegedly entitled to payments on NGLs, the implied covenant to market "applies to those two lease types across the board." Motion to Amend at 23.

Separately, the Plaintiffs contend that their claim for breach of the duty of good faith and fair dealing is also certifiable. <u>See</u> Motion to Amend at 26. They argue that, because WPX Energy has denied the class members payment on NGL royalties, WPX Energy has breached the

_____

[1]The Plaintiffs also note that the lone leases in categories D and E, respectively, "are unknowns." Motion to Amend at 22.

duty of good faith and fair dealing.

In conclusion, the Plaintiffs ask the Court to amend its decision in <u>Abraham</u> to conclude that the Plaintiffs' new class definition satisfies all of the rule 23 class certification requirements, and certify the case as a class action based on claims for breach of contract, breach of the duty of good faith and fair dealing, and breach of the implied covenant to market. <u>See</u> Motion to Amend at 27.

### 2. **<u>The Second Motion for Class Certification</u>.**

Much of the Second Motion for Class certification repeats arguments in the Motion to Amend. It states the Plaintiffs' new class definition and again contends that the new definition meets the rule 23(a)(2) commonality requirement. <u>See</u> Second Motion for Class Certification at 2. It notes again that, "[t]he proposed class definition eliminates the processing issue and focuses on those owners who are paid on the keep-whole methodology." Second Motion for Class Certification at 4.

The Second Motion for Class Certification also argues that the new class definition satisfies the rule 23(b)(3) predominance requirement. <u>See</u> Second Motion for Class Certification at 7. Specifically, the Plaintiffs contend that the question -- "are the class members entitled to be paid on the value of processed NGLs" -- is answerable on a class-wide basis under the new class definition. Second Motion for Class Certification at 7. After resolving that question, the Plaintiffs argue that "[t]he only lease language inquiry required is: do proceeds (net and gross) leases and market value at the well leases entitle the lessors to share in the value of processed NGLs?" Second Motion for Class Certification at 8. The Plaintiffs argue that this question can be answered on a class-wide basis. <u>See</u> Second Motion for Class Certification at 8-9.

The Plaintiffs then reassert their argument that the Court should certify their claims for

beach of the implied covenant to market and the duty of good faith and fair dealing. <u>See</u> Second Motion for Class Certification at 10. The Plaintiffs further reassert their argument that the Court should certify their claim for civil conspiracy to breach their royalty agreements. <u>See</u> Second Motion for Class Certification at 11.

Finally, the Plaintiffs conclude by asking the Court to certify the class based on the new class definition, and to certify their claims for breach of contract, breach of the covenant of good faith and fair dealing, breach of the implied covenant to market, and civil conspiracy. <u>See</u> Second Motion for Class Certification at 13. The Plaintiffs also request that the Court appoint the named Plaintiffs, Steve Abraham and H Limited, as class representatives, and appoint the Gallegos Law Firm, P.C. as class counsel. <u>See</u> Second Motion for Class Certification at 13.

### 3. <u>The Response to the Plaintiffs' Motion to Amend.</u>

The Defendants[2] respond to the Motion to Amend. <u>See</u> Defendants' Response in Opposition to Plaintiffs' Motion to Alter or Amend and to Reconsider Memorandum Opinion and Order, filed November 2, 2016 (Doc. 260)("Response to Motion 1"). The Defendants briefly argue that the new class definition "does not constitute a material change in circumstances and thus does not support relief under Rule 23(c)(1)(C)." Response to Motion 1 at 6.

Next, the Defendants assert that, "by pursuing and then abandoning the 'keep-whole' aspect of their new [class] definition, Plaintiffs waived it." Response to Motion 1 at 6. The Defendants argue that the Plaintiffs had previously offered a similar class definition, but later "admitted that their proposed amendment was 'inappropriate' and voluntarily withdrew it."

---

[2]There are three Defendants in this case: (i) WPX Energy Production, LLC ("WPX Energy") formerly known as Williams Production, LLC; (ii) Williams Four Corners, LLC ("WFC"); and (iii) Williams Energy Resources, LLC.

Response to Motion 1 at 6-7 (quoting Plaintiffs' Position on Defendants' Motion to Determine Class Certification Based on the Class Definition Contained in Plaintiffs' Fourth Amended Complaint, filed September 23, 2015 (Doc. 242). On these facts, the Defendants conclude that the Plaintiffs waived the "keep-whole" aspect of the new class definition. Response to Motion 1 at 6-7.

The Defendants then contend that "custom and usage evidence supports the Court's Commonality and Predominance rulings." Response to Motion 1 at 8. The Defendants note that, in Abraham, "the Court correctly concluded that 'the different industry custom and usage evidence needed to identify each proposed class members' royalty interest and determine how they should be paid' is not common, and cuts against predominance." Response to Motion 1 at 9-10 (quoting Abraham, 317 F.R.D. at 273). The Defendants add that, "at a trial on the merits, evidence of trade usages could potentially bind H Ltd, Mr. Abraham, [and others] to the meaning within the oil and gas industry of disputed lease terms. Whether any of them would be bound would be a question of fact as to each of them." Response to Motion 1 at 11. The Defendants make other arguments in support of the Court's previous rulings regarding commonality and predominance. See Response to Motion 1 at 12, 16, 17, 20, 22, 23. Most notably, however, the Defendants assert that, "whether considering 'proceeds' or 'market value' leases, [nothing] require[s] that royalty be paid on 'processed gas.'" Response to Motion 1 at 27. Specifically, the Defendants argue that the Court did not hold in Abraham that "proceeds" leases "require royalty payment on processed gas, and hence, on the value of refined NGLs." Response to Motion 1 at 27 (emphasis in original). The Defendants refer to a footnote in Abraham in which the court gave its "inclinations about what some of the royalty terms mean . . . 'Proceeds' . . . forbids paying NGL royalty on a keep-whole basis." Abraham, 317 F.R.D. at 275 n.82. The

Defendants note that this statement was merely the Court's "inclination" and not a holding. Response to Motion 1 at 27. "In contrast to its 'inclinations,' the Court held . . . that Plaintiffs' breach-of-contract claims "require an individualized inquiry." Response to Motion 1 at 28 (citing <u>Abraham</u>, 317 F.R.D. at 263).

Finally, the Defendants argue that the "Plaintiffs' implied duty to market and implied duty of good faith and fair dealing claims do not satisfy commonality or predominance." Response to Motion 1 at 31. Regarding the implied duty to market, the Defendants note that the Court held that, "'[e]ven if a reasonably prudent operator would not have marketed the products using the keep-whole scheme, the Plaintiffs suffer harm only if the keep-whole scheme deprived them of their royalty interest.'" Response to Motion 1 at 31 (quoting <u>Abraham</u>, 317 F.R.D. at 265). "The duty to market," the Court noted, "'does not define the lessor's royalty interest; the lease's royalty provision does that.'" Response to Motion 1 at 31 (quoting <u>Abraham</u>, 317 F.R.D. at 265). "Thus, determining whether WPX breached the duty to market turns on an individualized inquiry into whether a particular class member's royalty instrument provides for royalty on refined NGLs." Response to Motion 1 at 31. On these facts, the Defendants conclude that "the question whether WPX breached the duty to market is, as the Court held, not a common one." Response to Motion 1 at 32 (citing <u>Abraham</u>, 317 F.R.D. at 265-66).

Finally, the Defendants assert that the Court cannot certify the claim for breach of the duty of good faith and fair dealing. <u>See</u> Response to Motion 1 at 32. The Defendants argue that the Plantiffs "bald[ly] conclude[e] that WPX breached the duty by denying payment on the value of refined NGLs . . . but they do not explain why this claim is a common one." Response to Motion 1 at 32. The Defendants conclude that the Court should deny the Motion. Response to Motion 1 at 33.

4.     **The Response to the Plaintiffs' Second Motion for Class Certification.**

The Defendants respond to the Plaintiffs' Second Motion for Class Certification.  <u>See</u> Defendants' Response in Opposition to Plaintiffs' Second Motion for Class Certification, filed November 2, 2016 (Doc. 259)("Response to Motion 2").   They make several procedural arguments.   First, the Defendants assert that "the Court must continue to determine class certification based on the Definition contained in the operative complaint."  Response to Motion 2 at 3.  Specifically, the Defendants contend that the "Plaintiffs are bound by the class definition in the complaint and 'absent an amended complaint [the Court] will not consider certification beyond it.'" Response to Motion 2 at 3 (quoting <u>Costelo v. Chertoff</u>, 258 F.R.D. 600, 604-05 & n.6 (C.D. Cal. 2009)(Selna, J.)).  The Defendants contend that "courts will not permit plaintiffs to change or expand their class definition through a motion to certify."  Response to Motion 2 at 3 (citing <u>Phelps v. Parsons Tech. Support, Inc.</u>, 2010 WL 4386918, at *3 (S.D. Ind. 2010)(Magnus-Stinson, J.)).   The Defendants conclude that, because the Plaintiffs have not moved to amend their Complaint, the Court should not entertain the Plaintiffs' Motions.  <u>See</u> Response to Motion 2 at 3.

Next, The Defendants argue that the Plaintiffs cannot obtain leave to amend their Complaint, because "the deadline to Amend has passed, and Plaintiffs cannot show good cause under Rule 16(b)(4)."  Response to Motion 2 at 3.  The Defendants argue that a key requirement of the good-cause standard is "diligence" and that the Plaintiffs have not been diligent by tendering "this new [class] definition nearly three years after they first learned of their ascertainability problem and more than two years after the parties completed extensive discovery and a multi-day hearing premised on the [original class] definition."  Response to Motion 2 at 7.

Additionally, the Defendants contend that, to amend a complaint, "a party seeking to

amend must satisfy Rule 15(a), under which a court may deny an amendment for, among other things, the moving party's undue delay <u>or</u> the non-movant's undue prejudice."  Response to Motion 2 at 7 (citing <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)(emphasis in original)).  The Defendants contend that both undue delay and undue prejudice are grounds for denying a motion to amend a complaint here.  <u>See</u> Response to Motion 2 at 7.  The Defendants assert that the Plaintiffs "offer no adequate explanation for their delay."  Response to Motion 2 at 8.  Regarding undue prejudice, they assert that the "Defendants have been litigating class certification under the [original] class definition for over four years" and have relied on that definition, thus prejudicing the Defendants.  Response to Motion 2 at 8.

The Defendants next briefly reassert their waiver argument, before contending that "the proposed new class definition does not constitute a material change in circumstances justifying Plaintiffs' request to alter or amend the class certification ruling."  Response to Motion 2 at 9.  Specifically, the Defendants contend that Rule 23(c)(1)(C) "is designed so that 'a determination once made can be altered or amended before the decision on the merits, if upon fuller development of the facts, the original determination appears unsound.'"  Response to Motion 2 at 9 (quoting Fed. R. Civ. P. 23 advisory committee notes to 1966 amendment).  According to the Defendants, a new class definition, offered to replace one the court found wanting, does not meet this standard.  <u>See</u> Response to Motion 2 at 10.

Next, the Defendants assert that the Plaintiffs' new class definition "does not solve the ascertainability problem."  Response to Motion 2 at 11.  The Defendants argue that the new class definition is not ascertainable, because

> it is still tied to a demand for payment on processed NGLs.  Although they have eliminated the reference to the three processing plants, Plaintiffs have provided no new evidence concerning processing.  Because most gas is not processed, and because Plaintiffs failed to prove whether or not other gas was processed, the

problem of ascertaining whose gas was processed, and thus, who belongs in the class, remains.

Response to Motion 2 at 12.

Additionally, the Defendants argue that the new class definition "does not supply commonality." Response to Motion 2 at 13. They argue that "the breach of lease claims and the implied duty claims do not present a common question," and that "the civil conspiracy claim is derivative of the breach-of-contract claims, and it therefore does not supply a common issue." Response to Motion 2 at 13, 19.

Further, the Defendants assert that "the proposed new definition does not eliminate the predominance of individual issues over any common ones." Response to Motion 2 at 20. Specifically, they posit that, despite the new class definition, "lease language variations will continue to overwhelm any alleged common issue," and that "industry custom and usage evidence and other parol evidence will require individualized inquiries." Response to Motion 2 at 20-21.

The Defendants additionally argue that "damages evidence remains highly individualized." Response to Motion 2 at 20. Specifically, "because Plaintiffs have not shown they are entitled to extracted NGLs or actual amounts received by WPX under all royalty and overriding royalty instruments at issue, determining liability and damages requires an individualized inquiry that will differ by lease, well, and month." Response to Motion 2 at 22.

Finally, the Defendants assert that "former royalty owners add individualized issues concerning ownership of claims, which further defeats predominance." Response to Motion 2 at 23. The Defendants contend that the new class definition contains former royalty owners, and that "current royalty owners do not necessarily have the right to assert claims and recover damages for royalties that were not paid to their predecessors-in-interest." Response to Motion 2

at 23.  "Accordingly, determining whether a right of action was transferred, and thus, who owns a claim for past underpayments -- the current or former owner -- will entail examinations of the chain of title for each class member, and possibly extrinsic evidence."  Response to Motion 2 at 24.  The Defendants thus conclude that the Court should deny the Motion.  See Response to Motion 2 at 24.

**5.      The Reply to the First Response.**

The Plaintiffs reply to the Defendants' arguments.  See Plaintiffs' Reply to Defendants' Response to Plaintiffs' Motion to Alter or Amend and to Reconsider Memorandum Opinion and Order, filed November 28, 2016 (Doc. 263)("Reply 1").  First, the Plaintiffs re-assert that their new class definition meets the commonality and predominance requirements.  See Reply 1 at 1. They re-assert that the leases at issue can be divided into two categories of "proceeds" leases and "market value" leases, and that, at the very least, proceeds leases forbid paying NGL royalty on a keep-whole basis.  Reply 1 at 2-3 (citing Abraham, 317 F.R.D. at 275 n.82).

Next, the Plaintiffs argue that the class is ascertainable.  See Reply 1 at 4.  Specifically, "defining the class by those who are paid on the keep-whole method identifies the persons entitled to relief and who are bound by the judgment. It supplies a source of identification . . . based on WPX's records of past and current monthly remittances for royalty and overriding royalty."  Reply 1 at 4.

Additionally, the Plaintiffs argue that, although the Court concluded "'the evidence suggests 'gas' refers to the gas produced at the wellhead rather than the processed products,'" there is no dispute "that the proceeds and market value leases entitle payment on 'gas.'"  Reply 1 at 7 (quoting Abraham, 317 F.R.D. at 263).  "There are no sales at the wells. The proxy for sales of gas at the well are proceeds achieved by sales of the gas components at the place and in the

subdivide forms of the production found at the outlet of processing plants."  Reply 1 at 7-8.

The Plaintiffs also argue that "[c]onstruction of leases is to favor lessors," specifically that "between lessor and lessee construction of the lease shall be against the lessee and in favor of the lessor."  Reply 1 at 10 (citing Greer v. Salmon, 1971-NMSC-002, 479 P.2d 294).  This rule exists, because "the lessors . . . are not familiar with oil-and-gas industry usage and the leases are form contracts not ordinarily the product of meaningful negotiation."  Reply 1 at 11.

The Plaintiffs conclude by asking the Court to amend its decision denying class certification.  See Reply 1 at 12.

**6.    The Reply to the Second Response.**

The Plaintiffs reply to the Second Response.  See Reply in Support of Plaintiffs' Second Motion for Class Certification, filed November 28, 2016 (Doc. 264)("Reply 2").  First, the Plaintiffs argue that their Second Motion is timely.  See Reply 2 at 1.  They contend that, "[u]ntil the Court filed [Abraham] on August 16, 2016, the Plaintiffs reasonably believed that this case would be certified.  There was no reason for Plaintiffs to file additional motions addressed to the certification issue until the Court announced its decision."  Reply 2 at 2.  The Plaintiffs further argue that "the Court has ample authority to consider the Second Motion."  Reply 2 at 3. Specifically, they contend that "Rule 23 does not limit the class definition to a definition set forth in the complaint. To the contrary, Rule 23 puts the responsibility for defining a class on the Court.  The class definition is ultimately determined by the Court, not the parties."  Reply 2 at 5 (citing Blair v. Transam Trucking, Inc., 2015 WL 5006076, at *3 (D. Kan. 2015)(Melgren, J.)). Further, the Plaintiffs contend that "[t]he Tenth Circuit has never ruled that a district court is limited to the class definition in the complaint."  Reply 2 at 5.  The Plaintiffs argue: "The most that can be said in support of WPX's position is that district courts are split on the issue."  Reply

2 at 6.  The Plaintiffs add that, "[e]ven if the Court were inclined to narrowly view its authority to consider a class definition in a motion for class certification different from that in the operative complaint, the remedy should be to allow plaintiffs to amend their complaint."  Reply 2 at 7.

Next, the Plaintiffs assert that their new class definition cures the ascertainability problem.  See Reply 2 at 7.  They reassert that royalty owners paid on the keep-whole methodology are "readily ascertainable based on WPX's own records."  Reply 2 at 7.  The Plaintiffs further contend that the new class definition establishes commonality and predominance.  See Reply 2 at 8.  The Plaintiffs reassert their arguments that the new class definition includes only owners paid under proceeds and market value leases, and that these owners are similarly situated "for purposes of the case, subject only to minor variations in the damage formula that would apply to each."  Reply 2 at 9.

Finally, the Plaintiffs re-argue that their implied covenant claims are also certifiable.  See Reply 2 at 12.  Plaintiffs contend that WPX Energy has breached the implied covenant to market and the breach of the duty of good faith and fair dealing, because "WPX does not fully market the production for the class members, so [it] cannot establish that it has marketed to get the best possible price."  Reply 2 at 12.

The Plaintiffs conclude by requesting that the Court grant their Second Motion and certify the new class definition.  See Reply 2 at 12.

**7.    The Hearing.**

The Court held a motion hearing on January 24, 2017.  See Transcript of Motion Proceeding at 1:1 (taken January 24, 2017)(Court)("Tr.").  The Plaintiffs began by stating "there is no doubt that the class is financially injured by nonpayment of the royalty and overriding

royalty on natural gas liquids produced from the leases to which are burdened by those royalty interests, and that injury can only be remedied by a certified class action." Tr. at 3:18-24 (Gallegos). Regarding the Defendants' procedural challenges, the Plaintiffs argued that "[t]his is not an issue about amending a complaint. We're not changing or amending any causes of action or claims or defense. A motion is the proper means to seek an order of the Court. The motion is the proper way to come forward for class certification." Tr. at 7:3-8 (Gallegos).

Turning to the ascertainability issue, the Plaintiffs argued that the new class is ascertainable, because "[t]hose royalty owners and overriding royalty owners who are paid on a keep-whole basis are parties that can be easily determined from the database of WPX." Tr. at 10:16-18 (Gallegos). The Plaintiffs then pivoted to commonality, arguing that, under the new class definition, "the issue in this case simply becomes, with everybody paid on the same basis, on the keep-whole basis, are the parties injured by that, or are they not injured by that." Tr. at 12:9-13 (Gallegos). The Plaintiffs continued arguing on commonality, asserting that all but a few leases fit into one of two categories -- proceeds leases and market value leases. See Tr. at 23:7-12 (Gallegos). The Plaintiffs concluded by saying that

> we believe that what has been brought before the Court regarding application of the proceeds and market value leases, along with the definition of the proposed description of the class, the three elements, the three issues that [argued] against certification, set forth on page 2 of your opinion, have been satisfied; that there is no longer a problem.

Tr. at 29:3-11 (Gallegos). The Defendants began their argument on the ascertainability issue. See Tr. at 31:6-8 (Sheridan). Specifically, they asserted that in the Plaintiffs' Reply, they "challenged for the first time findings and conclusions that the Court made with respect to the -- which gas from which leases was or was not processed. And he does so in a way that is in direct conflict with the record in the case." Tr. at 32:5-10 (Sheridan). "[T]he reason that this becomes

significant is that if the gas was not processed, if it was sold without processing, then there would be no proceeds from the sale of refined NGLs, no proceeds derived by either WFC or WPX." Tr. at 32:23-25, 33:1-2 (Sheridan). "So on the ascertainability question, the Court has to ask itself: Have the plaintiffs proven which gas from which wells on which leases was processed or not? Because if it wasn't processed, then there is no royalty obligation under their new definition." Tr. at 36:9-14 (Sheridan). "[T]he Court's findings and conclusions stand for the proposition that a very substantial quantity of the WPX operated conventional production is not processed. And their definition doesn't cure that." Tr. at 39:8-12 (Sheridan).

The Defendants then turned to their procedural arguments. See Tr. at 40:12-13 (Sheridan). They argued that "a new class certification motion can effectively be nothing more than a motion for reconsideration of the denial of the prior class certification motion," meaning that a court should apply the standards applicable to a motion for reconsideration when considering a second motion for class certification. Tr. at 41:19-24. The Defendants argued that the Plaintiffs' Motions "do nothing more than raise issues that have already been raised, and then advance arguments that they could have raised, but tactically and strategically elected not to." Tr. at 41:7-11 (Sheridan).

> And if the Court's standards for reconsideration mean anything, then they mean that this motion must be denied, and they mean that this second motion for class certification is nothing more than a rehash of the same issues that have been in the case since they filed their motion for class certification in 2014.

Tr. at 53:11-17 (Sheridan). Turning to the proceeds issue, the Defendants argued that

> [t]he Court did not, in footnote 82,[3] nor anywhere else in the opinion that I can find, render a holding, whether for purposes of class certification, or otherwise,

---

[3] The referenced footnote reads:

The Court will, however, for the parties' benefit, give its inclinations about what some of the royalty terms mean, based on existing case law and the terms' plain meanings. "Proceeds," generically, refers to the amount the Defendants receive

that a royalty on a keep-whole . . . contract, where the royalty owner does not own an interest in the refined NGLs, nonetheless is required to be paid royalty as he did.

Tr. at 55:23-25, 1-5 (Sheridan)(citing Abraham, 317 F.R.D. at 275 n.82). Regarding commonality, the Defendants posited: "I think that, without first considering the circumstances surrounding the execution of those leases, when they were entered into, what was going on in the industry . . . they may not necessarily mean the same thing. That becomes an individualized inquiry." Tr. at 64:4-10 (Sheridan).

> Our argument with respect to custom and usage evidence supporting the Court's commonality and predominance ruling is uncontested. They rely on a canon of construction that an agreement is to be construed against the drafter. And they ignore, however, that that canon of construction applies only after the Court has fully considered the extrinsic evidence.

Tr. at 66:12-19 (Sheridan). The Defendants concluded by saying: "I think this Court correctly found that the Plaintiffs could not establish the requirements of commonality and predominance. And nothing that they've said in their motion for reconsideration or second motion for class certification changes the Court's findings and conclusions in that respect." Tr. at 70:5-10 (Sheridan).

The Court then asked the Defendants about the new class definition. See Tr. at 71:1-2 (Court). The Defendants asserted that there were several problems with the new class definition, including the inclusion of former owners and overriding royalty owners. See Tr. at 71:5-8 (Sheridan).

---

from selling the hydrocarbons, and not any index or market price. ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶¶ 16, 24, 299 P.3d at 850, 852-53. This term forbids paying NGL royalty on a keep-whole basis. "Net proceeds" permits post-production cost deductions -- but not production-cost deductions -- in New Mexico, ConocoPhillips Co. v. Lyons, 2013-NMSC-009, ¶¶ 16, 24, 299 P.3d at 850, 852-53. "Gross proceeds" forbids the deduction of costs. Rogers v. Westerman Farm Co., 29 P.3d at 897.
Abraham, 317 F.R.D. at 275 n.82.

The Court then inquired as to the Defendants' procedural arguments, asking how the Defendants would be prejudiced if the court ruled on the new class definition. See Tr. at 74:1-10 (Court). The Defendants responded by saying:

> The Plaintiffs in this case filed an initial motion for class certification . . . sometime in 2013. It was withdrawn. They refiled a motion for class certification in January of 2014 . . . [T]hey prepared and prosecuted their motion for class certification at great time and expense to the defendants . . . [T]he burden of discovery in these cases, as the Court knows, falls largely on the defendants.

Tr. at 77:13-23 (Sheridan). The Court also asked the Plaintiffs about prejudicing the Defendants by ruling on the new class definition. See Tr. at 89:13-16 (Court). The Plaintiffs responded that "we basically had a mini trial [--] five, six days of evidence . . . , I think every issue was thoroughly tried at that hearing." Tr. 90:20-25 (Gallegos).

## LAW REGARDING MOTIONS TO RECONSIDER

Except where the Federal Rules of Civil Procedure specify, motions to reconsider fall into three categories:

> (i) a motion to reconsider filed within [twenty-eight] days of the entry of judgment is treated as a motion to alter or amend the judgment under rule 59(e); (ii) a motion to reconsider filed more than [twenty-eight] days after judgment is considered a motion for relief from judgment under rule 60(b); and (iii) a motion to reconsider any order that is not final is a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion. See Price v. Philpot, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005).

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.). See Price v. Philpot, 420 F.3d at 1167; Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d 1292, 1296 (10th Cir. 2002).

### 1.    Motions for Reconsideration Under Rules 59(e) and 60(b).

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant files within twenty-eight days of a court's entry of judgment. See Price v. Philpot, 420 F.3d at 1167 n.9. If the movant files outside that time period, courts should treat the motion as seeking

relief from judgment under rule 60(b).  See Price v. Philpot, 420 F.3d at 1167 n.9.  "[A] motion

for reconsideration of the district court's judgment, filed within [rule 59's filing deadline],

postpones the notice of appeal's effect until the motion is resolved."  Jones v. United States, 355

F. App'x 117, 121 (10th Cir. 2009)(unpublished).  The time limit in rule 59(e) is now twenty-

eight days from the entry of a judgment.  See Fed. R. Civ. P. 59(e).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule

60 is not only a question of timing, but also "depends on the reasons expressed by the movant."

Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194,

1200 (10th Cir. 2011).  Where the motion "involves 'reconsideration of matters properly

encompassed in a decision on the merits,'" a court considers the motion under rule 59(e).  Phelps

v. Hamilton, 122 F.3d 1309, 1323-24 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874 F.2d

751, 753 (10th Cir. 1989)).  In other words, if the reconsideration motion seeks to alter the

district court's substantive ruling, then it should be considered a rule 59 motion and be subject to

rule 59's constraints.  See Phelps v. Hamilton, 122 F.3d at 1324.  In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal
> representatives from a final judgment, order, or proceeding for the following
> reasons:
>
> > (1)     mistake, inadvertence, surprise, or excusable neglect;
>
> > (2)     newly discovered evidence that, with reasonable diligence,
> > could not have been discovered in time to move for a new trial
> > under Rule 59(b);
>
> > (3)     fraud (whether previously called intrinsic or extrinsic),
> > misrepresentation, or misconduct by an opposing party;
>
> > (4)     the judgment is void;
>
> > (5)     the judgment has been satisfied, released or discharged; it is
> > based on an earlier judgment that has been reversed or vacated; or
> > applying it prospectively is no longer equitable; or

(6)     any other reason that justifies relief.

Fed. R. Civ. P. 60(b).  Neither a rule 59 nor a rule 60 motion for reconsideration

> are appropriate vehicles to reargue an issue previously addressed by the court
> when the motion merely advances new arguments, or supporting facts which were
> available at the time of the original motion. . . .  Grounds warranting a motion to
> reconsider include (1) an intervening change in the controlling law, (2) new
> evidence previously unavailable, and (3) the need to correct clear error or prevent
> manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000).  "[A] motion for

reconsideration is appropriate where the court has misapprehended the facts, a party's position,

or the controlling law."  Servants of the Paraclete v. Does, 204 F.3d at 1012.  A district court has

considerable discretion in ruling on a motion to reconsider.  See Phelps v. Hamilton, 122 F.3d at

1324.

Rule 60 authorizes a district court to, "[o]n motion and just terms[,] . . . relieve a party or

its legal representative from a final judgment, order, or proceeding for the following reasons,"

including "any other reason that justifies relief."  Fed. R. Civ. P. 60(b).  A court cannot enlarge

the time for filing a rule 59(e) motion.  See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 347

(10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions);

Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. 11-0103, 2012 WL 869000,

at *2 (D.N.M. Mar. 8, 2012)(Browning, J.)("The Court may not extend the time period for timely

filing motions under Rule 59(e) . . . .").  "A motion under rule 59 that is filed more than 28 days

after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment."  12

JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 59.11[4][b], at 59-32 (3d ed.

2012)(citations omitted).  Nevertheless, a court will not generally treat an untimely rule 59(e)

motion as a rule 60(b) motion when the party is seeking "'reconsideration of matters properly

encompassed in a decision on the merits' contemplated by Rule 59(e)." Jennings v. Rivers, 394 F.3d 850, 854 (10th Cir. 2005).

Under some circumstances, parties can rely on rule 60(b)(1) for a mistake by their attorney or when their attorney acted without their authority. See Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney has acted without authority . . . ."). Mistake in this context entails either acting without the client's consent or making a litigation mistake, such as failing to file or to comply with deadlines. See Yapp v. Excel Corp., 186 F.3d at 1231. If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault. See Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. 380, 394 (1993); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding that attorney carelessness is not a basis for relief under rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result of an attorney's deliberate litigation tactics. See Cashner v. Freedom Stores, Inc., 98 F.3d at 577. This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962))(internal quotation marks omitted). The Tenth Circuit has held that

there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct," and has noted that those "who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences." Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002).

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks omitted). "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)." Moore, supra § 60.48[2], at 60-182. Accord Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive."). "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'" Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863.

Generally, the situation must be one beyond the control of the party requesting relief under rule 60(b)(6) to warrant relief. See Ackermann v. United States, 340 U.S. 193, 202 (1950)("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence. Subsection 6 of Rule 60(b) has no application to the situation of petitioner."). Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(en banc)]. In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured." Pierce v. Cook & Co., 518 F.2d at 723. However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not justify relief under Rule 60(b)(6). Collins v. City of Wichita, 254 F.2d 837, 839 (10th Cir. 1958).

Van Skiver v. United States, 952 F.2d at 1244-45.

## 2.    Motions to Reconsider Interlocutory Orders.

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, i.e., an order that a district court issues while the case is ongoing, as distinguished from a final judgment. This confusion originates from the fact that the Federal Rules of Civil Procedure do not mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for analyzing them. A loose conflation in terminology in Servants of the Paraclete v. Does, which refers to rule 59(e) motions -- "motion[s] to alter or amend a judgment" -- as "motions to reconsider,"[4] compounded that baseline confusion. Fed. R. Civ. P. 59(e) (emphasis added); Servants of the Paraclete v. Does, 204 F.3d at 1005.

---

[4]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, who authored Servants of the Paraclete v. Does, refers to rule 59(e) motions as "motions to reconsider" several times throughout the opinion. E.g., 204 F.3d at 1005. He uses the term "motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions to reconsider an interlocutory order, which no set standard governs, save that the district court must decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b); (ii) motions to reconsider a judgment made within twenty-eight days of the entry of judgment, which the Servants of the Paraclete v. Does standard governs; and (iii) motions to reconsider a judgment made more than twenty-eight days after the entry of judgment, which rule 60(b) governs. There is arguably a fourth standard for motions to reconsider filed more than a year after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.
Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the

Final judgments are different from interlocutory orders. <u>See</u> Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order <u>from which an appeal lies</u>.")(emphasis added). In addition to ripening the case for appeal, <u>see</u> 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways. First, for the first twenty-eight days after the entry of judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals. <u>See</u> Fed. R. App. P. 4(a)(4)(B). Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case. <u>See</u> Fed. R. App. P. 4(a)(4)(B). Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion. Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments. First, when a case is not appealed, there is an interest in finality. The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight day window of

_____

second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category). These are the terms that the Federal Rules of Civil Procedure -- and other Circuits -- use to describe (ii) and (iii). The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely. Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals. "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decision making -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case. The "touchstone document" for this jurisdictional handoff is the notice of appeal, and not the final judgment, see Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." (citations omitted)); Garcia v. Burlington N. R.R. Co., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals. The district court is thus divested of jurisdiction. Any subsequent action by it is null and void." (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction." (citations omitted)), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court

jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Basically, rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days. In defining the "limited review" that rule 59(e) allows a district court to conduct in the 28-day flux period, the Tenth Circuit, in Servants of the Paraclete v. Does, incorporated traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e). See United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)(departing from the law-of-the-case doctrine in three exceptionally narrow circumstances: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice")(citation omitted); Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders. The Federal Rules do not specifically mention motions to reconsider interlocutory orders, but rule 54(b) makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.   Otherwise, <u>any order or other decision</u>, however designated, <u>that adjudicates fewer than all the claims</u> or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and <u>may be revised at any time before the entry of a judgment</u> adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphases added).   Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of judgment."   Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." <u>Been v. O.K. Indus.</u>, 495 F.3d at 1225.   In the Tenth Circuit, "law of the case doctrine has <u>no</u> bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." <u>Rimbert v. Eli Lilly & Co.</u>, 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225).   In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"   <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225 (quoting <u>Avitia v. Metro. Club of Chi., Inc.</u>, 49 F.3d 1219, 1227 (7th Cir. 1995)).   In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order.   It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors. Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'")(citation omitted). First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges. How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue. A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction,[5] than when the prior ruling is, e.g., a short discovery ruling. The Court should also look, not to the prior ruling's overall thoroughness, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges. A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to

---

[5]The Court typically makes findings of fact and conclusions of law in ruling on these motions. At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law:

> **Amended or Additional Findings.** On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59.

Fed. R. Civ. P. 52(b). This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to twenty-eight days. The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its 28-day time limit -- does not apply to interlocutory orders. The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling. See 18B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, VIKRAM DAVID AMAR, RICHARD D. FREER, HELEN HERSHKOFF, JOAN E. STEINMAN & CATHERINE T. STRUVE, FEDERAL PRACTICE & PROCEDURE § 4478.1, at 695-96 (2d ed. 2002)("Stability becomes increasingly important as the proceeding nears final disposition . . . . Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling."). For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time.

Third, the Court should consider the <u>Servants of the Paraclete v. Does</u> grounds. The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one

that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review. The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived their right to appeal the alleged error by not raising the appropriate argument. Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard. After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration. The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again. Basically, even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produces the earlier ruling, it should analyze the motion in a different way -- one focused on

reducing the litigation burdens of the party opposing reconsideration. For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing. If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time that the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production and not of persuasion. The Court analyzes motions to reconsider by picking up where it left off in the prior ruling -- not by starting anew. Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling. Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider. Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally. The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking.

**<u>LAW REGARDING A CLASS DEFINITION NOT IN THE OPERATIVE COMPLAINT</u>**

As an initial matter,

> [d]istrict courts are split over whether to hold a plaintiff to the definition of a class as set forth in the complaint. Compare <u>Costelo v. Chertoff</u>, 258 F.R.D. 600, 604 (C.D. Cal. 2009)("The Court is bound to class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond."); <u>Berlowitz v. Nob Hill Masonic Mgmt.</u>, No. C-96-01241 MHP, 1996 WL 724776, at *2 (N.D. Cal. Dec.6, 1996)("The court is bound by the class definition provided in the complaint."), with <u>Savanna Group, Inc. v. Trynex, Inc.</u>, No. 10 C 7995, 2013 WL 66181, at *2-3 (N.D. Ill. Jan. 4, 2013)(allowing amendment during certification proceedings and noting "[t]hat this approach is also consistent with Rule 23, which contemplated the amendment of a class certification order prior to judgment"); <u>Bridgeview Health Care Ctr. Ltd. v. Clark</u>, 09 C 5601, 2011 WL 4628744, at *2 (N.D. Ill. Sept. 30, 2011)(allowing amendment during certification proceedings).

<u>Grodzitsky v. Am. Honda Motor Co. Inc.</u>, No. 2:12-CV-01142-SVW, 2014 WL 718431, at *4 (C.D. Cal. Feb. 19, 2014)(Wilson, J.). The Tenth Circuit does not have a controlling opinion on this point, although Tenth Circuit language exists that might suggest that a court need not hold a plaintiff to the class definition in the operative complaint. See <u>Carpenter v. Boeing Co.</u>, 456 F.3d 1183, 1187 (10th Cir. 2006)("The district court can modify or amend its class-certification determination at any time before final judgment in response to changing circumstances in the case.")(citing Fed. R. Civ. P. 23(c)(1)(C)); <u>In re Integra Realty Res., Inc.</u>, 354 F.3d 1246, 1261 (10th Cir. 2004)("Moreover, a trial court overseeing a class action retains the ability to monitor the appropriateness of class certification throughout the proceedings and to modify or decertify a class at any time before final judgment.")(citing Fed. R. Civ. P. 23(c)(1)).

In litigation related to this case, this Court has noted:

> Moreover, rule 23(c)(1)(C) authorizes courts to alter or amend orders granting or denying class certification before final judgment. See Fed. R. Civ. P. 23(c)(1)(C). The Court has "ample discretion to consider (or decline to consider) a revised class certification motion after initial denial." <u>In re Initial Public Offering Sec. Litig.</u>, 483 F.3d 70, 73 (2d Cir. 2007). Even after courts have denied a plaintiff's first attempt at class certification, courts allow plaintiffs to propose a refined class

definition or different claims in an attempt to certify a different class than the one originally proposed. See Pettco Enterprises, Inc. v. White, 162 F.R.D. 151, 156 (M.D. Ala. 1995)(Albritton, J.)(allowing the plaintiffs to attempt to certify a class, even after the court had already denied certification once, and noting that the plaintiffs' new class definition changed the class and the claims). Courts of Appeals have made clear that nothing "precludes the [plaintiffs] from returning to the District Court to seek certification of a more modest class, as one to which the Rule 23 criteria might be met." In re Initial Public Offering Sec. Litig., 483 F.3d 70, 73 (2d Cir. 2006). The United States Court of Appeals for the Fifth Circuit has "specifically invited" a district court to reconsider a denial of class certification. Calderon v. Presidio Valley Farmers Ass'n, 863 F.2d 384, 389 (5th Cir. 1989). The United States Court of Appeals for the Second Circuit has similarly noted that a plaintiff could seek to certify a narrower class after the Second Circuit upheld the district court's denial of class certification. See In re Initial Public Offering Sec. Litig., 483 F.3d at 73. The Second Circuit stated that the district court "can be expected to give such a request full and fair consideration." In re Initial Public Offering Sec. Litig., 483 F.3d at 73. On remand, the Honorable Shira A. Scheindlin, United States District Judge for the Southern District of New York, "held that the revised class definition satisfied the Rule 23 certification requirements" for purposes of a class settlement. In re Initial Public Offering Sec. Litig., 2011 WL 2732563, at *3 (S.D.N.Y. July 8, 2011)(Scheindlin, J.). On the other hand, the plaintiffs need to be careful not to turn a new class certification motion into a motion to reconsider, thereby asking the Court to apply the standards applicable to motions to reconsider.

Anderson Living Tr. v. WPX Energy Prod., LLC, No. CIV 12-0040, 2016 WL 5376325, at *9 (D.N.M. Aug. 27, 2016)(Browning, J.)("Anderson"). In summary, the Tenth Circuit has not explicitly ruled on this issue, but other Courts of Appeals have at least implied that a court need not hold a plaintiff to the class definition in the operative complaint. For these reasons, the Court concludes that a plaintiff is not bound to the class definition in the operative complaint for purposes of a second motion to certify a class. Class actions are hard work for the Court and the parties; the Court and the parties need to conform the pleadings to the reality of discovery, a lengthy class certification hearing, and the judicial resources expended in analyzing all of the extensive evidence on record. Some flexibility -- not more formality -- is needed in crafting a class action where one is warranted.

## LAW REGARDING WAIVER OF CLAIMS

The Tenth Circuit has noted, in the context of waiver on appeal, that, "if the theory was intentionally relinquished or abandoned in the district court, we usually deem it waived and refuse to consider it." Richision v. Ernest Group, Inc., 634 F.3d 1123, 1127 (10th Cir. 2011)(Gorsuch, J.). "Waiver occurs when a party deliberately considers an issue and makes an intentional decision to forgo it." United States v. Cruz-Rodriguez, 570 F.3d 1179, 1183 (10th Cir. 2009). "We typically find waiver in cases where a party has invited the error that it now seeks to challenge, or where a party attempts to reassert an argument that it previously raised and abandoned below." United States v. Zubia-Torres, 550 F.3d 1202, 1205 (10th Cir. 2008).

In United States v. Zubia-Torres, 550 F.3d at 1207, the Tenth Circuit illustrated the waiver doctrine:

> Similarly, in United States v. Gambino-Zavala, 539 F.3d 1221, 1227 (10th Cir.2008), the court found waiver, not forfeiture, when defense counsel first raised an issue and then affirmatively abandoned it. The defendant moved to suppress certain evidence, which the government claimed had been found in plain view. In a written pleading, the defendant argued that no facts were in dispute, but during the suppression hearing challenged the evidentiary basis for the government's plain view argument. The prosecutor responded that he thought the facts were undisputed but that the government could prove its position by testimony. Defense counsel neither contested the prosecutor's argument nor insisted that the testimony be heard. Accordingly, this Court found waived, the argument that the government had not proved that the contraband was in plain view. Defense counsel obviously knew of the issue. By his action, the defendant "affirmatively abandoned his challenge to the officers' testimony about the contraband and waived any claim on appeal.

United States v. Zubia-Torres, 550 F.3d at 1207 (internal citation omitted).

## LAW REGARDING MODIFICATION OF SCHEDULING ORDERS

"The District Court has wide discretion in its regulation of pretrial matters." Si-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1514 (10th Cir. 1990). Scheduling orders, however, "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Accord

Street v. Curry Bd. of Cty. Comm'rs, No. CIV 06-0776 JB/KBM, 2008 WL 2397671, at *6

(D.N.M. Jan. 30, 2008)(Browning, J.).  The advisory committee notes to rule 16 observe:

> [T]he court may modify the schedule on a showing of good cause if it cannot
> reasonably be met despite the diligence of the party seeking the extension.  Since
> the scheduling order is entered early in the litigation, this standard seems more
> appropriate than a "manifest injustice" or "substantial hardship" test.  Otherwise,
> a fear that extensions will not be granted may encourage counsel to request the
> longest possible periods for completing pleading, joinder, and discovery.

Fed. R. Civ. P. 16(b)(4) advisory committee's note to 1983 amendment.

The Tenth Circuit has held that the concepts of good cause, excusable neglect, and

diligence are related.  "The Tenth Circuit . . . has recognized the interrelation between 'excusable

neglect' and 'good cause.'"  Pulsecard, Inc. v. Discover Card Servs. Inc., 168 F.R.D. 295, 301

(D. Kan. 1996)(Rushfelt, J.)(citing In re Kirkland, 86 F.3d 172, 175 (10th Cir. 1996)).  "Properly

construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent

efforts."  Street v. Curry Bd. of Cty. Comm'rs, 2008 WL 2397671, at *6.  See Advanced Optics

Electronics, Inc. v. Robins, 769 F. Supp. 2d 1285, 1313 (D.N.M. 2010)(Browning, J.)(noting that

the "rule 16(b) good-cause inquiry focuses on the diligence of the party seeking [to] amend the

scheduling order.").  In In re Kirkland, the Tenth Circuit dealt with the definition of "good

cause" in the context of a predecessor to modern rule 4(m) of the Federal Rules of Civil

Procedure,[6] and noted:

---

[6] Rule 4(m) provides that

If a defendant is not served within 120 days after the complaint is filed, the court -
- on motion or on its own after notice to the plaintiff -- must dismiss the action
without prejudice against that defendant or order that service be made within a
specified time.  But if the plaintiff shows good cause for the failure, the court
must extend the time for service for an appropriate period.  This subdivision (m)
does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

> [W]ithout attempting a rigid or all-encompassing definition of 'good cause,' it would appear to require <u>at least as much</u> as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice, and some showing of 'good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified' is normally required.

86 F.3d at 175 (emphasis in original)(quoting <u>Putnam v. Morris</u>, 833 F.2d 903, 905 (10th Cir. 1987))(internal quotation marks omitted).  The Tenth Circuit explained that <u>Putnam v. Morris</u> "thus recognized that the two standards, although interrelated, are not identical and that 'good cause' requires a greater showing than 'excusable neglect.'"  <u>In re Kirkland</u>, 86 F.3d at 175.

Where a party is diligent in its discovery efforts and nevertheless cannot comply with the scheduling order, the Court has found good cause to modify the scheduling order if the requesting party timely brings forward its request.  In <u>Advanced Optics Electronics, Inc. v. Robins</u>, the Court found that, where the defendant did not conduct discovery or make any good-faith discovery requests, and where the defendant did not make efforts "diligent or otherwise" to conduct discovery, the defendant did not, therefore, show good cause to modify the scheduling order.  769 F.Supp.2d at 1313 n.8.  In <u>Street v. Curry Bd. Of Cty. Comm'rs</u>, however, the Court found that the plaintiff had "shown good cause for a delay in seeking leave to amend," because she "was diligent in pursuing discovery . . . [and] brought to the Court's attention her identification of an additional claim in a timely manner," where she discovered the claim through "documents provided in discovery."  2008 WL 2397671, at *11.  In <u>Montoya v. Sheldon</u>, No. CIV 10-0360 JB/WDS, 2012 WL 5353493 (D.N.M. Oct. 7, 2012)(Browning, J.), the Court did not find good cause to modify the scheduling order and reopen discovery, and refused to grant

---

Fed. R. Civ. P. 4(m).  The Tenth Circuit in <u>In re Kirkland</u> interpreted rule 4(j), which was substantially identical.  <u>See</u> 86 F.3d at 174 ("Rule 4(j) requires the court to dismiss a proceeding if service has not been made upon the defendant within 120 days after filing and the party responsible for service cannot show good cause why it was not made.").

the plaintiffs' request do so, where the plaintiffs' excuse for not disclosing their expert before the close of discovery was that they thought that the case would settle and they would thus not require expert testimony.  See 2012 WL 5353493, at *14.  The Court noted:

> The [plaintiffs] filed this case on April 15, 2010.  Because [Plaintiff] D. Montoya had seen the physician before that date, the fact that the [plaintiffs] are only now bringing the physician forward as a newly identified expert witness, over two years later, and over one and a half years after the deadline to disclose expert witnesses, does not evidence circumstances in which the Court can find excusable neglect nor good cause.

2012 WL 5353493, at *14.

In Scull v. Management & Training Corp., 2012 WL 1596962 (D.N.M. May 2, 2012)(Browning, J.), the Court denied a plaintiff's request for an extension of time to name an expert witness against a defendant.  The plaintiff asserted that he had waited to name an expert witness until a second defendant joined the case, but a scheduling order was in effect before the second defendant entered the case.  The Court concluded that the plaintiff should have known that he would need to name an expert witness against the defendant already in the case.  See 2012 WL 1596962, at *8.  The Court determined that the plaintiff was seeking "relief from his own disregard" for the deadline.  2012 WL 1596962, at *8.  "Despite his knowledge that [defendant] PNA had yet to enter the case, [plaintiff] Scull chose to allow the deadline to pass without naming expert witnesses against [defendant] MTC."  2012 WL 1596962, at *8.  Regarding the defendant who entered the case at a later date, however, the Court allowed the plaintiff an extension of time to name an expert witness, because it "was not unreasonable for Scull to expect a new deadline to name expert witnesses upon PNA's entrance into the case because he had not yet had the opportunity to engage in discovery against PNA as he had against MTC."  2012 WL 1596962, at *9.  The Court also noted that not naming an expert witness "is a high price to pay for missing a deadline that was arguably unrealistic when it was set," as Scull

could not have determined the need for an expert witness until after PNA entered the case. 2012 WL 1596962, at *9.

In Stark-Romero v. National Railroad Passenger Co (AMTRAK), 275 F.R.D. 544 (D.N.M. 2011)(Browning, J.), the Court concluded that a lawyer had shown excusable neglect when he missed a scheduling deadline because, soon after his son's wedding, his father-in-law developed a tumor in his chest, and the lawyer arranged his father-in-law's medical care, and only after the lawyer returned to his work did he realize that a deadline passed. See 275 F.R.D. 549-550. The Court noted that the lawyer could have avoided missing the deadline had he not left his work until the last minute, just before his son's wedding, but concluded that the lawyer had demonstrated good faith and missed the deadline because of "life crises," and not because of his inadvertence. 275 F.R.D. 549-550. In West v. New Mexico Taxation and Revenue Department, No. CIV 09-0631 JB/CEG, 2010 WL 3834341 (D.N.M. July 29, 2010)(Browning, J.), the Court allowed a plaintiff extended time to file a response to a defendant's motion for summary judgment, in part because of the difficulty that the plaintiff's counsel experienced attempting to obtain depositions with certain defense witnesses, and thus it was not her fault, and in part because cross-motions on summary judgment are particularly helpful for the Court:

> [C]ross-motions tend to narrow the factual issues that would proceed to trial and promote reasonable settlements. In some cases, it allows the Court to determine that there are no genuine issues for trial and thereby avoid the expenses associated with trial. The Court prefers to reach the merits of motions for summary judgment when possible.

2010 WL 3834341, at **4-5. On the other hand, in Liles v. Washington Tru Solutions, LLC, No. CIV 06-854 JB/CEG, 2007 WL 2298440 (D.N.M. June 13, 2007)(Browning, J.), the Court denied a plaintiff's request for additional time to respond to a defendant's motion for summary

judgment, when the only rationale that the plaintiff provided was that its counsel's "family and medical emergencies" precluded the plaintiff from timely responding.  2007 WL 2298440, at *2.

### LAW REGARDING AMENDING THE PLEADINGS BEFORE TRIAL

Rule 15(a) provides that a party may amend his or her pleading as a matter of right within twenty-one days of serving it and within twenty-one days of the service of a response pleading. See Fed. R. Civ. P. 15(a).  Otherwise, the party must obtain the opposing parties' consent or the court's leave -- which should be "freely give[n] . . . when justice so requires" -- to amend his or her pleading.  Rule 15(a) provides:

> **(a)  Amendments Before Trial.**
>
> > **(1)  Amending as a Matter of Course.**  A party may amend its pleading once as a matter of course within:
> >
> > > **(A)**  21 days serving it, or
> > >
> > > **(B)**  if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.
> >
> > **(2)  Other Amendments.**  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.
> >
> > **(3)  Time to Respond.**  Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

Fed. R. Civ. P. 15(a).  Under rule 15(a), the court should freely grant leave to amend a pleading where justice so requires.  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.); Youell v. Russell, No. 04-1396, 2007 WL 709041, at *1-2

(D.N.M. Feb. 14, 2007)(Browning, J.); <u>Burleson v. ENMR-Plateau Tele. Co-op.</u>, No. 05-0073, 2005 WL 3664299, at *1-2 (D.N.M. Sept. 23, 2005)(Browning, J.).  The Supreme Court of the United States has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given.  <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).  Furthermore, the Tenth Circuit has held that district courts should grant a plaintiff leave to amend when doing so would yield a meritorious claim.  <u>See Curley v. Perry</u>, 246 F.3d 1278, 1284 (10th Cir. 2001).  <u>See also</u> <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 265 F.R.D. at 579-80.

A court should deny leave to amend under rule 15(a), however, where the proposed "amendment would be futile."  <u>Jefferson Cty. Sch. Dist. v. Moody's Investor's Serv.</u>, 175 F.3d 848, 859 (10th Cir. 1999).  <u>See</u> <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 265 F.R.D. at 579-80. An amendment is "futile" if the pleading, "as amended, would be subject to dismissal."  <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 265 F.R.D. at 579-80 (citing <u>TV Commc'ns Network, Inc. v. Turner Network Television, Inc.</u>, 964 F.2d 1022, 1028 (10th Cir. 1992)).  A court may also deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed."  <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 265 F.R.D. at 579 (quoting <u>Frank v. U.S. W., Inc.</u>, 3 F.3d 1357, 1365-66 (10th Cir. 1993)).

"The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'"  <u>B.T. ex rel. G.T. v. Santa Fe Pub. Sch.</u>, No. 05-1165, 2007 WL 1306814,

at *2 (D.N.M. March 12, 2007)(Browning, J.)(quoting <u>Minter v. Prime Equip. Co.</u>, 451 F.3d 1196, 1204 (10th Cir. 2006)).

If a party seeks to amend his or her pleading after the time for seeking leave for pleading amendments has passed under a scheduling order, then, in addition to meeting rule 15(a)(2)'s requirements, he or she must satisfy rule 16(b)(4)'s good-cause requirement. <u>See</u> <u>Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n</u>, 771 F.3d 1230, 1240 (10th Cir. 2014)(Matheson, J.) ("After a scheduling order deadline, a party seeking leave to amend must demonstrate (1) good cause for seeking modification under Fed. R. Civ. P. 16(b)(4) and (2) satisfaction of the Rule 15(a) standard."). Rule 16(b)(4) states: "A schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "In practice, this standard requires the movant to show the 'scheduling deadlines cannot be met despite [the movant's] diligent efforts.'" <u>Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n</u>, 771 F.3d at 1240. The rule "focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment." <u>Advanced Optics Elecs., Inc. v. Robins</u>, 769 F. Supp. 2d 1285, 1313 (D.N.M. 2010)(Browning, J.)("Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts."). <u>See</u> <u>Gerald v. Locksley</u>, 849 F. Supp. 2d 1190, 1209-11 (D.N.M. 2011)(Browning, J.)(same).

The Court has previously stated that its rule 16(b) good-cause inquiry focuses on the diligence of the party seeking to amend the scheduling order. <u>See</u> <u>Walker v. THI of N.M. at Hobbs Ctr.</u>, 262 F.R.D. 599, 602-03 (D.N.M. 2009)(Browning, J.); <u>Guidance Endodontics, LLC v. Dentsply Int'l, Inc.</u>, No. 08-1101, 2009 WL 3672505, at *2-3 (D.N.M. Sept. 29, 2009) (Browning, J.); <u>Trujillo v. Bd. of Educ. of the Albuquerque Pub. Sch.</u>, Nos. 02-1146 and 03-

1185, 2007 WL 2296955, at *3 (D.N.M. June 5, 2007)(Browning, J.).  The United States District

Court for the District of South Carolina has stated:

> Rule 16(b)'s "good cause" standard is much different than the more lenient standard contained in Rule 15(a).  Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party.  Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment.  Properly construed, "good cause" means that scheduling deadlines cannot be met despite a party's diligent efforts.  In other words, this court may "modify the schedule on a showing of good cause if [the deadline] cannot be met despite the diligence of the party seeking the extension."  Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.

Dilmar Oil Co., Inc. v. Federated Mut. Ins. Co., 986 F. Supp. 959, 980 (D.S.C. 1997)(Currie, J.)

(citations omitted), aff'd, 129 F.3d 116 (4th Cir. 1997).  See Denmon v. Runyon, 151 F.R.D.

404, 407 (D. Kan. 1993)(O'Connor, J.)(affirming an order denying the plaintiff's motion to

amend after the deadline which the scheduling order established had passed and stating that,

"[t]o establish 'good cause,' the party seeking to extend the deadline must establish that the

scheduling order's deadline could not have been met with diligence").  Cf. SIL-FLO, Inc. v.

SFHC, Inc., 917 F.2d 1507, 1518-19 (10th Cir. 1990)(affirming, under rule 16(b), denial of a

motion to amend an answer to include a compulsory counterclaim filed three months after the

scheduling order deadline).

In In re Kirkland, 86 F.3d 172 (10th Cir. 1996), the Tenth Circuit dealt with the definition

of "good cause" in the context of rule 4(j).[7]  The Tenth Circuit noted:

---

[7]The version of rule 4(j) that the Tenth Circuit discussed in In re Kirkland was the version in effect after the 1983 amendments to rule 4(j).  That version of rule 4(j) provided:

> If a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice upon the court's own initiative with notice to such party or upon

> [W]ithout attempting a rigid or all-encompassing definition of "good cause," it would appear to require at least as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice, and some showing of "good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified" is normally required.

86 F.3d at 175 (emphasis omitted)(internal quotation marks omitted)(quoting Putnam v. Morris, 833 F.2d 903, 905 (10th Cir. 1987)).  The Tenth Circuit explained that Putnam v. Morris "thus recognized that the two standards, although interrelated, are not identical and that 'good cause' requires a greater showing than 'excusable neglect.'" In re Kirkland, 86 F.3d at 175.

Other courts within the Tenth Circuit have held that "the 'good cause' standard primarily considers the diligence of the party . . . seeking an extension[, who] must show that despite due diligence it could not have reasonably met the scheduled deadlines.  Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." Pulsecard, Inc. v. Discover Card Servs. Inc., 168 F.R.D. 295, 301 (D. Kan.1996)(Rushfelt, M.J.)(alterations in original)(internal quotation marks omitted).  The Honorable Dale A. Kimball, United States District Judge for the District of Utah, concluded that "good cause" existed to amend his scheduling order when he decided to permit the plaintiff's counsel to withdraw as counsel. Kee v. Fifth Third Bank, No. CIV 06-0602 DAK/PMW, 2008 WL 183384, at *1 (D. Utah Jan. 17, 2008).  Judge Kimball reasoned: "[I]n light of the court's decision to permit [counsel] to withdraw . . . the court has determined that good cause exists for amending the existing scheduling order." Kee v. Fifth Third Bank, 2008 WL 183384, at *1.

------

motion.  This subdivision shall not apply to service in a foreign country pursuant to subdivision (i) of this rule.

Act of Feb. 26, 1983, Pub. L. No. 97-462, 96 Stat. 2527.

## RELEVANT LAW REGARDING CLASS CERTIFICATION UNDER RULE 23(b)(3).

Rule 23 sets forth the requirements for certifying a class action under the federal rules. See Fed. R. Civ. P. 23. All classes must satisfy: (i) all the requirements of rule 23(a); and (ii) one of the three sets of requirements under rule 23(b), where the three sets of requirements correspond to the three categories of classes that a court may certify. See Fed. R. Civ. P. 23(a)-(b). The plaintiff[8] bears the burden of showing that the requirements are met, see Rex v. Owens ex rel. Okla., 585 F.2d 432, 435 (10th Cir. 1978); Pueblo of Zuni v. United States, 243 F.R.D. 436, 444 (D.N.M. 2007)(Johnson, J.), but, in doubtful cases, class certification is favored, see Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968)("[T]he interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action."); Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968)("[W]e hold that . . . rule [23] should be given a liberal rather than a restrictive interpretation, and that [denying certification] is justified only by a clear showing to that effect . . . ."). In ruling on a class certification motion, the Court need not accept either party's representations, but must independently find the relevant facts by a preponderance of the evidence.[9] See Rutstein v. Avis

---

[8]Technically, it is the party seeking certification, i.e., the movant, who bears the burden of proof, and defendants may also move for class certification. See William B. Rubenstein, Newberg on Class Actions § 7:20 (5th ed.). As a practical matter, however, motions for class certification are made almost exclusively by plaintiffs.

[9]As the Court has previously noted, Tenth Circuit precedent suggests that the Court must show some level of deference to the Complaint's factual allegations when ruling on a rule 23 motion: "The Court must accept a plaintiff's substantive allegations as true," but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints." In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d 1178, 1120 (D.N.M. 2012)(Browning, J.)(citing Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004); J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)). Since the Court's statement in In re Thornburg Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued an opinion stating that district courts should apply a "strict burden of proof" to class certification issues. Wallace B.

Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000)("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir. 1982). See Vallario v. Vandehey, 554 F.3d 1259, 1267 (10th Cir. 2009)("We, of course, adhere to the principle that class certification does not depend on the merits of a suit."). Still, the Court must conduct a rigorous analysis of the rule 23 requirements, even if the facts that the Court finds in its analysis bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc. We recognized in [General Telephone Co. of the Southwest v.] Falcon that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. Actual, not presumed, conformance with Rule 23(a) remains indispensable." Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action. Nor is there anything

---

Roderick Revocable Living Trust v. XTO Energy, Inc., 725 F.3d 1213, 1218 (10th Cir. 2013). This request is consistent with the general trend in the federal judiciary towards using an ordinary preponderance standard to find facts at the class certification stage. See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3d Cir. 2008); William B. Rubenstein, Newberg on Class Actions § 7:21 (5th ed.)(tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities Litigation -- a statement that earlier versions of the treatise espoused). Thus, although the Tenth Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation.

Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551-52 (2011)(Scalia, J.)("Wal-Mart.")  In a subsequent, seemingly contradictory admonition, however, the Supreme Court cautioned district courts not to decide the case's merits at the class certification stage:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1194-95 (2013)(Ginsburg, J.). To reconcile these two directives, the Court will find facts for the purposes of class certification by the preponderance of the evidence, but will allow the parties to challenge these findings during the subsequent merits stage of this case.  This approach is analogous to preliminary injunction practice, and many circuits have endorsed it.  See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).  Because of the res judicata effect a class judgment has on absent parties, a court may not simply accept the named parties' stipulation that class certification is appropriate, but must conduct its own independent rule 23 analysis.  See Amchem Prods., Inc. v. Windsor, 521 U.S. at 620-22.  In taking evidence on the question of class certification, the Federal Rules of Evidence apply, albeit in a relaxed fashion.  See Anderson, 306 F.R.D. at 378 n.39.

**1.      Rule 23(a).**

All classes must satisfy the prerequisites of rule 23(a):

**(a)** **Prerequisites**. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

    **(1)** the class is so numerous that joinder of all members is impracticable;

    **(2)** there are questions of law or fact common to the class;

    **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

    **(4)** the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a)] are clearly met." Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988). "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'" Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004)(quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161 (1982))(citing Reed v. Bowen, 849 F.2d at 1309). These four requirements are often referenced as numerosity, commonality, typicality, and adequacy, respectively. The commonality requirement is particularly relevant to this case.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2) (emphasis added). Even "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist." In re Intelcom Group Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996). See Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); Lopez v. City of Santa Fe, 206 F.R.D.

285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy." (citations omitted)). A single common question will suffice to satisfy rule 23(a)(2), but the question must be one "that is central to the validity of each one of the claims." Wal-Mart, 131 S. Ct. at 2551.

"The commonality requirement has been applied permissively in securities fraud litigation." In re Initial Pub. Offering Sec. Litig., 227 F.R.D. 65, 87 (S.D.N.Y. 2004). "Securities cases often involve allegations of common courses of fraudulent conduct, which can be sufficient to satisfy the commonality requirement." 5 Jerold S. Solovy, Ronald L. Marmer, Timothy J. Chorvat & David M. Feinberg, Moore's Federal Practice § 23.23[4][b], at 23-77 (3d ed. 2004). "Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met." In re Oxford Health Plans, Inc. Sec. Litig., 191 F.R.D. 369, 374 (S.D.N.Y. 2000). Accord Initial Pub. Offering, 227 F.R.D. at 87 ("In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied.").

The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in Wal-Mart, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer. See Wal-Mart, 131 S. Ct. at 2550-52. In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination. See 131 S. Ct. at 2547. Wal-Mart, however, had no centralized company-wide

hiring or promotion policy, instead opting to leave personnel matters to the individual store managers' discretion.  See 131 S. Ct. at 2547-48.  The plaintiffs argued that, although no discriminatory formal policy applied to all proposed class members, "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class member] the victim of one common discriminatory practice."  131 S. Ct. at 2548.  The Supreme Court disagreed that such a theory constitutes a common question under rule 23(a)(2).

> The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class."  Rule 23(a)(2). That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'"  Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009).  For example: Do all of us plaintiffs indeed work for Wal-Mart?  Do our managers have discretion over pay?  Is that an unlawful employment practice?  What remedies should we get?  Reciting these questions is not sufficient to obtain class certification.  Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," Falcon, 102 S. Ct. at 2364.  This does not mean merely that they have all suffered a violation of the same provision of law.  Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company.  Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.  Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

> > What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Wal-Mart, 131 S. Ct. at 2550-51 (emphasis in original)(quoting Nagareda, supra, at 132).  In

EQT Production Co. v. Adair, 764 F.3d 347 (4th Cir. 2011), the United States Court of Appeals

for the Fourth Circuit stated:

> We first review the aspects of the district court's analysis that apply to all five royalty underpayment classes.
>
> At bottom, the district court believed that both the commonality and predominance requirements of Rule 23 were satisfied by the same basic fact: the defendants employed numerous uniform practices related to the calculation and payment of CBM [coalbed methane gas] royalties.  These common practices are not irrelevant to Rule 23(b)'s predominance requirement.  But we hold that the district court abused its discretion by failing to consider the significance of this common conduct to the broader litigation.
>
> The district court identified numerous common royalty payment practices.  For example, it noted that EQT sells all of the CBM it produces in Virginia to an affiliate, EQT Energy, and that "all royalty owners within the same field have been paid royalties based on the same sales price for the CBM."  With respect to CNX, it noted that CNX "has uniform policies and procedures which governed its calculation of CBM revenues," and that "it has deducted severance and license taxes when calculating royalties since January 1, 2004."
>
> That the defendants engaged in numerous common practices may be sufficient for commonality purposes.  As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).

764 F.3d at 366 (citations omitted).

In Wal-Mart, Justice Scalia stated: "Wal-Mart is entitled to individualized determinations

of each employee's eligibility for backpay."  131 S. Ct. at 2546.  From this observation, he then

concluded:

> Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims.  And because the necessity of that litigation will prevent backpay from being "incidental" to the classwide injunction, respondents' class could not be certified even assuming, arguendo, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

Wal-Mart, 131 S. Ct. at 2561. Thus, the common question or questions cannot be "incidental," nor can the plaintiff submit a long list of "incidental" questions or issues, and say that they predominate over the real issues to be used.

       2.      **Rule 23(b).**

       Once the court concludes that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)." Adamson v. Bowen, 855 F.2d at 675. See DG ex rel. Stricken v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010)("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23."). Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

     **(b)**     **Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

          **(1)**     prosecuting separate actions by or against individual putative class members would create a risk of:

               **(A)**     inconsistent or varying adjudications with respect to individual putative class members that would establish incompatible standards of conduct for the party opposing the class; or

               **(B)**     adjudications with respect to individual putative class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

          **(2)**     the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

    **(3)**      the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

        **(A)**      the putative class members' interests in individually controlling the prosecution or defense of separate actions;

        **(B)**      the extent and nature of any litigation concerning the controversy already begun by or against putative class members;

        **(C)**      the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

        **(D)**      the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *11 (D.N.M. Aug. 21, 2010)(Browning, J.)(citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

      The three categories of class actions -- really four, as rule 23(b)(1) contains two subcategories, known as (b)(1)(A) and (b)(1)(B) class actions -- are not of equal utility. Class actions under (b)(1) can be certified only in very particular circumstances. Class actions under (b)(2) are broadly available, but are only capable of seeking injunctive or declaratory relief, and not damages. Far and away the most controversial class action category, (b)(3), can be brought for class-wide damages, injunctive relief, declaratory relief, or any combination thereof. Class actions under (b)(3) always require notice to all proposed class members of certification of the

class, and those individuals must be given the opportunity to opt out if they so desire.  See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. at 812 ("[W]e hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court.").  The other class action categories, however, are ordinarily mandatory, and neither notice nor opportunity to opt out needs to be given.  See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. at 811 n.3 (limiting the constitutional requirement of an opt-out notice "to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments").  The Court will focus on the most important form of class action, the (b)(3) damages class action.[10]

---

[10]The Court will briefly address the other class-action types.  Rule 23(b)(1) contains two subcategories of class action, (b)(1)(A) actions and (b)(1)(B) actions; a class need satisfy the requirements of only one to be certified.  See Fed. R. Civ. P. 23(b)(1).  Class actions under (b)(1)(A) are designed to avoid the situation in which a defendant subject to suit by multiple plaintiffs is ordered to undertake incompatible courses of conduct as a result of the non-centralized nature of the adjudication.  See Fed. R. Civ. P. 23(b)(1)(A).  "Incompatible" means more than simply inconsistent.  A situation in which, for example, a defendant was ordered to pay $10,000.00 to a plaintiff in one case, was ordered to pay ten million dollars to another plaintiff in an identical or similar case, and was found to not be at fault at all in yet another case, may be inconsistent, but it does not create "incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A).  Such alleged inconsistency is a normal and expected part of the system of individualized adjudication used by the judiciary to apply a uniform set of laws to varied factual settings.  What (b)(1)(A) is designed to avoid is injunctive or declaratory "whipsawing," in which, e.g., one court orders a school district to close an underperforming inner-city school and bus its students to suburban schools, and another court orders the district to keep the school open and bus suburban students in to the school.

Class actions under (b)(1)(B) serve a similar role, but apply when varying adjudications would result in practically -- rather than legally -- incompatible judgments.  See Fed. R. Civ. P. 23(b)(1)(B).  Rule (b)(1)(B) applies when the defendant has possession or control of a res -- a pot of money or thing that constitutes the relief that the proposed class seeks -- and the relief sought by all the individual members of the proposed class would more than exhaust the res.  For example, if a Ponzi scheme operator took ten billion dollars of investors' money, and, upon law enforcement's discovery of the scheme, had only six billion dollars remaining, then the individual investors' claims to recover their rightful share would add up to four billion dollars more than existed in the res.  Thus, the court might certify a (b)(1)(B) class action to ensure that

the custodian of the *res* does not pay out the entire *res* to the first investors to file suit, but, instead, distributes the *res* fairly among all investors.

The two subcategories of (b)(1) class action have other things in common as well. Both exist, in a sense, for the benefit of the defendant -- at least relative to (b)(2) and (b)(3) class actions -- and are rarely brought, in part because plaintiffs have little incentive to bring them. In the (b)(1)(B) example, each investor hopes to recover the full value of his or her investment, not a 60% value, and thus is incentivized to file as an individual. In the (b)(1)(A) example, the plaintiff seeking to close down the school (i) does not care about the inconsistent obligations of the school district, and (ii) would rather not be joined in a class action with plaintiffs who want to keep the school open. Last, (b)(1) class actions, along with (b)(2) class actions, are mandatory: if certified, no person covered under the class definition may opt out of it or pursue his or her own individual claim. As such, no notice needs to be given to the class members that they are part of ongoing litigation, although the certifying court may elect to direct notice in appropriate circumstances. See Fed. R. Civ. P. 23(c)(2)(A).

Class actions under (b)(2) provide for injunctive or declaratory relief when a defendant has "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Nagareda, supra, at 132. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

Wal-Mart, 131 S. Ct. at 2557 (emphasis in original). The (b)(2) class action was invented for the purpose of facilitating civil rights suits, and much of its use is in that field today. See William B. Rubenstein, Newberg on Class Actions § 4:26 (5th ed. 2017)("Newberg"). The (b)(2) class action allows civil rights litigants to advocate on behalf of all similarly situated individuals, such as a disenfranchised black voter representing a class of all black voters within an unconstitutionally drawn district or a jail inmate representing all inmates in an overcrowding case. Anyone familiar with the nation's seminal civil rights cases, however, knows that many of them are not brought as class actions, which raises a question:

> [W]hy would anyone ever bring one? . . . Th[is] inquiry is generated because if an individual litigant pursues an individual case for injunctive relief and prevails, she can generally get all of the remedy that she needs without going through the hurdles of certifying a class. For example, to return to Brown v. Board of Education, once Linda Brown prevailed on her race discrimination claim, her remedy -- a desegregated school -- was hers to pursue. Although that remedy would affect many other persons not a part of her litigation, hence making class

To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class <u>predominate</u> over any questions affecting only individual members, and that a class action is <u>superior</u> to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3) (emphases added).  Rule 23(b)(3) provides that "[t]he matters pertinent to these findings include": (i) the class members' interest in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular

_____

certification appropriate, there is no requirement that to secure that remedy, she had to file a class action.

Nonetheless, social change advocates tend to pursue class certification under Rule 23(b)(2) for several reasons.  First, and perhaps most importantly, Linda Brown will likely graduate from school long before her case ends; if hers is simply an individual action, it will become moot and risk dismissal.  Class certification, however, constitutes an exception to the mootness doctrine in certain circumstances.  Second, the scope of the plaintiff's relief is likely augmented by certifying a class.  It is arguable that all that Linda Brown would have been able to secure as a remedy for her individual claim was a desegregated school for herself, not for students throughout the entire school district; there is some relationship between the scope of the class and the scale of the remedy.  Third, it is often the case that the attorneys pursuing civil rights actions are doing so as public interest lawyers paid by an organization like the NAACP Legal Defense Fund or the American Civil Liberties Union (ACLU); they may therefore have a financial incentive to pursue a class's case rather than a series of individual cases as they have limited resources, and the economies of scale may argue for a class action suit.  Most generally, many civil rights cases are brought as class suits because the attorneys and clients pursuing them conceptualize their efforts in group, not individual, terms.  Thus, while an individual civil rights plaintiff might be able to secure the relief that she seeks without a (b)(2) class, a series of factors may encourage the pursuit of one.

<u>Newberg</u> § 4:26 (footnotes omitted).  Like (b)(1) class actions, (b)(2) class actions are mandatory -- individuals covered under the class definition may not opt out -- and do not require notice to be given to the class.  <u>See</u> Fed. R. Civ. P. 23(c)(2)(A).

forum; and (iv) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Rule 23(b)(3)'s first requirement is that questions common to the class predominate over those that are individualized. See Fed. R. Civ. P. 23(b)(3). A question is common when "the same evidence will suffice for each member to make a prima facie showing," Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)(citing In re Visa Check/MasterMoney Antitrust Litig., 208 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," In re Nassau Cty. Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006). A question is individual when "the members of a proposed class will need to present evidence that varies from member to member," Blades v. Monsanto Co., 400 F.3d at 566. Although a case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common question or questions exist; the former requires that the common question or questions predominate over the individual ones. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24; In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d at 1225 ("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement."). As the Tenth Circuit, addressing a Title VII claim, put it:

> The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).
>
> . . . .
>
> Although we do not rest our decision upon Rule 23(a), cases that interpret . . . the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs'

inability to satisfy Rule 23(b)(3)'s 'far more demanding' requirement that common issues predominate.

Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(Ebel, J.)(footnote omitted).

The predominance question applies to both macro damages -- the total class damages -- and to the micro damages -- the individual damages. In Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013), the Supreme Court held that it could not accept the regression model which the plaintiffs' expert had developed as evidence that damages were susceptible of measurement across an entire class -- as rule 23(b)(3) requires. The plaintiffs argued four theories of antitrust violations; one theory was that Comcast Corp.'s activities had an antitrust impact, because Comcast Corp.'s activities reduced the level of competition from "overbuilders," companies that build competing cable networks in areas where an incumbent cable company already operates. The district court found, among other things, that the damages resulting from overbuilder-deterrence impact could be calculated on a classwide basis. To establish such damages, the plaintiffs relied solely on the testimony of Dr. James McClave. Dr. McClave designed a regression model which compared actual cable prices in the Philadelphia "Designated Market Area" with hypothetical prices that would have prevailed but for Comcast Corp.'s allegedly anticompetitive activities. The model calculated damages of $875,576,662.00 for the entire class. As Dr. McClave acknowledged, however, the model did not isolate damages resulting from any one theory of antitrust impact. The district court nonetheless certified the class.

The Court of Appeals for the Third Circuit affirmed the district court decision. The Third Circuit concluded that the plaintiffs "provided a method to measure and quantify damages on a classwide basis," finding it unnecessary to decide "whether the methodology was a just and reasonable inference or speculation." 133 S. Ct. at 1433 (quoting 655 F.3d 182, 206 (3d Cir. 2011)). The Supreme Court granted certiorari on the question "[w]hether a district court may

certify a class action without resolving whether the plaintiff class had introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis."  133 S. Ct. at 24.  Justice Scalia criticized the Third Circuit's reluctance to entertain arguments against the plaintiffs' damages model "simply because those arguments would also be pertinent to the merits determination . . . ."  133 S. Ct. at 1433.  Justice Scalia said that

> it is clear that, under the proper standard for evaluating certification, respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis.  Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.

133 S. Ct. at 1433.  Justice Scalia stated that, under the Third Circuit's logic, "at the class-certification stage, *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be.  Such a proposition would reduce rule 23(b)(3)'s predominance requirement to a nullity."   133 S. Ct. at 1433 (emphasis in original).

It is clear that Comcast Corp. v. Behrend applies to classwide damages.  It is less clear that Comcast Corp. v. Behrend's language applies to the determination of individual damages.  There are three ways that the Court could deal with Comcast Corp. v. Behrend and the determination of individual damage awards.  First, the Court could decide that Comcast Corp. v. Behrend applies only to classwide damages and is not controlling at all in the determination of individual damages.   Second, the Court could decide that everything that Justice Scalia said about classwide damages also applies to the determination of individual damages.  Third, the Court could decide that Justice Scalia said some things relating to the determination of individual damages, but not the same things that apply to classwide damages.  As to the first option, while

much could be said of limiting Justice Scalia's opinion to classwide damages -- even from the language of the opinion and from the wording of the question presented -- the Court is reluctant to say that it has nothing to say that might be relevant to the determination of individual damages awards.  Some of Justice Scalia's concerns about admissible evidence to determine damages -- whether classwide or individual damage awards -- still seems relevant to whether damages are classwide or individual.  While Justice Scalia was not addressing the determination of individual damage awards, some of what he said -- and how he said it -- causes the Court to be cautious in determining a methodology for calculating individual damage awards.  On the other hand, the Court is not convinced that it should or even can apply Comcast Corp. v. Behrend's language to the individual determination of damages as it does to classwide damages.  The dissent stated that "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal."  133 S. Ct. at 1437 (Ginsburg, J., dissenting).  Justice Scalia did not refute this proposition, and the Court has no reason to think the dissent's statement -- which is accurate -- does not remain good law.  Accordingly, just because each plaintiff and class member may get a different amount and there has to be a separate calculation of each plaintiff's damages does not defeat class certification.

What the Court thinks that Comcast Corp. v. Behrend says that is relevant to the individual determination of damages is threefold.  First, at the class certification stage, the Court cannot ignore how individual damages, if any are appropriate, are to be decided.  In other words, the Court cannot ignore the possible complexities of the individual damages determinations in making the predominance calculation.  A class can have individual damage calculations, but the Court has to look at the issues of individual damages calculations at the class certification stage. Second, the methodology for all class members needs to be common or, if there are different

methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification stage in the predominance analysis. In other words, if the Court is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class. Third, even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member. The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class members that they do not create for other class members or groups. The predominance analysis must identify precisely the common issues and uncommon issues that application of the class methodology or methodologies raise, and then determine whether, in the total issue mix, the common issues predominate over the individual ones.

A defendant's desire to assert individual counterclaims[11] does not typically defeat predominance. See Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 810 (1985); Allapattah Servs, Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003). A defendant's desire to assert individual affirmative defenses also often does not defeat predominance, see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members."), but this statement is less true after Wal-Mart.[12] Other

_____

[11]Generally speaking, counterclaims, even common ones, are not permitted against absent class members at all.

[12]Limitations defenses are an especially common breed of affirmative defense. Limitations defenses generally present common questions, rather than individual ones, because a limitations defense's merits rest on two facts: (i) the date on which the statute of limitations accrued; and (ii) the date on which the action was filed. Fact (ii) is a common issue in virtually

recurring individual issues present more serious challenges to predominance, such as: (i) the

prima facie element of reliance or due diligence in common-law fraud and other cases;[13]

---

every class action, because the entire class gets credit for the filing date of the class action complaint.  Fact (i) may not be truly common, but it might be, if, for example, the discovery rule delays accrual of a statute of limitations until the cause of action is discovered, and all class members' causes of action are discovered at the same time, or if a single act by the defendant breached contracts with all class members at once.

Even if the question is individual -- for example, if a class is defined as only encompassing preexisting filed claims, or if the discovery rule might delay the accrual of the statute for some class members but not others -- it still typically does not defeat predominance.

> Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier.  In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.  As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3).  Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.46[3] (3d ed. 1999)).  See Newberg § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

[13]The advisory committee's notes to rule 23 state that

> a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes (citations omitted).

> Despite the generalized concern about the individual nature of the misrepresentations and/or reliance inquiry in fraud cases, there are at least three recurring situations in which courts have found common issues predominant in fraud cases: (1) those in which reliance is common across the class; (2) those in which courts have excused a showing of individual reliance; and (3) those in

(ii) differences in the applicable law in a multi-state, state law-based class actions,[14] see Castano

v. Am. Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996); and (iii) the need to determine individual

_____

which the underlying law does not require a showing of individual reliance.

Newberg § 4:58. Reliance may be a common issue when the same misrepresentation is made to the entire class; some circuits have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized. See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)("[T]he Third, Fourth, Fifth, Sixth, and Seventh Circuits . . . have held that oral misrepresentations are presumptively individualized."); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(certifying class where class definition was narrowed to include only those who had received written communications from defendant). The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company -- are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.

> We have found a rebuttable presumption of reliance in two different circumstances. First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008)(citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972); Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988)).

[14]In In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002), Judge Easterbrook, in an opinion that predates Wal-Mart and Comcast, stated:

> No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3). Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or products-liability suits may not proceed as nationwide classes

288 F.3d at 1015. Judge Easterbrook then discussed how variations in tires defeat class treatment:

Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable. Lest we soon see a Rule 23(f) petition to review the certification of 50 state classes, we add that this litigation is not manageable as a class action even on a statewide basis. About 20% of the Ford Explorers were shipped without Firestone tires. The Firestone tires supplied with the majority of the vehicles were recalled at different times; they may well have differed in their propensity to fail, and this would require sub-subclassing among those owners of Ford Explorers with Firestone tires. Some of the vehicles were resold and others have not been; the resales may have reflected different discounts that could require vehicle-specific litigation. Plaintiffs contend that many of the failures occurred because Ford and Firestone advised the owners to underinflate their tires, leading them to overheat. Other factors also affect heating; the failure rate (and hence the discount) may have been higher in Arizona than in Alaska. Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any discount) and some never will be resold. Owners who wring the last possible mile out of their vehicles receive everything they paid for and have claims that differ from owners who sold their Explorers to the second-hand market during the height of the publicity in 2000. Some owners drove their SUVs off the road over rugged terrain, while others never used the "sport" or "utility" features; these differences also affect resale prices.

Firestone's tires likewise exhibit variability; that's why fewer than half of those included in the tire class were recalled. The tire class includes many buyers who used Firestone tires on vehicles other than Ford Explorers, and who therefore were not advised to underinflate their tires.

. . . .

When courts think of efficiency, they should think of market models rather than central-planning models.

Our decision in Rhone-Poulenc Rorer made this point, and it is worth reiterating: only "a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions" (51 F.3d at 1299) will yield the information needed for accurate evaluation of mass tort claims.

. . . .

No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism. Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our

personal injury damages, which presents such a challenge to predominance that class certification of mass tort claims is now exceedingly rare, see Amchem Prods., Inc. v. Windsor, 521 U.S. at 625. There is little uniform guidance on how to assess when common issues predominate over individual ones, and the Court's statements to this point have, obviously, done more to disavow various tempting but fallacious rules than they have to set forth a usable standard.

There is currently a split of authority between the United States Court of Appeals over the proper way to analyze predominance -- with the United States Courts of Appeals for the Seventh and Sixth Circuits on one side and the United States Courts of Appeals for the Third, Tenth, and Eleventh Circuits on the other. The Honorable Richard A. Posner,[15] United States Circuit Judge for the Seventh Circuit, concludes that the predominance inquiry boils down to "a question of efficiency." Butler v. Sears, Roebuck & Co., 702 F.3d at 362. Judge Posner poses the predominance question as: "Is it more efficient, in terms both of economy of judicial

_____

federal republic and must not be overridden in a quest to clear the queue in court. See BMW v. Gore, 517 U.S. [559, 568-73 (1996)]; Szabo[v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001)](reversing a nationwide warranty class certification); Spence v. Glock, G.m.b.H., 227 F.3d 308 (5th Cir. 2000) (reversing a nationwide tort class certification); Larry Kramer, Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547, 579 (1996); Linda S. Mullenix, Mass Tort Litigation and the Dilemma of Federalization, 44 DePaul L. Rev. 755, 781 (1995); Robert A. Sedler, The Complex Litigation Project's Proposal for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty, 54 La. L .Rev. 1085 (1994). Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

In re Bridgestone/Firestone, Inc., 288 F.3d at 1018-20.

[15]Judge Posner is not only the most widely referenced legal authority alive -- he is the most-cited legal scholar of all time. See Fred R. Shapiro, The Most-Cited Legal Scholars, 29 J. Legal Stud. 409, 424 (2000). Judge Posner retired from the Seventh Circuit, effective September 2, 2017.

resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?"  Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  In Butler v. Sears, Roebuck & Co., the Seventh Circuit reversed a district court's denial of certification of a class of washing-machine owners who alleged that Sears' washing machines were prone to cultivate mold and affirmed the district court's certification of the same class to pursue a claim that the machines' control units were defective.  See 702 F.3d at 360-61.  The Seventh Circuit certified the class -- which spanned six states -- to pursue its mold claim under state breach-of-warranty law:

> A class action is the more efficient procedure for determining liability and damages in a case such as this, involving a defect that may have imposed costs on tens of thousands of consumers yet not a cost to any one of them large enough to justify the expense of an individual suit.  If necessary a determination of liability could be followed by individual hearings to determine the damages sustained by each class member (probably capped at the cost of replacing a defective washing machine -- there doesn't seem to be a claim that the odors caused an illness that might support a claim for products liability as distinct from one for breach of warranty).  But probably the parties would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines.  The class action procedure would be efficient not only in cost, but also in efficacy, if we are right that the stakes in an individual case would be too small to justify the expense of suing, in which event denial of class certification would preclude any relief.

> . . . .

> [T]he district court will want to consider whether to create different subclasses of the control unit class for the different states.  That should depend on whether there are big enough differences among the relevant laws of those states to make it impossible to draft a single, coherent set of jury instructions should the case ever go to trial before a jury.

Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  Along with numerous other class actions pending appeal before the Supreme Court, the Supreme Court vacated Butler v. Sears, Roebuck & Co., and remanded it to the Seventh Circuit "for reconsideration in light of Comcast Corp. v.

Behrend."  Butler v. Sears, Roebuck & Co., 727 F.3d at 797 (7th Cir. 2013).  On reconsideration,

the Seventh Circuit reaffirmed its prior decision, again in an opinion written by Judge Posner:

> Sears thinks that predominance is determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance.  That's incorrect.  An issue "central to the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment.  Wal-Mart, 131 S. Ct. at 2551.  That was said in the context of Rule 23(a)(2), the rule that provides that class actions are permissible only when there are issues common to the members of the class (as of course there are in this case).  But predominance requires a qualitative assessment too; it is not bean counting.  In Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, 133 S. Ct. at 1196, the Court said that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class," and in Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997), it said that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  And in In re Inter-Op Hip Prosthesis Liability Litigation, 204 F.R.D. 330, 345 (N.D. Ohio 2001), we read that "common issues need only predominate, not outnumber individual issues." . . .
>
> As we noted in Carnegie v. Household Int'l., Inc., 376 F.3d 656, 661 (7th Cir. 2004), "the more claimants there are, the more likely a class action is to yield substantial economies in litigation.  It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30. . . .  The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (emphasis in original).  The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars.  But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.
>
> There is a single, central, common issue of liability: whether the Sears washing machine was defective.  Two separate defects are alleged, but remember that this class action is really two class actions.  In one the defect alleged involves mold, in the other the control unit.  Each defect is central to liability.  Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of subclasses.  See, e.g., Johnson v. Meriter Health Services Employee Retirement Plan, 702 F.3d at 365 (10 subclasses).

Butler v. Sears, Roebuck & Co., 727 F.3d at 801-02(emphasis in original).[16]

_____

[16]In addition to articulating the Seventh Circuit's construction of the predominance

inquiry, Judge Posner addressed <u>Comcast Corp. v. Behrend</u>'s impact on the Seventh Circuit's case:

> So how does the Supreme Court's <u>Comcast</u> decision bear on the rulings . . . in our first decision?

> <u>Comcast</u> holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges. <u>Comcast</u> was an antitrust suit, and the Court said that "if [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." "[A] methodology that identifies damages *that are not the result of the wrong*" is an impermissible basis for calculating class-wide damages. Id. at 1434 (emphasis added). "For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (*a theory of liability that is not capable of classwide proof* )." And on the next page of its opinion the Court quotes approvingly from Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed.2011), that "the first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact *of that event*." (emphasis the [Supreme] Court's). None of the parties had even challenged the district court's ruling that class certification required "that the damages resulting from . . . [the antitrust violation] were measurable 'on a class-wide basis' through use of a 'common methodology.'"

> Unlike the situation in <u>Comcast</u>, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit.

> Sears argues that Comcast rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency." But in support of its argument Sears cites only the statement in the dissenting opinion in Comcast that "economies of time and expense" favor class certification, -- a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority must disapprove of.

> Sears compares the design changes that may have affected the severity of

The Sixth Circuit handled essentially the same case -- a class action against Sears for defective washing machines -- in In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 678 F.3d 409 (6th Cir. 2012), and also elected to certify the mold-based claim.[17]

> [W]e have no difficulty affirming the district court's finding that common questions predominate over individual ones and that the class action mechanism is the superior method to resolve these claims fairly and efficiently. This is especially true since class members are not likely to file individual actions because the cost of litigation would dwarf any potential recovery. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997)(finding that in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all' "). Further, [as] the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(b)(3)(A).

In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 678 F.3d at 421 (citation omitted). That case was also vacated after Comcast Corp. v. Behrend, and, like the

_____

> the mold problem to the different antitrust liability theories in Comcast. But it was not the existence of multiple theories in that case that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact -- the injury -- of which the plaintiffs were complaining. In contrast, any buyer of a Kenmore washing machine who experienced a mold problem was harmed by a breach of warranty alleged in the complaint.

> Furthermore and fundamentally, the district court in our case, unlike Comcast, neither was asked to decide nor did decide whether to determine damages on a class-wide basis. As we explained in McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491-92 (7th Cir. 2012), a class action limited to determining liability on a class-wide basis, with separate hearings to determine -- if liability is established -- the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed

Bulter v. Sears, Roebuck & Co., 727 F.3d at 799-800 (emphasis in Butler v. Sears, Roebuck & Co. but not Comcast Corp. v. Behrend, except as noted)(citations omitted).

[17]The Sixth Circuit's class "did not involve the other claim in [the Seventh Circuit's] case, the control unit claim." Butler v. Sears, Roebuck & Co., 727 F.3d at 802.

Seventh Circuit, the Sixth Circuit reaffirmed its prior decision, fleshing out the predominance inquiry in more detail than it had done in its prior opinion:

> Whirlpool does not point to any "fatal dissimilarity" among the members of the certified class that would render the class action mechanism unfair or inefficient for decision-making. Instead, Whirlpool points to "a fatal similarity -- [an alleged] failure of proof as to an element of the plaintiffs' cause of action." That contention, the Supreme Court instructs, "is properly addressed at trial or in a ruling on a summary-judgment motion. The allegation should not be resolved in deciding whether to certify a proposed class." Tracking the Supreme Court's reasoning, we conclude here that common questions predominate over any individual ones. Simply put, this case comports with the "focus of the predominance inquiry" -- it is "sufficiently cohesive to warrant adjudication by representation."

In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 722 F.3d 838, (7th Cir. 2013)(citations omitted). The Seventh Circuit and Sixth Circuit, thus, define predominance in much the same way: if the district court can design a mechanism for trying the case that is fair to the defendants and more efficient than individual litigation of the same dispute, then predominance is satisfied. See Butler v. Sears, Roebuck & Co., 727 F.3d at 802. This styling of the predominance inquiry is in keeping with that given, many years earlier, by a leading class-action treatise:

> [A] court addressing predominance must determine whether the evidence about the putative class representative's circumstances and the opposing evidence from the defense will enable a jury to make across-the-board "yes" or "no" factual determinations that fairly resolve the claims of the entire class. Where the right to recover for each class member would "turn . . . on facts particular to each individual plaintiff," class treatment makes little sense. If the resolution of the common issues devolves into an unmanageable variety of individual issues, then the lack of increased efficiency will prohibit certification of the class.

> The predominance and efficiency criteria are of course intertwined. When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class. When there are no predominant issues of law or fact, however -- as in the instant case -- class treatment would be either singularly inefficient, as one court attempts to resolve diverse claims from

- 70 -

<u>around the country in its own courtroom, or unjust</u>, as the various factual and legal nuances of particular claims are lost in the press to clear the lone court's docket.

<u>McLaughlin on Class Actions</u> § 5:23 (11th ed. 2016)(emphases added)(omission in original) (footnotes omitted).

Although the Seventh Circuit and the Sixth Circuit may agree about the definition of predominance, the Third, Tenth, and Eleventh Circuits stake out a different test.

"Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." Common issues of fact and law predominate if they "'ha[ve] a direct impact on every class member's effort to establish liability' *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member." If "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)."

<u>Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc.</u>, 601 F.3d 1159, 1170 (11th Cir. 2010)(emphasis in original)(citations omitted).[18] The Eleventh Circuit, however,

_____

[18]The Eleventh Circuit first adopted this test -- relying on district court decisions -- in 2004 in <u>Klay v. Humana, Inc.</u>, 382 F.3d 1241 (11th Cir. 2004) and gave renewed articulations of the test in 2009 in <u>Vega v. T-Mobile USA, Inc.</u>, 564 F.3d 1256 (11th Cir. 2009) and in 2010 in <u>Sacred Heart Health Systems, Inc. v. Humana Healthcare Services, Inc.</u> In each case, the Eleventh Circuit made some reference to additionally adopting a Fifth Circuit rule-of-thumb test:

An alternate formulation of this test was offered in <u>Alabama v. Blue Bird Body Co.</u>, 573 F.2d 309 (5th Cir. 1978). In that case, we observed that if common issues truly predominate over individualized issues in a lawsuit, then "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered." Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important. <u>Alabama v. Blue Bird Body Co.</u>, 573 F.2d at 322 ("If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present."). If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced

imposes a different, more rigorous, second step: the district court's trial plan must spend more

time adjudicating the common questions than it does adjudicating the individual questions.  The

Eleventh Circuit's test may not be the greatest -- the Court sees little reason why negative-value

cases that can be fairly and efficiently adjudicated via class action should not be certified[19] -- but

_____

by the plaintiffs as a whole relatively undisturbed, then common issues are likely
to predominate.

Klay v. Humana, Inc., 382 F.3d at 1255.  See Sacred Heart Health Sys., Inc. v. Humana Military
Healthcare Serv., Inc., 601 F.3d at 1170 ("In practical terms, while '[i]t is not necessary that all
questions of fact or law be common,' 'the addition or subtraction of any of the plaintiffs to or
from the class [should not] have a substantial effect on the substance or quantity of evidence
offered.'"); Vega v. T-Mobile USA, Inc., 564 F.3d at 1270 (quoting the above portion of Klay v.
Humana, Inc.).

The Fifth Circuit, however, was not setting forth a test for when predominance is satisfied
so much as a test for when an issue is common versus individualized.  The Fifth Circuit's full
quote -- without the Eleventh Circuit's alterations -- is:

We only point out that in a situation wherein one seeks to represent a nationwide
class in order to obtain redress for harm done from a nationwide conspiracy
consideration should be given to whether the addition or subtraction of any of the
plaintiffs to or from the class will have a substantial effect on the substance or
quantity of evidence offered.  If such addition or subtraction of plaintiffs does
affect the substance or quantity of evidence offered, then the necessary common
question might not be present.

State of Alabama v. Blue Bird Body Co., Inc., 573 F.2d at 322 (emphasis added)(footnote
omitted).

[19]In fairness to the Eleventh Circuit, Judge Posner's test merges the predominance and
superiority inquiries -- effectively reading out predominance -- in negative-value cases.  Thus,
the Eleventh Circuit's test is truer to rule 23's text than Judge Posner's.  "Predominate," the word
that rule 23 uses, means "[t]o be of greater power, importance, or quantity; be most important or
outstanding."  The American Heritage Dictionary of the English Language 1032 (William Morris
ed., New College ed. 1976)(emphasis added).  Rule 23's text thus arguably suggests a direct
comparison of common and individual issues, and not -- as Judge Posner suggests -- an indirect
comparison that decides the predominance question on the basis of a fancy economic analysis.
There are, however, two other rule 23 provisions whose impact on predominance is not often
discussed: (i) the issue class-action clause, see Fed. R. Civ. P. 23(c)(4) ("When appropriate, an
action may be brought or maintained as a class action with respect to particular issues."); and
(ii) the subclassification clause, see Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be
divided into subclasses that are each treated as a class under this rule.").  These provisions are

indeed unfortunate for those who wish to read rule 23 as containing the seeds of its own destruction. Rule 23(c)(4) allows for adjudication of common issues, even if these issues do not add up to a common claim. Rule 23(c)(5) allows for collective adjudication, even if it falls short of being completely "classwide" adjudication. Judge Posner's test explicitly admits of subclasses and issue classes. Even if it had not allowed for these classes, their impact in Judge Posner's analysis would be obvious: the district court uses the tools of subclassification and issue classification -- along with other management tools, such as polyfurcation -- to design a class-action management plan, and then decide whether the plan is more or less efficient than separate trials.

The impact that these provisions have on the Eleventh Circuit's approach is less clear. The Eleventh Circuit's best discussion of subclasses comes from <u>Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.</u>:

> [W]e cannot accept the district court's proposal to use subclasses corresponding to the hospitals' six categories of payment clauses. We recognize the long and venerated practice of creating subclasses as a device to manage complex class actions, but the six subclasses proposed here mask a staggering contractual variety. The sixth proposed subclass -- a miscellaneous residue of numerous payment clauses that are insusceptible of ready classification -- alone is fatal to predominance. When this "potpourri" subclass, as Humana has termed it, is broken down into its disparate component parts, the illusion of uniformity gives way to nearly thirty subclasses.

> Common sense tells us that "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate," <u>Manual for Complex Litigation</u> § 21.23 (4th ed. 2004); <u>see also</u> <u>Harding v. Tambrands Inc.</u>, 165 F.R.D. 623, 630 (D. Kan. 1996)("The potential for numerous different subclasses weighs against a finding of predominance of common issues."). Here, the necessary recourse to a "miscellaneous" subclass readily indicates the lack of a predominant question.

> Ultimately, after examining the many individualized payment clauses contained in the network agreements, we perceive a "distinct possibility that there was a breach of contract with some class members, but not with other class members." Subclasses are no answer to this problem, meaning that the efficiency of a class action will be lost entirely unless the hospitals are allowed "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights. The hospitals, however, may not lawfully "amalgamate" their disparate claims in the name of convenience. The Rules Enabling Act, 28 U.S.C. § 2072 -- and due process -- prevents the use of class actions from abridging the substantive rights of any party. Yet, from the record before us, an abridgment of the defendant's rights seems the most likely result of class treatment. By glossing over the striking differences in the material terms of the agreements, the district court created an "unnecessarily high risk," of such unlawful results, and thereby abused its

discretion.

601 F.3d at 1176 (citations omitted).  These statements imply that, but for the sixth "category" of payment clauses -- really a catchall for all contracts that did not fit into one of the five real categories -- the class would be certifiable.  The only "abridgement of the defendant's rights" that the district court's plan would produce would be the "'amalgamat[ion]'" of different contractual language into a single category -- the sixth category.  601 F.3d at 1176.  That case, thus, leaves open the question whether subclassification and issue certification can aid in satisfying predominance, or if these techniques are separate from the predominance inquiry.

The Fifth Circuit staked out a clear answer to this question in its much-discussed Castano v. American Tobacco Co. case, deciding the issue in a way one might expect:

> Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action.  A district court cannot manufacture predominance through the nimble use of subdivision (c)(4).  The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.  Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

84 F.3d at 745 n.21 (citations omitted).  This logic is hardly unassailable.  Namely, the result of reading rules 23(c)(4) and (c)(5) as bearing on the predominance inquiry would <u>not</u> be "automatic certification in every case where there is a common issue," because superiority must still be satisfied.  Castano v. American Tobacco Co., 84 F.3d at 745 n.21.  If a proposed class action is superior -- <u>e.g.</u>, if it lacks the value to be brought on an individual basis -- and individual issues can be pared away via rules 23(c)(4) and (c)(5) then it is not clear why certification "could not have been intended" by the rule.  Castano v. American Tobacco Co., 84 F.3d at 745 n.21.  Moreover, it is a poor reading of the rule's text.  Presumably, even if rules 23(c)(4) and (c)(5) are mere "housekeeping rule[s]," they would still alleviate "likely difficulties in managing a class action."  Castano v. American Tobacco Co., 84 F.3d at 745 n.21; Fed. R. Civ. P. 23(b)(3)(D).  Because rule 23 directs that "[t]he matters pertinent to these findings [predominance and superiority] include: . . . the likely difficulties in managing a class action," the Court, if it were writing on a clear slate would think that rules 23(c)(4) and (c)(5) would play a part in the predominance determination, Fed. R. Civ. P. 23(b)(3), and that this result thus "could not have been intended."  Castano v. American Tobacco Co., 84 F.3d at 745 n.21.

The Fifth Circuit's approach attracted the adherence of a revered jurist on the Fourth Circuit -- although not the Fourth Circuit itself.  The Honorable Paul V. Niemeyer, United States Circuit Judge for the Fourth Circuit, endorsed the Fifth Circuit's view in an opinion concurring in part and dissenting in part from an opinion in which the Fourth Circuit adopted the opposing view:

> Despite the overwhelming predominance of these individualized issues and claims over the common issue that the majority now certifies for class

_____

treatment, the majority has adopted an inventive approach to Rule 23 that allows certification of a class where the predominance requirement of Rule 23(b)(3) is admittedly unmet in the context of the case as a whole. According to the majority, to require the certified issue in this case to predominate over the individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3). In doing so, the majority glorifies Rule 23(c)(4)(A) -- a housekeeping rule that authorizes a court to certify for class treatment "particular issues" in a case that otherwise satisfies Rule 23(a) and 23(b) -- with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s requirements no longer need be applied to "[a]n action," see Fed. R. Civ. P. 23(b), but rather to any single issue, no matter how small.

Not only does the majority's approach expand Rule 23 beyond its intended reach, but it also creates a direct conflict with the Fifth Circuit which has held:

> A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.

Castano v. American Tobacco Co., 84 F.3d 734, 745 n.21 (5th Cir. 1996).

Gunnells v. Healthplan Servs., Inc., 348 F.3d at 446-47. Despite Judge Niemeyer's concern with creating a Circuit split, the Second Circuit, the Ninth Circuit, and, of course, the Seventh Circuit have all held that subclasses can be used to satisfy predominance concerns since at least 2001, two years before Gunnells v. Healthplan Services, Inc. See Zinser v. Accufix Research Inst., Inc. 253 F.3d at 1189-90, 1192 n.8. See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001); Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999).

The Eleventh Circuit has refrained from taking a side on this question:

> Some have been critical of the piecemeal certification of class action status for claims within a case. See Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., dissenting)(arguing that the predominance requirement in Fed. R. Civ. P. 23(b) applies to the action as a whole, not to individual subclasses or claims); Castano v. Am. Tobacco Co., 84 F.3d 734, 745 n. 21 (5th Cir. 1996)("The proper interpretation of the interaction between [Fed. R. Civ. P. 23] subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial."). We did not directly address the propriety of such partial certification in Klay.

- 75 -

it is commendable in that it is a test that district courts can use, rather than yet another meaningless recitation, see CGC Holding Co. LLC v. Broad & Cassel, 773 F.3d 1076 (10th Cir. 2014)("[T]he predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues." (quoting Newberg § 4:49)), circular axiom, see, e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."), obvious guidepost, see Reed v. Bowen, 849 F.2d at 1309 ("Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'"), self-evident comparison, see Monreal v. Potter, 367 F.3d at 1237 ("[T]he predominance criterion of Rule 23(b)(3) [i]s 'far more demanding' tha[n] the Rule 23(a) commonality requirement[.]" (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24)), or worthless slogan, see Marcus v. BMW of N. Am., LLC, 687 F.3d at 600 (exhorting district courts to examine claims "'through the prism' of Rule 23(b)(3)").

---

Borrero v. United Healthcare of N.Y., Inc., 610 F.3d 1296, 1310 n.5 (11th Cir. 2010)(alterations in original).  The Tenth Circuit also appears to have refrained from taking a side:

> Plaintiffs urge us to consider a "hybrid" certification whereby the liability stage might be certified for class treatment under Rule 23(b)(2) even if the damages stage does not qualify for such treatment.  See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001).  Compare Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL-CIO, 216 F.3d 577, 581 (7th Cir. 2000), and Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999), with Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420-22 (5th Cir. 1998).  We do not need to rule on a hybrid possibility because in the instant case, the liability stage does not satisfy either Rules 23(b)(2) or 23(b)(3).  The district court's ruling that plaintiffs did not allege a sufficient policy, practice or pattern of discrimination to warrant class treatment for liability determination is not an abuse of discretion.

Monreal v. Potter, 367 F.3d at 1237 n.12 (Ebel, J.).

The Tenth Circuit followed the Eleventh Circuit's approach in <u>CGC Holding Co., LLC v. Broad and Cassel</u>.

> Predominance regularly presents the greatest obstacle to class certification, especially in fraud cases. Accordingly, the issues disputed in this case are not unusual. And given our obligation to ensure that the district court did not err in conducting its rigorous analysis, we must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate. Here, that task requires us to survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not. Stated another way, consideration of how the class intends to answer factual and legal questions to prove its claim -- and the extent to which the evidence needed to do so is common or individual -- will frequently entail some discussion of the claim itself.

> In this context, it is worth reiterating that our review on appeal is limited. For the purposes of class certification, our primary function is to ensure that the requirements of Rule 23 are satisfied, not to make a determination on the merits of the putative class's claims. But it is impractical to construct "an impermeable wall" that will prevent the merits from bleeding into the class certification decision to some degree. So, although class certification does not depend on the merits of the suit, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims."

> With these legal principles in mind, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." For this limited purpose, we consider the proposed class's claim for a RICO conspiracy.

**3.      Oil-and-Gas Class Actions.**

Oil-and-gas wells are often drilled on land owned by entities or individuals other than the oil company that performs the drilling. The landowners execute mineral leases or deeds with the oil companies, dividing the estate up into a royalty interest, which the landowner-lessor owns, and a working interest, which the oil company-lessee owns. The lessee builds wells on the leased land and connects them to a gathering system -- a system of small pipelines that collect oil and gas from a large number of wells in a region -- which then carries it to a plant for treatment or processing. When the lessee sells the oil or gas, it then pays the lessors a fraction of the

proceeds, known as a royalty, which effectively serves as "rent" for the use of the leased land. Royalty owners sometimes contend that their lessees are underpaying their royalty, either by deducting impermissible costs from the proceeds -- a lessee can typically deduct post-production costs, but not production costs, from the sale proceeds before dividing off royalties -- or by paying on an amount that does not reflect the true sale proceeds. The relationship between lessors and lessee is fundamentally a contractual one, but there is also positive law -- case law and statutes -- supplying default terms and contractual gap-fillers. Each lessor's monthly royalty is typically small and, thus, lessors have little practical recourse for royalty underpayment in individual litigation. They will, instead, band together with other landowner-lessors with whom a given oil company-lessor contracts -- often other lessors on a single gathering system or within a region -- and sue the oil company via class action. These class actions have a prodigious history in the state courts, where they were traditionally brought -- because oil-and-gas royalty law is principally state law -- before CAFA's passage. See, e.g., Phillips Petrol. Co. v. Shutts, 472 U.S. at 799. These actions present recurring issues, and, as certification reversals are both more common[20] and more instructive than affirmances, the Court will focus on cases where

---

[20]Before rule 23(f)'s interlocutory-appeal provision was added, the Courts of Appeals could only rule on class certification (i) after a final judgment issued in the case, which, given the class actions' high settlement rate, was rare; or (ii) by way of a writ of mandamus, in which case the Courts of Appeals would not generally issue an opinion unless they granted the writ and ordered decertification. See, e.g., In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293 (7th Cir. 1995). Even now, most circuits interpret rule 23(f) in such a way that they will only hear an interlocutory appeal if it appears the certification decision was erroneous:

> We apply a five-factor test to assess the appropriateness of granting a Rule 23(f) petition. The relevant factors are:

> (1) whether the certification ruling is likely dispositive of the litigation; (2) whether the district court's certification decision contains a substantial weakness; (3) whether the appeal will permit the resolution of an unsettled legal question of general importance;

appellate courts concluded that a proposed class failed to satisfy rule 23's requirements.  But see

Karen E. Kahle & Denielle M. Stritch, Grouping the Marcellus Payout: Use of Class Actions in

Royalty Litigation Concerning Post-Production Cost Deductions, 88 N.D. L. Rev. 699 (2012).

The Tenth Circuit's only cases on rule 23(a) and (b)(3)'s application to oil-and-gas

royalty cases[21] came in two companion cases issued on July 9, 2013, Roderick and Chieftain

_____

> (4) the nature and status of the litigation before the district court
> (such as the presence of outstanding dispositive motions and the
> status of discovery); and (5) the likelihood that future events will
> make appellate review more or less appropriate.

> We consider these factors on a holistic basis, but the court should grant the
> petition, notwithstanding the other factors, "[w]here a district court's certification
> decision is manifestly erroneous and virtually certain to be reversed on appeal."

EQT Prod. Co. v. Adair, 764 F.3d 347, 356-57 (4th Cir. 2014)(citations omitted).  These
standards -- rule 23(f) and, formerly, the mandamus standard -- result in the Courts of Appeals
appearing to reverse a higher proportion of class certifications that they actually do.  A district
court's decision to certify a class or deny certification is reviewed for abuse of discretion.  See
Vallario v. Vandehey, 554 F.3d 1259, 1264 (10th Cir. 2009).

[21]Unsurprisingly, given that the Tenth Circuit's geographic footprint encompasses such
oil-rich states as Oklahoma, New Mexico, and Colorado, the Tenth Circuit has dealt with a
number of other oil-and-gas royalty class actions, but those cases addressed questions other than
the front-end certification inquiry.  See, e.g., Eatinger v. BP Am. Prod. Co., 528 F. App'x 859
(10th Cir. 2013)(unpublished)(McKay, J., joined by Kelly & Matheson, JJ.)(holding that the
execution of a class-action settlement mooted the appeal of royalty owners who had been
excluded from the class definition); Abraham v. BP Am. Prod. Co., 685 F.3d at 1196 (Kelly, J.,
joined by Murphy & Hartz, JJ.)(reversing, after a class-action trial, the district court's decisions
to admit evidence of the defendant's transition to a uniform same-as-fed payment methodology
and to grant judgment as a matter of law on two lease forms); Pelt v. Utah, 539 F.3d 1271 (10th
Cir. 2008)(Robinson, J., joined by Murphy & Lucero, JJ.)(holding that plaintiffs were not bound
by conclusions in a prior class action to which they were not parties); Elliott, 407 F.3d at 1091
(Murphy, J., joined by Seymour & McKay, JJ.)(making a number of substantive holdings and
ruling that an intervention was timely and proper); S. Ute Indian Tribe v. Amoco Prod. Co., 151
F.3d 1251 (10th Cir. 1998)(en banc)(Seymour, C.J.)(holding that Indian tribes that owned
mineral rights in coal also owned the rights to the accompanying coalbed methane), rev'd by 526
U.S. 865; Craig v. Champlin Petrol. Co., 435 F.2d 933, 939 (10th Cir. 1971)(overturning the
district court's clearly erroneous factual finding that "a market exists for . . . gas in 1965 at the
contract price established in 1960").

Royalty Co. v. XTO Energy, Inc., 528 F. App'x 938 (10th Cir. 2013)(unpublished),[22] which were

both written by the Honorable Paul J. Kelly, Jr.,[23] United States Circuit Judge for the Tenth

Circuit, and joined by the Honorable Scott M. Matheson, Jr.,[24] United States Circuit Judge for

the Tenth Circuit, and the Honorable Monroe G. McKay, Senior United States Circuit Judge for

the Tenth Circuit. In Roderick, a class of individuals owning interests in a total of roughly 650

leases and over 300 wells across ten well fields in Kansas brought a class action against XTO

Energy for breach of contract, unjust enrichment, and an accounting. See 725 F.3d at 1215. The

district court certified the class on the basis of a single common issue, "whether XTO's uniform

---

[22]Chieftain Royalty Co. v. XTO Energy, Inc. is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that Chieftain Royalty Co. v. XTO Energy, Inc., as well as Skinner v. Uphoff, 175 F. App'x 255 (10th Cir. 2006), Baldauf v. Garoutte, 137 F. App'x 137 (10th Cir. 2005), Laboratory Corp. of America Holdings v. Metabolite Laboratories, Inc., 410 F. App'x 151 (10th Cir. 2011), and In re Kahn, 133 F.3d 932 (10th Cir. 1998), all have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[23]Judge Kelly is a subject-matter expert in oil-and-gas law, having practiced for many years with one of New Mexico's oldest firms, the vaunted Hinkle Firm, now Hinkle Shanor LLP, in Roswell and Santa Fe, New Mexico, known for its representation of oil companies.

[24]Westlaw lists the third member of the panel as being the Honorable Charles E. Matheson, then-Chief United States Bankruptcy Judge for the District of Colorado. The Court thinks it more likely that the Judge Matheson on the panel was the Tenth Circuit judge, because: (i) the official published opinion states that the case is "[b]efore Kelly, McKay, and Matheson, Circuit Judges"; and (ii) the Court does not believe that Article I judges can, or do, sit on federal appellate panels.

payment methodology breached the implied duty of marketability under Kansas law," which the district court deemed to predominate over individual issues.  725 F.3d at 1217.  On appeal, the Tenth Circuit decertified the class on two grounds.

First, the Tenth Circuit stated that the district court had failed to consider variations in lease language at all, relying instead on the implied duty of marketability.  See 725 F.3d at 1216.  This failure constituted an abuse of discretion, because the duty of marketability obtains only "[a]bsent a contract providing to the contrary," and, thus, can be negated by express lease language.  725 F.3d at 1216 (alteration in original)(quoting Sternberger v. Marathon Oil Co., 894 P.2d 788, 800 (Kan. 1995)).  The plaintiffs had not reviewed any of the class leases, and XTO Energy reviewed only one-fifth of them, categorizing them by royalty type, "several of which negate[d] the IDM [implied duty of marketability] completely or in part (i.e., by providing for certain express deductions)."  725 F.3d at 1216.  Second, the Tenth Circuit held that applying Kansas' implied duty to market requires determining the point at which gas from each well becomes marketable, declaring that "[o]nce gas is in marketable condition, the IDM is satisfied -- regardless of whether a market exists at that location . . . [and] gas may be marketable *at the well*."  725 F.3d at 1219 (emphasis in original).  Importantly, the Tenth Circuit did not hold that the class could not be certified, and, to the extent that the Court reads such things into judicial opinions, it implied the opposite.  Rather, it held that the district court's inquiry -- and the form in which it certified the class -- was inadequate, and gave the district court multiple leads for conducting a new rule 23 analysis on remand.  See 725 F.3d at 1219 ("On remand, the [plaintiffs] could, for example, create a chart classifying lease types, and although we express no opinion as to the merits, the district court could decide that no lease type negates the IDM." (citing Foster v. Merit Energy Co., 282 F.R.D. 541, 551 n.12 (W.D. Okla. 2012))); id. at 1219

("On remand, the district court should consider whether and to what extent marketability affects commonality." (footnote omitted)).

In the unpublished companion case, Chieftain Royalty v. XTO Energy, Inc., the Tenth Circuit applied Roderick's holding to a much larger class action composed of lessors for 14,300 leases and 2,300 wells in Oklahoma. See 528 F. App'x at 940. Again, Judge Kelly noted that "approximately 13,568 leases have yet to be examined by XTO Energy -- let alone by Chieftain or the district court," and that this omission was "particularly significant because unlike the plaintiff in Roderick, Chieftain admits that some leases expressly abrogate -- and one even negates -- the IDM." 528 F. App'x at 942-43. Judge Kelly added one interesting elaboration on the Roderick holding:

> [T]he district court acknowledged the significance of lease language variations when it stated that "the express terms of the various leases will necessarily have to be evaluated . . . to determine whether the [IDM] has been abrogated." However, the district court decided the issue was "capable of resolution at the summary judgment stage of this litigation."
>
> To be sure, the legal effect of lease language is a merits question that is likely "capable of resolution at the summary judgment stage." However, it is also an issue that bears directly on Rule 23's criteria. As the Supreme Court has emphasized, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims." Therefore, the district court must address the lease language issue as it relates to Rule 23 *before* certifying the class.

528 F. App'x at 942 (alteration in original)(emphasis in original)(citations omitted).

Other Circuits have also analyzed oil-and-gas royalty class actions, although, the Tenth Circuit did not cite any of them in the companion cases discussed above. The Court suspects that the Tenth Circuit did not want to rely too heavily on cases issued before Wal-Mart. One influential case that discusses rule 23's application to oil-and-gas royalty cases in the post-Wal-Mart era is EQT Production Co. v. Adair. The Honorable Albert Diaz, United States Circuit

Judge for the Fourth Circuit, joined by the Honorable J. Harvie Wilkinson III and Barbara M. Keenan, United States Circuit Judges for the Fourth Circuit, vacated a district court's certification of five closely related oil-and-gas royalty class actions and remanded them for further analysis.  See 764 F.3d at 352.  That case was primarily about mineral-rights ownership -- namely, whether certain coal-rights owners also held title to the coalbed methane under the leased premises -- but it also addressed royalty underpayments.  See 764 F.3d at 347-365 (addressing the coalbed methane ownership issue).  Judge Diaz pointed out three individual issues that the district court failed to consider and that weighed against predominance.  First, the case addresses the issue of intra-class variations in lease language; the Fourth Circuit's rationale parallels the Tenth Circuit's, going into more detail in some areas:

> [T]he mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement. The predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation.  Even a plethora of identical practices will not satisfy the predominance requirement if the defendants' common conduct has little bearing on the central issue in the litigation -- in this case, whether the defendants underpaid royalties.  Absent such a relationship, there is no basis for concluding that individual issues will not predominate.

> We believe the district court placed an inordinate emphasis on the sheer number of uniform practices without considering whether those practices are relevant to assessing the defendants' ultimate liability.  Some of the common practices that the district court identified -- e.g., the fact that EQT sold all of its CBM into one of two interstate pipelines -- have little relevance to the validity of the defendants' royalty payment practices.

> The district court did identify common practices that may be pertinent to the predominance inquiry -- e.g., the fact that "EQT calculated all royalties based on the same methodology."  But the district court's analysis fell short because it never analyzed why those common practices were sufficient to ensure that the class members' common issues would predominate over individual ones.

> The defendants have highlighted a number of uncommon practices that might cause individual issues to predominate.  For example, EQT notes that it calculates royalties in different ways for different class members, depending on

where the CBM is produced. Its method of calculating royalties -- and the deductions it applies -- have also changed over time. CNX submitted evidence that it takes different deductions depending on where it sells the CBM, and that its deduction calculations sometimes vary between and even within wells during different time periods.

764 F.3d at 366-67 (citations omitted). These statements support the Court's conclusion that the predominance inquiry is neither a quantitative inquiry comparing the number of common questions to the number of individual questions, nor a cursory inquiry asking whether the defendants generally subjected the class members to the same factual treatment by the defendants or whether their claims are subject to the same legal standard. Rather, it is a manageability inquiry that requires the Court to determine whether common legal issues, susceptible to common evidence, exist in the right places to try the case in a way that is fair to all parties. Second, the Fourth Circuit pointed out that the district court would "likely need to consider" course-of-performance evidence. 764 F.3d at 370-71. Third, it stated that "the district court should reevaluate the implications of the defendants' statute of limitations defense for Rule 23's predominance requirement." 764 F.3d at 371. The plaintiffs' claims were facially time-barred, but they pled fraudulent concealment to toll the statute, and the Fourth Circuit held that, "[a]lthough a defendant's conduct is not irrelevant, attention must also be paid to the plaintiff's knowledge and actions," and, "[i]n this context, a plaintiff's knowledge typically requires individual evidence." 764 F.3d at 370.

After determining that the facts that oil-and-gas companies engaged in numerous common practices may be sufficient for commonality purposes, the Fourth Circuit in EQT Production Co. v. Adair made it clear that such common practices are not enough to satisfy the predominance requirement:

But the mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance

- 84 -

requirement. The predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation. See Amchem Prods., 521 U.S. at 623 (noting that the predominance inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy"). Even a plethora of identical practices will not satisfy the predominance requirement if the defendants' common conduct has little bearing on the central issue in the litigation -- in this case, whether the defendants underpaid royalties. Absent such a relationship, there is no basis for concluding that individual issues will not predominate.

We believe the district court placed an inordinate emphasis on the sheer number of uniform practices without considering whether those practices are relevant to assessing the defendants' ultimate liability. Some of the common practices that the district court identified -- e.g., the fact that EQT sold all of its CBM into one of two interstate pipelines -- have little relevance to the validity of the defendants' royalty payment practices.

The district court did identify common practices that may be pertinent to the predominance inquiry -- e.g., the fact that "EQT calculated all royalties based on the same methodology." But the district court's analysis fell short because it never analyzed why those common practices were sufficient to ensure that the class members' common issues would predominate over individual ones.

The defendants have highlighted a number of uncommon practices that might cause individual issues to predominate. For example, EQT notes that it calculates royalties in different ways for different class members, depending on where the CBM is produced. Its method of calculating royalties -- and the deductions it applies -- have also changed over time. CNX submitted evidence that it takes different deductions depending on where it sells the CBM, and that its deduction calculations sometimes vary between and even within wells during different time periods.

. . . .

Although the district court recognized the problem of lease language variation, it did not see it as a barrier to class certification in any of these cases. In our view, however, these variable terms will make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis.

. . . .

Yet, as the defendants note, the district court failed to discuss course of performance evidence entirely.

Second, the district court should reevaluate the implications of the

defendants' statute of limitations defense for Rule 23's predominance requirement.

764 F.3d at 366-68, 70 (footnote omitted)(citation omitted).

The Fourth Circuit, like the Tenth Circuit, never held that the five putative classes were intractably or irredeemably uncertifiable -- just that the district court did not ask all the necessary questions.[25]

> We do not decide today whether the disparate practices identified by the defendants are sufficient to defeat the predominance requirement. On remand, the district court may well conclude that the defendants' common conduct is sufficient to ensure the predominance of common issues over individual ones. But it was an abuse of discretion for the district court to focus only on the number of common practices without considering the significance of the defendants' disparate conduct in the broader litigation.

EQT Prod. Co. v. Adair, 764 F.3d at 367. The case is littered with instructions to the district court for improving its rule 23 analysis on remand. See, e.g., EQT Prod. Co. v. Adair, 764 F.3d at 367 ("We also remand for the district court to . . . consider how variations in the defendants' royalty obligations to the class members implicate the commonality and predominance inquiries in [certain of the five classes]."); 764 F.3d at 371 ("Where the proper balance lies in the superiority analysis we leave to the district court on remand as part of its broader consideration of the other Rule 23(b)(3) factors."). In its conclusion, the Fourth Circuit summed up its holding:

> We ultimately hold that the district court's analysis lacked the requisite

---

[25]Unlike the Tenth Circuit, however, the Fourth Circuit implied that the case might be doomed: "In our view, however, these variable [royalty] terms will make it difficult, if not impossible, for a court to assess the validity of the defendants' royalty payment practices on a classwide basis." EQT Prod. Co. v. Adair, 764 F.3d at 367-68. The Fourth Circuit left open the possibility, however, that the classes might be certifiable: "On remand, after reviewing the leases in this case, the plaintiffs may be able to show that there are a limited number of lease forms, such that the validity of the defendants' conduct can be assessed on a subclass basis." 764 F.3d at 369.

rigor to ensure the requirements of Rule 23 were satisfied by any of the certified classes. On remand, the district court may conclude that one or more subclasses should be certified. It may also find that class certification should be denied entirely. At this point, we only conclude that certification was premature.

We recognize that there are numerous CBM owners in Virginia who haven't received a penny of CBM royalties and others who may have gotten less than their due. We are not unsympathetic to their plight.

But sympathy alone cannot justify certification under Rule 23. We therefore vacate the district court's grant of the plaintiffs' motions for class certification, and remand the case for further proceedings consistent with this opinion

764 F.3d at 371.

## **ANALYSIS**

The Court concludes that: (i) the Plaintiffs may raise a new class definition not in the operative Complaint, because the Tenth Circuit has no controlling opinion, other Courts of Appeals have indicated that such a practice is allowed, and such a practice is sound; (ii) even if the Court bound the Plaintiffs to the class definition in the operative Complaint, rules 16(b)(4) and 15(a) would not bar the Plaintiffs from amending their Complaint; (iii) the Plaintiffs have not previously waived their new class definition even though they previously submitted and withdrew a different class definition; (iv) the proposed class definition is ascertainable, because the Plaintiffs have eliminated the gas processing problem; (v) the proposed class definition does not create commonality because of differences in lease language; and (vi) those same differences in lease language indicate that common issues would not predominate over individual issues. Accordingly, the Court denies the Motion to Amend and the Second Motion for Class Certification.

# I. THE PLAINTIFFS MAY RAISE A NEW CLASS DEFINITION NOT IN THE OPERATIVE COMPLAINT.

The Court concludes that the Plaintiffs need not rely on the class definition in their operative Complaint. District Courts are split on this topic. Some courts have found that "[t]he Court is bound to class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond." Costelo v. Chertoff, 258 F.R.D. at 604. Others have allowed amendment during class certification proceedings and noted "[t]hat this approach is also consistent with Rule 23, which contemplated the amendment of a class certification order prior to judgment." Savanna Group, Inc. v. Trynex, Inc., 2013 WL 66181, at *2-3.

The Tenth Circuit does not have a controlling opinion on this point, although Tenth Circuit language exists that might suggest that a court need not hold a plaintiff to the class definition in the operative complaint. See Carpenter v. Boeing Co., 456 F.3d at 1187 ("The district court can modify or amend its class-certification determination at any time before final judgment in response to changing circumstances in the case.")(citing Fed. R. Civ. P. 23(c)(1)(C)); In re Integra Realty Res., Inc., 354 F.3d at 1261 ("Moreover, a trial court overseeing a class action retains the ability to monitor the appropriateness of class certification throughout the proceedings and to modify or decertify a class at any time before final judgment.")(citing Fed. R. Civ. P. 23(c)(1)).

Other Courts of Appeals have implied that the operative complaint does not bind the plaintiff during class certification. The United States Court of Appeals for the Fifth Circuit has "specifically invited" a district court to reconsider a denial of class certification. Calderon v. Presidio Valley Farmers Ass'n, 863 F.2d at 389. The Second Circuit has similarly noted that a plaintiff could seek to certify a narrower class after the United States Court of Appeals for the Second Circuit upheld the district court's denial of class certification. See In re Initial Public

Offering Sec. Litig., 483 F.3d at 73. The Second Circuit stated that the district court "can be expected to give such a request full and fair consideration." 483 F.3d at 73.

In short, the Tenth Circuit has no controlling opinion on this issue, but other Courts of Appeals have implied that a court need not bind the plaintiff to the class definition in the operative complaint. The Court consequently concludes that the Plaintiffs may submit a new class definition without amending their complaint. This rule is consistent with rule 23(c)(1)(C) which explains that "an order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C).

## II. THE PLAINTIFFS COULD AMEND THEIR COMPLAINT NOTWITHSTANDING RULES 16(B)(4) AND 15(A).

Even if the operative Complaint bound the Plaintiffs to their original class definition, the Court would grant leave to amend their complaint. If a party seeks to amend his or her pleading after the time for seeking leave for pleading amendments has passed under a scheduling order, then he or she must meet rule 15(a)(2)'s requirements and satisfy rule 16(b)(4)'s good-cause requirement. See Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d at 1240 ("After a scheduling order deadline, a party seeking leave to amend must demonstrate (1) good cause for seeking modification under Fed. R. Civ. P. 16(b)(4) and (2) satisfaction of the Rule 15(a) standard."). Rule 16(b)(4) states: "A schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "In practice, this standard requires the movant to show the 'scheduling deadlines cannot be met despite [the movant's] diligent efforts.'" Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d at 1240.

Here, the Plaintiffs have been "diligent." The Defendants argue that the "Plaintiffs tender this new [class] definition nearly three years after they first learned of their ascertainability problem and more than two years after the parties completed extensive discovery and a multi-day

hearing premised on the [original class] definition." Response to Motion 2 at 7. This statement, however, leaves out the key fact that the Plaintiffs did not propose a new class definition until after the Court announced <u>Abraham</u>. "Until the Court filed [<u>Abraham</u>] on August 16, 2016, plaintiffs reasonably believed that this case would be certified. There was no reason for plaintiffs to file additional motions addressed to the certification issues until the Court announced its decision." Reply 2 at 2. In other words, rule 16(b)(4)'s "diligence" requirement does not mean that plaintiffs must be clairvoyant and preemptively file a new class certification motion. That the Plaintiffs did not propose a new class definition until after the Court rejected the original one does not demonstrate lack of diligence.

Similarly, rule 15(a) would not prevent the Plaintiffs from hypothetically re-filing an amended complaint. Rule 15(a) provides that a party may amend his or her pleading as a matter of right within twenty-one days of serving it and within twenty-one days of the service of a response pleading. <u>See</u> Fed. R. Civ. P. 15(a). Otherwise, the party must obtain the opposing parties' consent or the court's leave -- which should be "freely give[n] . . . when justice so requires" -- to amend his or her pleading. The Supreme Court has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given. <u>Foman v. Davis</u>, 371 U.S. at 182.

Here, the Defendants object that the Plaintiffs have unduly delayed amending their class definition, and that an amended class definition would unduly prejudice the defendants. <u>See</u> Response to Motion 2 at 7. Neither of these allegations are correct. First, the same reasoning described above regarding the rule 16(b)(4)'s "diligence" requirement applies to the Defendants'

undue delay allegation.  The Defendants protest that the Plaintiffs waited to submit a new class definition until after the parties retained experts, briefed the original class definition, completed discovery, and had a hearing.  <u>See</u> Response to Motion 2 at 8.  The Plaintiffs waited, however, because the Court had yet to issue an opinion rejecting their original class definition before submitting a new one. Like the rule 16(b)(4) diligence requirement, the rule 15(a) undue delay defense does not require the Plaintiffs to predict how a court will rule on a pending motion.

Similarly, the Defendants would not suffer undue prejudice if the Court hypothetically allowed an amended complaint.  The Defendants argue that they "have been litigating this class certification under the operative class definition for over four years . . . Defendants tailored their arguments and evidence to that definition."  Response to Motion 2 at 8.  "Now, after four years of vigorous and expensive litigation culminating in the denial of their motion, Plaintiffs come forward with a new class definition."  Response to Motion 2 at 8.  The Defendants contend that "[c]ompelling Defendants to re-litigate certification under this new definition would be manifestly unfair."  Response to Motion 2 at 8-9.  In other words, the Defendants are proposing a rule saying that a plaintiff attempting to certify a class only gets one opportunity to do so if the litigation is sufficiently long and expensive.  No such rule exists or should exist.  The Court should try to get its decision right, and if the Court is convinced -- notwithstanding its earlier determinations -- that a class action is the appropriate vehicle to litigate a set of claims, then the Court should certify the class notwithstanding its earlier determinations.  "Courts typically find prejudice only when the amendment unfairly affects the defendants in terms of preparing their defense to the amendment.  Most often, this occurs when the amended claims arise out of a subject matter different from what was set forth in the complaint and raise significant new factual issues."  <u>Minter v. Prime Equipment Co.</u>, 451 F.3d 1196, 1208 (10th Cir. 2006).  Here,

however, the Plaintiffs propose a new class definition based on the same "subject matter" and on the same facts as in Abraham.

Further, the Fifth Circuit has "specifically invited" a district court to reconsider a denial of class certification. Calderon v. Presidio Valley Farmers Ass'n, 863 F.2d at 389. The Second Circuit has similarly noted that a plaintiff could seek to certify a narrower class after the Second Circuit upheld the district court's denial of class certification. See In re Initial Public Offering Sec. Litig., 483 F.3d at 73. The Second Circuit stated that the district court "can be expected to give such a request full and fair consideration." 483 F.3d at 73. The suggestion that the Plaintiffs should only get one opportunity to submit a class definition is therefore incorrect. Accordingly, even if the Court required the Plaintiffs to amend their complaint, there would be no undue delay, and the Defendants would not suffer undue prejudice.

## III.     THE PLAINTIFFS DID NOT WAIVE THEIR NEW CLASS DEFINITION.

The Court concludes that the Plaintiffs did not waive their new class definition. The Tenth Circuit has noted, in the context of waiver on appeal, that "if the theory was intentionally relinquished or abandoned in the district court, we usually deem it waived and refuse to consider it." Richision v. Ernest Group, Inc., 634 F.3d 1123, 1127 (10th Cir. 2011)(Gorsuch, J.). "Waiver occurs when a party deliberately considers an issue and makes an intentional decision to forgo it." United States v. Cruz-Rodriguez, 570 F.3d 1179, 1183 (10th Cir. 2009).

The Defendants reference a proposal to change the class definition that the Plaintiffs made during oral argument related to Abraham. See Response to Motion 1 at 6. Specifically, the Plaintiffs stated at oral argument: "[W]e also propose that the class definition speak to the gas and liquids processed at the various plants, or if not processed, the gas is or has been allocated natural gas liquids . . . ." Response to Motion 1 at 6 (citing Abraham, 317 F.R.D. at

216)(emphasis in original)). The Defendants allege that "the sole reason counsel offered [for this class definition] mimics the current one," in other words, mimics the current reason that the Plaintiffs have offered their new class definition. Response to Motion 1 at 6. That reason, according to the Defendants, is so that the class definition would "encompass all royalty and overriding royalty owners injured by the defendants' 'keep-whole' royalty payment methodology." Response to Motion 1 at 6. The Defendants conclude that, because the Plaintiffs, at oral argument, proposed a class definition for the <u>same reason</u> that they propose the new class definition at issue in this motion, and subsequently withdrew the former one, the Plaintiffs have waived their new class definition. <u>See</u> Response to Motion 1 at 7.

This argument is incorrect. According to the Tenth Circuit, "[w]aiver occurs when a party deliberately considers an issue and makes an intentional decision to forgo it." <u>United States v. Cruz-Rodriguez</u>, 570 F.3d at 1183. Here, the Plaintiffs submitted two different class definitions, the one they orally submitted and withdrew, and the one presently at issue. That the Plaintiffs submitted the former definition for the same <u>reason</u> that they submit the current one does not change the fact that the two class definitions themselves are different. In other words, the plaintiffs did not "deliberately consider[] an issue and make[] an intentional decision to forgo it"; rather, the Plaintiffs submitted two issues, namely, two class definitions, for the Court to consider, albeit for the same underlying reason. <u>United States v. Cruz-Rodriguez</u>, 570 F.3d at 1183. The Plaintiffs did not, therefore, waive their current class definition.

## IV.     **<u>THE PROPOSED NEW CLASS IS ASCERTAINABLE.</u>**

The Court concludes that the new class definition solves the ascertainability problem. Rule 23(c) requires the Court to "define the class and the class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(1)(B). Specifically, the Court must include "a readily discernible, clear, and

precise statement of the parameters defining the class or classes to be certified." Wachtel v. Guardian Life Ins. Co., 453 F.3d 179, 187 (3d Cir. 2006). Another "essential" prerequisite to a rule 23(b)(3) class action is that the "class must be currently and readily ascertainable based on objective criteria." Marcus v. BMW of N. Am., LLC, 687 F.3d at 592-93. See EQT Prod. Co. v. Adair, 764 F.3d at 358 ("A class cannot be certified unless a court can readily identify the class members in reference to objective criteria.").

A key reason why the original class is not ascertainable is:

> The Plaintiffs did not identify by a preponderance of the evidence which leases' gas is or has been processed at the named processing plants, and therefore, which interests burdening leases and wells are part of the Plaintiffs' proposed class. The Plaintiffs assumed that, when a contract named a delivery point for the gas, the gas would be processed at that plant. The Defendants demonstrated, however, that a well's contractual dedication to a particular plant does not determine whether the well's gas flows to that plant . . . Gas from a well may not flow to the plant associated with the gathering system to which the well is connected.

Abraham, 317 F.R.D. at 255 (internal citations omitted). The new class definition solves this processing problem. Unlike the old putative class, which the plaintiffs define based on "where the oil or natural gas produced from the leases was delivered to [enumerated processing plants]," the new class definition is based on people "whose royalty and overriding royalty has been calculated on a 'keep-whole' method omitting payment on the value of the processed natural gas liquids portion of the production." Abraham, 317 F.R.D. at 184; Motion to Amend at 5. Under the new class definition, "the class members can be identified without regard to where their gas was processed." Motion to Amend at 6. More important, "[t]he class is limited to those owners who are paid on the keep whole methodology. WPX records provide a database which can identify the class members. WPX records show which owners' interests apply to production on the WFC system and are paid on the keep-whole methodology." Motion to Amend at 6. The Defendants do not specifically deny that they have such records. See Response to Motion 2 at

11-12.  Instead, the Defendants protest that the new class definition is still "tied to a demand for payment on processed NGLs."  Response to Motion 2 at 12.  The keep-whole methodology identifies, however, "those class members whose gas is processed."  Reply 2 at 7.  Because the Defendants appear to have records showing who they pay on the keep-whole methodology, there is  "a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified."  Wachtel v. Guardian Life Ins. Co., 453 F.3d at 187.  Accordingly, the Court concludes that the new class definition is ascertainable.

## V.    THE NEW CLASS DEFINITION DOES NOT MEET THE COMMONALITY REQUIREMENT.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2) (emphasis added).  The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in Wal-Mart, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer.  See Wal-Mart, 131 S. Ct. at 2550-52.  In Wal-Mart, Justice Scalia stated: "Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay."  131 S. Ct. at 2546.  From this observation, he then concluded:

> Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims.  And because the necessity of that litigation will prevent backpay from being "incidental" to the classwide injunction, respondents' class could not be certified even assuming, arguendo, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

Wal-Mart, 131 S. Ct. at 2561.  Thus, the common question or questions cannot be "incidental" nor can the plaintiff submit a long list of "incidental" questions or issues, and say that they predominate over the real issues to be used.

Here, the Plaintiffs have moved the Court to certify claims for royalty underpayment, breach of contract, breach of the duty of good faith and fair dealing, breach of the implied covenant to market, and civil conspiracy  See Motion to Amend at 27; Second Motion for Class Certification at 13.  The Court will address each claim in light of the commonality requirement.

**1.      Both the Royalty-Underpayment Claim and Breach-of-Contract Claim Lack Commonality.**

Previously, the Court held that the underpayment and breach-of-contract claims did not meet the commonality requirement. See Abraham, 317 F.R.D. at 260-61.  The Court ruled, regarding the keep-whole method, that "this uniform policy, which calculates and pays the class' royalties without regard to variations in lease language, is a common issue."  Abraham, 317 F.R.D. at 260.  However, "to determine whether royalty agreements require payment on all production in the method that the Plaintiffs seek, the Court must ask the question as to each of the different lease forms. The question, therefore, is not common to all proposed class members." Abraham, 317 F.R.D. at 261.  Under the new class definition, the leases still have varying language.

> Category A consists of leases that pay royalty on the basis of "market value at the well" or "market price at the well," and includes 120 leases . . .  Category C includes leases that pay on "proceeds, as such," and includes 210 leases. Category D contains a lone lease that pays on "gross proceeds," with no reference to the well or mouth of the well, and no indication that it should be paid on net proceeds.  Category E also includes a single lease that pays on "net proceeds at the well." . . .  Category G includes those leases that pay on the "market value at the well of the gas sold or used, provided that on gas sold, the market value shall not exceed the amount received for such gas computed at the mouth of the well," and contains 78 leases.  Category H includes those leases that pay on "market value at the well if sold or used to manufacture products," after "deducting post-production costs," and includes 23 leases.  Finally, category I consists of leases that pay based on "gross proceeds received for gas sold, used off the premises or in the manufacture of products therefrom, but in no event more than the actual amount received," and includes 34 leases.

Abraham, 317 F.R.D. at 274-75.  The Plaintiffs urge that all of these leases can be primarily

grouped into only two categories, namely, "proceeds" leases and "market value" leases.  See

Motion to Amend at 20.  The Court concludes that this is an oversimplification of lease

language.  First, the Plaintiffs actually propose three categories of leases and not two.  The

Plaintiffs assert that "[t]he new class definition includes only those owners paid under proceeds

(gross and net) leases and market value leases . . . [G]ross proceeds owners are all similarly

situated.  Net Proceeds owners are all similarly situated.   Market value owners are all similarly

situated."  Reply 2 at 9.  In other words, the three categories that the Plaintiffs actually propose

are gross proceeds, net proceeds, and market value leases.

The larger problem is, however, at the beginning of the new class definition.  The

Plaintiffs state that "[t]he class consists of all present and former owners of <u>royalty and

overriding royalty</u> from August 2006 to the present . . . ."  Motion to Amend at 5 (emphasis

added). There is an important distinction between royalty and overriding royalty instruments.  As

the Court found, unlike many oil and gas leases, "[o]verriding royalty interests generally are not

created through the use of form contracts."  <u>Abraham</u>, 317 F.R.D. at 196.  Instead, "[o]verriding

royalty interests often are created in individualized circumstances and business transactions, and

the agreements contain unique royalty valuation terms . . . .  [T]here is no standardization in the

overriding royalty interest terms, because overriding royalty instruments are not generic like

leases."  317 F.R.D. at 195.  In related litigation, the Court, however, noted that it has "a list of

some of the textual provisions found in the class overriding royalties . . . .  [T]he list contains far

more textual permutations than the eleven that exist for royalty instruments, and that list is

illustrative, not exhaustive, of all of the overriding royalty provisions among the class."

<u>Anderson Living Trust v. WPX Energy Production, LLC</u>, 306 F.R.D. 312, 343 (D.N.M.

2015)(Browning, J.).

Importantly, the Plaintiffs bear the burden of showing that they meet the class certification requirements. See Rex v. Owens ex rel. Okla., 585 F.2d at 435. Here, the Plaintiffs have not explained why the overriding royalty instruments in the putative class are substantively the same as the leases. Considering that their new class definition specifically includes both royalty and overriding royalty owners, and that variances in lease language was a key reason that the Court denied class certification in Abraham, the Plaintiffs have not met their burden of showing commonality.

Because of the distinction between royalty and overriding royalty instruments, the Court cannot soundly say that the Plaintiffs have shown, by a preponderance of the evidence, that common questions whether WPX Energy is underpaying the Plaintiffs or whether WPX Energy breached the leases are capable of common answers. See Wal-Mart, 131 S. Ct. at 2550-52.

2.    **The Implied Covenant to Market and Breach of the Duty of Good Faith and Fair Dealing Claims Lack Commonality.**

As previously explained, "the duty to market does not define the lessor's royalty interest; the lease's royalty provision does that." Abraham, 317 F.R.D. at 265. "To determine which class members were entitled to be paid on the NGLs, however, the Court must examine each lease." Abraham, 317 F.R.D. at 265. "Accordingly, although the implied duty to market applies in every class lease, to demonstrate that WPX Production violated that duty by failing to pay royalties on NGLs, the Plaintiffs must establish the right to NGL payment under the various lease forms." Abraham, 317 F.R.D. at 265. Because the Court concludes that large variations in the leases and overriding royalty instruments still exist, despite the new class definition, the Court cannot soundly depart from its holding in Abraham that the common question whether WPX Energy breached the implied covenant to market is capable of a common answer. See Wal-Mart, 131 S. Ct. at 2550-52.

For similar reasons, the Court cannot hold that the common question whether WPX Energy breached the duty of good faith and fair dealing is capable of a common answer. See El Paso Natural Gas Co. v. American Petrofina Co. of Texas, 733 S.W.2d 541, 550 (Tex. App. -- Houston [1st Dist] 1986 )(stating that the duty to market in good faith "is based on the assumption that the operator is marketing something that belongs to the royalty owners").

**3.      The Civil Conspiracy Claim Lacks Commonality.**

Similarly, the Court cannot soundly conclude that the Plaintiffs' civil conspiracy claim is capable of a common answer. The "Plaintiffs allege that WPX and WFC engage in a conspiracy to breach the class royalty and overriding royalty agreements." Second Motion for Class Certification at 11. The Plaintiffs argue that, "based on the fact that royalty owners under proceeds leases and market value leases are entitled to royalty on the value of the NGLs, the Court should reinstate the conspiracy claim." Second Motion for Class Certification at 11-12. This allegation rests, however, on the premise that all of the lease and overriding royalty instruments at issue can be grouped into the simple categories of "proceeds" and "market value" leases. As explained above, the Court holds that the Plaintiffs have not met their burden of demonstrating, by a preponderance of the evidence, that all of the instruments at issue in this case can be grouped into these two categories, especially in the case of the overriding royalty owners. For this reason, the Court cannot soundly conclude that this claim is one capable of a common answer. See Wal-Mart, 131 S. Ct. at 2550-52.

**VI.     UNDER THE NEW CLASS DEFINITION, COMMON ISSUES WILL NOT PREDOMINATE.**

The Court concludes that, based on the new class definition, common issues will not predominate over individual ones. "Predominance regularly presents the greatest obstacle to class certification." CGC Holding Co. v. Broad and Cassel, 773 F.3d at 1087. As the Tenth

Circuit has instructed, to determine predominance, the Court must "*characterize* the issues in the case as common or not, and then *weigh* which issues predominate."  CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d at 1087 (emphasis in original).  "The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual."  Seabron v. Am. Family Mut. Ins. Co., 2013 WL 3713652, at *7 (citing In re Visa Check/Master Money Antitrust Litig., 280 F.3d at 136-40).  "If, to make a prima facie showing on a given question, the members of the proposed class will need to present evidence that varies from member to member, then it is an individual question."  Blades v. Monsanto Co., 400 F.3d at 566.  See Messner v. Northshore Univ. Healthsystem, 669 F.3d at 815.

In Abraham, the Court applied the 10th Circuit test and made the following determinations:

> The common evidence in this case includes: (i) evidence about the Defendants' payment methodology, which is likely to be minimal; (ii) industry-custom-and-usage evidence shedding light on the meaning of all of the class leases, which is quasi-common; (iii) course-of-performance evidence, which is essentially the same as (i); (iv) evidence about gathering and processing contracts in the San Juan Basin; and (v) evidence about the relative NGL and residue gas prices during the class period.

> The individualized evidence in this case includes: (i) industry-custom-and-usage evidence regarding the meaning of specific royalty provisions -- e.g., "proceeds," "market value," "gross proceeds," "net proceeds" -- which all class members do not share; (ii) the various leases' differing language; (iii) parol evidence concerning negotiations and oral agreements contemporaneous to the execution of certain class leases;[26] (iv) evidence about which wells' gas was processed; (v) evidence regarding the extent to which the commingled wells contain Fruitland coal gas or gas belonging to interests other than WPX Production; and (vi) the individual damages evidence -- which includes analyses of which wells' gas tends to travel to which plants, various plants' efficiency levels and bypass rates over time, and what costs are attributable to which individual wells.  Weighing the individualized evidence against the common evidence, the Court will spend the

---

[26]The Court doubts that much of this evidence exists, however, and assigns a low weight to it in the predominance calculus.

majority of its time hearing individualized evidence and adjudicating individual
questions.

Abraham, 317 F.R.D. at 270-271.  Under the new class definition, individual issues (iv), (v), and

(vi) are eliminated.  See Motion to Amend at 10.  All of these issues involved how the Plaintiffs'

gas was processed.  The key to the new class definition, however, is royalty owners "whose

royalty and overriding royalty has been calculated on a 'keep-whole' method omitting payment

on the value of the processed natural gas liquids portion of the production."  Motion to Amend at

5.  Unlike the old class definition, which would have required the Court to spend significant time

"determining which wells' gas is or has been delivered to processing plants for extraction and

marketing of natural gas liquids from the gas at [various processing plants]," the new definition

is no longer tied to any specific processing plants.  Abraham, 317 F.R.D. at 272.  The old

definition specifically involved natural gas that "was delivered to the Ignacio Processing Plant

. . . the Kutz Plant . . . or the Lybrook Plant."  Abraham, 317 F.R.D. at 184.  A key problem with

this definition was that:

> The Plaintiffs did not identify by a preponderance of the evidence which leases'
> gas is or has been processed at the named processing plants, and therefore, which
> interests burdening leases and wells are part of the Plaintiffs' proposed class.  The
> Plaintiffs assumed that, when a contract named a delivery point for the gas, the
> gas would be processed at that plant.  The Defendants demonstrated, however,
> that a well's contractual dedication to a particular plant does not determine
> whether the well's gas flows to that plant . . . Gas from a well may not flow to the
> plant associated with the gathering system to which the well is connected.

Abraham, 317 F.R.D. at 255 (internal citations omitted).  The new class definition, however,

does not rely upon how or where gas is processed.  Instead, the key to the class is WPX Energy's

keep-whole payment method.  The Court, therefore, concludes that the new class definition

eliminates individual issues (iv), (v), and (vi).

Individual issue (iii) is "parol evidence concerning negotiations and oral agreements

contemporaneous to the execution of certain class leases." <u>Abraham</u>, 317 F.R.D. at 270-271. The Court noted, however, that it "doubts that much of this evidence exists . . . and assigns a low weight to it in the predominance calculus." <u>Abraham</u>, 317 F.R.D. at 271 n.77. The Defendants have not given the Court any reason to depart from assigning parol evidence "low weight." In fact, the Defendants point out that the "Plaintiffs introduced no evidence of the circumstances surrounding the execution of any lease, and they cite none in their motion." Response to Motion 1 at 18. Because the Court has not seen any parol evidence concerning the leases' execution, it continues to assign individual issue (ii) low weight.

That leaves individual issues (i) and (ii). Individual issue (ii), "the various leases' differing language," is the most important. <u>Abraham</u>, 317 F.R.D. at 270-271. In <u>Abraham</u>, the Court held that, under the original class definition, "given the lease language obligations and the variations in state law, this class action could involve up to thirteen different legal standards for the jury to apply, <u>which would be manageable</u> if the Court did not have to confront the considerable number of other individualized issues already discussed." <u>Abraham</u>, 317 F.R.D. at 275 (emphasis added). In other words, the Court was concerned that common issues would not predominate. Under the new class definition, however, the Plaintiffs have conceded that what the Court termed Category B and Category F leases would no longer be part of the class. Motion to Amend at 20-21. Previously, the Court found, in the chart below, that up to 13 legal standards may exist among the several categories of leases due to variations in Colorado and New Mexico oil and gas law. See <u>Abraham</u>, 317 F.R.D. at 275.

| **New Mexico Leases** | | | | | **Colorado Leases** | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **A** | **C** | **E** | **F** | **G** | **A** | **B** | **C** | **D** | **F** | **G** | **H** | **I** |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |

Based on the Plaintiffs' concessions regarding their new class definition, the Court modifies the chart as follows:

| New Mexico Leases | | | | | Colorado Leases | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **A** | **C** | **E** | | **G** | **A** | | **C** | **D** | | **G** | **H** | **I** |
| 1 | 2 | 3 | | 4 | 5 | | 6 | 7 | | 8 | 9 | 10 |

Because the Court held in <u>Abraham</u> that 13 legal standards would be manageable if it were not for other individualized issues, and because the Court is satisfied that individual issues (iv), (v), and (vi) are eliminated and individual (iii) is assigned "low weight," the Court now holds that up to 10 legal standards would be manageable. <u>See</u> <u>Abraham</u>, 317 F.R.D. at 275.

Finally, regarding individual issue (i), "industry-custom-and-usage evidence regarding the meaning of specific royalty provisions," the Court previously held that:

> the evidence is common for all leases with the same language. Many of the leases contain similar wording. The Court can therefore use common industry custom evidence to prove what the lease language means. Nevertheless, the leases do not all share the same language. Rather, they can be grouped into a number of categories, each containing differing language. Because the language's meaning could materially differ between categories, the variations require individual consideration, which cut against a predominance finding.

<u>Abraham</u>, 317 F.R.D. at 271. The Court notes that, by the Plaintiffs' own admission, the new class definition removes Category F leases in both New Mexico and Colorado, as well as Category B leases, all of which are in Colorado. <u>See</u> Motion to Amend at 20-21. Because the new class definition contains fewer categories, the issue of the lease language will be less individualized.

Having characterized the issues, the Court must now weigh them to determine which

issues will predominate.  See CGC Holding Co., LLC v. Broad & Cassel, 773 F.3d at 1087.

First:

> The common evidence in this case includes: (i) evidence about the Defendants' payment methodology, which is likely to be minimal; (ii) industry-custom-and-usage evidence shedding light on the meaning of all of the class leases, which is quasi-common; (iii) course-of-performance evidence, which is essentially the same as (i); (iv) evidence about gathering and processing contracts in the San Juan Basin; and (v) evidence about the relative NGL and residue gas prices during the class period.

Abraham, 317 F.R.D. at 270-271.  Now, the individual evidence in this case includes, (i) less industry and custom usage evidence regarding the meaning of specific royalty provisions than under the old class definition, (ii) up to 10, as opposed to up to 13, possible legal standards regarding variance in lease language, and (iii) low weight given to parol evidence regarding lease negotiation and execution.  The evidence regarding lease language variation would likely consume the most time at a trial.

Just as the variations in lease language prevent the Court from soundly concluding that the new class definition satisfies the commonality requirement, those variations prevent the Court from soundly concluding that common issues predominate over individual issues.  The Court will, consequently, deny class certification.

**IT IS ORDERED** that (i) the Plaintiffs' Motion to Alter or Amend and to Reconsider Memorandum Opinion and Order [Doc. 252], filed September 15, 2016 (Doc. 255), is denied; and (ii) Plaintiffs' Second Motion for Class Certification, filed September 15, 2016 (Doc. 256), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Jake Eugene Gallegos
Michael J. Condon
Gallegos Law Firm, P.C.
Santa Fe, New Mexico

    *Attorneys for the Plaintiffs*

Sarah Gillett
Dustin L. Perry
Hall Estill Hardwick, P.C.
Tulsa, Oklahoma

--and--

Christopher A. Chisman
Holland & Hart LLP
Denver, Colorado

--and--

Mark F. Sheridan
Bradford C. Berge
Robert J. Sutphin
John C. Anderson
Elisa C. Dimas
Holland & Hart LLP
Santa Fe, New Mexico

    *Attorneys for the Defendants*